No. 24-6882

---

In the

# United States Court of Appeals
## for the Ninth Circuit

---

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MATTHEW PANUWAT,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Northern District of California, Case No. 3:21-cv-06322-WHO
Hon. William Horsley Orrick, *United States District Judge*

---

## DEFENDANT-APPELLANT'S OPENING BRIEF

---

|  |  |
|---|---|
|  | Shay Dvoretzky |
|  | Parker Rider-Longmaid |
|  | Steven Marcus |
|  | SKADDEN, ARPS, SLATE, |
|  |   MEAGHER & FLOM LLP |
| Jack P. DiCanio | 1440 New York Ave., NW |
| Caroline Van Ness | Washington, DC 20005 |
| SKADDEN, ARPS, SLATE, | Telephone: 202-371-7000 |
|   MEAGHER & FLOM LLP | shay.dvoretzky@skadden.com |
| 525 University Ave. | parker.rider-longmaid@skadden.com |
| Palo Alto, CA 94301 |  |

*Counsel for Defendant-Appellant Matthew Panuwat*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. v

REQUEST FOR ORAL ARGUMENT ............................................. xii

INTRODUCTION ............................................................................. 1

JURISDICTION ................................................................................ 7

STATEMENT OF THE ISSUES ....................................................... 8

STATUTES AND REGULATIONS .................................................. 9

STATEMENT OF THE CASE ........................................................... 9

      A.     Legal background ................................................................. 9

      B.     Factual background .............................................................. 13

            1.     Mr. Panuwat begins work at Medivation, a biopharmaceutical company, in 2014 ................................ 13

            2.     In 2016, Medivation begins discussions about being acquired, and Pfizer eventually acquires Medivation. ............................................................. 14

            3.     Mr. Panuwat purchases, and later sells, Incyte call options. ....................................................... 17

      C.     Procedural background ........................................................ 17

            1.     Pretrial motions practice ..................................... 17

            2.     Trial ...................................................................... 20

            3.     Posttrial motions .................................................. 21

STANDARD OF REVIEW ............................................................... 22

# TABLE OF CONTENTS
(continued)

Page

SUMMARY OF ARGUMENT ...........................................................24

ARGUMENT ...................................................................................31

I.    The SEC did not and could not prove that Mr. Panuwat had a
      duty to Medivation not to trade in the securities of Incyte,
      because the controlling Insider Trading Policy permitted the
      trade. .................................................................................31

      A.    To prevail under the misappropriation theory, the SEC
            must establish that the recipient of information owed a
            duty to the source not to trade based on that information. .......32

            1.    The SEC must prove that the defendant had an
                  objective fiduciary duty to the source of information
                  not to trade based on that information. ...............................32

            2.    Mere entrustment of material nonpublic
                  information cannot establish a fiduciary
                  relationship or duty. ............................................................35

            3.    Even if the SEC proves the existence of a fiduciary
                  relationship between the source and recipient, if the
                  parties have a contractual relationship defining
                  trading duties, the terms of the contract control. ..............37

      B.    Reversal is required because the Insider Trading Policy
            permitted Mr. Panuwat to trade in Incyte securities,
            meaning the SEC did not and could not show duty or
            deception ...........................................................................40

            1.    The Policy's text shows that Mr. Panuwat was
                  permitted to trade in securities of companies
                  without a significant business relationship with
                  Medivation, as the *ejusdem generis* and *noscitur a
                  sociis* canons make clear. .......................................................42

- ii -

## TABLE OF CONTENTS
(continued)

Page

2.  Other context clues confirm that the Policy permits trading in the securities of companies without a significant business relationship with Medivation. ..........47

3.  Principles of *contra proferentem* and the rule of lenity require resolving any ambiguity in the Policy's trading prohibition to reach only securities of companies with a significant business relationship with Medivation. ...................................................48

4.  The Insider Trading Policy permits trading in Incyte securities because Incyte does not have a significant business relationship with Medivation. ............................52

5.  The district court's contrary reasoning and the SEC's contrary arguments lack merit.................................53

C.  The trial record supports no other potential sources of duty—after all, the Policy resolves the duty question in Mr. Panuwat's favor as a matter of law. ........................55

1.  The Insider Trading Policy, not the Confidentiality Policy, controls. ....................................................55

2.  Mr. Panuwat's role at Medivation likewise did not establish a duty not to trade in Incyte securities..............56

3.  Mere entrustment does not establish a duty, either. ........57

4.  Mr. Panuwat's supposed "admission" doesn't support a duty either............................................58

II.  Alternatively, a new trial is required because the district court erred in instructing the jury about the duty element and barring Mr. Panuwat from introducing key testimony about the Policy.........59

# TABLE OF CONTENTS
### (continued)

**Page**

A.  The district court wrongly instructed the jury that it could find that Mr. Panuwat had a duty not to trade in Incyte securities based solely on Mr. Panuwat's receipt of material nonpublic information. ................................................. 60

    1.  The jury instruction was wrong. .......................................... 61

    2.  The error was prejudicial. ................................................... 62

B.  The district court erred in barring Mr. Panuwat from introducing testimony about Medivation's interpretation of its own Insider Trading Policy ................................................. 64

    1.  When contractual language is ambiguous, evidence about the parties' intent is relevant and admissible. ........ 64

    2.  The district court erred by barring Mr. Panuwat from introducing extrinsic evidence about the meaning of the Insider Trading Policy. ............................ 66

    3.  The error was prejudicial. ................................................... 69

CONCLUSION ........................................................................... 71

STATEMENT OF RELATED CASES ................................................ 72

CERTIFICATE OF COMPLIANCE .................................................. 73

CERTIFICATE OF SERVICE ......................................................... 74

INDEX OF ADDENDUM ............................................................... 76

- iv -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

ABF Capital Corp. v. Berglass,
  30 Cal. Rptr. 3d 588 (Ct. App. 2005) ............................................................45

Ali v. Federal Bureau of Prisons,
  552 U.S. 214 (2008) ........................................................................................47

Anchor v. O'Toole,
  94 F.3d 1014 (6th Cir. 1996) .........................................................................36

Arizona State Board for Charter Schools v.
  U.S. Department of Education,
  464 F.3d 1003 (9th Cir. 2006) .......................................................................53

Bancoklahoma Mortgage Corp. v. Capital Title Co.,
  194 F.3d 1089 (10th Cir. 1999) .....................................................................36

Belliveau v. Barco, Inc.,
  987 F.3d 122 (5th Cir. 2021) .........................................................................34

Bittner v. United States,
  598 U.S. 85 (2023) ..........................................................................................50

BladeRoom Group Limited v. Emerson Electric Co.,
  20 F.4th 1231 (9th Cir. 2021) ........................................................................62

California State Legislative Board, United Transportation
  Union v. Department of Transportation,
  400 F.3d 760 (9th Cir. 2005) ............................................................. 43, 44, 45

Chiarella v. United States,
  445 U.S. 222 (1980) .....................................................................................9, 10

City Solutions, Inc. v. Clear Channel Communications, Inc.,
  201 F. Supp. 2d 1048 (N.D. Cal. 2002) .................................................. 38, 39

Clem v. Lomeli,
  566 F.3d 1177 (9th Cir. 2009) .......................................................................23

Commissioner v. Acker,
  361 U.S. 87 (1959) ..........................................................................................50

# TABLE OF AUTHORITIES
## (continued)

<b>Page(s)</b>

*County of Yolo v. Los Rios Community College District*,
    7 Cal. Rptr. 2d 647 (Ct. App. 1992) ...............................................45

*Dell Computer Corp. v. Rodriguez*,
    390 F.3d 377 (5th Cir. 2004) ................................................... 65, 66

*Dirks v. Securities & Exchange Commission*,
    463 U.S. 646 (1983)...............................................................................36

*Federal Land Bank of St. Paul v. Bismarck Lumber Co.*,
    314 U.S. 95 (1941).................................................................................54

*Fierro v. Smith*,
    39 F.4th 640 (9th Cir. 2022)................................................................62

*Fischer v. United States*,
    603 U.S. 480 (2024) ...................................................................... 43, 44

*Glaziers & Glassworkers Union Loc. No. 252 Annuity*
    *Fund v. Newbridge Securities, Inc.*,
    93 F.3d 1171 (3d Cir. 1996) .................................................................35

*In re Grand Jury Subpoena: Under Seal*,
    415 F.3d 333 (4th Cir. 2005) ...............................................................34

*In re Sallee*,
    286 F.3d 878 (6th Cir. 2002) ...............................................................34

*Insight Health Corp. v. Marquis Diagnostic*
    *Imaging of North Carolina, LLC*,
    No. 14-CVS-1783, 2017 WL 4413034
    (N.C. Super. Ct. Oct. 3, 2017) .................................................... 33, 34

*Jones v. United States*,
    527 U.S. 373 (1999).............................................................................42

*JPMorgan Chase Bank, N.A. v. 29-33 Ninth Avenue, LLC*,
    710 F. Supp. 3d 259 (S.D.N.Y. 2024)...............................................36

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*K Street Developers, LLC v. Teachers Insurance &*
*Annuity Ass'n of America,*
69 F. Supp. 3d 45 (D.D.C. 2014) ..................................................39

*Lamps Plus, Inc. v. Varela,*
587 U.S. 176 (2019) ....................................................................49

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) ........................................................................51

*McBoyle v. United States,*
283 U.S. 25 (1931) ......................................................................44

*McEuin v. Crown Equipment Corp.,*
328 F.3d 1028 (9th Cir. 2003) ....................................................23

*Merriam v. Demoulas Super Markets, Inc.,*
985 N.E.2d 388 (Mass. 2013) .....................................................39

*Nemec v. Shrader,*
991 A.2d 1120 (Del. 2010) .................................................... 38, 39

*Nolan Bros. of Texas v. WhiteRaven, LLC,*
No. 1:99-cv-10256, 2004 WL 376265
(S.D.N.Y. Feb. 27, 2004) ....................................................... 39, 40

*Northern Shipping Funds I, LLC v. Icon Capital Corp.,*
921 F. Supp. 2d 94 (S.D.N.Y. 2013) ...........................................38

*Onyx Pharmaceuticals, Inc. v. Bayer Corp.,*
863 F. Supp. 2d 894 (N.D. Cal. 2011) .........................................65

*Pacific Gas & Electric Co. v. G. W. Thomas*
*Drayage & Rigging Co.,*
442 P.2d 641 (Cal. 1968) ............................................................65

*Peralta v. Dillard,*
744 F.3d 1076 (9th Cir. 2014) (en banc).....................................23

*Planned Parenthood Federation of America, Inc. v. Newman,*
51 F.4th 1125 (9th Cir. 2022) ................................................ 22, 23

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Post v. St. Paul Travelers Insurance Co.,*
  691 F.3d 500 (3d Cir. 2012) ...............................................................44

*Rainier Credit Co v. Western Alliance Corp.,*
  217 Cal. Rptr. 291 (Ct. App. 1985)....................................................49

*Schrader Cellars, LLC v. Roach,*
  129 F.4th 1115 (9th Cir. 2025).........................................................22

*Securitas Security Services USA, Inc. v. Superior Court,*
  184 Cal. Rptr. 3d 568 (Ct. App. 2015) .............................................49

*Securities & Exchange Commission v. Alpert,*
  No. 1:17-cv-1879, 2018 WL 1156012
  (S.D.N.Y. March 2, 2018) .................................................................41

*Securities & Exchange Commission v. Chenery Corp.,*
  318 U.S. 80 (1943)............................................................................57

*Securities & Exchange Commission v. Cuban,*
  620 F.3d 551 (5th Cir. 2010) ............................................................34

*Securities & Exchange Commission v. Ginder,*
  752 F.3d 569 (2d Cir. 2014) ....................................................... 39, 40

*Securities & Exchange Commission v. Kornman,*
  391 F. Supp. 2d 477 (N.D. Tex. 2005)........................................ 34, 35

*Securities & Exchange Commission v. Lyon,*
  605 F. Supp. 2d 531 (S.D.N.Y. 2009)..........................................2, 37

*Securities & Exchange Commission v. Rorech,*
  720 F. Supp. 2d 367 (S.D.N.Y. 2010)...............................................63

*Securities & Exchange Commission v. Talbot,*
  530 F.3d 1085 (9th Cir. 2008) ..................................................... 12, 47

*Seror v. Insurance Co. of North America,*
  947 F.2d 951, 1991 WL 216972 (9th Cir. 1991)
  (unpublished table decision) .............................................................23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sidibe v. Sutter Health,*
103 F.4th 675 (9th Cir. 2024) ............................................................62

*Third National Bank in Nashville v. Impac Ltd.,*
432 U.S. 312 (1977) ............................................................................43

*United States v. Chestman,*
947 F.2d 551 (2d Cir. 1991) (en banc) ......................... 6, 24, 34, 35,
.......................................................................... 36, 37, 57, 61, 62

*United States ex rel. Lindenthal v. General Dynamics Corp.,*
61 F.3d 1402 (9th Cir. 1995) ...................................................... 64, 65

*United States ex rel. Union Building Materials Corp. v.*
*Haas & Haynie Corp.,*
577 F.2d 568 (9th Cir. 1978) ............................................................65

*United States ex rel. Welch v. My Left Foot Children's*
*Therapy, LLC,*
871 F.3d 791 (9th Cir. 2017) ............................................................38

*United States v. Kim,*
184 F. Supp. 2d 1006 (N.D. Cal. 2002) ......................... 35, 39, 40, 59

*United States v. McPhail,*
831 F.3d 1 (1st Cir. 2016) .......................................................... 11, 12

*United States v. Millis,*
621 F.3d 914 (9th Cir. 2010) ............................................................50

*United States v. O'Hagan,*
521 U.S. 642 (1997) ........................................................ 2, 10, 11, 12
.......................................................................... 32, 33, 34, 35, 47

*United States v. Wells Fargo Bank,*
485 U.S. 351 (1988) ............................................................................46

*Veleron Holding, B.V. v. Morgan Stanley,*
694 F. App'x 858 (2d Cir. 2017) (per curiam) .................................63

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Whitman v. United States*,
135 S. Ct. 352 (2014) ........................................................51

*Wooden v. United States*,
595 U.S. 360 (2022) .........................................................50

**STATUTES, REGULATION, AND RULE**

National Bank Act,
12 U.S.C. § 38 ...............................................................50

Federal Farm Loan Act,
12 U.S.C. § 641 *et seq.* ....................................................54

15 U.S.C. § 77x...............................................................51

Securities Exchange Act of 1934,
15 U.S.C. § 78a *et seq.* ........................................ 7, 24, 51

15 U.S.C. § 78j(b)............................................ 1, 2, 9, 11, 12,
.......................................................... 17, 24, 31, 32, 33, 63

15 U.S.C. § 78aa(a) ...........................................................7

15 U.S.C. § 78ff(a) ..........................................................51

28 U.S.C. § 1291 ..............................................................7

28 U.S.C. § 1331 ..............................................................7

Communications Act of 1934,
47 U.S.C. § 151 *et seq.* ....................................................50

Securities & Exchange Commission Rule 10b-5,
17 C.F.R. § 240.10b-5 .................................... 1, 9, 12, 17, 31

Fed. R. App. P. 4(a)(1)(B)(iii) ..............................................7

**OTHER AUTHORITIES**

Frank H. Easterbrook & Daniel R. Fischel,
*Contract and Fiduciary Duty*,
36 J.L. & Econ. 425 (1993) .................................................38

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Frank H. Easterbrook & Daniel R. Fischel,
 *The Economic Structure of Corporate Law* (1991)................................38

18 Donald C. Langevoort, *Insider Trading Regulation,
 Enforcement, and Prevention* (May 2025) .........................................36

11 Richard A. Lord, *Williston on Contracts* (4th ed. May 2025)............... 49, 50

Restatement (Second) of Agency (Oct. 2024) ........................................... 37, 38

Restatement (Second) of Torts (Oct. 2024) ........................................33

Restatement (Third) of Agency (Oct. 2024)................................ 56, 57

Antonin Scalia & Bryan A. Garner,
 *Reading Law: The Interpretation of Legal Texts* (2012) ....................................50

2A Shambie Singer & Norman J. Singer,
 *Sutherland Statutes & Statutory Construction*
 (7th ed. Nov. 2024) ........................................................................43

## REQUEST FOR ORAL ARGUMENT

This appeal presents important legal issues about the scope of the misappropriation theory for finding violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The district court adopted a novel theory that a trader violates Section 10(b) if he uses confidential information to trade in the securities of an unrelated company, even if his own company's insider trading policy doesn't clearly prohibit the trades. In recognizing that theory, the district court allowed the jury to find Defendant-Appellant Matthew Panuwat liable for misappropriating Medivation's confidential information when he traded the securities of Incyte, an unrelated company, even though Medivation's Insider Trading Policy permitted the trade. The case thus presents important questions about the relationship between a company's insider trading policy and the requirement that the Securities and Exchange Commission show a breach of a fiduciary duty to prove liability. Mr. Panuwat respectfully submits that oral argument would help the Court decide this case.

# INTRODUCTION

A jury found Defendant-Appellant Matthew Panuwat liable for violating Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Securities and Exchange Commission (SEC) Rule 10b-5, which together prohibit the use of "any manipulative or deceptive device" in connection with the purchase of a security. 15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5. Mr. Panuwat was the senior director of business development at Medivation, a public mid-sized cancer drug company. Medivation was acquired by Pfizer while Mr. Panuwat worked there, and Mr. Panuwat had access to confidential information about the timing of the acquisition. The SEC alleged that Mr. Panuwat used that information to trade securities—not of Medivation or Pfizer, but of Incyte, a company with which Medivation had no business relationship. The SEC argued that Mr. Panuwat's trade violated Section 10(b) because it violated Medivation's Insider Trading Policy (Policy), which Mr. Panuwat had signed. The Policy prohibited Medivation's employees from trading in Medivation securities, or "the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors" of Medivation.

The scope of the Insider Trading Policy is the key question in this case. That's because the SEC charged Mr. Panuwat under the "misappropriation theory" of insider trading. Under that theory, a trader uses a "deceptive device," in violation of Section 10(b), if he has a duty not to trade based on confidential information but breaches that duty without disclosing the trade to the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). "[T]he cornerstone of a misappropriation liability case" is the duty to the source of the confidential information not to trade based on that information. *SEC v. Lyon*, 605 F. Supp. 2d 531, 542 (S.D.N.Y. 2009). If there's no duty not to trade, there's no deception, either, and the trade cannot trigger Section 10(b)'s "deceptive device" requirement. The reason duty-breaching trades are generally deceptive is that they "involve[] feigning fidelity to the source of the information" that the trader will adhere to the duty not to misappropriate the source's confidential information to trade for his own benefit. *O'Hagan*, 521 U.S. at 655. That's why the Policy plays such a critical role: The relevant contract between Mr. Panuwat and Medivation, the Policy sets out the scope of Mr. Panuwat's duty to Medivation and supersedes whatever default fiduciary duty rules might otherwise apply.

The Policy allowed Mr. Panuwat to trade Incyte securities—and no one from Medivation ever suggested otherwise. The Policy's text prohibits employees from trading only in the securities of Medivation and companies that have a significant business relationship with Medivation. That reading follows from a straightforward application of basic canons of construction, reflecting ordinary ways of reading terms in context, that give effect to the specific terms—collaborators, customers, partners, suppliers or competitors—listed in the Policy. Other context clues support that reading, too—the Policy itself states that it bars trading only in "the securities of other public companies engaged in business transactions" with Medivation. 2-ER-84. The policy unambiguously permits Mr. Panuwat's trade, so this case never should have gone to the jury.

It didn't matter to the SEC that Medivation didn't prohibit Mr. Panuwat's trade, or that no Medivation witness testified that Mr. Panuwat's trade violated the Insider Trading Policy. The SEC charged Mr. Panuwat anyway, and then it prevailed at trial, after the district court committed two prejudicial errors independently requiring reversal. The court first prohibited senior Medivation executives from testifying that the Policy permitted Mr. Panuwat's trades. It then instructed the jury that it could find that Mr. Panuwat

- 3 -

had a duty not to trade separate and apart from the Policy, based only on his receipt of confidential Medivation information. But the case against Mr. Panuwat should never have gone to the jury in the first place. The Insider Trading Policy established the relationship between Mr. Panuwat and Medivation, and that Policy permits Mr. Panuwat's trades as a matter of unambiguous contract interpretation, meaning there was no duty not to trade as a matter of law and thus no breach of duty or deception. This Court should reverse the judgment against Mr. Panuwat, or, in the alternative, vacate and remand for a new trial.

**1.** Mr. Panuwat is entitled to judgment as a matter of law and the case should never have gone to a jury. The SEC did not and could not prove that Mr. Panuwat owed a fiduciary relationship to the source of the material nonpublic information—his employer, Medivation—not to trade in Incyte securities based on Medivation's confidential information. The Insider Trading Policy established the terms of Mr. Panuwat's duty to Medivation, and it controlled over any otherwise applicable background principles of fiduciary duty. The Policy allowed employees to trade securities of companies without a significant business relationship with Medivation. Specifically, the Policy prohibited trading only in Medivation's securities and "the securities

of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company." 1-ER-36. As the Policy's context confirms, that language, with its specific examples, prohibits employees from trading only in the securities of companies *related to* Medivation. It doesn't prohibit Medivation employees from trading in every publicly traded company in America. Ordinary canons of construction, including *ejusdem generis* and *noscitur a sociis*, make clear that the enumerated examples define the boundaries of the general term. And other clauses of the Policy, which refer to trades in "other public companies engaged in business transactions with [Medivation]" reinforce that reading. 2-ER-84.

No other source of law governs Mr. Panuwat's duty to Medivation. Parties can contract around otherwise applicable fiduciary duties. That's just what Medivation and Mr. Panuwat did here: The Insider Trading Policy speaks directly to trading by Medivation employees, so it sets the terms of the fiduciary relationship as to employees' trades. Medivation's Confidentiality Policy plays no role; nor does any common law fiduciary duty. The fact that Mr. Panuwat was privy to confidential information at Medivation doesn't establish, without more, that Mr. Panuwat had a duty to Medivation, and it could not override the Policy anyway.

**2.**    Alternatively, the Court should remand for a new trial, because the district court committed two independent and prejudicial errors. Each relates to this critical question of duty.

*First*, over Mr. Panuwat's objection, the district court instructed the jury that it could find the duty element satisfied based solely on the fact that Medivation entrusted Mr. Panuwat with confidential information. That "mere entrustment" theory is wrong. The en banc Second Circuit has squarely rejected it, *see United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991), and no court of appeals has adopted it. For good reason: A fiduciary relationship requires assent from both parties, and one party cannot make another a fiduciary merely by giving them confidential information.

*Second*, the district court wrongly prohibited Mr. Panuwat from introducing evidence about the Insider Trading Policy's meaning. As explained, the Policy unambiguously allowed Mr. Panuwat's trades. But assuming it did not, then the Policy was at least ambiguous about whether it prohibited trading in securities of a company without a significant business relationship with Medivation. When a contract is ambiguous, California law (which governs the Policy) requires the trial court to allow parties to introduce extrinsic evidence of the contract's meaning. The district court *agreed* that the

- 6 -

language was ambiguous, but nonetheless refused to admit evidence from witnesses central to the contract—the CEO of Medivation and its lead outside counsel at the time Mr. Panuwat signed the contract and traded. That ruling violated basic contract interpretation principles, and it gutted Mr. Panuwat's defense: The excluded testimony would have given the jury powerful evidence that Mr. Panuwat had no duty not to trade in Incyte securities and thus could not be liable for doing so.

This Court should reverse the judgment or remand for a new trial.

## JURISDICTION

**a.**    The district court had jurisdiction under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1331 because this action arose under the Exchange Act.

**b.**    This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

**c.**    This appeal is timely. The district court denied Mr. Panuwat's post-trial motions on September 9, 2024, 1-ER-56, and entered final judgment on October 24, 2024, 1-ER-3. Within sixty days, Mr. Panuwat timely filed a notice of appeal on November 8, 2024. 3-ER-420; *see* Fed. R. App. P. 4(a)(1)(B)(iii).

## STATEMENT OF THE ISSUES

1.     Whether the SEC failed to prove that Mr. Panuwat had a duty to Medivation not to trade in securities of Incyte, a company unrelated to Medivation and with which Medivation did no business, when Medivation's Insider Trading Policy did not prohibit employees from trading in companies that don't have a significant business relationship with Medivation and thus established that Mr. Panuwat had no duty as a matter of law not to make the charged trade.

2.     Whether the district court erred in instructing the jury that it could find, based on "mere entrustment" of confidential information—a theory endorsed by no court of appeals and squarely rejected by the en banc Second Circuit—that Mr. Panuwat had a duty not to trade in securities of Incyte based on confidential Medivation information.

3.     Whether the district court erred by barring Mr. Panuwat from offering evidence about the interpretation of the Insider Trading Policy, including from senior Medivation executives, who would have testified that the Policy did not prohibit Mr. Panuwat's trades.

## STATUTES AND REGULATIONS

The addendum bound with this brief reproduces relevant statutes and regulations.

## STATEMENT OF THE CASE

### A.    Legal background

**1.**    Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance," "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered," "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC, in turn, has made it unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The core of the prohibition is manipulation or deception—a requirement that mere information disparity between trading parties doesn't meet. *See Chiarella v. United States*, 445 U.S. 222, 233 (1980). Put differently, there is

no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Id.* Instead, under both the "classical" insider trading theory and the "misappropriation" theory, the focus is on deception of the source of confidential information through a trade based on that information, without disclosure, despite a duty not to trade based on that information. *See O'Hagan*, 521 U.S. at 651-52, 655-56.

**a.**     In "classical" insider trading, deception occurs when a corporate insider relies on material, nonpublic information to trade in securities of his own corporation. *Chiarella*, 445 U.S. at 227-29. The insider deceives the corporation's shareholders by converting material nonpublic information ("owned" by the corporate shareholders) to the insider's own benefit, without disclosing that information. *Id.* The key point is that the insider has a duty to disclose the information to the shareholders based on the insider's fiduciary relationship to the shareholders. But if the insider discloses the information to the shareholders, there's no deception. *See id.*

**b.**     The "misappropriation" theory also focuses on the trader's duty to the source of confidential information not to trade based on that information. *See O'Hagan*, 521 U.S. at 651-53. Unlike the classical theory, however, misappropriation doesn't require a traditional fiduciary relationship

- 10 -

between the corporate insider trading in his corporation's securities, on the one hand, and the corporation's shareholders, on the other. *See id.* Instead, misappropriation violates Section 10(b) when a person trades based on material nonpublic information, without disclosure, despite a duty to the source of the information not to do so. *See id.* "In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Id.* at 652. In *O'Hagan*, for example, the Court found that a lawyer violated Section 10(b) because he breached "a duty of trust and confidence he owed to his law firm … and to its client" by trading on material nonpublic information he received from his firm and failing to disclose the trade. *Id.* at 653-55 & n.6.

The misappropriation theory thus applies only if the trader owes a "duty of loyalty and confidentiality" to the source of confidential information that prohibits the recipient from trading based on that information. *Id.* For example, "when Sally tells Joe insider information about her corporation, to be held by Joe in confidence, and Joe then trades on that information without telling Sally, Joe is guilty of deception" of Sally if Joe

owes a duty to Sally not to trade on that information. *United States v. McPhail*, 831 F.3d 1, 4 (1st Cir. 2016). Only when the recipient has a fiduciary duty to the source of information and violates it by trading on that information, without disclosure to the source, can the deception necessary to trigger Section 10(b) and Rule 10b-5 occur.

In turn, there is no deception if the trader discloses the trade to the source. *O'Hagan*, 521 U.S. at 655 n.6. Section 10(b) "is not an all-purpose breach of fiduciary duty ban." *Id.* at 655. Rather, "deception [is] essential to the misappropriation theory," so the government must show that the fiduciary-turned-trader "feign[ed] fidelity to the source of information" by purporting to comply with the duty he in fact breached. *Id.* If Joe never had a duty to Sally not to trade on the information he received from her, or if Joe discloses his trade to Sally, Joe has not deceived Sally by trading.

In sum, the SEC "must demonstrate that [the trader] knowingly misappropriated confidential, material, and nonpublic information for securities trading purposes, in breach of a duty arising from a relationship of trust and confidence owed to the source of the information." *SEC v. Talbot*, 530 F.3d 1085, 1092 (9th Cir. 2008).

- 12 -

**B.    Factual background**

> **1.    Mr. Panuwat begins work at Medivation, a biopharmaceutical company, in 2014.**

Medivation was a mid-sized cancer drug company with its principal place of business in California. 3-ER-411. Founded by Dr. David Hung, who was also the company's CEO, 2-ER-218, Medivation specialized in developing drugs to treat prostate cancer. 2-ER-94. Medivation's primary revenue driver was a prostate cancer drug called Xtandi. 2-ER-122.

Mr. Panuwat joined Medivation in 2014 as senior director of business development. 2-ER-179-80. In that role, Mr. Panuwat looked for business opportunities and collaborations for Medivation. 2-ER-180. He didn't supervise any employees, and he reported to the chief financial officer. 2-ER-180. During Mr. Panuwat's tenure at Medivation, Medivation's outside counsel was Cooley partner Kenneth Guernsey. 1-ER-32.

When he joined the company, Mr. Panuwat signed Medivation's Insider Trading Policy and Confidentiality Agreement. 1-ER-7. The Insider Trading Policy provides:

> During the course of your employment, temporary assignment, consultancy or directorship with the Company, you may receive important information that is not yet publicly disseminated ('inside information'), about the Company or about other publicly-

traded companies with which the Company has business deal-
ings. Because of your access to this information, you may be in a
position to profit financially by buying or selling or in some other
way dealing in the Company's securities (including not only
stock but also debt securities such as convertible notes) or the
securities of another publicly-traded company, including all sig-
nificant collaborators, customers, partners, suppliers or
competitors of the Company, or to disclose such information to
a third party who does so (a 'tippee').

1-ER-36. The Confidentiality Agreement provides:

I agree at all times during the term of my employment and there-
after to hold in strictest confidence, and not to use, except for the
benefit of the Company, or to disclose to any person, firm or cor-
poration without written authorization of the Company, any
trade secrets, confidential knowledge, … business plans, finan-
cial information or other subject matter pertaining to any
business of the Company ….

1-ER-36. The Confidentiality Agreement provided the agreement would be

"governed by the laws of the State of California." 2-ER-77.

### 2. In 2016, Medivation begins discussions about being acquired, and Pfizer eventually acquires Medivation.

In March 2016, Sanofi S.A. approached Medivation about acquiring the

company. 1-ER-8. That effort turned hostile, and Medivation directed its in-

vestment bankers to contact other companies to "assess their interest in

potentially acquiring Medivation on terms that were more favorable" to

Medivation. 1-ER-8. Medivation then contacted Pfizer, a multibillion dollar

pharmaceutical company, about the possibility of Pfizer's acquiring Medivation. 1-ER-8.

This process received broader attention, and industry analysts began to write about Medivation's potential acquisition. 1-ER-8. That analysis included the potential effect that Medivation's acquisition might have on other biopharmaceutical companies. 1-ER-8. Some analysts identified Incyte Corporation, another biopharmaceutical company, as a company that might be affected by Medivation's acquisition. 1-ER-8. The public speculation was that Medivation's acquisition would boost Incyte's stock price, because it suggested that other pharmaceutical companies might be interested in acquiring mid-sized companies. 1-ER-8.

Medivation conducted its own analysis to evaluate the company's value. Financial analysts identified Incyte as a comparable company because Incyte was also a publicly traded, mid-sized drug company. 3-ER-371. One of those analyses listed Incyte among a group of six biotech companies that were "peers" of Medivation. 2-ER-105. That's because "[t]here are only a handful of $10 billion-range biotech companies (i.e., BioMarin, Incyte, Medivation) and mid-cap cancer assets (i.e., Incyte, Medivation, Seattle Genetics)." 2-ER-148. Those "peers" weren't selected because they were also

likely to be acquired, but rather, just to get a sense of a fair valuation for Medivation. 2-ER-111-13. Indeed, while Medivation was acquired in 2016, Incyte has, to this day, never been acquired. 2-ER-126. Incyte did not, however, have any business relationship with Medivation: It was not a competitor, customer, supplier, or partner to Medivation. 2-ER-159.

The acquisition process played out largely in public. Medivation publicly explained that it had entered into confidentiality agreements with several pharmaceutical companies interested in acquiring Medivation, and the press reported that Medivation set a "mid-August deadline" for the companies to formally bid to acquire Medivation. 3-ER-372. The press also named five major pharmaceutical companies (including Pfizer) as the companies that had submitted indications of interest in acquiring Medivation. Dist. Ct. Doc. 63, at 12. But the exact mid-August date for bids was not publicly broadcast. 3-ER-372.

On August 18, 2016, Medivation CEO Dr. Hung sent 13 employees, including Mr. Panuwat, an email stating that Pfizer "really want[ed]" to acquire Medivation and wanted to sign the contract that weekend. 2-ER-71.

### 3. Mr. Panuwat purchases, and later sells, Incyte call options.

Seven minutes after receiving Dr. Hung's email, Mr. Panuwat purchased "call options" in Incyte. 3-ER-372 Those options allowed Mr. Panuwat to purchase Incyte at a particular strike price. 3-ER-372.

On August 22, 2016, Pfizer announced its acquisition of Medivation. 3-ER-373. That same day, Incyte's stock price rose 7.7%. 3-ER-373. A few days later, Mr. Panuwat sold some of his Incyte call options, and he sold the rest a month later. 3-ER-373. But he held on to the rest, ultimately selling them at a loss. 2-ER-209. All told, he made $120,031.32 on the trades. 3-ER-373.

### C. Procedural background

### 1. Pretrial motions practice

**a.** In August 2021, the SEC charged Mr. Panuwat with violating Section 10(b) of the Exchange Act and Rule 10b-5 by breaching a duty owed to Medivation not to trade in Incyte securities based on material confidential Medivation information—information about Medivation, not Incyte. 3-ER-408-18. The source of that duty, the SEC alleged, was Mr. Panuwat's "employment at Medivation" and the "confidentiality and insider trade policies [Mr. Panuwat] signed." 3-ER-414-15.

- 17 -

Mr. Panuwat moved for dismissal, arguing that he had no duty to Medivation to refrain from trading in the stock of a company lacking a business relationship with Medivation. Dist. Ct. Doc. 18, at 11-12. The plain text of the Policy governing his employment didn't "contemplate trading in the securities of an unrelated company," Mr. Panuwat explained; rather, it prohibited trading in "significant collaborators, customers, partners, suppliers or competitors." *Id.* at 12.

The district court denied the motion, reasoning that the SEC had sufficiently pleaded that Mr. Panuwat breached his duty to Medivation because he violated the Insider Trading Policy. 3-ER-400-01. The court interpreted the Policy to prohibit Medivation employees from trading in *any* publicly traded company, even those without any connection to Medivation. 3-ER-401.

**b.**   The court took a different tack in denying Mr. Panuwat's motion for summary judgment. Mr. Panuwat again argued that the Policy didn't prohibit trading in unrelated companies, and the district court conceded that while this argument "may persuade a jury," the text of the Policy "allows for the SEC's interpretation." 3-ER-384-85.

**c.**    Given the district court's ruling that the Policy was ambiguous as to whether it prohibited employees from trading in unrelated companies, Mr. Panuwat sought to introduce evidence about the Policy's meaning from key Medivation executives involved in the Policy. *See* Dist. Ct. Doc. 109, at 13. But the SEC moved *in limine* to preclude this testimony, including from CEO and founder Dr. Hung and outside counsel Kenneth Guernsey. Dist. Ct. Doc. 98, at 6-10.

The district court granted the motion in part. The court acknowledged that "[u]nderstanding the meaning of Medivation's internal policies and practices vis-à-vis the kind of trade Panuwat made is critical to the jury's ability to decide whether he breached his duty." 3-ER-328. But the court nevertheless prohibited *any* witness from testifying about "the legal meaning of the policies." 3-ER-328. The court prohibited Mr. Guernsey and Dr. Hung from testifying about their interpretation of the Policy. 3-ER-328. The court allowed Mr. Panuwat to testify only about "what he understood the policies to mean as of the date of the Incyte trade." 3-ER-328. And it permitted witnesses to testify only about ancillary issues related to the Policy, but not about Policy's substance. 3-ER-328.

## 2. Trial

The district court held a weeklong jury trial. 1-ER-7. The SEC called six witnesses, who focused on the timing of Mr. Panuwat's trade, his access to confidential information, and the relationship between Medivation's acquisition and Incyte's stock price. The SEC argued that Mr. Panuwat bought Incyte call options based on confidential inside information about Medivation—the timing of Pfizer's acquisition of Medivation. 2-ER-270. As to duty, the SEC relied on the Insider Trading Policy, the Confidentiality Agreement, and Mr. Panuwat's role at Medivation. 2-ER-283-85. The SEC also relied on Mr. Panuwat's agreement on cross-examination that he knew he was not supposed to use Medivation's confidential information for personal gain. 2-ER-283-85.

Mr. Panuwat called four witnesses, and introduced a declaration by Incyte's Vice President of Business Development confirming that Incyte did not have a business relationship with Medivation, not even as competitors. 2-ER-159. Mr. Panuwat argued that he bought Incyte call options based not on Medivation's confidential information, but because he believed Incyte was undervalued, plus analysis from Goldman Sachs recommending investing in Incyte. 2-ER-198-99, 2-ER-296. As to duty, he explained that Incyte had

no relationship with Medivation. But the district court's prohibition on introducing evidence about the Policy hamstrung the defense. The defense tried to point out in closing that the SEC hadn't introduced any testimony about the Policy's meaning, either, but the court sustained an objection in light of its prior motion in limine ruling. 2-ER-308–09.

At the close of his case, Mr. Panuwat moved for judgment as a matter of law. Dist. Ct. Doc. 158. The district court denied the motion. 2-ER-257.

The jury found Mr. Panuwat liable for insider trading. 1-ER-59.

### 3. Posttrial motions

Mr. Panuwat renewed his motion for judgment as a matter of law and moved for a new trial.

Mr. Panuwat argued that he was entitled to judgment as a matter of law because the SEC did not and could not establish that he owed a fiduciary duty to Medivation not to trade in Incyte securities, because the Insider Trading Policy permitted his trade, and no other evidence established the necessary duty. Dist. Ct. Doc. 191, at 7-13. Alternatively, Mr. Panuwat sought a new trial because the district court erred in (a) instructing the jury on the mere entrustment theory, and (b) prohibiting Mr. Panuwat from introducing testimony about the Policy. Dist. Ct. Doc. 192, at 4-7, 18-21.

- 21 -

The district court denied both motions and imposed civil penalty. 1-ER-7-56. The court concluded that the Policy established the required duty. 1-ER-36-67. The court reasoned that the Policy prohibited trading in "the securities of another publicly-traded company," like Incyte. 1-ER-37. In the district court's view, the specific examples following "another publicly-traded company" didn't limit the scope of that phrase, because "the term 'including'… connotes simply an illustrative application of the general principle" that precedes it. 1-ER-38-39. Separately, the court concluded that Medivation's entrusting Mr. Panuwat with confidential information established a duty not to trade in Incyte securities based on that information. 1-ER-37-38. Finally, the district court saw no error in its decision to prohibit Dr. Hung and Mr. Guernsey from testifying about "the legal meaning of the policies." 1-ER-33-34.

Mr. Panuwat filed a timely notice of appeal. 3-ER-420.

## STANDARD OF REVIEW

The Court reviews "de novo the district court's denial of a renewed motion for judgment as a matter of law." *Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 (9th Cir. 2025). "Judgment as a matter of law is appropriate when the evidence permits only one reasonable conclusion." *Planned*

*Parenthood Federation of America, Inc. v. Newman*, 51 F.4th 1125, 1133 (9th Cir. 2022).

"[The Court] review[s] a district court's formulation of civil jury instructions for abuse of discretion, but [it] review[s] de novo whether an instruction states the law correctly. Jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc). "An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009).

With evidentiary rulings, this Court "first reviews de novo the substantive legal decision and then reviews the evidentiary ruling under the abuse of discretion standard." *Seror v. Insurance Co. of North America*, 947 F.2d 951, 1991 WL 216972, at *2 (9th Cir. 1991) (unpublished table decision). When a district court excludes evidence based on an erroneous legal ruling, this Court must determine whether "the district court abused its discretion and that the error was prejudicial." *McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003).

## SUMMARY OF ARGUMENT

**I.**     The SEC did not, and could not, prove that Mr. Panuwat had a duty to Medivation not to trade in Incyte securities, because the Insider Trading Policy permitted the trade.

**A.**   **1.**     The misappropriation theory requires the SEC to prove that the defendant (the recipient of material nonpublic information) owed a specific objective duty to the information's source not to trade based on that information. The Exchange Act is triggered only by a "manipulative or deceptive device," 15 U.S.C. § 78j(b); under the misappropriation theory, the recipient of information must deceive its source. But no deception occurs if the recipient has no duty to the source. And deception doesn't occur just because the recipient might *subjectively* believe he has a duty to the source: As with other special relationships, whether a fiduciary relationship exists turns on an objective inquiry.

**2.**     One party cannot impose a fiduciary duty on another merely by entrusting the other party with confidential information. After all, a fiduciary duty cannot be imposed unilaterally. Courts thus uniformly hold that mere entrustment of confidential information cannot create a fiduciary duty. *See Chestman*, 947 F.2d at 567.

- 24 -

**3.** Parties can contract around fiduciary duties, which are default background rules. Thus, the specific terms of a contractual relationship set the scope of the fiduciary's duties. The ability to write around default rules is basic contract law, and it applies in misappropriation cases too, meaning courts must examine contract provisions to determine whether they create the required duty not to trade.

**B.** The Court should reverse because the Insider Trading Policy allowed Mr. Panuwat to trade in Incyte securities. The SEC thus did not and could not show duty or deception.

**1.** The Insider Trading Policy allowed Mr. Panuwat to trade Incyte securities. The Policy prohibits employees from using Medivation's confidential information to trade securities of "another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors" of Medivation. The related canons of *noscitur a sociis* and *ejusdem generis* require understanding the term "another publicly-traded company" through the lens of the specifically enumerated terms that follow—which means companies with a significant business relationship with Medivation. That language doesn't permit reading the Policy to prohibit to employees from trading in a company without a significant business

relationship with Medivation. Indeed, the term "significant" in the Policy—applying only to trades in the securities of "*significant* collaborators" and other related companies—confirms that trading in companies with insignificant ties to Medivation is allowed.

2.    Context clues point to the same conclusion. Elsewhere the Policy states that it bars trading in "the securities of other public companies engaged in business transactions with [Medivation]." And it warns employees that violating the Policy by trading in "the securities of other public companies engaged in business transactions with the company" could trigger liability. That makes sense. The Policy was drafted against the backdrop of SEC and judicial precedent. And up until this case, the SEC had never brought a misappropriation case against someone who traded in an unrelated company. Those context clues amplify what the canons of construction also reveal.

3.    To the extent there is any ambiguity in the Policy, it should be resolved in Mr. Panuwat's favor. Under *contra proferentem*—the doctrine that ambiguous contract terms should be construed against the drafter—vague prohibitions must cut in Mr. Panuwat's favor. And the rule of lenity has a

role to play, too, because the Policy, by its own terms, gives rise to both civil and criminal liability.

4.      Incyte is not a related company (as an Incyte executive stipulated at trial), so Mr. Panuwat was allowed to trade Incyte securities. Because Mr. Panuwat's trade didn't violate the Policy, he owed no duty to Medivation not to trade in Incyte securities. As was undisputed at trial, Incyte had no business dealings with Medivation, nor was it a competitor to Medivation.

5.      The district court and the SEC's contrary reasoning was wrong. The district court relied on inapposite decisions that interpreted text without a general term followed by a list of specific terms. Nor do those decisions supply the same sort of context clues that exist here and that make clear that the Policy permitted trades in unrelated companies.

C.      The trial record supports no other potential sources of duty. The Insider Trading Policy alone determines the scope of Mr. Panuwat's duty.

1.      The SEC pointed to a Confidentiality Policy that Mr. Panuwat signed when he began his employment. But the Insider Trading Policy specifically sets out the duty as to Mr. Panuwat's trades, so it, and not the more general Confidentiality Policy, controls.

**2.** The SEC pointed to Mr. Panuwat's role as a senior leader at Medivation. But that role, without more, is insufficient, because the Insider Trading Policy supersedes any background fiduciary duties that might apply.

**3.** The SEC argued that the mere fact that Medivation entrusted Mr. Panuwat with confidential information created a fiduciary duty not to trade. But the "mere entrustment" theory has been widely rejected by courts, including the en banc Second Circuit, and for good reason: Fiduciary relationships cannot be created unilaterally.

**4.** The SEC contended that Mr. Panuwat admitted at trial that he understood he had a duty not to trade in Incyte. But Mr. Panuwat did not make a relevant admission. And in any event, subjective beliefs cannot establish a fiduciary duty.

**II.** In the alternative, the court should vacate and remand for a new trial because the district court made two fundamental legal errors, each independently warranting a new trial: (a) instructing the jury that "mere entrustment" could establish the required duty and (b) prohibiting Mr. Panuwat from introducing critical testimony.

**A.**   **1.**     At the close of trial, the district court instructed the jury that it could find the required element of duty satisfied based on mere entrustment. That instruction was wrong, as the Second Circuit and other courts have held. A fiduciary duty cannot be unilaterally created by one party—it's a relationship of mutual consent. Merely transmitting confidential information to another person doesn't make that person a fiduciary.

**2.**     The error was highly prejudicial. The instruction blew the door wide open for the jury to find the duty element satisfied without engaging with the Insider Trading Policy, which established Mr. Panuwat's duty regarding trading. The mere entrustment instruction allowed the jury to find duty satisfied—the "cornerstone" of misappropriation—based on a feature of misappropriation that is *always* present: The receipt of material nonpublic information.

**B.**     The district court erroneously barred Mr. Panuwat from introducing testimony from Dr. Hung and Mr. Guernsey about the meaning of the Insider Trading Policy, thus hamstringing Mr. Panuwat's defense.

**1.**     When contract language is ambiguous, California law (which governs here) requires courts to allow evidence about the intent of the contracting parties. Courts applying California law thus regularly reverse jury

verdicts when a district court refuses to allow evidence explaining the meaning of a written instrument.

 **2.** The district court erred by prohibiting Mr. Panuwat from calling witnesses to testify about the meaning of the Insider Trading Policy. The Policy unambiguously allowed Mr. Panuwat's trade, but at worst, it's ambiguous—as the district court itself found. The district court thus was required to allow Mr. Panuwat to introduce evidence about the Policy's meaning. But the court did just the opposite, barring testimony from Dr. Hung and Mr. Guernsey that the Policy prohibited trades only in the securities of companies related to Medivation. That was error.

 **3.** That erroneous decision was prejudicial. The excluded evidence would have made a significant impression on the jury. The SEC failed to introduce any evidence interpreting the Insider Trading Policy, so anything Mr. Panuwat could have offered to help the jury interpret difficult language would have been important. And Mr. Panuwat had powerful evidence to offer—testimony from Medivation's CEO and founder, and from its outside lawyer, that the Policy didn't prohibit his trades. That testimony, from senior Medivation leaders involved in crafting and enforcing the Policy, would

have given the jury a basis on which to conclude that Mr. Panuwat didn't

have a duty to Medivation not to trade in Incyte securities.

## ARGUMENT

**I.     The SEC did not and could not prove that Mr. Panuwat had a duty to Medivation not to trade in the securities of Incyte, because the controlling Insider Trading Policy permitted the trade.**

The SEC needed to show that Mr. Panuwat had a duty to Medivation

not to trade in Incyte securities. Misappropriation is deceptive, in violation

of Section 10(b) and Rule 10b-5, only if the recipient of confidential infor-

mation deceives the information's source. No duty, no deception. Here,

Medivation's Insider Trading Policy governs whether Mr. Panuwat had any

duty not to trade in Incyte securities based on Medivation's information, be-

cause that Policy speaks directly to employees' duties not to trade. And that

Policy prohibits employees from trading only in companies with a signifi-

cant business relationship with Medivation. That reading follows from

applying canons of construction, like *ejusdem generis* and *noscitur a sociis*, and

considering the Policy's broader context. And because Incyte is unrelated to

Medivation, the Policy permitted Mr. Panuwat's Incyte trades.

### A. To prevail under the misappropriation theory, the SEC must establish that the recipient of information owed a duty to the source not to trade based on that information.

The linchpin of misappropriation is the recipient's duty to the source of confidential information not to trade based on that information. Three legal principles govern that inquiry. *First*, the SEC must prove a *specific* duty not to trade based on material nonpublic information; establishing a general fiduciary relationship between the recipient and source is not enough. And whether such a duty exists is assessed objectively, not subjectively—a mistaken belief in a fiduciary duty doesn't create one. *Second*, contractual duties supersede any common law fiduciary duties that might otherwise apply. *Finally*, mere entrustment of confidential information doesn't establish a fiduciary duty barring the recipient from trading based on that information.

### 1. The SEC must prove that the defendant had an objective fiduciary duty to the source of information not to trade based on that information.

**a.** Section 10(b) of the Exchange Act requires manipulation or deception. 15 U.S.C. § 78j(b). Misappropriation thus focuses on deception by the recipient of material nonpublic information to its source, not between two parties on either side of a trade. *Supra* pp. 10-12. Liability for misappropriation starts with duty: The SEC must show that the defendant breached a

- 32 -

specific duty arising out of a "fiduciary or other similar relation of trust and confidence." *O'Hagan*, 521 U.S. at 670. The prohibited deception, in turn, is nondisclosure of the breach of that duty—that is, "feigning fidelity to the source of information" later used by the trader. *Id.* at 655. That's why disclosure of a trade thwarts liability even if the trade breaches a fiduciary duty. *Id.*

But Section 10(b) "is not an all-purpose breach of fiduciary duty ban." *Id.* Rather, the SEC must prove that the defendant violated a duty not to trade on confidential information. *Id.* Unless there is a duty not to trade based on material nonpublic information, the trader cannot deceive the source of the information by failing to disclose the trade. The requirement to prove that duty follows from the law's general treatment of duties between parties with special relationships—duties are obligations that an "actor shall conduct himself or not conduct himself *in a particular manner*." Restatement (Second) of Torts § 4 cmt. a (Oct. 2024) (emphasis added).

**b.** Whether a duty exists turns on an objective inquiry. The recipient's subjective belief about whether he can trade based on the information is irrelevant. *See, e.g.*, *Insight Health Corp. v. Marquis Diagnostic Imaging of North Carolina, LLC*, No. 14-CVS-1783, 2017 WL 4413034, at *3 (N.C. Super.

Ct. Oct. 3, 2017). That objective approach aligns with the objective test for fiduciary relationships in other contexts—the "party claiming a fiduciary relationship must show that reliance was not merely subjective." *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002). For instance, one party's subjective belief that she has entered an attorney-client relationship does not bind the parties to an attorney-client relationship. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 133 (5th Cir. 2021); *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339 (4th Cir. 2005).

 **c.** In the misappropriation context, a fiduciary relationship encompassing a duty not to trade based on confidential information may exist in three primary circumstances.

 *First*, the defendant might enter into an express agreement with the source not to trade based on nonpublic information. *See Chestman*, 947 F.2d at 571. The agreement must be that the recipient of information "was not to trade" on the information. *SEC v. Cuban*, 620 F.3d 551, 557 (5th Cir. 2010).

 *Second*, the defendant can have a relationship with the source of information that is "inherently fiduciary" as a matter of law. *Chestman*, 947 F.2d at 568. Those relationships include attorney–client, *see O'Hagan*, 521 U.S. at

647, or tax advisor–client, *SEC v. Kornman*, 391 F. Supp. 2d 477, 479-80 (N.D. Tex. 2005), but not stock broker–customer, *Chestman*, 947 F.2d at 571.

*Third*, the defendant can have "the functional equivalent of a fiduciary relationship" with the source of the information. *Id.* at 569. The relationship between the defendant and source must "share the essential characteristics of a fiduciary association." *Id.* at 568. That relationship "generally arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid." *United States v. Kim*, 184 F. Supp. 2d 1006, 1011 (N.D. Cal. 2002).

### 2.    Mere entrustment of material nonpublic information cannot establish a fiduciary relationship or duty.

Consistent with the principles set out above, one party cannot unilaterally impose a fiduciary relationship or duty on another merely by entrusting the other with confidential information. That rule flows from the bedrock premise that fiduciary relationships are "consensual in the sense that the parties must voluntarily enter a relationship having the stipulated characteristics." *Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1183 (3d Cir. 1996). Fiduciary duties

arise out of a *relationship* between two parties—not an obligation one person foists on another.

For that reason, courts uniformly hold that "[r]eposing confidential information in another … does not by itself create a fiduciary relationship." *Chestman*, 947 F.2d at 568; *see Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1108 (10th Cir. 1999); *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996); *JPMorgan Chase Bank, N.A. v. 29-33 Ninth Avenue, LLC*, 710 F. Supp. 3d 259, 278 (S.D.N.Y. 2024). Scholars agree: "[I]t is not enough merely to entrust another with a secret; there must also be assent to the duty." 18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement, and Prevention* § 6:7 (May 2025). That rule, forcefully expressed in *Chestman*, picks up on *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983), where the Court held that the basis for recognizing a fiduciary duty is not that the employee "acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business." The contrary rule—that mere entrustment creates a fiduciary relationship—is rooted in the squarely rejected theory that the law "require[s] equal information among all traders." *Id.* at 657. That view, which is not the law, would allow one party to

unilaterally create a fiduciary relationship merely by disclosing confidential information.

Mere entrustment likewise does not establish the required duty in the misappropriation context. In the leading case, the en banc Second Circuit held that a "fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *Chestman*, 947 F.2d at 567. There, the court reversed criminal convictions for misappropriation because the government failed to establish a fiduciary relationship between family members. *Id.* at 570-71. At most, the government showed at trial that "critical information was gratuitously communicated" to the alleged misappropriator, which was insufficient to sustain a conviction for misappropriation. *Id.* That result followed from the rule that a fiduciary relationship cannot established unilaterally. *See also Lyon*, 605 F. Supp. 2d at 544.

### 3. Even if the SEC proves the existence of a fiduciary relationship between the source and recipient, if the parties have a contractual relationship defining trading duties, the terms of the contract control.

Even when parties have a fiduciary relationship in the abstract, if the parties have a contractual relationship, it is that contractual relationship (and not any common law fiduciary duty) that defines the scope of duty owed. In

other words, the terms of a fiduciary relationship "are determined by the terms of the agreement between the parties." Restatement (Second) of Agency § 376 (Oct. 2024). Thus, a contract between recipient and source of information that governs trading based on that information will always supersede any background fiduciary duties.

    **a.**    Broadly speaking, fiduciary duties are default rules—terms that parties might have agreed to had they negotiated terms. Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 92-93 (1991). As with all default rules, parties may modify (or eliminate) fiduciary duties. In that sense, "[f]iduciary duties are not special duties": "Actual contracts always prevail over implied ones." Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 J.L. & Econ. 425, 427 (1993); *see, e.g.*, *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010); *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013).

    That rule rests on two key principles. *First*, the understanding that a specific contract trumps a general fiduciary duty is just a species of the textbook rule that the "specific governs the general." *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 797 (9th Cir. 2017). *Second*, the existence of detailed contract terms—particularly between

sophisticated parties—"suggests arm's-length dealings between co-equals," not the kind of power imbalance calling for the imposition of common law fiduciary duties. *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 201 F. Supp. 2d 1048, 1049 (N.D. Cal. 2002). Enforcing clear and negotiated contract terms over vague common law fiduciary principles protects the settled expectations of parties.

Thus, courts have adhered to the "well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim." *Nemec*, 991 A.2d at 1129; *see Merriam v. Demoulas Super Markets, Inc.*, 985 N.E.2d 388, 394-95 (Mass. 2013). "In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec*, 991 A.2d at 1129. Recognizing general fiduciary duties when specific contract terms apply "would undermine the primacy of contract law over fiduciary law in matters involving … contractual rights and obligations." *K Street Developers, LLC v. Teachers Insurance & Annuity Ass'n of America*, 69 F. Supp. 3d 45, 57 (D.D.C. 2014).

**b.**     That rule applies in misappropriation cases. For instance, in *Kim*, the court found that an "express confidentiality agreement" signed by

members of an organization did not create a fiduciary duty, because the agreement didn't give rise to a specific "legal dut[y]" not to trade based on nonpublic information. 184 F. Supp. 2d at 1015; *see Nolan Bros. of Texas v. WhiteRaven, LLC*, No. 1:99-cv-10256, 2004 WL 376265, at *2 (S.D.N.Y. Feb. 27, 2004). *Cf. SEC v. Ginder*, 752 F.3d 569, 575-76 (2d Cir. 2014).

Thus, if the recipient and source agree that the recipient has a duty not to trade only in the securities of companies X, Y, and Z, and the recipient then trades in securities of company A, the recipient does not deceive the source by not disclosing the trade. The recipient owed no duty not to trade in company A's securities, so the recipient feigned no fealty to the source not to trade in A by not disclosing the trade in A.

### B. Reversal is required because the Insider Trading Policy permitted Mr. Panuwat to trade in Incyte securities, meaning the SEC did not and could not show duty or deception.

The Insider Trading Policy was the core of the SEC's case. The SEC contended that the Policy established a duty not to trade in Incyte securities. That is incorrect. The Policy prohibited employees from trading only in the securities of companies with a significant business relationship with Medivation. Conversely, it permitted employees to trade in the securities of companies without a significant business relationship with Medivation. All

- 40 -

agree (indeed, stipulated) that Incyte had no business relationship with Medivation, so the Policy imposed no duty on Mr. Panuwat to refrain from trading in Incyte securities.

Companies commonly require employees to sign insider trading or confidentiality policies. Many such agreements prohibit a wide-range of conduct related to information belonging to the employer. *See, e.g.*, *SEC v. Alpert*, No. 1:17-cv-1879, 2018 WL 1156012, at *3 (S.D.N.Y. March 2, 2018). But other contracts and policies are not as broad, and consequently, courts have declined to find a fiduciary duty where the policy doesn't prohibit the trade at issue. *Supra* pp. 39-40.

The Insider Trading Policy falls into that latter category. It prohibits employees like Mr. Panuwat from trading in companies with a significant business relationship with Medivation—collaborators, customers, partners, suppliers, or competitors of Medivation. But the Policy doesn't prohibit Mr. Panuwat from trading in every single company; indeed, it would be absurd (and wrong) to interpret the policies to prohibit Mr. Panuwat from trading Starbucks securities. Instead, the Policy prohibits Mr. Panuwat from using confidential Medivation information to trade securities of companies with a

significant business relationship with Medivation. Incyte is not one of those companies, so the Policy doesn't establish the necessary duty.

### 1. The Policy's text shows that Mr. Panuwat was permitted to trade in securities of companies without a significant business relationship with Medivation, as the *ejusdem generis* and *noscitur a sociis* canons make clear.

The text of the Policy permits Medivation employees to trade securities of companies that do not have a significant business relationship with Medivation. The Policy warns employees that because of their access to confidential Medivation information, they "may be in a position to profit financially by buying or selling or in some other way dealing in … the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company." 2-ER-82. Employees may not use "such information to gain personal benefit" by trading in companies related to Medivation. 2-ER-82. That text makes clear that employees are permitted to trade in securities of companies that lack a significant business relationship with Medivation.

**a.** Words are known by the company they keep, and they take their meaning from context. *Jones v. United States*, 527 U.S. 373, 389 (1999). Those principles help interpret text where, as here, a general term ("the securities

of another publicly-traded company") is accompanied by a list of specific examples ("collaborators, customers, partners, suppliers or competitors"). *First*, "the canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024). *Second*, the related canon of *ejusdem generis* applies when a general term accompanies a list of specific items. *See California State Legislative Board, United Transportation Union v. Department of Transportation*, 400 F.3d 760, 763-64 (9th Cir. 2005); 2A Shambie Singer & Norman J. Singer, *Sutherland Statutes & Statutory Construction* § 47:17 (7th ed. Nov. 2024).

*Noscitur a sociis* and *ejusdem generis* recognize ordinary ways of reading text based on the understanding that a drafter "would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer*, 603 U.S. at 487. Both canons reflect the commonsense notion that words grouped together should be understood by their common meaning. *See, e.g., Third National Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977). So, for instance, *noscitur a sociis* helps the reader understand that a sign at the zoo that says "do not pet, feed, yell or throw objects at the animals, or otherwise disturb them" covers only "direct

interaction with and harassment of the zoo animals," but not eating or talking near the animals. *Fischer*, 603 U.S. at 487-88. And under *ejusdem generis*, a statute applying to a "motor vehicle … includ[ing] an automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" excludes airplanes, because the term "motor vehicle" must be understood in the context of the specific examples that follow it. *McBoyle v. United States*, 283 U.S. 25, 26 (1931).

Those principles apply equally when the drafter uses a term like "including" followed by a list of specific examples. Indeed, it is "widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." *Post v. St. Paul Travelers Insurance Co.*, 691 F.3d 500, 520 (3d Cir. 2012). Thus, in *California State Legislative Board*, this Court interpreted a statute requiring that railroads provide clean, safe, and sanitary "sleeping quarters (including crew quarters, camp or bunk cars, and trailers) for employees" in certain circumstances. 400 F.3d at 762. The question was whether a motel room was a sleeping quarter—an argument the court rejected, applying *ejusdem generis*

to conclude that "'sleeping quarters' only refers to railroad-owned or oper-ated facilities." *Id.* at 763. Even though the statute used the term "including," the court looked at the specific examples, and concluded that they are "all lodgings typically owned or operated by railroads." *Id.* A motel might be a "sleeping quarter," but it didn't fit the category exemplified by the specific terms that followed.

These interpretive rules apply the same way under California law, which governs the Policy (which was negotiated and performed in Califor-nia, *see ABF Capital Corp. v. Berglass*, 30 Cal. Rptr. 3d 588, 596 (Ct. App. 2005)). Even when context clues reveal that the term "include" is a term "of expan-sion," the *ejusdem generis* canon nevertheless requires that "the general words will be construed as applicable only to things of the same general na-ture or class as those enumerated." *County of Yolo v. Los Rios Community College District*, 7 Cal. Rptr. 2d 647, 654 (Ct. App. 1992) (citing cases). That fundamental principle requires that "including" is not a term "of unlimited expansion." *Id.*

**b.** *Ejusdem generis* and *noscitur a sociis* show that the Policy prohibits trades based on nonpublic Medivation information only in securities of com-panies with a significant business relationship with Medivation. The Policy

- 45 -

uses a general term ("publicly-traded company"), followed by a list of specific terms ("all significant collaborators, customers, partners, suppliers or competitors of the Company"). The common denominator of those terms is a significant business relationship with Medivation. There would have been no reason to list those related examples if the Policy reached *every* publicly traded company—to the contrary, the list would be wholly superfluous.

The Policy's use of the word "significant" in "all *significant* collaborators, customers, partners, suppliers, or competitors" of Medivation, 2-ER-8 (emphasis added), supports that conclusion. That language suggests that trading securities of companies with *insignificant* relationships to Medivation is allowed. The *expressio unius* canon confirms that the term "significant" excludes trades in securities of companies with insignificant ties to Medivation. *See United States v. Wells Fargo Bank*, 485 U.S. 351, 357 (1988). Otherwise there would have been no reason to use the word "significant" at all, and the term would be superfluous.

### 2. Other context clues confirm that the Policy permits trading in the securities of companies without a significant business relationship with Medivation.

Like canons of construction, "contextual cues" help the reader understand text. *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 226 (2008). Here, several clues confirm what the canons of constructions make clear.

To start, Medivation drafted the Policy against the backdrop of SEC and judicial precedent. And the SEC had never applied the misappropriation theory to an employee who trades in the securities of *other* companies, much less unrelated companies. 3-ER-404. In *O'Hagan*, for instance, the trader received material nonpublic information about Pillsbury, and he traded in Pillsbury securities. 521 U.S. at 647-48. In *Talbot*, the trader received material nonpublic information about LendingTree, and traded in LendingTree securities. 530 F.3d at 1087-88. This case, all agree, is the first time the SEC has claimed misappropriation against a defendant who traded securities of a company that wasn't the subject of material nonpublic information. The Insider Trading Policy, drafted before the SEC initiated this action, reflects that background understanding.

Other clauses of the Policy track that understanding. They state that the Policy applies to "transactions in [Medivation's] securities or the

securities *of other public companies engaged in business transactions with* [Medivation]." 2-ER-84 (emphasis added). It warns employees that anyone "who effects transactions in the Company's securities *or the securities of other public companies engaged in business transactions with the Company* … on the basis of inside information is subject to both civil liability and criminal penalties, as well as disciplinary action by the Company." 2-ER-84 (emphasis added). And the Policy states that it applies to "important information that is not yet publicly disseminated" about Medivation "or about other publicly-traded companies *with which the Company has business dealings*." 2-ER-82 (emphasis added). That language underscores that the Policy prohibits only trades in securities of companies with a significant business relationship with Medivation.

> ### 3. Principles of *contra proferentem* and the rule of lenity require resolving any ambiguity in the Policy's trading prohibition to reach only securities of companies with a significant business relationship with Medivation.

Assuming any doubt remains about the Policy's scope after considering text and context, it should be resolved in Mr. Panuwat's favor under principles of *contra proferentem* and the rule of lenity.

As discussed below (at 64-65), a court confronting an ambiguous contract must look to extrinsic evidence to discern the drafters' intent. *See, e.g.*, *Rainier Credit Co v. Western Alliance Corp.*, 217 Cal. Rptr. 291, 295 (Ct. App. 1985). Any remaining doubts must be resolved against the drafter, and against penalties, under the principles of *contra proferentem* and the rule of lenity. Thus, even assuming there is doubt about whether the Insider Trading Policy permitted Mr. Panuwat's trade, the district court erred in blocking extrinsic evidence about the Policy's meaning (as discussed below (at 65-69)) and failing to account for *contra proferentem* and the rule of lenity. Absent any extrinsic evidence supporting the SEC's position (and there was none), *contra proferentem* and the rule of lenity require construing the term "publicly-traded company" in the Policy narrowly to reach only those companies with a significant business relationship with Medivation.

*First*, the age-old rule of *contra proferentem* requires that ambiguity in a contract should be construed against the drafter. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019); *Securitas Security Services USA, Inc. v. Superior Court*, 184 Cal. Rptr. 3d 568, 583 (Ct. App. 2015); 11 Richard A. Lord, *Williston on Contracts* § 32:12 (4th ed. May 2025). The rule applies when "secondary

rules of interpretation have failed to elucidate the contract's meaning." Lord, *supra*, § 32.12.

*Second*, under the "venerable" rule of lenity, statutes imposing penalties should be "construed strictly" against the government and in favor of individuals. *Bittner v. United States*, 598 U.S. 85, 101 (2023) (quoting *Commissioner v. Acker*, 361 U.S. 87, 91 (1959)); *see United States v. Millis*, 621 F.3d 914, 916-17 (9th Cir. 2010). The rule promotes due process, fair notice, and the separation of powers. *See Wooden v. United States*, 595 U.S. 360, 389 (2022) (Gorsuch, J., concurring). And it is well-established that the rule of lenity applies to statutes that impose "civil penalties." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 297 (2012). Indeed, the Supreme Court has applied the rule across a host of statutes, including in bankruptcy and under the Communications Act of 1934 and the National Bank Act. *Bittner*, 598 U.S. at 102 (citing cases).

To the extent there is any ambiguity in the Insider Trading Policy, *contra proferentem* and the rule of lenity require construing that ambiguity in Mr. Panuwat's favor and finding that the Policy does not prohibit trades in companies without a significant business relationship with Medviation. *Contra proferentem* applies because Medivation—not Mr. Panuwat—drafted the

Insider Trading Policy. Applying *contra proferentum* is especially appropriate given that, as discussed below (at 66-67), Mr. Panuwat and senior Medivation executives understood the policy to prohibit trading only in related companies. Indeed, senior Medivation employees subject to the same Insider Trading Policy testified that they traded in the securities of other biopharmaceutical companies. *See, e.g.*, 2-ER-167-69. If the SEC's view were correct, those executives would be in violation of the Insider Trading Policy.

The rule of lenity also applies. The scope of the Policy governs the application of the Exchange Act, which provides for both civil and criminal penalties. *See* 15 U.S.C. §§ 77x, 78ff(a). If a law "has both criminal and civil applications"—as the Act does—the "rule of lenity governs its application in both settings." *Whitman v. United States*, 135 S. Ct. 352, 353-54 (2014) (statement of Scalia, J., respecting the denial of certiorari) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)). Here, where the scope of the policy has potentially criminal effects (as the policy itself describes, *see* 2-ER-84), lenity counsels in favor of narrowly construing the "another publicly-traded company" clause.

### 4. The Insider Trading Policy permits trading in Incyte securities because Incyte does not have a significant business relationship with Medivation.

As the trial evidence showed—without dispute—Incyte was not related to Medivation in any way, and certainly not in a way that would bring it within the ambit of the Insider Trading Policy. Mr. Panuwat thus had no duty not to trade in Medivation securities based on nonpublic Medivation information.

The evidence was clear and undisputed. Incyte's Vice President of Business Development confirmed that "Incyte did not have a business relationship with Medivation in 2016 or 2017, and that "Incyte and Medivation were not significant collaborators, competitors, customers, suppliers, or partners during that period." 2-ER-159. Mr. Panuwat also testified that Medivation and Incyte had no business relationship, and that Medivation did "not consider Incyte a competitor by any metric." 2-ER-190.

The SEC did not dispute that characterization. Nor did the SEC introduce any evidence suggesting that Incyte had any relationship with Medivation. That would have been impossible in any event, because Incyte and Medivation were significantly different companies, with different pharmaceutical focuses. *Supra* pp. 15-16.

Because Incyte and Medivation were not related companies, Mr. Panuwat's trade did not violate the Insider Trading Policy. And that policy defines the scope of Mr. Panuwat's duty of Medivation.

### 5. The district court's contrary reasoning and the SEC's contrary arguments lack merit.

In the SEC's and district court's view, the Policy's list of specific examples does not limit the scope of "publicly-traded compan[ies]" in whose securities employees may not trade. 1-ER-39; Dist. Ct. Doc. 70, at 27-28. But the decisions the SEC and district court cite do not support that view.

In *Arizona State Board for Charter Schools v. U.S. Department of Education*, 464 F.3d 1003 (9th Cir. 2006), the court interpreted the definition of "elementary school"—a "nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education." *Id.* at 1006 (emphasis omitted). Plaintiffs sought to classify for-profit charter schools as elementary schools, but the court rejected that reading, concluding that term "including" did not expand the definition of eligible schools, but rather gave "an example of the preceding principle." *Id.* at 1007-08.

That case doesn't help the SEC. Unlike the Insider Trading Policy, the text there didn't provide a general term followed by a list of specific terms.

The terms "collaborators, customers, partners, suppliers, and competitors" give color to the term "another publicly-traded company." And context supports that reading. *Supra* pp. 45-48.

*Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95 (1941), doesn't support the district court's or the SEC's reading, either. There, the Court interpreted a provision of the Federal Farm Loan Act providing that "every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt" from taxation. *Id.* at 96 n.1. In reaching the conclusion that the provision exempted a loan from North Dakota's sales tax regime, *id.* at 96 n.1, 99, the Court relied on context clues that aren't present here. The Act provided, as the Court emphasized, that "*every*" bank and "*every*" association is exempt from tax. *Id.* at 96 n.1 (emphasis added). The Court also relied on other sections of the Act in finding the loan exempt. *Id.* at 100. But the general term in the Insider Trading Policy simply says "another publicly-traded company"—not "*every* other publicly-traded company," or even "*any* publicly-traded company." And context likewise supports Mr. Panuwat's reading: Other sections of the Policy emphasize

companies "engaged in business transactions" with Medivation. *Supra* pp. 45-48.

### C. The trial record supports no other potential sources of duty — after all, the Policy resolves the duty question in Mr. Panuwat's favor as a matter of law.

The SEC's duty argument rests primarily on the Insider Trading Policy, which spells out the duty that employees owe Medivation. But the SEC also relied on four other arguments, which the district court accepted, to claim that Mr. Panuwat had a duty not to trade in Incyte securities: the Confidentiality Policy, Mr. Panuwat's role at Medivation, mere entrustment of confidential information, and Mr. Panuwat's supposed admissions. Each of those arguments fails.

#### 1. The Insider Trading Policy, not the Confidentiality Policy, controls.

The SEC argued that the Confidentiality Policy supported a duty not to trade in Incyte securities. Dist. Ct. Doc. 70, at 25-27. That is incorrect. As explained (at 37-39), blackletter contract law dictates that specific policies control over general ones, including when contracts define fiduciary duties. Here, the specific contract provision that controls is the Insider Trading Policy. The Confidentiality Policy requires employees to "hold in strictest

confidence, and not to use, except for the benefit of the Company … any trade secrets [or] confidential knowledge." 2-ER-284. That general prohibition says nothing about trading securities, much less trading securities of companies other than Medivation. Rather, the duties Medivation imposes as to securities trading—the central question here—are found in the Insider Trading Policy, which expressly addresses the use of "important information that is not yet publicly disseminated" for trades in "securities of another publicly-traded company." 2-ER-82. The Insider Trading Policy, not the Confidentiality Policy, governs employees' trading based on nonpublic information.

### 2.    Mr. Panuwat's role at Medivation likewise did not establish a duty not to trade in Incyte securities.

The SEC also incorrectly argued, and the district court found, that Mr. Panuwat had a duty not to trade in Incyte securities given his role at Medivation because he was "part of Medivation's leadership team." 1-ER-15. Simply identifying Mr. Panuwat as an executive at Medivation is not sufficient to establish that he had a duty not to trade in Incyte securities. For one thing, even putting aside the Insider Trading Policy, not all employees have a fiduciary duty to their employers not to trade in securities. Restatement

(Third) of Agency § 1.01 cmt. g (Oct. 2024). For another, "to say that a man is a fiduciary only begins analysis" — the key question is "[w]hat obligations does he owe as a fiduciary?" *SEC v. Chenery Corp.*, 318 U.S. 80, 85-86 (1943).

In any event, as explained (at 37-39), the Insider Trading Policy controls over any background duties arising from the circumstances or the parties' relationship. And the Policy imposes on employees a duty not to trade based on Medivation information in the securities only of companies with which Medivation has a significant business relationship.

### 3. Mere entrustment does not establish a duty, either.

The SEC also incorrectly argued, and the district court likewise accepted, that Mr. Panuwat had a duty to Medivation just because Medivation entrusted him with confidential information. As the leading appellate decision has long made clear, a "fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *Chestman*, 947 F.2d at 567; *supra* pp. 35-37. Thus, the mere fact that Mr. Panuwat sometimes received material nonpublic information about Medivation is not sufficient to establish that he had a fiduciary relationship with Medivation, much less a duty not to trade in Incyte securities.

### 4.    Mr. Panuwat's supposed "admission" doesn't support a duty either.

Finally, the SEC contended that Mr. Panuwat admitted that he understood he had a duty not to trade in Incyte securities. Dist. Ct. Doc. 196, at 16. At trial, the SEC asked if Mr. Panuwat "knew, separate and apart from any written policy, that [he was] not supposed to use Medivation's confidential information for [his] own personal benefit." 2-ER-246-47. Mr. Panuwat answered: "Yes, I believe I had that understanding." 2-ER-247. The SEC described this as the "clearest" indication of Mr. Panuwat's duty to Medivation. Dist. Ct. Doc. 196, at 9-10. That argument fails for two reasons.

*First*, even on the government's understanding of Mr. Panuwat's testimony, the testimony does not establish the necessary duty. Mr. Panuwat did not testify that he thought he had a duty not to trade in Incyte securities— and that particular duty is what the law requires. *Supra* pp. 31-35. Mr. Panuwat never testified that the Policy covered the Incyte trade. That's not surprising, especially considering that *no* Medivation employee testified that they shared the SEC's belief that employees were prohibited from trading shares in unrelated companies. It's not enough for Mr. Panuwat to believe he had a fiduciary relationship with Medivation.

*Second*, Mr. Panuwat's beliefs cannot establish a fiduciary duty regardless, because, as explained (at 33-34), the inquiry is objective, not subjective. And, as explained (at 37-40), in the absence of a contract, the existence of fiduciary duties would turn on the parties' relationship and the circumstances. As the court explained in *Kim*, even where parties may "feel a special bond" with each other, the court must analyze the objective nature of their relationship—including especially where a written agreement governs that relationship. 184 F. Supp. 2d at 1008. Here, in contrast, the Insider Trading Policy controls, and it makes clear that Medivation *permitted* trading based on nonpublic information in securities of companies without a significant business relationship with Medivation. That conclusion results from an objective reading of contract language, not what Mr. Panuwat might have believed. *Supra* pp. 33-34.

## II.    Alternatively, a new trial is required because the district court erred in instructing the jury about the duty element and barring Mr. Panuwat from introducing key testimony about the Policy.

The district court made two critical and prejudicial errors at trial. Each independently requires a new trial.

*First*, the court instructed the jury that it could find duty established based solely on the fact that Medivation entrusted Mr. Panuwat with

material nonpublic information. That was incorrect. The en banc Second Circuit has rejected that "mere entrustment" theory, and no other court of appeals has adopted it. For good reason: Fiduciary duties require consent from both parties.

*Second*, the court barred Mr. Panuwat from introducing testimony about the meaning of the Insider Trading Policy, despite finding the Policy ambiguous. When contract language is ambiguous, courts must allow parties to introduce extrinsic evidence to establish the intent of the agreement. But the court prohibited Mr. Panuwat from introducing testimony from Dr. Hung, the CEO and founder of Medivation, and from Kenneth Guernsey, Medivation's outside counsel. Both would have testified that the Policy permitted Mr. Panuwat's trade. And that testimony, from senior Medivation leaders, would have made a strong impression on the jury.

### A.    The district court wrongly instructed the jury that it could find that Mr. Panuwat had a duty not to trade in Incyte securities based solely on Mr. Panuwat's receipt of material nonpublic information.

As explained (35-37), merely entrusting someone with confidential information does not establish a fiduciary duty or relationship. The district court's jury instruction contravened that basic principles. The court

instructed the jury that a "duty also arises, even in the absence of a written agreement, when an employer entrusts an employee with confidential information." 2-ER-267. That instruction was legally wrong. It was also highly prejudicial, because it relieved the SEC of the responsibility of proving that Mr. Panuwat had a duty—and took the jury's focus away from the Insider Trading Policy, which controls.

### 1. The jury instruction was wrong.

Entrusting an employee with confidential information does not, without more, establish a fiduciary duty. *Supra* pp. 35-37. But the district court told the jury just the opposite. By the clear terms of the instruction, the district court invited the jury to find the crucial duty element satisfied based solely on the fact that Medivation had entrusted Mr. Panuwat with confidential information. The court's reasoning cannot salvage its instruction.

*First*, the court insisted that the jury actually wasn't instructed on a mere entrustment theory. 1-ER-15. But the instruction speaks for itself.

*Second*, the district court explained that *Chestman* was "non-controlling and inapposite." 1-ER-15. Although *Chestman* is not this Court's precedent, it is well-reasoned, and no court of appeals has rejected its reasoning. The district court tried to distinguish *Chestman* by noting that unlike the recipient

in *Chestman*, "Panuwat was part of Medivation's leadership team." 1-ER-15. But that's not a relevant distinction for purposes of the mere entrustment theory, which *Chestman* rejected. And the district court's mere entrustment theory didn't require the jury to make any findings about Mr. Panuwat and Medivation's relationship. (Further, as explained (at 56), Mr. Panuwat's role doesn't establish his duty anyway.) There's no reason to split from the Second Circuit and endorse the mere entrustment theory.

### 2. The error was prejudicial.

If the jury was "incorrectly instructed, then [this court] will affirm *only if* the prevailing party below can show harmless error." *Sidibe v. Sutter Health*, 103 F.4th 675, 685 (9th Cir. 2024) (emphasis added). Put differently, the Ninth Circuit will "presume prejudice" from the erroneous instruction. *BladeRoom Group Limited v. Emerson Electric Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021). To show harmless error, the SEC here must show that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Fierro v. Smith*, 39 F.4th 640, 651 (9th Cir. 2022).

The SEC cannot show that the error was harmless. The instruction invited the jury to find the critical element duty element satisfied based on nothing more than Mr. Panuwat's receipt of Medivation information—

- 62 -

without any showing of a fiduciary relationship or duty or any analysis of the Insider Trading Policy. The instruction was thus tantamount to requiring no showing on duty at all. And the SEC capitalized on that error. In closing argument—after the jury had been wrongly instructed—the SEC argued that the duty element was "not seriously in dispute." 2-ER-283. Indeed, the SEC argued in closing that it wasn't "even necessary" for the jury to look to the Insider Trading Policy—the key document in the case—because the SEC had easily satisfied the element of duty. 2-ER-284.

The district court magnified that error and its prejudicial effect with a corresponding error in its scienter instruction. The scienter element requires the jury to find that Mr. Panuwat knew he had a specific duty *not to trade Incyte securities*. Only that mental state captures the deception required under Section 10(b). *See Veleron Holding, B.V. v. Morgan Stanley*, 694 F. App'x 858, 862 (2d Cir. 2017) (per curiam); *SEC v. Rorech*, 720 F. Supp. 2d 367, 415 (S.D.N.Y. 2010). But the district court told the jury it could find scienter simply by finding that Mr. Panuwat knew he "lacked consent from Mediva-tion to use the information." 2-ER-266. That doesn't capture the required scienter. Worse, it exacerbates the duty instruction problem by telling the

jury it need not find the required objective *or* subjective intent. The instructional error requires a new trial where the SEC must actually prove duty.

**B.    The district court erred in barring Mr. Panuwat from introducing testimony about Medivation's interpretation of its own Insider Trading Policy.**

Separately, the district court erred in barring Mr. Panuwat from introducing evidence about the Policy's meaning. At the very least, the Policy, which was central to the SEC's case because it defines Mr. Panuwat's duty to Medivation, is ambiguous—as the district court itself determined. And the Policy didn't prohibit Mr. Panuwat from trading Incyte securities, as testimony from Dr. Hung and Mr. Guernsey would have made clear. Mr. Panuwat thus cannot be liable for misappropriation. Excluding this testimony hamstrung Mr. Panuwat's defense on the crucial duty issue.

**1.    When contractual language is ambiguous, evidence about the parties' intent is relevant and admissible.**

California law (which governs the Insider Trading Policy, *supra* p. 45) requires that "[w]here contractual language is unclear and suggests several speculative interpretations, the scope of the language must be read in accordance with the parties' contemporaneous construction, and extrinsic evidence is admissible to show what the parties intended it to mean." *United*

*States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1411 (9th Cir. 1995). For instance, in *Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 643-44 (Cal. 1968), the Court reversed a jury verdict where the trial judge had "refused to admit" evidence "to explain the meaning of a written instrument." Because the contracting parties' intent is the touchstone of contract interpretation, if the trial court finds that a contract is "fairly susceptible" of multiple interpretations, then "extrinsic evidence relevant to prove either of such meanings is admissible." *Id.* at 645-46. Thus, courts confronting ambiguous contract language under California law regularly allow "witnesses to testify about their understanding of a contract when that understanding is not simply a private interpretation, but rather is founded in personal knowledge of the negotiations and the parties' expressed intent." *Onyx Pharmaceuticals, Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894, 897 (N.D. Cal. 2011) (emphasis omitted) (citing decisions); *see United States ex rel. Union Building Materials Corp. v. Haas & Haynie Corp.*, 577 F.2d 568, 572 (9th Cir. 1978).

California law isn't unique. Appellate courts regularly remand for a new trial where the trial court improperly excluded testimony from witnesses who could testify about the meaning of ambiguous contract terms.

*See, e.g.*, *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 389 (5th Cir. 2004) (Texas law).

> ## 2. The district court erred by barring Mr. Panuwat from introducing extrinsic evidence about the meaning of the Insider Trading Policy.

The Insider Trading Policy clearly permits Mr. Panuwat's trade. *Supra* pp. 45-48. But at worst, the Policy is ambiguous, and the district court was required to permit Mr. Panuwat to introduce extrinsic evidence about its meaning. The district court *agreed* that the Policy was ambiguous. It nonetheless barred Mr. Panuwat from presenting evidence from Medivation's founder and CEO or its outside counsel about the meaning of the Policy.

**a.** At summary judgment, the district court ruled that the Policy was susceptible to multiple meanings. Mr. Panuwat explained that the Insider Trading Policy prohibited trades only in securities of companies with a significant business relationship with Medivation. Dist. Ct. Doc. 63, at 28. The SEC, in contrast, argued that the Policy prohibited trading in all public companies. Dist. Ct. Doc. 70, at 27-29. The district court denied summary judgment, concluding that while Mr. Panuwat's interpretation "may persuade a jury," the Policy was ambiguous—it could also "allow[] for the SEC's interpretation." 3-ER-384-85. Reasoning that a jury "could find that

Panuwat breached the policy when he traded Incyte," the district court left the interpretation of the Policy to the jury. 3-ER-385.

Given that ruling, Mr. Panuwat sought to introduce testimony from Dr. Hung and Kenneth Guernsey, who were both involved in the Insider Trading Policy. 1-ER-32-33.

- Dr. Hung founded Medivation and was its CEO when Mr. Panu-wat was hired and signed the Insider Trading Policy. Dist. Ct. Doc. 63, at 29. At his deposition, Dr. Hung testified that the Pol-icy's language "seems like it applies to publicly traded companies with which the company has business dealings." 3-ER-365.

- Kenneth Guernsey was a law partner at Cooley who represented Medivation from 2009 to 2016. 3-ER-349. In his deposition, Mr. Guernsey testified that he advised Medivation about its Insider Trading Policy, and that he was outside counsel when the Policy was revised in 2014. 3-ER-337-38. Mr. Guernsey didn't believe the Policy was intended to sweep so broadly as to prohibit an employee from trading in a company without business dealings with Medivation. 3-ER-354-55.

Despite ruling that the Policy was ambiguous and presented a ques-tion for the jury, the district court barred Dr. Hung and Mr. Guernsey from testifying about the meaning of the Policy. While the court allowed Dr. Hung and Mr. Guernsey to testify about ancillary issues related to the Policy, like "trainings" and "enforcement," the court barred them from testifying about "the legal meaning of the policies." 3-ER-328. The court went further with

Mr. Guernsey, prohibiting him from testifying "about his understandings of the policies" at all. 3-ER-328 n.5.

That was error. Having concluded that the Policy was ambiguous, the district court was required to allow Mr. Panuwat to introduce evidence from witnesses with firsthand knowledge of the Policy. *Supra* pp. 64-66. That evidence includes testimony from the CEO and outside counsel of the company at the times the Policy was drafted and signed by Mr. Panuwat, and at the time of the trade. As noted, both of those proposed witnesses gave deposition testimony that the Policy permitted Mr. Panuwat's trades.

    **b.**    The district court's contrary reasoning was wrong. In denying the new trial motion, the court agreed that it was "critical that the jury understand the meaning of Medivation's internal policies." 1-ER-33. And the court recognized that it was excluding evidence from Dr. Hung and Mr. Guernsey about the meaning of the Policy. 1-ER-32-33. The court reasoned that it "wanted to avoid post hoc rationalizations, which would be irrelevant" to the jury's determination. 1-ER-34. But that reasoning lacks merit. What the court called a "post hoc rationalization" is evidence that this Court and others have recognized as highly relevant extrinsic evidence of the meaning of an ambiguous contract. *Supra* pp. 64-66. Indeed, the reason the

district court thought the evidence impermissible is exactly the reason why it *is* admissible—the understanding of parties involved in the contract proceedings is always relevant information that the jury must be allowed to hear to make sense of ambiguous text. *Supra* pp. 64-66. Relevant extrinsic evidence cannot be barred as an impermissible "post hoc rationalization" just because the testimony necessarily comes out at trial after contract formation. Nor could the district court exclude the testimony as after-the-fact understandings of the Policy, because, as explained, Dr. Hung and Mr. Guernsey both played a role in the adoption and enforcement of the Policy.

### 3. The error was prejudicial.

Barring Dr. Hung and Mr. Guernsey from testifying that the Policy did not prohibit Mr. Panuwat's trade was prejudicial and requires a new trial.

The Insider Trading Policy was the key document in the case. It sets the bounds of Mr. Panuwat's duty to Medivation. *Supra* pp. 55-56. And assuming the Policy doesn't unambiguously permit Mr. Panuwat's trades (*but see supra* pp. 45-48), then, by the district court's own account, the Policy is subject to multiple interpretations. 3-ER-385.

The error was highly prejudicial. The district court crushed Mr. Panuwat's defense by excluding testimony that would have resonated with the

jury—powerful evidence that *Medivation* did not think Mr. Panuwat owed it any relevant duty. Indeed, it's hard to imagine more persuasive evidence than testimony from the company's CEO and outside lawyer that the Policy allowed Mr. Panuwat's trade. The result was that Mr. Panuwat could argue nothing but contract interpretation—law—to the jury (and, again, law that requires judgment in his favor, *supra* pp. 31-59). Then in closing, the SEC claimed the Policy cemented Mr. Panuwat's duty to Medivation. 2-ER-284-85. And when defense counsel observed in closing that the jury didn't hear "from any Medivation employee about how to interpret [the] policy," the district court sustained the SEC's objection. 2-ER-308-09. Had the jury heard Dr. Hung's and Mr. Guernsey's testimony, in contrast, it likely would have found no relevant duty and thus found Mr. Panuwat not liable.

## CONCLUSION

The Court should reverse the judgment. Alternatively, it should vacate and remand for a new trial.

Dated: May 16, 2025                    Respectfully submitted,

                                       */s/ Parker Rider-Longmaid*

                                       Shay Dvoretzky
                                       Parker Rider-Longmaid
                                       Steven Marcus
                                       SKADDEN, ARPS, SLATE,
Jack P. DiCanio                          MEAGHER & FLOM LLP
Caroline Van Ness                      1440 New York Ave., NW
SKADDEN, ARPS, SLATE,                  Washington, DC 20005
  MEAGHER & FLOM LLP                   Telephone: 202-371-7000
525 University Ave.                    shay.dvoretzky@skadden.com
Palo Alto, CA 94301                    parker.rider-longmaid@skadden.com

          *Counsel for Defendant-Appellant Matthew Panuwat*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  | 24-6882

The undersigned attorney or self-represented party states the following:

◉  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Parker Rider-Longmaid | **Date** | 05/16/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                       - 72 -                       *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   24-6882

I am the attorney or self-represented party.

**This brief contains**   14,000   **words,** including   0   words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ Parker Rider-Longmaid   **Date**   05/16/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: May 16, 2025     Respectfully submitted,

*/s/ Parker Rider-Longmaid*

*Counsel for Defendant-Appellant
Matthew Panuwat*

[This page intentionally left blank.]

## INDEX OF ADDENDUM

**Page**

15 U.S.C. § 78j.................................................................................Add. 1

17 C.F.R. § 240.10b-5 ....................................................................Add. 3

# ADDENDUM

## 15 U.S.C. § 78j Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a)(1) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2) Paragraph (1) of this subsection shall not apply to security futures products.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

---

[1] So in original. Probably should be followed by a comma.

necessary or appropriate in the public interest or for the protection of investors.

(c)(1) To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2) Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or record-keeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit

fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78*o*, 78p, 78t, and 78u–1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

## 17 C.F.R. § 240.10b-5 Employment of manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

(Sec. 10; 48 Stat. 891; 15 U.S.C. 78j)