No. 24-6882

In the

# United States Court of Appeals
## for the Ninth Circuit

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MATTHEW PANUWAT,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of California, Case No. 3:21-cv-06322-WHO
Hon. William Horsley Orrick, *United States District Judge*

**DEFENDANT-APPELLANT MATTHEW PANUWAT'S
EXCERPTS OF RECORD: VOLUME 2 OF 3**

|  |  |
|---|---|
|  | Shay Dvoretzky |
|  | Parker Rider-Longmaid |
|  | Steven Marcus |
|  | SKADDEN, ARPS, SLATE, |
|  |   MEAGHER & FLOM LLP |
| Jack P. DiCanio | 1440 New York Ave., NW |
| Caroline Van Ness | Washington, DC 20005 |
| SKADDEN, ARPS, SLATE, | Telephone: 202-371-7000 |
|   MEAGHER & FLOM LLP | shay.dvoretzky@skadden.com |
| 525 University Ave. | parker.rider-longmaid@skadden.com |
| Palo Alto, CA 94301 |  |

*Counsel for Defendant-Appellant Matthew Panuwat*

**Joint Certification of Counsel Regarding Admitted Trial Exhibits,
Dist. Ct. Doc. 176 (Apr. 15, 2024)**

**SECURITIES AND EXCHANGE COMMISSION**
Monique C. Winkler (Cal. Bar No. 213031)
Susan F. LaMarca (Cal. Bar No. 215231) lamarcas@sec.gov
Bernard B. Smyth (Cal. Bar No. 217741) smythb@sec.gov
Jason M. Bussey (Cal. Bar No. 227185) busseyja@sec.gov
Matthew G. Meyerhofer (Cal. Bar No. 268559) meyerhoferm@sec.gov
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501
**ATTORNEYS FOR PLAINTIFF**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Jack P. DiCanio (SBN 138782) Jack.DiCanio@skadden.com
Caroline Van Ness (SBN 281675) Caroline.vanness@skadden.com
Andrew Woo (SBN 341604) Andrew.Woo@skadden.com
525 University Avenue, Suite 1400
Palo Alto, California 94301
**ATTORNEYS FOR DEFENDANT**

**SPERTUS, LANDES & JOSEPHS, LLP**
James W. Spertus (SBN 159825) jspertus@spertuslaw.com
Anthony Pacheco (SBN 128277) apacheco@spertuslaw.com
Maura L. Riley (SBN 319826) mriley@spertuslaw.com
Payton J. Lyon (SBN 305763) plyon@spertuslaw.com
Kirsi Luther (SBN 347279) kluther@spertuslaw.com
617 West 7th Street, Suite 200
Los Angeles, California 90017
**ATTORNEYS FOR DEFENDANT**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>MATTHEW PANUWAT,<br><br>        Defendant. | Case No. 3:21-cv-06322 WHO<br><br>**JOINT CERTIFICATION OF COUNSEL REGARDING ADMITTED EXHIBITS**<br><br>Judge:      Hon. William H. Orrick<br>Trial Date:   March 25, 2024<br>Time:       8:00 am<br>Place:      Courtroom 2, 17th Floor |

In compliance with Local Rule 5-1(g)(1)(A), Plaintiff Securities and Exchange Commission and Defendant Matthew Panuwat certify that the exhibits listed below and attached hereto (and, due to the size of the exhibits, to the related docket entries) are true and correct copies of the admitted exhibits that were submitted to the jury in the above-captioned matter.

| EXHIBIT | DESCRIPTION | DATE ADMITTED |
|---------|-------------|---------------|
| 1101 | Matthew Panuwat Merrill Lynch Brokerage Statement (account ending 4921 – August 2016) | March 27, 2024 |
| 1102 | Matthew Panuwat Merrill Lynch Brokerage Statement (account ending 4921 – September 2016) | March 27, 2024 |
| 1183 | Matthew Panuwat Merrill Lynch Trade Blotter (2012-2014) | March 27, 2024 |
| 1184 | Matthew Panuwat Merrill Lynch Trade Blotter (2015) | March 27, 2024 |
| 1185 | Matthew Panuwat Merrill Lynch Trade Blotter (2016) | March 27, 2024 |
| 1203 | Minutes of Meeting of Medivation Board of Directors (April 22, 2016) | March 27, 2024 |
| 1207 | Minutes of Meeting of Medivation Board of Directors (June 30, 2016) | March 27, 2024 |
| 1209 | Minutes of Meeting of Medivation Board of Directors (August 14, 2016) | March 27, 2024 |
| 1211 | Medivation Schedule 14A (April 28, 2016) | April 3, 2024 |
| 1213 | Medivation Schedule 14D-9 (August 30, 2016) | March 26, 2024 |
| 1216 | Email from Hayley Fahey (Sard) to Matthew Panuwat and others regarding Project Masterpiece Coverage (May 21, 2016) | March 26, 2024 |
| 1218 | Email from Hayley Fahey to Matthew Panuwat and others regarding Project Masterpiece Coverage (June 3, 2016) | April 4, 2024 |
| 1220 | Email from Hayley Fahey to Matthew Panuwat and others regarding Project Masterpiece Coverage (June 30, 2016) | March 26, 2024 |
| 1224 | Email from Hayley Fahey to Matthew Panuwat and others regarding Project Masterpiece Coverage (August 22, 2016) | April 4, 2024 |
| 1227 | Email from Millad Matin to Matthew Panuwat and others regarding Project Masterpiece Coverage (August 23, 2016) | March 29, 2024 |
| 1241 | Incyte Press Release reporting 2015 Fourth Quarter and Year End Financial Results (February 11, 2016) | March 28, 2024 |

| | | | |
|---|---|---|---|
| | 1245 | Email chain concluding with email from Matthew Panuwat to Jennifer Jarrett and others regarding Project X coverage (April 2, 2016) | March 26, 2024 |
| | 1247 | Eli Lilly PR Newswire Article titled "Phase 3 Study Findings Demonstrate Treatment with Baricitinib Results in Significant Improvements for Patients with Rheumatoid Arthritis Who Had Inadequate Response to Biologics (March 31, 2016) | March 28, 2024 |
| | 1251 | SunTrust Robinson Humphrey Analyst Report "Small, Profitable and the Next Big Biotech? Initiating a BUY & $56 PT" (April 5, 2016) | March 28, 2024 |
| | 1252 | Bank of America/Merrill Lynch Analyst Report "Medivation 1Q16 Earnings preview" (April 5, 2016) | March 28, 2024 |
| | 1253 | BMO Capital Markets Analyst Report for Incyte "Initiating Coverage at Outperform & $92 PT" (April 6, 2016) | March 28, 2024 |
| | 1254 | Cowen and Company Analyst Report for Incyte "Jakafi Gets A New Indication And A Price Increase" (April 6, 2016) | March 28, 2024 |
| | 1255 | JMP Analyst Report for Incyte "Investment Highlights" (April 6, 2016) | March 28, 2024 |
| | 1256 | Morgan Stanley Analyst Report for Incyte "Moving Jakafi into GVHD, An Area of High Unmet Need with Favorable Deal Terms" (April 6, 2016) | March 28, 2024 |
| | 1260 | Strategic Review Process (Draft) slide presentation (April 17, 2016) | March 27, 2024 |
| | 1262 | Project Masterpiece Board of Directors slide deck presentation (April 22, 2016) | March 27, 2024 |
| | 1266 | Evercore Presentation to Medivation Board of Directors regarding Project Masterpiece (April 28, 2016) | March 26, 2024 |
| | 1277 | Email from Conor Flemming to Matthew Panuwat and others with Project Masterpiece ISS Prep Pack (June 23, 2016) | March 26, 2024 |
| | 1288 | Email from David Hung to Matthew Panuwat and others forwarding Celgene proposal (August 8, 2016) | March 26, 2024 |
| | 1290 | Email chain concluding with email from Justin Ng to Jennifer Jarrett and others (copy Matthew Panuwat) with August 10 Board materials (August 10, 2016) | March 27, 2024 |
| | 1294 | Email from Steven Weiner to Matthew Panuwat and others with Project Masterpiece bid summary (August 12, 2016) | March 26, 2024 |
| | 1295 | Email chain concluding with email from Matthew Panuwat to Jennifer Jarrett regarding due diligence (August 12, 2016) | March 27, 2024 |

| 1296 | Email from Matthew Panuwat to Ed Baxter regarding Cezanne diligence call (August 12, 2016) | March 26, 2024 |
|---|---|---|
| 1297 | Email chain concluding with email and attachment from Nishant Saxena to David Hung and others (copy Matthew Panuwat) regarding diligence requests (August 12, 2016) | March 27, 2024 |
| 1301 | Email chain with email from Francois Maisonrouge to Matthew Panuwat and others regarding draft process letter (August 14, 2016) | March 26, 2024 |
| 1306 | Email chain concluding with email from Matthew Panuwat to David Hung and others regarding M call (August 17, 2016) | March 27, 2024 |
| 1308 | Email chain concluding with email from Matthew Panuwat to Jennifer Jarrett regarding slides for data room (August 17, 2016) | March 27, 2024 |
| 1309 | Email chain concluding with email from Ed Baxter to Matthew Panuwat and others regarding Gaugin call (August 17, 2016) | March 26, 2024 |
| 1320 | Email from Panuwat to Jesse Hershman re: Good to connect, with attachment (August 18, 2016) | April 4, 2024 |
| 1321 | Meeting invitation from Dominic Piscitelli to Matthew Panuwat and others regarding meeting to discuss LEK (August 18, 2016) | March 27, 2024 |
| 1328 | Email from Matthew Panuwat to Johanna Kleckner re: Adobe (August 18, 2016) | April 3, 2024 |
| 1330 | Email chain concluding with email from Matthew Panuwat to Johanna Kleckner re: Management rep letters for 2015 (August 18, 2016) | April 3, 2024 |
| 1333 | Email chain concluding with email from Andrew Powell to David Hung (copy Panuwat) regarding Picasso (August 18, 2016) | March 27, 2024 |
| 1334 | Email from Matthew Panuwat to Nishant Saxena and other re: TERRAIN Publication in European Urology (August 18, 2016) | April 3, 2024 |
| 1337 | Email from Matthew Panuwat to Nishant Saxena and others regarding Gauguin call (August 18, 2016) | March 27, 2024 |
| 1338 | Email chain concluding with email from Jamie Leigh to David Hung, Matthew Panuwat and others regarding Picasso (August 18, 2016) | March 26, 2024 |
| 1340 | Email chain concluding with email from Dominic Piscitelli to Jennifer Jarrett regarding status (August 18, 2016) | March 27, 2024 |
| 1343 | Email from Matthew Panuwat to Andy Potter and Dominic Piscitelli re: I assume we will not be needed to review tox slides - correct (August 18, 2016) | April 3, 2024 |
| 1344 | Email from Matthew Panuwat to Jennifer Jarrett and Johanna Kleckner regarding daily meeting (August 18, 2016) | March 27, 2024 |

| | | |
|---|---|---|
| 1345 | Email from Matthew Panuwat to David Hung attaching breast cancer study (August 18, 2016) | April 3, 2024 |
| 1371 | Matthew Panuwat executed Medivation Confidential Information and Invention Assignment Agreement (September 2, 2014) | March 27, 2024 |
| 1372 | Matthew Panuwat executed Medivation Policy Regarding Securities Trading By Company Personnel and Treatment of Confidential Information (September 2, 2014) | March 27, 2024 |
| 1384 | Incyte historical stock prices from 2014 through 2019 | April 3, 2024 |
| 1386 | Summary of Matthew Panuwat's Incyte trades | March 27, 2024 |
| 1404 | Email from Millad Matin to Panuwat and others re: FYI - CNBC: Squawk on the Street (August 12, 2016) | April 4, 2024 |
| 1408 | Email from Hayley Fahey to Matthew Panuwat and others re: Project Masterpiece Coverage (August 18, 2016) | March 29, 2024 |
| 1418 | Summary of Matthew Panuwat's securities trades before August 18, 2016 | March 27, 2024 |
| 1700 | SoFi - Guide to Leverage in Options Trading | April 4, 2024 |
| 2003 | Medivation, Inc. Policy Regarding Securities Trading by Company Personnel and Treatment of Confidential Information (Unexecuted) | March 27, 2024 |
| 2010 | Medivation Form 10-K (February 26, 2016) | April 3, 2024 |
| 2139 | Email from David Hung to Matthew Panuwat and others re: Matisse (August 8, 2016) | March 29, 2024 |
| 2141 | Email from Ed Baxter to Matthew Panuwat and others re: Matisse (August 8, 2016) | April 3, 2024 |
| 2156 | Email from Jennifer Jarrett to William Thiessen (cc: Matthew Panuwat) re: Gauguin Diligence Meetings (August 13, 2016) | April 3, 2024 |
| 2320 | Email from Hayley Fahey to Matthew Panuwat and others re: Project Masterpiece Coverage (July 28, 2016) | March 28, 2024 |
| 2601 | Email thread concluding with email from Matthew Panuwat to Dominic Piscitelli re: INCY (Buy): Buy INCY calls ahead of a key quarter for Jakafi (July 27, 2016) | March 29, 2024 |
| 2703 | This is Money article "MARKET REPORT: Whitebread shares froth up on talk the owner of Costa Coffee and Premier Inn is about to split" (March 22, 2016) | March 29, 2024 |
| 2705 | Reuters article "Medivation working with JPMorgan on takeover approaches: sources" (March 30, 2016) | March 29, 2024 |
| 2710 | Bloomberg News Article "AstraZeneca, Pfizer Said Among Firms Weighing Medivation Bid" (April 29, 2016) | March 29, 2024 |

JOINT CERTIFICATION OF COUNSEL
REGARDING ADMITTED EXHIBITS

5

SEC v. PANUWAT
CASE NO. 21-CV-06322-WHO

| | | |
|---|---|---|
| 2715 | Reuters article "BRIEF-Sanofi, Pfizer, Gilead & Celgene interested in Medivation - CNBC citing sources" (July 29, 2016) | March 29, 2024 |
| 2717 | Reuters article "Exclusive - Merck enters race for cancer drugmaker Medivation: sources" (August 17, 2016) | March 29, 2024 |
| 2718 | Citi Research Equities Report "Medivation's Last Supper? The 2Q16 Call May Be the Final Act as a Public Company" (August 10, 2016) | March 29, 2024 |
| 2719 | Leerink Report for Medivation "Xtandi Still Soft, Shifting Focus to PARP, Ests Cut, PT $64" (August 10, 2016) | March 29, 2024 |
| 2965 | List of Matthew Panuwat Investments Over $48,000 (2013-2020) | April 3, 2024 |
| 2966 | List of Matthew Panuwat Investments in 2016 | April 3, 2024 |
| 2967 | Spreadsheet containing Medivation's stock price history | April 3, 2024 |
| 2968 | Summary showing Incyte Stock Price (July 25, 2016 - September 23, 2016) | April 3, 2024 |
| 2969 | Summary of Deal-Related Emails Sent to Matthew Panuwat | April 3, 2024 |
| 2980 | Wire: Bloomberg First Word reporting "Incyte Gains Most Since Jan. 22 After RA Data Published in NEJM" (March 31, 2016) | March 28, 2024 |
| 2984 | Summary of Trades In Matthew Panuwat's Merrill Lynch Accounts (January 2008 – March 2020) | April 3, 2024 |

Respectfully submitted,

Dated: April 15, 2024          By:     /s/ Matthew Meyerhofer
                                       Bernard B. Smyth
                                       Jason M. Bussey
                                       Matthew Meyerhofer
                                       **SECURITIES AND EXCHANGE COMMISSION**
                                       *Attorneys for Plaintiff Securities and Exchange*
                                       *Commission*

Dated: April 15, 2024                  /s/ Anthony Pacheco
                                       Anthony Pacheco
                                       **SPERTUS, LANDES & JOSEPHS, LLP**
                                       *Attorneys for Defendant Matthew Panuwat*


## E-FILING ATTESTATION

I, Matthew Meyerhofer, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.


                                       /s/ Matthew Meyerhofer
                                       Matthew Meyerhofer

**Trial Exhibit 1333: E-mail from A. Powell to D. Hung, dated Aug. 18, 2016, Dist. Ct. Doc. 176-13**

| | |
|---|---|
| **From:** | Andrew Powell <Andrew.Powell@medivation.com> |
| **To:** | David Hung <David.Hung@medivation.com> |
| **CC:** | Huffines, Robert <robert.huffines@jpmorgan.com>;Gaito, Mike" <Mike.Gaito@jpmorgan.com>;Blesharski, Joshua R" <joshua.r.blesharski@jpmorgan.com>;Maisonrouge, Francois" <maisonrouge@Evercore.com>;Baxter, Ed <Ed.Baxter@Evercore.com>;Dominic Piscitelli <dominic.piscitelli@medivation.com>;Jennifer Jarrett <Jennifer.Jarrett@medivation.com>;Marion McCourt <marion.mccourt@medivation.com>;Matt Panuwat <matthew.panuwat@medivation.com>;Johanna Kleckner <johanna.kleckner@medivation.com>;Guernsey, Kenneth" <kguernsey@cooley.com>;Leigh, Jamie <jleigh@cooley.com> |
| **Sent:** | 8/18/2016 7:43:48 PM |
| **Subject:** | Re: Picasso |

Looks like we're on a promise ... so long as the lawyers stay out of it!

Sent from my iPhone

On Aug 18, 2016, at 12:19 PM, David Hung <David.Hung@medivation.com> wrote:

Doug Giordano just called.  Reiterated how much they really want this.  Only giving me a few head's up on the coming contracts.  He said:

1)  If we are going to put in 280Gs, they want it before signing and won't do it after signing.  So want it in this weekend.
2)  They want to work with us on retention to make sure that they hit the ground running and have us identify who's key to keep it that way
3)  They have some wording on retention bonuses in the contract
4)  If there is anything at all that bothers us in the contract (he said it is minimally marked up), he wants me to just call him directly and not get the lawyers involved.
5)  Ian will call me this afternoon to reiterate some of the same points.

Closed by saying that they were so impressed with our team and really want this.

David

**David Hung, M.D.**
**President and CEO**
**Medivation**
**525 Market Street, 36th Floor**
**San Francisco, CA  94105**

**Office:  (415) 829-4103**
**Cell:  (650) 245-3818**

FOIA Confidential Treatment Requested by J.P. Morgan Securities LLC

**EXHIBIT 1333-0001**
JPMS-00153-SEC-00043429

**Trial Exhibit 1371: Executed Medivation Confidential Information and
Invention Assignment Agreement, dated Sept. 2, 2014,
Dist. Ct. Doc. 176-21**



## MEDIVATION INC.
### CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

As an employee of Medivation, Inc., any of its subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of the compensation now and hereafter paid to me, I hereby agree as follows:

1. **Maintaining Confidential Information**

    a. **Company Information.** I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Company, any trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs (including source code and object code), data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants or licensees.

    b. **Third Party Information.** I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree during the term of my employment and thereafter, to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation (except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party) or to use it for the benefit of anyone other than for the Company or such third party (consistent with the Company's agreement with such third party) without the express prior written authorization of the Company.

2. **Retaining and Assigning Inventions and Original Works**

    a. **Inventions and Original Works Retained by Me.** I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively, the "Prior Inventions"), which belong to me, which relate to the Company's proposed or current business, products or research and development, and which

PFE_TES_00000393
**EXHIBIT 1371-0001**

are not assigned to the Company; or, if no such list is attached, I represent that there are no such inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a non-exclusive, royalty free, irrevocable, perpetual, or world-wide license to make, have made, sublicense, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

b.   Inventions and Original Works Assigned to the Company.

(i)   I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will transfer, convey, release and assign to the Company all my right, title, and interest, if any, in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company.

(ii)   If I have been employed by the Company for any period of time prior to the execution of this Agreement, by execution of this Agreement I hereby transfer, convey, release and assign to the Company all my right, title and interest, if any, in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets which I have solely or jointly conceived or developed or reduced to practice, or caused to be conceived or developed or reduced to practice, during the period of time that I have been employed with the Company. The inventions, original works of authorship, developments, concepts, improvements or trade secrets referred to in subsections (i) and (ii) and in subsection (i) above are collectively referred to as the "Inventions".

(iii)   I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

c.   Maintenance of Records. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the

PFE_TES_00000394
EXHIBIT 1371-0002

Company. The records will be available to and remain the sole property of the Company at all times.

     d.     **Inventions Assigned to the United States**. I agree to assign to the United States government all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

     e.     **Patent and Copyright Registrations**. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure and enforce the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

     f.     **Exception to Assignments**.  I understand that the provisions of this Agreement requiring assignment to the Company do not apply to any Invention which qualifies fully under the following provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as Exhibit B. I will advise the Company promptly in writing of any Inventions that I believe meet the criteria of the California Labor Code Section 2870 and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief.

     3.     **Conflicting Employment**.  I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or

FOIA Confidential Treatment Requested by Pfizer Inc.

PFE_TES_00000395

**EXHIBIT 1371-0003**

becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

4. **Returning Company Documents**. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to the Company, its successors or assigns.

5. **Representations**. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement (i) to keep in confidence pro-prietary information acquired by me in confidence or in trust prior to my employment by the Company or (ii) to assign Inventions to any former employer or any other third party. I will not disclose to the Company or use on its behalf any confidential information belonging to others. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

6. **Employee Solicitation**. I agree that for a period of six months from the date of termination of my employment with the Company that I will not, directly or indirectly, solicit or cause to be solicited for any person or entity other than the Company (i) any of the existing customers of the Company or (ii) any of the existing employees of the Company for purposes of obtaining their employment services; provided that clause (ii) above will not restrict me from soliciting customers of the Company in a line of business that is not substantially similar to the existing or future business of the Company.

7. **Equitable Relief**. I agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 1, 2, 4 and 6 herein. Accordingly, I agree that if I breach any of such Sections, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.

8. **General Provisions**.

a. Acknowledgment. I acknowledge that I have had the opportunity to consult legal counsel in regard to this Agreement, that I have read and understood this Agreement, that I am fully aware of its legal effect, and that I have entered into it freely and voluntarily and based on my own judgment and not on any representations, understandings, or promises other than those contained in this Agreement.

FOIA Confidential Treatment Requested by Pfizer Inc.

PFE_TES_00000396
**EXHIBIT 1371-0004**

    b.      **Governing Law.** This Agreement will be governed by the laws of the State of California without giving effect to the conflicts of law principles thereof.

    c.      **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

    d.      **Severability.** If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

    e.      **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

_____  9/2/14
**Employee Signature**                    **Date**

_____
**Employee Name**


_____
**Witness**

FOIA Confidential Treatment Requested by Pfizer Inc.

2-ER-77

PFE_TES_00000397

**EXHIBIT 1371-0005**

# EXHIBIT A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

**Name of Employee:**

FOIA Confidential Treatment Requested by Pfizer Inc.

2-ER-78

PFE_TES_00000398
**EXHIBIT 1371-0006**

**EXHIBIT B**

**CALIFORNIA LABOR CODE SECTION 2870**
**EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS**

"(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   (1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

   (2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Medivation, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, or licensees.

Date: _____

_____

(Employee's Signature)

_____

(Type/Print Employee's Name)

**Trial Exhibit 1372: Executed Medivation Policy Regarding Securities Trading by Company Personnel and Treatment of Confidential Information, dated Sept. 2, 2014, Dist. Ct. Doc. 176-22**



**POLICY REGARDING SECURITIES TRADING BY COMPANY PERSONNEL
AND TREATMENT OF CONFIDENTIAL INFORMATION**

This policy of Medivation, Inc. (together with its subsidiaries, the "***Company***") was adopted by the Company's Board of Directors (the "***Board***") on January 13, 2009 and subsequently amended by the Board, most recently on October 25, 2012.

*Note: This policy covers the legal prohibition on insider trading generally. Under a separate policy, we require (i) all Company personnel to limit their transactions in the Company's securities to defined time periods and (ii) all directors and all officers at the level of Vice President and above to obtain approval from the Company's Chief Financial Officer ("CFO") prior to engaging in transactions in the Company's securities and observe other restrictions designed to minimize the risk of apparent or actual insider trading.*

During the course of your employment, temporary assignment, consultancy or directorship with the Company, you may receive important information that is not yet publicly disseminated ("***inside information***"), about the Company or about other publicly-traded companies with which the Company has business dealings. Because of your access to this information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities (including not only stock but also debt securities such as convertible notes) or the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company, or to disclose such information to a third party who does so (a "***tippee***").

For anyone to use such information to gain personal benefit, or to pass on, or "tip," the information to someone who does so, is illegal regardless of the quantity of shares and is therefore prohibited. There is no *de minimis* test. Use of inside information to gain personal benefit and tipping are as illegal with respect to a few shares of stock as they are with respect to a large number of shares. You can be held liable both for your own transactions and for transactions effected by a tippee, or even a tippee of a tippee, whether or not you derive any personal benefit from the actions of the tippee. Furthermore, it is important that the **appearance** as well as the fact of insider trading be avoided. The only exception is that transactions directly with the Company, *i.e.,* option exercises for cash, are permitted. However, the subsequent **sale** or other disposition of such stock (including the

1

FOIA Confidential Treatment Requested by Pfizer Inc.

PFE_TES_00000401

EXHIBIT 1372-0001

sale of shares through a broker in a "cashless" option exercise) **is** fully subject to these restrictions.

As a practical matter, it is sometimes difficult to determine whether you possess inside information. The key to determining whether nonpublic information you possess about a public company is inside information is whether dissemination of the information would be likely to affect the market price of the issuer's securities or would be likely to be considered important or material by investors who are considering trading in that issuer's securities. Certainly, if the information makes **you** want to trade, it would probably have the same effect on others. Both positive and negative information can be material. If you possess inside information, you must refrain from trading in a company's securities, advising anyone else to do so or communicating the information to anyone else until you know that the information has been publicly disseminated. This means that in some circumstances, you may have to forego a proposed transaction in a company's securities even if you planned to execute the transaction prior to learning of the inside information and even though you believe you may suffer an economic loss or sacrifice an anticipated profit by waiting. "***Trading***" includes engaging in short sales, transactions in put or call options, hedging transactions and other inherently speculative transactions.

Although by no means an all-inclusive list, information about the following items may be considered to be inside information until it is publicly disseminated:

(a)    financial results or forecasts;

(b)    major new products or processes;

(c)    acquisitions or dispositions of businesses;

(d)    pending public or private sales of debt or equity securities or declaration of a stock split;

(e)    major contract awards or cancellations;

(f)    scientific, clinical or regulatory results;

(g)    top management or control changes;

(h)    possible tender offers or proxy fights;

(i)    significant writeoffs;

(j)    significant litigation;

(k)    impending bankruptcy;

(l)    gain or loss of a significant customer or supplier;

(m)    pricing changes or discount policies;

2

FOIA Confidential Treatment Requested by Pfizer Inc.

**EXHIBIT 1372-0002**

(n)   corporate partner relationships; and

(o)   notice of issuance of patents.

For information to be considered "publicly disseminated," it must be widely disclosed through a press release or a filing with the Securities and Exchange Commission, and a sufficient amount of time must have passed to allow the information to be fully disclosed.

This policy continues to apply to your transactions in the Company's securities or the securities of other public companies engaged in business transactions with the Company even after your employment, temporary assignment, consultancy or directorship with the Company has terminated. If you are in possession of inside information when your employment, temporary assignment, consultancy, or directorship terminates, you may not trade in the Company's securities or the securities of such other company until the information has become publicly disseminated or is no longer material.

Anyone who effects transactions in the Company's securities or the securities of other public companies engaged in business transactions with the Company (or provides information to enable others to do so) on the basis of inside information is subject to both civil liability and criminal penalties, as well as disciplinary action by the Company.

You should also not engage in any of the following activities with respect to securities of the Company:

- Purchases of Company securities on margin. This means borrowing from a brokerage firm, bank or other entity in order to purchase Company securities (other than in connection with a so-called "cashless" exercise of options under the Company's stock plans).

- Pledging the Company's securities as security for any loans or margining the Company's securities.   This means borrowing against the Company's securities as collateral to secure loans and includes holding the Company's securities in a margin account on which there is an outstanding margin loan. Such pledges also cannot be carried out through a 10b5-1 plan.

- Short sales of Company securities. This involves selling Company securities you do not currently own in the expectation that the price of the securities will fall, or as part of a hedge or arbitrage transaction.

- Buying or selling put or call options on Company securities, or entering into other derivative contracts. This includes options trading on any of the stock exchanges or futures exchanges, as well as customized derivative transactions with third parties.

3

FOIA Confidential Treatment Requested by Pfizer Inc.

PFE_TES_00000403

EXHIBIT 1372-0003

Unauthorized disclosure of internal information relating to the Company (including information regarding new products, the Company's partners, suppliers, customers, competitors or collaborators) could cause competitive harm to the Company and in some cases could result in liability for the Company.

- <u>Unauthorized disclosure</u>. You should not disclose internal information about the Company with <u>anyone</u> outside the Company, except as required in the performance of your regular duties for the Company. You should not post internal information about the Company on a "bulletin board" on the Internet or communicating about the Company and its business in Internet-based "chat" rooms.

- <u>Communications with the media, securities analysts and investors</u>. Communications on behalf of the Company with the media, securities analysts and investors must be made only by specifically designated representatives of the Company. Unless you have been expressly authorized to make such communications, if you receive any inquiry relating to the Company from the media, a securities analyst or an investor, you should refer the inquiry to the CFO.

- <u>Rumors</u>. Rumors concerning the business and affairs of the Company may circulate from time to time. Our general policy is not to comment upon those rumors. You should also refrain from commenting upon or responding to rumors and should refer any requests for comments or responses to the CFO.

- <u>Safeguarding confidential information</u>. Care must be taken to safeguard the confidentiality of internal information. For example, sensitive documents should not be left lying on desks, and visitors should not be left unattended in offices containing internal Company documents.

If you have questions about this policy, you should speak with your own attorney or the CFO. All employees, temporary employees, consultants and directors will be required to acknowledge their understanding of, and an agreement to comply with, this policy.

4

### TRADING WINDOW POLICY APPLICABLE TO
### ALL COMPANY PERSONNEL

### PRE-CLEARANCE POLICY APPLICABLE TO DIRECTORS AND OFFICERS AT THE LEVEL
### OF VICE PRESIDENT AND ABOVE

This policy of Medivation, Inc. (together with its subsidiaries, the "*Company*") was adopted by the Company's Board of Directors (the "*Board*") on January 13, 2009 and subsequently amended by the Board, most recently on October 25, 2012.

The Board believes that directors and employees of the Company should have a meaningful investment in the Company. As stockholders themselves, directors and employees are more likely to represent the interests of other stockholders. Likewise, officers and other employees may perform more effectively with the incentive of stock options or stock ownership.

However, from time to time, directors and employees will be aware of information that could be material to a stockholder's investment decision, but which in the best interests of the Company should not be disclosed until some later time. Hindsight can be remarkably acute, and an accusation can always be made that at any particular time a purchase or sale of securities by an insider was motivated by undisclosed favorable or unfavorable information. In such circumstances, the appearance of impropriety can be almost as problematic as an actual abuse, both to the Company and to the insider involved.

The Board has therefore determined that it would be useful to establish this policy for securities transactions by directors, officers and other employees.

**A.    WINDOW PERIOD APPLICABLE TO ALL COMPANY PERSONNEL.**

1. **Window Period Policy.** Generally, except as set forth in this paragraph A of this policy, directors and employees may buy or sell securities of the Company (including not only stock but also debt securities such as convertible notes) only during a "window" period that opens at the beginning of trading after at least one full trading day has elapsed following the public dissemination of the Company's quarterly financial results and closes at the close of trading on the last trading day that occurs at least 15 calendar days before the end of each quarter. This trading "window" may be closed early or may not open if, in the judgment of the Company's Chief Financial Officer ("*CFO*"), there exists undisclosed information that would make trades by members of the Company's directors or employees inappropriate. It is important to note that the fact that the trading "window" has closed early or has not opened should itself be considered inside information. A director or employee who believes that special circumstances require him or her to trade outside the "window" period should consult with the CFO or, in the case of a proposed transaction by the CFO, the Company's Chief Executive Officer ("*CEO*"). Permission to trade outside the "window" period will be granted only where the circumstances are extenuating

5

EXHIBIT 1372-0005

and there appears to be no significant risk that the trade may subsequently be questioned.

2. **Exceptions to Window Period.** The foregoing window period policy is subject to the exceptions described below.

a. **Option Exercises.** Directors and employees may exercise for cash options granted under the Company's stock option plans without restriction to any particular period. However, the subsequent **sale** of the stock acquired upon the exercise of an option (including a sale of stock in a "cashless" exercise) is subject to all provisions of this policy.

b. **10b5-1 Automatic Trading Plans.** Purchases or sales of the Company's securities made pursuant to, and in compliance with, a written plan established by a director or employee that meets the requirements of Rule 10b5-1 under the Securities Exchange Act of 1934 (the "***Exchange Act***") (a "***Plan***") may be made without restriction to any particular period provided that:

(i) the Plan must be in writing and signed by the person adopting the Plan;

(ii) the Plan must be established in good faith, in compliance with the requirements of Rule 10b5-1, at the time when the Company's trading window is open and such individual is not in possession of inside information about the Company;

(iii) the first trade made pursuant to the Plan may take place no earlier than 45 calendar days after adoption of the Plan;

(iv) the Plan must specify, or state a method for determining, the number of shares to be purchased or sold, the dates on which the securities are to be purchased or sold and the prices at which the securities are to be purchased or sold;

(v) the person adopting the Plan must acknowledge that, during the term of the Plan, he or she may not confer with any brokerage firm employees executing trades under the Plan regarding the Company or its securities;

(vi) the Plan must allow for the cancellation of a transaction and/or suspension or cancellation of the Plan upon request by the Company if any proposed trade (a) fails to comply with applicable laws (*e.g.*, exceeding the number of shares that may be sold under Rule 144 under the Securities Act of 1933) or (b) would create material adverse consequences for the Company; and

6

FOIA Confidential Treatment Requested by Pfizer Inc.                    PFE_TES_00000406

**EXHIBIT 1372-0006**

    **(vii)**    the Plan and any amendments to it must be reviewed by the Company prior to implementation, solely to confirm compliance with this policy and the securities laws, and the Company must be notified of any termination of the Plan.

**B.**    **PRE-CLEARANCE OR ADVANCE NOTICE REQUIREMENT APPLICABLE TO DIRECTORS, OFFICERS AT THE LEVEL OF VICE PRESIDENT AND ABOVE AND OTHER DESIGNATED EMPLOYEES.** In addition to the requirements of paragraph A above, the following pre-clearance and reporting requirements shall apply at all times to the Company's directors, all officers at the level of Vice President and above and all other employees designated by the CFO:

    **1.**    Persons subject to this requirement may not engage in any transaction in the Company's securities, including any purchase or sale in the open market, loan, pledge, hedge or other transfer of beneficial ownership, without first obtaining pre-clearance of the transaction on the day of the proposed transaction from the CFO (or, in the case of a proposed transaction by the CFO, the CEO).

    **2.**    Pre-cleared transactions not completed within five business days shall require new pre-clearance under the provisions of this paragraph. The Company may, at its discretion, shorten such period of time.

    **3.**    Notwithstanding paragraph 1 above, gifts of securities and exercises of outstanding stock options shall not require pre-clearance, but advance notice of an intent to make a gift or exercise an outstanding stock option shall be given to the CFO (or, in the case of a proposed gift or stock option exercise by the CFO, the CEO).

    **4.**    Upon the completion of any transaction in the Company's securities, directors, executive officers and others who are subject to reporting obligations under Section 16(a) of the Exchange Act ("*Section 16*") must notify the CFO or the CEO (as applicable), who will direct counsel to assist in complying with the applicable requirements.

**C.**    **PROHIBITION OF SPECULATIVE TRADING.** No director or employee may engage in short sales, transactions in put or call options, hedging transactions, margin accounts, pledges, or other inherently speculative transactions with respect to the Company's securities at any time.

**D.**    **COVERED INSIDERS.** The provisions outlined in this policy apply to all directors and employees of the Company and to such other individuals as the CFO or the CEO may designate from time to time because of their access to sensitive Company information. Generally, any entities or family members whose trading activities are controlled or influenced by any of such persons should be considered to be subject to the same restrictions.

7

FOIA Confidential Treatment Requested by Pfizer Inc.          PFE_TES_00000407

**EXHIBIT 1372-0007**

E.    **SHORT-SWING TRADING/SECTION 16 REPORTS.** Directors and executive officers subject to reporting obligations under Section 16 should take care not to violate the prohibition on short-swing trading (Section 16(b) of the Exchange Act) and the restrictions on sales by control persons (Rule 144 under the Securities Act of 1933, as amended) and should file all appropriate reports required by Section 16 (Forms 3, 4 and 5).

F.    **PROHIBITION OF TRADING DURING PENSION FUND BLACKOUTS.** In accordance with Regulation BTR under the Exchange Act, no director or executive officer of the Company shall, directly or indirectly, purchase, sell or otherwise acquire or transfer any equity security of the Company (other than an exempt security) during any "blackout period" (as defined in Regulation BTR) with respect to such equity security, if such director or executive officer acquires or previously acquired such equity security in connection with his or her service or employment as a director or executive officer. This prohibition shall not apply to any transactions that are specifically exempted from Section 306(a)(1) of the Sarbanes-Oxley Act of 2002 (as set forth in Regulation BTR), including but not limited to, purchases or sales of the Company's securities made pursuant to, and in compliance with, a Plan; compensatory grants or awards of equity securities pursuant to a plan that, by its terns, permits executive officers and directors to receive automatic grants or awards and specifies the terms of the grants and awards; or acquisitions or dispositions of equity securities involving a bona fide gift or by will or the laws of descent or pursuant to a domestic relations order; etc. The Company shall timely notify each director and executive officer of any blackout periods in accordance with the provisions of Regulation BTR.

**ACKNOWLEDGMENT**

The undersigned hereby acknowledges that he/she has read and understands, and agrees to comply with, the Policy Regarding Trades in Securities by Directors, Officers and Company Personnel and Treatment of Confidential Information.

Dated: _9/2/14_        Signature: _____

Print Name: _Matthew Pankurst_

8

FOIA Confidential Treatment Requested by Pfizer Inc.        PFE_TES_00000408

**EXHIBIT 1372-0008**

**Excerpts of E. Baxter's Trial Testimony, dated Mar. 26, 2024,
Dist. Ct. Doc. 160 (Apr. 5, 2024)**

PROCEEDINGS

```
 1              "E-mails lower in the chain generally are not in

 2        UTC but, instead, reflect the time zone of the sender

 3        or recipient.  When Daylight Savings Time is in

 4        effect, UTC is seven hours later than Pacific Time.

 5        For documents sent during Daylight Savings, to

 6        convert UTC to Pacific Time zone, one must subtract

 7        seven hours."

 8        Thank you, Your Honor.

 9              THE COURT:  Thank you.

10              MR. MEYERHOFER:  So the SEC will now call Edmund

11   Baxter, Your Honor.

12        (Edmund Baxter steps forward to be sworn.)

13              THE COURT:  Come on up to the witness stand, please.

14              THE CLERK:  If you'll step up to the witness stand,

15   I'm going to take your picture.

16              THE WITNESS:  Okay.

17                          EDMUND BAXTER,

18   called as a witness for the Plaintiff, having been duly sworn,

19   testified as follows:

20              THE COURT:  I do.

21              THE CLERK:  Be seated.

22        If you will please begin by stating your full name and

23   spelling it for the court reporter.

24              THE WITNESS:  Edmund, E-D-M-U-N-D, B-A-X-T-E-R.

25              MR. MEYERHOFER:  And, Your Honor, can I hand up the
```

BAXTER - DIRECT / MEYERHOFER

| | |
|---|---|
| 1 | witness binders? |
| 2 | **THE COURT:** Yes, please. |
| 3 | **DIRECT EXAMINATION** |
| 4 | BY MR. MEYERHOFER: |
| 5 | Q.   Good morning, Mr. Baxter. |
| 6 | A.   Good morning. |
| 7 | Q.   Thank you for being here today.  My name is Matt |
| 8 | Meyerhofer, and I'm going to ask you some questions. |
| 9 |     I want to start briefly with some background information, |
| 10 | though. |
| 11 |     Do you have a college degree? |
| 12 | A.   I do. |
| 13 | Q.   What is it? |
| 14 | A.   It's a bachelor of science in business administration as |
| 15 | well as a master's in business administration. |
| 16 | Q.   What do you do for a living? |
| 17 | A.   I'm an investment banker. |
| 18 | Q.   And what does that mean? |
| 19 | A.   I provide advisory services to corporate clients in the |
| 20 | biotechnology industry.  And advisory services is -- basically, |
| 21 | it can be anything from M&A activity, which is helping one |
| 22 | company acquire another or selling one company to another |
| 23 | company.  I help raise capital for these companies, things like |
| 24 | that. |
| 25 | Q.   And try to keep your answers slow today.  There's a court |

BAXTER - DIRECT / MEYERHOFER

```
 1   reporter.  I just want to make sure she gets everything.

 2   A.   Okay.

 3   Q.   You used the phrase "M&A."  Could you briefly explain,

 4   again, what that refers to?

 5   A.   It's an acronym for mergers and acquisitions.  The reason

 6   for the two words -- "mergers" is generally two companies of

 7   similar size that combine.  And "acquisition" is one company

 8   much larger than the other acquiring that company.

 9   Q.   And I believe, in one of your prior answers, you said you

10   advised biotech companies?

11   A.   Correct.

12   Q.   Could you explain that term, please?

13   A.   Biotechnology industry is the industry that helps develop

14   drugs for cures for diseases, and biotechnology versus

15   pharmaceutical, pharmaceutical is usually chemistry-based.

16   Biotechnology is biology-based.

17   Q.   And how long have you been in this line of work?

18   A.   More than 25 years.

19   Q.   What is the name of the firm that you work for?

20   A.   Evercore.

21   Q.   How long have you worked for Evercore?

22   A.   For almost nine years.

23   Q.   Over the course of your career, how many mergers or

24   acquisitions would you say that you've worked on?

25   A.   A couple of dozen, easily.
```

BAXTER - DIRECT / MEYERHOFER

```
 1    Q.   Thanks for walking us through that.

 2         Now, are you familiar with a company called Medivation?

 3    A.   Yes.

 4    Q.   What -- what was Medivation?

 5    A.   Medivation was a biotechnology company specifically

 6    focused on diseases in cancer.  And they had successfully

 7    gotten a drug approved called Xtandi for prostate cancer.

 8    Q.   Would you mind spelling that drug, just so we're sure the

 9    reporter has it?

10    A.   X-T-A-N-D-I.

11    Q.   Thank you.

12         Was Medivation a public company?

13    A.   Yes.

14    Q.   Could you explain briefly what it means to be a public

15    company?

16    A.   Public company is one that has stock which investors are

17    able to acquire in the market.  And information on that public

18    company is readily available via SEC-related channels.

19    Q.   Did Evercore ever do any work for Medivation?

20    A.   Yes.

21    Q.   When did that begin?

22    A.   In the spring of 2016.

23    Q.   Did you know anyone at Medivation before Evercore began

24    doing work for Medivation?

25    A.   Yes.  I knew several of the management team.
```

BAXTER - DIRECT / MEYERHOFER

1   Q.   Who specifically did you know?

2   A.   David Hung, Matt Panuwat, Jennifer Jarrett, Dominic

3   Piscitelli, and there were probably a handful of others.

4   Q.   All right.  So let me go through those individuals

5   briefly.

6        Who was David Hung?

7   A.   The CEO.

8   Q.   And who was Jennifer Jarrett?

9   A.   The CFO, chief financial officer.

10  Q.   Who was Dominic Piscitelli?

11  A.   The treasurer.

12  Q.   And what role did Matthew Panuwat have at Medivation?

13  A.   He was the head of business development.

14  Q.   When did you first meet Mr. Panuwat?

15  A.   It would have been more than a decade before that.  Matt

16  used to work for me at Merrill Lynch.

17  Q.   How long did you work together?

18  A.   About a decade in total, but on and off.  There was about

19  a year and a half when I had left B of A after the financial

20  crisis, but then I rejoined.

21  Q.   I think you used another acronym, B of A?

22  A.   Back of America.

23  Q.   Thank you.

24       Have you ever provided a job reference for Mr. Panuwat?

25  A.   I have, yeah.

**BAXTER - DIRECT / MEYERHOFER**

1   Q.   When, to the best of your memory, did that happen?

2   A.   Well, I offered to provide reference for Mr. Panuwat, but

3   I actually never received a call for the reference check.

4   Q.   Thank you for that clarification.

5        Do you consider Mr. Panuwat to be a friend?

6   A.   I do.

7   Q.   So I believe you said Evercore started working for

8   Medivation in the spring of 2016?

9   A.   Correct.

10  Q.   And how long did Evercore work for Medivation?

11  A.   The company was sold in August of 2016, so it would have

12  been between -- I believe it was the end of March, early April

13  through August of 2016.

14  Q.   And to what entity was Medivation sold?

15  A.   Pfizer.

16  Q.   And what kind of company is Pfizer?

17  A.   Pfizer is a large pharmaceutical company.

18  Q.   Now, how big of a team did Evercore have working on the

19  engagement for Medivation?

20  A.   We had a pretty sizable team.  I can't recall the exact

21  number of people, but ordinarily there's -- there's at least

22  five or six people that will be working on the deal on a

23  day-to-day basis.

24  Q.   And what was your role on that team?

25  A.   So I spearheaded the transaction.  I was responsible for

BAXTER - DIRECT / MEYERHOFER

1   the relationship of the transaction, but I didn't actually

2   produce the work product.  I supervised and oversaw the work

3   product associated with it.  I also had two colleagues that

4   were also partners who were involved in elements of the

5   transaction as well that did supervisory-related work and

6   advising counsel.

7   Q.   And which employees at Medivation did Evercore primarily

8   interact with?

9   A.   It would have been the senior leadership team, which

10  included the four I mentioned.  So David, Jennifer Jarrett,

11  Dominic, and Matt.

12  Q.   Any other names come to mind of people at Medivation that

13  Evercore worked with?

14  A.   I cannot recall.

15  Q.   Okay.  Now, what did Medivation initially hire Evercore to

16  do in the spring of 2016?

17  A.   We were hired to defend the company against a hostile

18  attack.  A hostile attack is one in which a would-be acquirer

19  wants to acquire the company but Medivation, the company, did

20  not want to be sold, did not feel the valuation was

21  appropriate.

22  Q.   And what was the name of the company that made this

23  attack?

24  A.   The company was called Sanofi, S-A-N-O-F-I.  It's a French

25  pharmaceutical company.

BAXTER - DIRECT / MEYERHOFER

1   Q.   Did Sanofi -- tell me what you remember about Sanofi's

2   initial attack in terms of the details?

3   A.   There were rumors before actual awareness.  The rumors,

4   I believe, started in March of 2016, that Sanofi was interested

5   in acquiring Medivation.  The rumors are what sparked my

6   outreach to management to see if the rumors were indeed true,

7   if we could be helpful in advising them in how to navigate the

8   process.

9   Q.   Did Sanofi say what it was willing to pay to acquire

10   Medivation?

11   A.   They did.  They first released a private letter to

12   management and the board.  And then after we rejected, the

13   management team and the board rejected the proposal, they then

14   released the proposal to the public.

15   Q.   And how much was Sanofi proposing to pay?

16   A.   It was $52.50 per share.

17   Q.   So can you give us a little bit more detail in terms of

18   the types of tasks that Evercore was engaged to perform in

19   responding to that proposal?

20   A.   So the point of a defense is to help the shareholders who

21   own stock in the company understand why management would reject

22   a proposal for $52.50 per share.  And so part of that defense

23   was to create an investor presentation that would walk you

24   through the components of value and what differentiates

25   Medivation from other companies in the industry and therefore

BAXTER - DIRECT / MEYERHOFER

```
 1    what makes it valuable or scarce as an asset.

 2    Q.   You said Sanofi made its proposal to purchase Medivation

 3    public?

 4    A.   Correct.

 5    Q.   When did it do that?

 6    A.   I don't recall the exact date.

 7    Q.   All right.  Mr. Baxter, can I ask you to turn to Tab 1213

 8    in the binder.

 9         Do you know what this document is?

10    A.   It would appear to be the 14D-9 of the acquisition of

11    Medivation by Pfizer.

12    Q.   Can you briefly explain what you understand a 14D-9 to be?

13    A.   This document is used to help shareholders understand the

14    nature of the transaction and the sale process.  It gives

15    background information on the other parties that may have been

16    involved in the transaction.  It gives background on the

17    valuations that were proposed to acquire the company and how an

18    ultimate conclusion became -- that the board and the management

19    team elected to recommend the sale of the company to Pfizer.

20         Ultimately, shareholders have to vote on that.  It doesn't

21    happen without the shareholder vote, and this document is meant

22    to help shareholders understand, before they vote, what they're

23    voting for.

24    Q.   Have you reviewed this particular document before?

25    A.   I have.
```

BAXTER - DIRECT / MEYERHOFER

 1    Q.    And are you familiar with Incyte Corporation?

 2    A.    I am, yes.

 3    Q.    What is Incyte?

 4    A.    It's a -- it's a biotechnology company in our industry

 5    that also pursues drug development for cancer, but it also has

 6    a business that works on inflammation.  So there are

 7    multiple -- multiple areas of business that they're in, but it

 8    was one of the comparables that we used for the valuation of

 9    Medivation.

10    Q.    In 2016, did Incyte have a cancer drug that was approved

11    and available for commercial use?

12    A.    They did have a commercial drug, yes.

13    Q.    What was it called?

14    A.    Jakafi, I believe.  I can't recall for sure.  I think

15    that's --

16    Q.    What did -- what did it treat?

17    A.    J-A-K-A-F-I.

18          Oh, boy.  It was blood cancer.  I can't recall

19    specifically.  MF, I believe.

20    Q.    But just to make -- we were kind of talking over each

21    other, so I just want to make sure the record is clear.

22          So at this time, 2016, Incyte had a product approved to

23    treat a blood cancer?

24    A.    Correct.

25    Q.    Now, a little bit earlier, we talked about Medivation

BAXTER - DIRECT / MEYERHOFER

```
 1  board of director meetings.  And I believe you said that you

 2  attended those meetings during the process of Evercore's

 3  engagement by Medivation; right?

 4  A.    Correct.  Myself and others -- and/or others of my team.

 5  Q.    Did Evercore typically prepare written materials to use at

 6  those meetings?

 7  A.    We did, in conjunction with JPMorgan.

 8  Q.    Can I ask you to please turn to Exhibit 1266 in your

 9  binder.

10        Do you recognize Exhibit 1266?

11  A.    Yes.

12  Q.    Could you briefly describe what this is?

13  A.    This is a presentation that Evercore presented to the

14  board of directors of Medivation with respect to the

15  unsolicited proposal by Sanofi.

16  Q.    Evercore prepared this document?

17  A.    This is a document that was prepared by Evercore, yes.

18  Q.    Did you help prepare this document?

19  A.    I -- I helped oversee the preparation of the document and

20  reviewed the document, but my team actually handled the actual

21  preparation of the material -- the information that went into

22  the document.

23  Q.    But you said you reviewed it?

24  A.    Yes.

25  Q.    And at the time you arrived the document, were you
```

BAXTER - DIRECT / MEYERHOFER

1    generally knowledgeable about its contents?

2    A.   Yes.

3    Q.   And were the other Evercore personnel who worked on this

4    document, were they also generally familiar with the document's

5    contents?

6    A.   Yes.

7    Q.   Evercore regularly advises companies evaluating and

8    responding to acquisition proposals; right?

9    A.   Correct.

10   Q.   And is this kind of document something that Evercore

11   typically prepares as part of its practice advising companies?

12   A.   Yes, it would be.

13   Q.   What's the date of this document?

14   A.   April 28.

15   Q.   And was this document prepared, you know, around the same

16   time of -- that this document is dated?

17   A.   Yeah, it would have had been a -- it would have taken a

18   couple of weeks to produce, but, yes, that's correct.

19   Q.   And was this particular document used at a Medivation

20   board of directors meeting?

21   A.   Yes, this was a presentation to the board of directors to

22   assess the unsolicited proposal by Sanofi.

23   Q.   What -- and what was the date of that meeting?

24   A.   I thought it was the 28th.

25   Q.   Did members of Medivation's management attend that

BAXTER - DIRECT / MEYERHOFER

1    meeting?

2    **A.**    Yes.

3    **Q.**    Did Mr. Panuwat attend that meeting?

4    **A.**    Yes.

5              **MR. MEYERHOFER:**  Your Honor, I'd like to move

6    Exhibit 1266 into evidence.

7              **MR. PACHECO:**  Objection.  Hearsay, foundation.

8              **THE COURT:**  Overruled.  It's admitted.

9         (Trial Exhibit 1266 received in evidence.)

10   **BY MR. MEYERHOFER:**

11   **Q.**    Did Mr. Panuwat typically attend Medivation board of

12   director meetings?

13   **A.**    I don't know about typically, but he was involved during

14   the process.

15   **Q.**    Was Mr. Panuwat given an opportunity to review this

16   presentation before it was used at the board meeting?

17   **A.**    I can't recall if he had an opportunity to review it, but

18   he did participate in -- in the selection process as we thought

19   about comparables for the valuation work.

20   **Q.**    Can I ask you to please turn to the page numbered

21   1266-0018.

22        Mr. Baxter, do you see, at the top of the page, where it

23   says, "WACC analysis"?

24   **A.**    Yes.

25   **Q.**    What does WACC stand for?

BAXTER - DIRECT / MEYERHOFER

1    **A.**    It stands for weighted average cost of capital.

2    **Q.**    Weighted average cost of capital.

3         Okay.  Could you just explain for the jury at a very high

4    level what the purpose is of an analysis like this?

5    **A.**    This helps us to ascertain the relative risk of an

6    investment by a shareholder into Medivation versus other

7    potential investments that it could make.  And then that gets

8    used to discount the cash flows of the company to determine its

9    valuation.

10   **Q.**    So it's a process for coming up with a value of

11   Medivation?

12   **A.**    Correct.

13   **Q.**    And do you see, in the upper right-hand part of this

14   document, there's a box titled, "Selected Peers"?

15   **A.**    Yes.

16   **Q.**    What role -- again at a high level, what role do the

17   selected peers play in this analysis?

18   **A.**    So these are comparable companies to Medivation.  Our

19   best -- our best ability to attain similar -- companies that

20   are similar in terms of the business, the size, the scope,

21   whether or not they generate revenues.  And then the financial

22   theory behind it is that they should carry similar risk

23   characteristics, and so if we can ascertain the cost of

24   capitals of those other companies, it can be an inference to

25   the cost of capital of Medivation, and then that gets used to

BAXTER - DIRECT / MEYERHOFER

```
 1   value the company.
 2   Q.   And of these six companies, are there any of them that are
 3   closer peers to Medivation than the others?
 4   A.   It depends on the definition of peer.  We insert the word
 5   "selected" purposefully because there's a balance here between,
 6   you know, trying to find enough of a sample set of companies to
 7   be reflective of a true sample set.
 8        You know, in an ideal world -- Medivation, for example, in
 9   an ideal world, you would just simply select companies that are
10   revenue generating, are profitable, and are similarly sized,
11   but the -- you know, then you wouldn't have any comparables;
12   right?
13        Then you'd go one step further from that, which is, okay,
14   how about companies that are predominantly focused on oncology
15   and generating revenues but maybe they aren't profitable, and
16   that's when Incyte and Seattle Genetics become a peer.  And
17   then that's still too small of a group, so then we look to
18   other elements; and so Alexion, Vertex, Actelion, BioMarin are
19   companies that are similarly sized, are generating revenues.
20   They are biotechnology companies; they just work on different
21   disease areas from cancer.
22   Q.   So Incyte and Seattle Genetics are the only two cancer
23   oncology companies on this list?
24   A.   On this list, yes.
25   Q.   And given the metrics that you listed in terms of how peer
```

BAXTER - DIRECT / MEYERHOFER

1  companies were identified, are there any other -- or I should

2  say, in 2016, were there any other cancer companies that should

3  have gone on this list but aren't reflected here?

4  A.   Not to my knowledge.

5  Q.   And in 2016, did Seattle Genetics have a product that was

6  approved and available for commercial use?

7  A.   Yes, but I don't recall the name of it.

8  Q.   Okay.  And if I could get you to turn to just the next

9  page of the document, the one with the page Number 1266-1019.

10      And you see the title of that slide is "Public Company

11  Trading Multiples"?

12  A.   Yes.

13  Q.   So, again, at a similarly high level, can you please

14  explain to the jury what the purpose or the function of this

15  slide is?

16  A.   So unlike the prior slide, which was used to ascertain a

17  cost of capital, this slide just simply looks at the various

18  measures of each of the companies to try to compare them to one

19  another.  So you see the different columns, percentage of

20  52-week high, it just shows how is the stock trading relative

21  to, you know, where it had been for a high.

22      All the way to the right-hand side of the page, which is

23  one of the more important metrics, which is TEV, which stands

24  for total enterprise value, divided by NTM revenue, which is

25  next 12 months' revenue.  So that goes back to my point about

BAXTER - DIRECT / MEYERHOFER

1    finding revenue-generating companies and then you look to see

2    how they're trading relative to the revenue that they are

3    generating.

4         And so what you can see on the page is that the mean and

5    median of these comparable companies are trading at higher than

6    where -- where Medivation was trading and where the offer for

7    Medivation came.  The -- excuse me, the 52.50 offer.  So going

8    back to my comment at the beginning where I stated that we knew

9    the 52.50 proposal was not fair to shareholders, this was one

10   of the bases of the analysis, because the offer itself is below

11   where there their peers are simply trading in the marketplace

12   without somebody trying to come and acquire it.

13   Q.   And you mentioned Medivation.  Where does Medivation

14   appear on this slide?

15   A.   It's -- the bottom two rows mentioned "Van Gogh" and

16   "offer."

17   Q.   That Van Gogh, that's another one of those code word

18   references?

19   A.   Yes, for Medivation.

20   Q.   And so I appreciate all that detail, but to boil it down,

21   this slide is another way of attempting to derive a value for

22   Medivation?

23   A.   Correct.

24   Q.   And in terms of comparing to other companies, it's this --

25   is it the same six companies we saw in the previous slide?

BAXTER - DIRECT / MEYERHOFER

1   A.   Yes.

2   Q.   And, again, just very briefly, why is it the same six

3   companies?

4   A.   Because, again, we're trying to find companies that have

5   similar characteristics, similar revenue, scale, similar lines

6   of business, similar trading values within -- you know, there

7   are error bars on any of this type of work but we do our best

8   to come up with as large of a sample set as we can.

9         MR. MEYERHOFER:   All right.   Thank you, Taylor, you

10  can take that -- or Mr. Taylor, you can take that document

11  down.

12  BY MR. MEYERHOFER:

13  Q.   Did there -- Mr. Baxter, did there come a point in the

14  Medivation process where Medivation met with an entity called

15  ISS?

16  A.   Yes.

17  Q.   Could you very briefly explain for the jury what ISS is

18  and what it does?

19  A.   Simply stated, it's a -- it's an organization that rates

20  companies and their boards in terms of fiduciary obligations to

21  shareholders.

22  Q.   And how was ISS relevant to the ongoing process with

23  Medivation?

24  A.   Because, at the time, this was a public fight, Sanofi

25  trying to hostilely acquire Medivation, and Medivation not

**BAXTER - DIRECT / MEYERHOFER**

1  wanting to be sold at $52.50.  ISS can serve as an independent

2  body to help shareholders understand, if the board and

3  management of Medivation are making decisions that are truly in

4  the best interest of their shareholders, that they abide by a

5  certain fiduciary hurdle.

6      And so often in these cases, you will have management meet

7  with ISS and walk ISS through the logic and the regimen that

8  Medivation had on why they were rejecting the Sanofi proposal.

9  Q.   And at the point in time when ISS was relevant, was this

10  before Medivation had started reaching out to other potentially

11  interested buyers in a formal way?

12  A.   Yes, it was.

13  Q.   It was when the only company that had put out -- forward a

14  proposal was Sanofi?

15  A.   Correct.

16  Q.   Can I ask you to please turn to Exhibit 1277 in your

17  binder.  And when you've gotten there, let us know if you

18  recognize this document.

19  A.   I do.

20  Q.   What is this document?

21  A.   This is the -- what we call the ISS prep pack.

22  Q.   What is the ISS prep pack used for?

23  A.   So this is the document that we put together to inform the

24  management of Medivation about what ISS is, and then also what

25  our recommendation is on how we would interact with ISS to

BAXTER - CROSS / PACHECO

```
 1    value of the company.
 2         But not -- not disclosing information about the
 3    confidential nature of the process.  I don't recall disclosing
 4    anything of that nature.
 5    Q.   So when you talked about scarcity value -- and that
 6    information was shared with the street, so to speak, about this
 7    particular transaction; did I understand your testimony?
 8    A.   Well, I'm not sure I'd use the word "information."
 9         That perspective was shared with the investment community.
10    Q.   So scarcity value wasn't some secret thing.  It was
11    something that was willingly conveyed by the company and the
12    bankers to the investing community?
13    A.   I believe that's fair.
14              THE COURT:  Mr. Pacheco, is this a good time to take a
15    break?
16              MR. PACHECO:  Thank you, Your Honor.
17              THE COURT:  All right.  So, ladies and gentlemen,
18    we'll take our second break.  It's now noon by my watch, and
19    we'll be back at 12:15.
20         Please remember the admonitions.  Don't talk about the
21    case amongst yourselves, but enjoy your break.
22              (The jury leaves the courtroom.)
23         (Proceedings were heard out of the presence of the jury.)
24              THE COURT:  All right.  We'll be in recess.
25              (Recess taken at 12:01 p.m.)
```

BAXTER - CROSS / PACHECO

```
 1              (Proceedings resumed at 12:17 p.m.)

 2      (Proceedings were heard out of the presence of the jury.)

 3          THE CLERK:  Please come to order.

 4          THE COURT:  Mr. Pacheco, are you ready to go?

 5          MR. PACHECO:  We're ready.

 6          THE COURT:  All right.

 7              (The jury enters the courtroom.)

 8      (Proceedings were heard in the presence of the jury.)

 9          THE COURT:  All right.  Please be seated, everybody.

10      Mr. Pacheco, please proceed.

11          MR. PACHECO:  Thank you, Your Honor.

12  BY MR. PACHECO:

13  Q.   Mr. Baxter, there were some questions and testimony about

14  peer companies.

15       Do you remember that testimony?

16  A.   Yes.

17  Q.   And how those companies were selected?

18  A.   Yes.

19  Q.   And so that I get it right, is there anything in your mind

20  scientific about the selection of those companies?

21  A.   Well, it's a -- I think it's a combination of art and

22  science.  You try to -- you try to make it as scientific as

23  possible, but when the -- when the sample set is too small,

24  then it becomes less relevant, so then you expand.

25       And that's what I -- when I refer to the art, that's
```

BAXTER - CROSS / PACHECO

1    including companies like an Alexion or a BioMarin, which are

2    not -- not comparable in the sense that they aren't cancer

3    companies.  But they were included, nonetheless, because they

4    are similar in that they generate revenues in biotechnology

5    that should be of interest to -- to plaintiff, ultimately.

6    Q.    The selection of these peer companies was, in your words,

7    a combination of science and art?  Yep?

8    A.    Yes.

9    Q.    Would you describe that process as a rough triangulation

10   to figure out those peer companies to include in the chart or

11   in your analysis?

12   A.    I'm not sure what you mean, "rough triangulation."  There

13   aren't that many companies to begin with, right?  So -- that

14   have the same size and scale.  So it's a small group.

15   Q.    And you looked at a slide that talked about selected

16   peers.  And did that slide in any way provide information about

17   whether the companies listed on that slide -- whether their

18   stock prices moved in any way?

19   A.    No.  There is a beta -- something called a beta on that

20   page, which shows how stock prices -- an individual company

21   might move relative to the market, but not to one another.

22   Q.    But the exercise about selected peers, was that an

23   evaluation that was done to look at stock prices, for example,

24   to help an investor decide whether or not to buy stock?

25   A.    No.  It's a different calculus.

BAXTER - CROSS / PACHECO

1   Q.   And, in fact, in conducting the valuation work for

2   Medivation, did Evercore intend to provide information to

3   investors about trading stocks in any of the identified

4   companies in the slide?

5   A.   No.

6   Q.   And that selected peer slide, did it have anything to do

7   whatsoever whether -- with whether any of those companies would

8   likely be acquired or not?

9   A.   That was not part of the analysis in choosing those

10   companies.

11   Q.   And as part of its work for Medivation, did Evercore do

12   anything to determine if the identified peer companies would be

13   acquired?

14   A.   Not -- not to my knowledge.

15   Q.   I would like to look at --

16        MR. PACHECO:  Your Honor, it's already been published.

17   BY MR. PACHECO:

18   Q.   -- SEC Exhibit 1266.  And if I could, sir, have you turn

19   to page 18.

20        MR. PACHECO:  And, Mr. Shorr, could you put that up on

21   the screen?

22   BY MR. PACHECO:

23   Q.   Do you remember seeing that slide when the SEC lawyer

24   asked you questions?

25   A.   Yes.

**BAXTER - CROSS / PACHECO**

1    Q.    And where did the information for the creation of this

2    slide come from?

3    A.    It's footnoted, the sources.  It's publicly available

4    information from FactSet, Bloomberg, Ibbotson, Duff & Phelps.

5    And the companies own -- each of the companies own public

6    filings with the SEC.

7    Q.    Is it accurate that all of the information on this slide

8    comes from publicly available sources like Bloomberg?

9    A.    Yes.

10    Q.    And for the valuation slides, did the information generate

11    from public sources?

12    A.    For the peer companies, yes, not for Medivation.  That

13    came from the management team, as we used the projection

14    profile for the management team.

15    Q.    But for all of the peer companies, that information came

16    from publicly available information?

17    A.    Yes.

18    Q.    If we can turn to page 19, same document.

19          Do you remember seeing this particular slide, Mr. Baxter?

20    A.    Yes.

21    Q.    And do you see the same footnote, and can you read that

22    footnote, please?

23    A.    Yes.  It says, "FactSet consensus estimates as of

24    April 26, 2016, company filings, company press releases, and

25    Van Gogh, which is Medivation revenue from management

BAXTER - CROSS / PACHECO

```
 1    estimates."
 2    Q.    So did the information for this slide about all of the
 3    companies except Medivation come from publicly available
 4    sources?
 5    A.    Yes.
 6    Q.    And the management estimates, where did they come from
 7    for -- for Medivation?
 8    A.    That would be the Medivation management for --
 9    specifically for the Medivation numbers and the green bars.
10    Not the other -- not the other companies.
11    Q.    I'm sorry.  I didn't hear you.
12    A.    The management estimates referred to here are specifically
13    on Medivation's revenue, and they came from the management team
14    of Medivation.  Medivation's management team did not opine on
15    the revenues of the competitors.
16    Q.    I see.
17          And Medivation's -- Medivation was a publicly traded
18    company; is that right?
19    A.    Yes.
20    Q.    And did Medivation share its revenue numbers with the
21    public?
22    A.    Medivation, as part of the strategy, shared a long-term
23    revenue target with the public.  I can't remember specifically
24    when that took place, but it was a defense strategy against
25    Sanofi.
```

**BAXTER - CROSS / PACHECO**

1   Q.   And on that particular slide we were looking at, can you

2   tell us whether or not that slide was used to determine whether

3   the companies listed in that particular slide -- whether their

4   stock prices moved together?

5   A.   No.

6   Q.   And you never evaluated -- you -- Evercore never evaluated

7   that as part of the valuation exercise that you did on behalf

8   of Medivation; is that right?

9   A.   That's correct.

10  Q.   And in conducting its work for Medivation, did Evercore

11  intend to provide information to investors about trading in

12  Medivation?

13  A.   No.

14  Q.   And nor about trading in the stock of any other company;

15  is that true?

16  A.   Correct, no.

17  Q.   And did that slide that the SEC showed you -- is there

18  anything in there that -- is there anything about that slide --

19  that it had anything to do with whether any of the companies

20  identified would be acquired?

21  A.   No.

22  Q.   And did that slide provide information about whether

23  Medivation's acquisition would impact those particular

24  companies' stock prices?

25  A.   No.

**BAXTER - CROSS / PACHECO**

1  Q.   And what does that slide that we showed you -- what does

2  it mean, if anything, about whether the stock prices in any of

3  those companies are in any way correlated?

4  A.   It -- it doesn't show correlation.

5  Q.   And that slide doesn't show anything about the likelihood

6  that these companies will be acquired by another company; is

7  that true?

8  A.   That's true.

9  Q.   For an acquisition to become final, what has to happen?

10  A.   Are you referring to the time of announcement to the close

11  of the transaction?

12  Q.   I'll ask a better question, Mr. Baxter.  Sorry about that.

13       In terms of -- does the board have to approve, for a

14  publicly traded company, an acquisition before it can

15  materialize and happen?

16  A.   Yes.

17  Q.   And if the board at any point, for whatever reason,

18  decides not to approve a deal, then is it fair that then

19  there's no deal?

20  A.   Almost.  Because the shareholders could still make their

21  own decision independently to the board's decision.

22  Q.   Okay.  And in the Medivation situation, the shareholders

23  weren't looking to make a deal, correct?  It was the -- I'll

24  stop there.

25       Is that right?

BAXTER - CROSS / PACHECO

```
 1   A.   Can you repeat that?

 2   Q.   The shareholders weren't looking to make a deal in the

 3   Medivation acquisition.  This was a board-considered process?

 4   A.   Once the board initially rejected the public proposal by

 5   Sanofi, the board went inward.  We didn't -- we didn't make a

 6   recommendation to our shareholders or managing -- and the board

 7   did not make a recommendation to their shareholders until the

 8   announcement of the transaction with Pfizer.

 9   Q.   How big is the Pfizer board?

10   A.   It's much larger, but I can't recall how large it is.  But

11   it's much larger than Medivation's.

12   Q.   And Medivation's board was six or seven people?

13   A.   Somewhere in that range.

14   Q.   And Pfizer's would be multiples bigger?

15   A.   Probably twice as large would be my guess.

16   Q.   And in terms of -- once a board approves an acquisition,

17   is then the next step a merger agreement has to be finalized?

18   Is that right?

19   A.   The merger agreement is actually signed on the

20   announcement of the transaction.  Depending on the terms within

21   the merger agreement, it's possible that the transaction

22   doesn't get to close.

23   Q.   So there could be a merger agreement in place, but the

24   transaction still doesn't close; is that correct?

25   A.   That is correct.
```

**BAXTER - CROSS / PACHECO**

1  Q.   I believe counsel asked you, in your experience, how many

2  mergers and acquisitions you worked at and -- while you were at

3  Evercore; is that correct?

4  A.   I think he asked what has been my experience in mergers

5  and acquisitions, yes.

6  Q.   And I believe you said you had --

7  A.   A couple dozen.

8  Q.   -- a couple dozen.  And of those couple dozen, did they

9  always close?

10  A.   Well, yes.  Because those were announced and completed.

11  There's lots of deals that I've worked on historically that we

12  thought would get to an announcement and to a closure but then

13  did not.

14  Q.   And the deals that didn't close, did they close -- not

15  close, in your experience, the ones you worked on, later in the

16  process or earlier in the process?

17  A.   Probably earlier in the process something goes --

18  something goes awry in the process that prevents us from

19  continuing, whether the values, just even with repeated rounds

20  of bidding, don't get to an appropriate level that the board is

21  willing to engage on or something might happen.  There might be

22  some business interruption that would require a pause to make

23  the acquisition, that sort of thing.

24  Q.   Did you ever, in your experience, ever work on a deal that

25  didn't close in the final stages, maybe around confirmatory

**BAXTER - CROSS / PACHECO**

1   diligence?

2   **A.**    I don't think so, not to my recollection.

3   **Q.**    Did you work on mergers and acquisions prior to your

4   time at Evercore?

5   **A.**    Yes.

6   **Q.**    How many mergers and acquisitions did you work on at that

7   point?

8   **A.**    A couple of dozen is my entire -- my entire experience.

9   **Q.**    For the entire --

10   **A.**    Right.

11   **Q.**    Even before Evercore; is that right?

12   **A.**    Right.

13   **Q.**    Now, did you work on a deal, Mirati/Bristol-Myers?

14   **A.**    I was not personally involved in that transaction, but my

15   partner was, yes.

16   **Q.**    And did that deal fall through at the late stages?

17   **A.**    The deal complete -- the deal closed, but it took -- it

18   took time for the deal to close.

19   **Q.**    When you say "it took time," it extended beyond what was

20   originally anticipated?

21   **A.**    That's correct.  I mean, there's a public filing now that

22   details, just like in our situation for Medivation, the 14D-9

23   for Mirati, which highlighted that -- that, you know, Mirati

24   had been in conversations with our client, Bristol-Myers, a

25   couple of years prior, but conversations broke down and then

BAXTER - CROSS / PACHECO

1    reemerged again as a much lower valuation than the original

2    talked-about price.

3    Q.   Was the -- I'm taking you back now to Sanofi.

4         Was the Sanofi hostile bid -- was that covered widely in

5    the press?

6    A.   Exceedingly so, yes.

7    Q.   And why do you think that was, if you know?

8    A.   I'm not sure.  It's possible leaks could come from all

9    sorts of sources.  These rumors seemed to be pretty -- pretty

10   accurate, so it leads you to believe somebody informed --

11   potentially leaked it, but I don't know when or why or where it

12   came from.

13   Q.   And so when you say "somebody informed," that means

14   somebody who had information at the company would have shared

15   that information with the public.  Is that what you mean by

16   "leak"?

17   A.   I don't know if it would have come from -- what source it

18   would have come from.  It could have come from Sanofi itself,

19   for example.

20        But from my perspective, there was never a time where --

21   where Evercore or JPMorgan counseled Medivation to share

22   nonpublic information about the process to the street.

23   Q.   But there were -- you do acknowledge there were leaks

24   relative to Sanofi?

25   A.   Well, there were rumors that clearly included information

BAXTER - CROSS / PACHECO

1   that we knew to be true, but it also included information that

2   we knew to be false.

3   Q.   And in part, that's why Sard's involved, is to try to

4   monitor that sort of press; is that correct?

5   A.   That's correct.

6   Q.   And I believe that you testified that Medivation was a

7   unique asset or something to that effect; is that correct?

8   A.   Certainly, yes.

9   Q.   And in 2016, were you familiar with Incyte Corporation?

10  I believe you said you were.

11  A.   I was familiar with it.  It was not my client, but I was

12  familiar with the company.

13  Q.   And what was Medivation's primary drug in 2016?

14  A.   It was Xtandi for prostate cancer.

15  Q.   And that's what it treated, was prostate cancer, no other

16  types of cancer; is that right?

17  A.   Right.  But they had drugs in development for other things

18  as well.  But that was the major value driver until midway

19  through the process, when some data on a competing PARP

20  inhibitor implied that the Medivation asset in the pipeline

21  might be more valuable than people had thought.

22  Q.   But Medivation's Xtandi was viewed as a blockbuster; is

23  that right?

24  A.   Absolutely, yes.

25  Q.   And what other company had a prostate cancer drug, if you

BAXTER - CROSS / PACHECO

 1  know, in 2016?

 2  A.   Well, the drugs on the market were large pharmaceutical

 3  companies.  So Medivation was unique in that aspect as well,

 4  that the prostate cancer market was dominated by the likes of

 5  Johnson & Johnson and Roche, with their competing assets.

 6  Q.   They were much bigger than Medivation?

 7  A.   Much, much larger.

 8  Q.   And what was Incyte's primary drug?

 9  A.   It was called Jakafi, J-A-K-A-F-I, for myelofibrosis,

10  which is a different -- different disease area.  Still cancer,

11  but it's just a different disease area.  It's not a direct

12  competitor.

13  Q.   Did -- so the two drugs are not competitors with each

14  other.  We've got a prostate cancer drug and a myelofibrosis

15  drug; is that correct?

16  A.   Right.  They're different -- different diseases, so you're

17  not competing for the same -- the same source of revenue.

18  Q.   And Incyte did not have a prostate cancer drug in 2016; is

19  that correct?

20  A.   Not to my knowledge.

21  Q.   And do you know whether or not Medivation and Incyte had a

22  business relationship in 2016?

23  A.   Not to my knowledge.

24  Q.   The SEC lawyer asked you some questions about scarcity

25  value.  Do you remember those questions?

**BAXTER - CROSS / PACHECO**

```
1   A.    Yes.

2   Q.    Do you view yourself as a scarcity value expert?

3   A.    No.  Just an opinion.

4   Q.    I'm sorry.  What's that?

5   A.    Just an opinion.

6         No.

7   Q.    No.

8         And I take it you haven't published any peer-review

9   articles about scarcity value or anything like that?

10  A.    No.

11  Q.    Did Incyte have anything to do with the Medivation sale

12  process?

13  A.    No.

14  Q.    What was the market cap of Medivation in 2016, if you

15  know?

16  A.    Well, it -- there was a very wide range over the period of

17  2016, so it depends on when.  Before -- before the rumors of

18  the hostile, it was trading, you know, sub 7 billion, but I

19  think it was trading in and around 9 or 10 billion.

20  Q.    9 or 10 billion.

21        And do you know what the market cap of Incyte was in 2016?

22  A.    I don't remember.  But it would have been in the

23  similar -- similar ballpark, but I just don't remember.

24  Q.    Would it surprise you if it was in the $15 billion range?

25  A.    10 to 15, yeah.  It was anything below -- well, I know we
```

BAXTER - CROSS / PACHECO

1  had 20.75 in the material, but 25 and below, we kind of

2  consider it similar.  Similar vein.

3  Q.  And if Medivation was larger, would it have been harder

4  for a company to acquire it in 2016 as opposed to Medivation?

5  A.  I think you meant if Incyte --

6        THE COURT:  Could you ask that question again.

7        MR. PACHECO:  Sorry, Your Honor.

8  BY MR. PACHECO:

9  Q.  Would it have been harder to acquire Incyte or Medivation

10 in 2016, given their size disparity?

11 A.  Not for the acquirers in question.  Is it harder

12 generically?  Yes, it's a larger company.

13 Q.  And Incyte, in 2015, was not acquired; is that correct?

14 A.  Correct.

15 Q.  And Incyte wasn't acquired in 2016; is that correct?

16 A.  Correct.

17 Q.  And Incyte wasn't acquired in 2017; is that correct?

18 A.  Correct.

19 Q.  And as a matter of fact, from 2015 all the way to right

20 now, Incyte hasn't been acquired; is that correct?

21 A.  Correct.

22 Q.  Do you know anything about Incyte's debt in 2016?

23 A.  I don't recall the specifics behind it.  I know they

24 raised some convertible debt and they were not profitable, but

25 I don't have the specific recollection of exactly how much.

BAXTER - CROSS / PACHECO

1  Q.   And the opposite was true for Medivation.  Medivation was

2  profitable; is that correct?

3  A.   Yes.

4  Q.   And in 2016, Medivation did not have debt; is that

5  correct -- compared to Incyte?

6  A.   I can't recall.  I believe there was a convertible debt

7  instrument that was -- might have been paid off, but it would

8  have been deeply in the money anyway.  I just can't remember

9  for sure.

10  Q.   And so from 2016 to the present, no biotech or

11  biopharmaceutical company, large or small, has acquired Incyte.

12  That's correct; right?

13          MR. MEYERHOFER:  Objection.  Leading.

14          THE COURT:  It is leading.  Do you want to rephrase

15  it?

16          MR. PACHECO:  Sure.

17  BY MR. PACHECO:

18  Q.   Do you know whether, from 2016 to the present time --

19  whether a large biotech or biopharmaceutical company acquired

20  Incyte?

21  A.   Incyte has not been acquired.

22  Q.   So as far as I understand it, there was an acquisition of

23  Medivation in August of 2016.  And yet, to this date, Incyte

24  has never been acquired; is that true?

25          THE COURT:  Sustained.  Argumentative.  Redundant.

BAXTER - CROSS / PACHECO

```
 1         Go on to the next thing, Mr. Pacheco.
 2    BY MR. PACHECO:
 3    Q.   In your prior testimony, you testified about formal and
 4    informal solicitation of bidders.  And I think you focused
 5    mostly on the formal solicitation of bidders.
 6         What is meant by the informal solicitation of bidders in
 7    connection with this transaction?
 8    A.   I don't think I -- I don't believe I said "solicitation,"
 9    but I did refer to informal; i.e., embedded in the proxy, the
10    Schedule 14D-9, there's notations about Pfizer, inbound phone
11    calls from Pfizer before any formal or official process had
12    started, just raising awareness to David Hung that should
13    Medivation entertain a process, that Pfizer hopes that it will
14    be called.  So that's what I mean by informal.
15    Q.   And you were not part of any of those informal
16    discussions?
17    A.   No.
18    Q.   And do you know whether people other than the CEO were
19    involved in any of those informal discussions?
20    A.   I don't recall, but it would be -- the 14D-9 would
21    articulate that.
22    Q.   And were you involved in all of the formal discussions
23    about the bids, the bidders?
24    A.   Not every single conversation, me personally.  But
25    Evercore institutionally, certainly we had several other
```

BAXTER - CROSS / PACHECO

1    partners involved in the deal.  And I went on vacation for a

2    week or so during the period of the transaction, so I wouldn't

3    have been involved in every single one of them.

4    Q.    Was JPMorgan involved in any of the formal bidding --

5    A.    Certainly.

6    Q.    -- discussions?

7    A.    If we were involved, they were involved.

8    Q.    When you were out, was JPMorgan handling the bidding

9    process?

10   A.    Well, there was my other partners within Evercore.  The

11   individual's name is Francois Maisonrouge, who is still there.

12   It wasn't JPMorgan.  Without Evercore, if I wasn't available,

13   Francois would be participating.

14   Q.    Here -- switching your attention.  There were five

15   bidders; correct?

16   A.    Correct.

17   Q.    And they were all well financed; is that fair to say?

18   A.    Correct.

19   Q.    And the -- what was the difference between the ultimate

20   bid that won and the second best bid?

21   A.    It was pretty narrow.  It was $81.50 versus -- I can't

22   recall, but it was narrow.

23   Q.    So this was a -- was this a tight competition for the

24   acquisition of Medivation, from a financial standpoint?

25   A.    My opinion was very competitive and, at the end, very

**BAXTER - CROSS / PACHECO**

 1  tight, yes.

 2  **Q.**    Was it accurate that all five bidders could pay cash for

 3  the transaction?

 4  **A.**    That's certainly what they intimated in their bid letters.

 5  I didn't personally do diligence to ascertain whether or not

 6  that statement was true.

 7  **Q.**    And were there -- did you hear, were any of the other

 8  bidders excited about the transaction, like Celgene or Gilead

 9  or any of the others?  Did you get any information about that

10  one way or the other?

11  **A.**    Excited about the transaction, you mean excited about the

12  possibility of entering into a transaction with Medivation?

13  They wouldn't have been excited to lose the transaction.

14  But --

15  **Q.**    Yes, you're right.

16  **A.**    But, yes, there were a number of conversations throughout

17  the process, and I believe there were also some e-mail

18  exchanges that articulated others that were also excited, not

19  just -- not just Pfizer.

20  **Q.**    And in your experience, you wouldn't expect bidders to

21  enter this process not being excited to actually get the

22  acquisition that they're bidding for?

23  **A.**    I'm not sure I can opine on the feelings or emotional

24  impact of entering into a process one way or the other, but

25  you'd certainly have to have conviction.

BAXTER - CROSS / PACHECO

1   Q.   And is conviction having the money to be able to

2   ultimately close the deal or the means to close the deal?

3   A.   Either having the money or you've got an agreement with

4   financial counterparties to provide the money.

5   Q.   You were shown an e-mail, August 18, 2016.  Do you

6   remember that e-mail?

7   A.   I think I was shown a couple on that day.

8   Q.   Oh, fair enough.

9        MR. PACHECO:  Your Honor, with your permission,

10  SEC 1338.

11       THE COURT:  Sure.  I think it's in, isn't it?

12       MR. PACHECO:  It's in.

13       Is there more to the top of that e-mail?  Yes.

14  BY MR. PACHECO:

15  Q.   Who's James Leigh on the top?

16  A.   It's actually Jamie.

17  Q.   Jamie, sorry.

18  A.   Yeah.  And she was the partner at Cooley, which was the

19  M&A law firm that was advising Medivation.

20  Q.   And so they were the lawyers on the deal?

21  A.   Mm-hmm.

22  Q.   And I know this will shock everybody, but can lawyers on a

23  deal somehow slow a deal?

24  A.   Well, I certainly -- and I think she's making fun of

25  herself, so, yes.

**BAXTER - CROSS / PACHECO**

1    Q.   In fact, she says (as read):

2              "And who could ever push lawyers out of the

3         game?"

4              What -- how did you understand that language?

5    A.   I could certainly take an educated guess.  I think she was

6    being a little bit tongue in cheek about it, but that clearly,

7    you know, Pfizer is articulating that they're going to move

8    very quickly and part of the way to do that is, you know,

9    keeping the lawyers out of the way.

10   Q.   But the lawyer was -- knew about the transaction and is on

11   that e-mail; is that right?

12   A.   Of course, yes.

13   Q.   Right.

14        And, in fact, you would not expect a deal of this

15   magnitude to go without lawyers and have -- not having their --

16   A.   Oh, no, no, not at all.  This is tongue in cheek.

17   Q.   Understood.

18            MR. PACHECO:  We can take that down now.

19   BY MR. PACHECO:

20   Q.   You talked a little bit about a WACC analysis; right?

21   A.   Yes.

22   Q.   Weighted average -- can you help me out with that?

23   What's -- what does that stand for again?

24   A.   Weighted average cost of capital.

25   Q.   And that's just a means to evaluate or value Medivation at

**Excerpt of J. Jarrett's Trial Testimony, dated Mar. 27, 2024,
Dist. Ct. Doc. 161 (Apr. 5, 2024)**

**JARRETT - DIRECT / BUSSEY**

```
 1   A.   No.

 2   Q.   Is there any dial-in for this meeting?

 3   A.   No.

 4   Q.   Is there any WebEx link or similar link for participating

 5   remotely?

 6   A.   No.

 7   Q.   Do you remember whether this meeting occurred?

 8   A.   I can't remember, no.

 9   Q.   I may have misspoken in one of my previous questions.

10        Did Dominic Piscitelli identify Matthew Panuwat as a

11   required attendee for this meeting?

12   A.   Yes.

13   Q.   Did Medivation have an insider trading policy while you

14   were there at the company?

15   A.   Yes.

16   Q.   Are you generally familiar with that policy?

17   A.   Yes.

18   Q.   Did you understand yourself to be subject to that policy?

19   A.   Yes.

20   Q.   Did you understand Mr. Panuwat to be subject to that

21   policy?

22   A.   Yes.

23   Q.   Take a look at Exhibit 1371, if you would.  What has been

24   marked for identification as Exhibit 1371.

25        Do you have that before you, ma'am?
```

**JARRETT - DIRECT / BUSSEY**

1    A.    Yes.

2    Q.    And direct your attention to the page that's marked

3    1371-005.

4         Do you see that?

5    A.    Yes.

6    Q.    And do you see a name and signature on this document?

7    A.    Yes.

8    Q.    And what is the name written?

9    A.    "Matthew Panuwat."

10   Q.    And do you recognize the signature above the name?

11   A.    Yes.

12   Q.    And whose signature is that?

13   A.    Matthew Panuwat.

14        MR. BUSSEY:  The SEC offers 1371 into evidence.

15        THE COURT:  Is there any objection?

16        MR. PACHECO:  Foundation.

17        THE COURT:  Do you want to explore it further with

18   respect to this?

19        MR. BUSSEY:  Sure.

20   BY MR. BUSSEY:

21   Q.    Ma'am, you said a moment ago that you were familiar with

22   Medivation's insider trading policy?

23   A.    Yes.

24   Q.    Does this appear to be a version of Medivation's insider

25   trading policy?

**JARRETT - DIRECT / BUSSEY**

1   A.   Yes.

2   Q.   And you're familiar with Matthew Panuwat for being his

3   direct supervisor, are you not?

4   A.   Yes.

5   Q.   And are you accustomed to seeing documents with his name

6   on them?

7   A.   Am I --

8   Q.   Have you seen other documents with Matthew Panuwat's name

9   on it, other Medivation documents?

10  A.   Yes.

11  Q.   Have you seen his signature before?

12  A.   Yes.

13  Q.   And looking at the first page of the document, do you

14  recognize the logo there?

15  A.   Yes.

16  Q.   Is that Medivation's logo?

17  A.   Yes.

18  Q.   And looking at the substance of the document, does this

19  appear to be Medivation's insider trading policy?

20  A.   Yes.  Oh, sorry.  No, no, no.  I'm looking at the wrong

21  thing.  Wait.

22  Q.   Excuse me.  You know what, I can -- I apologize.  I've

23  created a whole lot of confusion by turning you to the wrong

24  document.

25  A.   Yeah.

**JARRETT - DIRECT / BUSSEY**

1   Q.   So let me start all over.

2        So we're at 1371.

3   A.   Yes.

4   Q.   Okay.  So let's go back.  The signature.

5   A.   Yes.

6   Q.   Didn't get that wrong.

7        Is that Matthew Panuwat's signature?

8   A.   Yes.

9   Q.   Do you recognize his name there?

10  A.   Yes.

11  Q.   Okay.  And did you understand Medivation to have a

12  confidential information and invention assignment agreement

13  during your time there?

14  A.   Yes.

15  Q.   And did you understand yourself to be subject to that

16  policy?

17  A.   Yes.

18  Q.   And did you understand Matthew Panuwat to be subject to

19  that policy?

20  A.   Yes.  Everyone at the company would be.  Yes.

21  Q.   Did you say everybody in the company was?

22  A.   The company would be, yes.

23  Q.   And do you recognize the logo at the top of Exhibit 1371?

24  A.   Yes.

25  Q.   Is that Medivation's logo?

**JARRETT - DIRECT / BUSSEY**

1    A.    Yes.

2    Q.    And do you recognize the contents of this document?

3    A.    Yes.

4              MR. BUSSEY:  The SEC moves Exhibit 1371 into evidence.

5              MR. PACHECO:  Foundation.

6              THE COURT:  Overruled.  It's admitted.

7         (Trial Exhibit 1371 received in evidence.)

8    BY MR. BUSSEY:

9    Q.    Now, let's go to 1372, if we could.  And I apologize for

10   the confusion that I created with my last questions, but do you

11   have Exhibit 1372 in front of you, ma'am?

12   A.    Yes.

13   Q.    And what do you recognize this to be?

14   A.    An insider trading policy.

15   Q.    And if you go to the last page of the document, do you see

16   a signature there?

17   A.    Yes.

18   Q.    Whose signature is that?

19   A.    Matthew Panuwat's.

20   Q.    And whose name is written there?

21   A.    Matthew Panuwat.

22   Q.    Again, turning to the first page, do you recognize the

23   logo on the first page?

24   A.    Yes.

25   Q.    Does this have the same look as other Medivation documents

**JARRETT - DIRECT / BUSSEY**

```
 1    from your time with the company?

 2    A.   Yes.

 3    Q.   And do you recognize the substance and contents of this

 4    document to be the insider trading policy?

 5    A.   Yes.

 6          MR. BUSSEY:  The SEC offers 1372 into evidence.

 7          MR. PACHECO:  Foundation.

 8          THE COURT:  I'm going to conditionally allow the

 9    document.

10        You may proceed.

11        (Trial Exhibit 1372 conditionally received in evidence.)

12    BY MR. BUSSEY:

13    Q.   So, ma'am, you mentioned a moment ago that you understood

14    yourself to be subject to an insider trading policy while you

15    were at the company.

16        Did I hear that right?

17    A.   Yes.

18    Q.   And reviewing this document, does this appear to be the

19    same in substance as the agreement that you agreed to abide by

20    yourself?

21    A.   Yes.

22    Q.   And do you have any reason, looking at this, as

23    Mr. Panuwat's direct supervisor, to think that this was not the

24    insider trading policy that Mr. Panuwat signed?

25    A.   No.  I have no reason to believe that.
```

**JARRETT - DIRECT / BUSSEY**

1    Q.   Have you ever seen another version of this document that

2    Mr. Panuwat signed?

3    A.   No.

4    Q.   I want to redirect your attention to the afternoon of

5    August 18th, when you received that e-mail from Dr. Hung and

6    were noticing that things had gotten quiet.

7         At around that time, did you know one way other the other

8    whether Mr. Panuwat was purchasing call options in Incyte

9    Corporation?

10   A.   I did not know.

11   Q.   Did Mr. Panuwat tell you, as his supervisor, that he was

12   planning to spend a portion of that afternoon buying Incyte

13   call options?

14   A.   No.

15   Q.   Did Mr. Panuwat ask you, as his direct supervisor, whether

16   it was okay for him to buy call options in the Incyte company

17   on the eve of the Medivation deal being announced?

18   A.   No.

19   Q.   Did Mr. Panuwat tell you after the fact that he had bought

20   Incyte call options?

21   A.   No.

22   Q.   Did Mr. Panuwat ever say anything to you at all about his

23   purchase of Incyte call options?

24   A.   No.

25   Q.   Before you were contacted by the SEC, did you have any

**JARRETT - DIRECT / BUSSEY**

1  idea that Mr. Panuwat had purchased call options that day?

2  A.   No.

3  Q.   Ma'am, did you make any personal trades in the stock

4  market based on the information that was contained in that

5  e-mail from David Hung?

6  A.   No.

7  Q.   And to be clear, was the information in that e-mail

8  confidential?

9  A.   Yes.

10  Q.   Was that information ever released to the public?

11  A.   No.

12  Q.   And was it your expectation that everybody who received

13  that e-mail, including the advisors and others members of

14  Medivation's team would maintain its confidentiality?

15  A.   Yes.

16  Q.   Did you make any personal --

17         THE COURT:   Excuse me.  We've been having some

18  microphone issues over time, and I apologize when they occur.

19     Mr. Bussey, go ahead.

20  BY MR. BUSSEY:

21  Q.   Did you make any personal trades in the stock market based

22  on any other information about the Medivation sales process

23  besides what we saw in that e-mail?

24  A.   No.

25  Q.   Did you ever use any of Medivation's confidential

**JARRETT - DIRECT / BUSSEY**

 1   information to buy or sell the stock of any company?

 2   **A.**   No.

 3   **Q.**   Did you ever use any of Medivation's confidential

 4   information to buy or sell options in any company?

 5   **A.**   No.

 6   **Q.**   Did you ever use Medivation's confidential information to

 7   personally trade in the stock market in any way?

 8   **A.**   No.

 9   **Q.**   During your time at Medivation, did anybody ever tell you

10   that it was okay to use Medivation's confidential information

11   to make personal trades in the stock market?

12   **A.**   No.

13   **Q.**   Did you ever tell Mr. Panuwat that it was okay to do that?

14   **A.**   No.

15           **MR. BUSSEY:**  No further questions.

16           **THE COURT:**  All right.  So, ladies and gentlemen,

17   we'll take our morning break for 15 minutes.  And we'll be back

18   at 10:16.  Please remember the admonitions.

19       Enjoy the break.

20                   (The jury leaves the courtroom.)

21     (Proceedings were heard out of the presence of the jury.)

22           **THE COURT:**  We'll be in recess.

23       I will say one thing.  Mr. Bussey, I conditionally

24   admitted the document, and when I conditionally admit

25   something, it means that you can publish it if you want to.

**Excerpt of C. Becker's Trial Testimony, dated Mar. 27, 2024, Dist. Ct. Doc. 161 (Apr. 5, 2024)**

BECKER - DIRECT / SMYTH

 1  **A.**    That's okay.

 2      So I looked at three kinds of reasons that market

 3  observers would expect Incyte's reaction on August 22.  The

 4  first kind of reaction is the spillover effects that I was just

 5  talking about.

 6      Sorry.  Did I say the first kind of reaction?  I meant the

 7  first kind of reason is the spillover effects that I was just

 8  talking about.

 9      The second kind of reason is the fact that Medivation and

10  Incyte are companies that were linked.

11      And the third reason is because it had happened before.

12  **Q.**    Okay.  Now, let's focus a little bit more on that first

13  reason.

14      Did you do anything to see whether or not the research

15  that you had just discussed was relevant to the biopharma

16  industry and to Incyte?

17  **A.**    Yes, I did.

18  **Q.**    And what did you do?

19  **A.**    So one of the things I did was I looked at whether or not

20  Incyte's stock price had reacted to past merger announcements

21  in the biopharma industry.

22      I looked at a sample of about 44 merger announcements,

23  going back to 2010.  And I looked at Incyte's stock price

24  reaction to that merger news to see, was it -- did it react in

25  a positive way to merger news in the biopharma industry or not.

BECKER - DIRECT / SMYTH

1   Q.   And what did you find?

2   A.   I found that it did react on average.  There was a

3   positive stock price reaction.  Incyte was reacting positively

4   to biopharma merger news in the past.

5   Q.   And could you draw that conclusion to any degree of

6   certainty?

7   A.   Yes.  I tested that conclusion, and I concluded it -- my

8   statistical test said that I could draw that conclusion at a

9   99 percent confidence level.

10  Q.   Did you do anything further with those dates in terms of

11  analyzing them?

12  A.   Yes, I did.

13  Q.   What did you do?

14  A.   So I looked further to see, if the company being acquired

15  was more closely linked to Incyte, was this stock price

16  reaction larger?

17  Q.   And what did you find?

18  A.   I found that it was, and I was able to draw that

19  conclusion, also, at a 99 percent confidence level.

20  Q.   So what did you conclude from that analysis?

21  A.   That analysis helped me conclude that the economic

22  research was relevant to Incyte and the biopharma industry.

23  Yeah.  Incyte and the biopharma industry.

24  Q.   Did you do anything else to see whether spillover effects

25  would have affected Incyte?

BECKER - DIRECT / SMYTH

 1    A.    Yes.

 2    Q.    And what else did you do?

 3    A.    So I looked at industry and market commentary around the

 4    time of Medivation's acquisition to see whether or not people

 5    in the market were commenting that Medivation's acquisition

 6    would be expected to have a positive effect on Incyte.

 7    Q.    Okay.  I'd like to take a look at some of those -- some of

 8    that industry commentary.  So if we could pull up Exhibit 1216,

 9    which I believe is already admitted into evidence.

10          And do you recognize this?  Take a moment to look at it,

11    and I believe you have it in your binder as well.

12          Do you recognize this document?

13    A.    I do.

14    Q.    And what is this?

15    A.    This is an e-mail that was circulated -- so there were a

16    series of e-mails that were circulated to a whole bunch of

17    people that were on the Medivation acquisition team.

18    Q.    Okay.  And was Mr. Panuwat one of the recipients of this

19    e-mail?

20    A.    Yes, he was.

21    Q.    And what is the date of this e-mail?

22    A.    May 21st, 2016.

23    Q.    Is this a document that you relied on in reaching your

24    opinions?

25    A.    It is.

BECKER - DIRECT / SMYTH

1   Q.   And if you look to the article that's included in this

2   e-mail, you'll see at the bottom of the first page here,

3   there's an article titled "A Scarcity of Biotech Assets for

4   Buyouts."

5        Do you see that?

6   A.   I do.

7   Q.   And below that, there is -- the beginning of that article

8   states (as read):

9            "Gabelli's Jing He argues that a 'scarcity of

10       valuable biotech assets...'"

11           Let me just stop there.  Do you see that

12       language?

13  A.   I do.

14  Q.   And what do you understand -- do you have an understanding

15  as to what "scarcity of valuable biotech assets" might refer to

16  there?

17  A.   Yes.  It's a specific reference to the idea that there

18  were not very many companies available in the biotech industry

19  for -- that were available to be acquired.  So there was just a

20  limited number of companies in the biotech industry.

21  Q.   And if you could -- continuing on in -- with that

22  sentence, it says (as read):

23           "Available for purchase by bigger biotech and

24       pharmaceutical companies."

25           And then it states (as read):

BECKER - DIRECT / SMYTH

1          "...should keep a floor under Medivation -- and

2       by implication BioMarin Pharmaceutical, Incyte, and

3       Seattle Genetics."

4          Do you see that?

5   A.   I do.

6   Q.   What do you understand this to refer to?

7   A.   So this is talking about the fact that since there were

8   relatively few candidates to be acquired, Medivation and these

9   other companies, which included Incyte, would be more valuable

10  because there's relatively few of them out there.

11      This is one way -- one of the reasons why you observe a

12  spillover effect; right?  Because one company gets acquired,

13  and then under circumstances where there aren't that many other

14  candidates for a takeover in the industry, the other companies

15  would tend to become more valuable because there just are fewer

16  of them.  It's scarce.

17  Q.   Okay.  If we could turn to the second page of this

18  exhibit.  So it will be the page marked 002 in your binder.

19      You'll see in the end of the italicized portion of the

20  paragraph at the top there, do you see this part where it

21  begins "since the valuation," kind of in the middle of that

22  italicized paragraph?

23  A.   Yeah.

24  Q.   Okay.  And it reads (as read):

25          "Since the valuation of the biotech sector has

BECKER - DIRECT / SMYTH

1    dropped over 30 percent since mid-2015, large

2    pharmaceutical and biotech companies have been eyeing

3    valuable assets, especially in cancer.  There are

4    only a handful of $10 billion-range biotech companies

5    (i.e., BioMarin, Incyte, Medivation) and mid-cap

6    cancer assets (i.e., Incyte, Medivation, Seattle

7    Genetics).  Given the scarcity of valuable biotech

8    assets, we believe Medivation should continue to

9    trade at a premium due to the buyout speculation."

10       Do you see that?

11   A.   I do.

12   Q.   What do you understand -- what is this general idea -- I

13   think you've touched on it a bit, but if you could describe a

14   bit more of what this idea of scarcity was and how it was

15   relevant to these types of biopharma companies in particular at

16   this time?

17   A.   So at this time, large companies like Pfizer, like

18   Genentech were looking to acquire smaller companies.  So

19   that's -- when I say that there were a limited number of

20   potential takeover candidates, there are a limited number of

21   candidate -- takeover candidates that had the kinds of

22   characteristics that they were looking for, like having a drug

23   that was commercially viable and that it was a certain size of

24   company.

25       So since there wasn't that many of them, again, this is

BECKER - DIRECT / SMYTH

1  the thing that makes the spillover effect happen; right?  So

2  when, under these circumstances, a takeover is announced, you

3  would be -- you would tend to expect that the other candidate

4  companies would experience a positive stock price reaction in

5  response to the news of the takeover.

6  Q.   Great.

7          MR. SMYTH:  If we could take that one down,

8  Mr. Taylor, thank you.

9  BY MR. SMYTH:

10 Q.   And if we move now to Exhibit 1220, another document that

11 I believe has been admitted into evidence and should be in your

12 binder, Dr. Becker.

13     Do you recognize this document?

14 A.   Yes, I do.

15 Q.   And what is this?

16 A.   This is another one of those e-mails that was circulated

17 to a broad group of people.

18 Q.   Okay.  And do you see that Mr. Panuwat was a recipient of

19 this particular e-mail?

20 A.   Yes.

21 Q.   And what is the date of this e-mail?

22 A.   June 30th, 2016.

23 Q.   Is this a document that you reviewed in connection with

24 reaching your opinions?

25 A.   It is.

BECKER - DIRECT / SMYTH

1   Q.   And if you turn to the page with -- that's labeled

2   Exhibit 1220-0004, do you see an article there in the bottom

3   half titled "After Medivation, what's next?"

4   A.   Yes.

5   Q.   Okay.  And it goes on, "Alexion, BioMarin, Incyte could be

6   Big Pharma's next M&A targets."

7        Do you see that?

8   A.   Yes.

9   Q.   And is this an article in particular that you reviewed in

10  reaching your opinions?

11  A.   Yes.

12  Q.   And you'll see that the article begins (as read):

13           "Several big pharma and big biotech companies

14       are in the hunt to acquire San Francisco's

15       Medivation, but only one will come away victorious.

16       So once that happens, where might drug makers turns

17       next?"

18           Do you see that?

19  A.   Yes.

20  Q.   And if you'd go down ten to the third photograph in that

21  document, it reads (as read):

22           "If it's marketed assets the big kahunas are

23       looking for - such as Medivation's prized prostate

24       cancer pill Xtandi - they could look to Delaware's

25       Incyte, a $14.7 billion market-cap company that

BECKER - DIRECT / SMYTH

1          boasts myelofibrosis med Jakafi.  Incyte could check

2          another box for those particularly keen on bulking up

3          in cancer."

4               Do you see that?

5    A.   I do.

6    Q.   And was this article relevant to your opinions?

7    A.   Yes.

8    Q.   How so?

9    A.   So this is another article that confirmed my opinion that

10   spillover effects were relevant in this particular industry,

11   that it was relevant to Medivation, it was relevant to Incyte,

12   and it was relevant to this part of the biopharma industry at

13   that time.

14   Q.   Okay.  Thank you.

15              MR. SMYTH:  You can take that down, Mr. Taylor.

16   BY MR. SMYTH:

17   Q.   If you'll look in your binder at Exhibit 1276.  And can

18   you let me know if you recognize this document?

19   A.   I do.

20   Q.   And what is this document?

21   A.   This is a report -- I was talking before about industry

22   analysts.  So one of the things that industry analysts do is

23   they write reports, and they publish them with their opinions.

24   And this is a report authored by an industry -- by industry

25   analysts.  They work for a company called Cowen and Company,

BECKER - DIRECT / SMYTH

```
 1    and it's about the company Incyte.

 2    Q.   And what is the date of the report?

 3    A.   It's May 9th, 2016.

 4    Q.   And is this a document that you reviewed in connection

 5    with reaching your opinions?

 6    A.   Yes.

 7    Q.   And is this a report that was published to the market?

 8    A.   Yes.

 9              MR. SMYTH:  Move to admit Exhibit 1276.

10              MR. SPERTUS:  Objection.  Hearsay, Your Honor.

11              THE COURT:  Yeah, sustained.

12    BY MR. SMYTH:

13    Q.   Is Exhibit 1276 a document that you relied on in reaching

14    your opinions?

15    A.   Yes.

16    Q.   And can you explain how it is -- what it is about

17    Exhibit 1276 that you relied on in connection with reaching

18    your opinions?

19    A.   Yes.  So what this article says is that --

20              MR. SPERTUS:  Objection, Your Honor.  It calls for

21    hearsay.

22              THE COURT:  She can rely on it for her expert opinion.

23    It's the kind of document that you would use; it's just not

24    admissible in evidence.

25         So go ahead, you may proceed.
```

BECKER - DIRECT / SMYTH

1          **THE WITNESS:**  So what the document says is that the

2    fact that Medivation's -- the fact that Medivation is in merger

3    and acquisition talks makes Incyte's shares more appealing.

4          So to me, this is a direct confirmation of the idea that

5    Medivation's takeover announcement is good news for Incyte, and

6    it would lead somebody to expect Incyte's positive stock price

7    reaction when Medivation's news is announced.

8    **BY MR. SMYTH:**

9    **Q.**   Thank you, Dr. Becker.

10   **A.**   Sorry.  There's something --

11   **Q.**   I'm sorry.  Did I cut you off?

12   **A.**   -- a little bit more in particular on this document.

13         So they do say that Incyte's shares -- they comment that

14   Incyte's shares have yet to benefit from the premiums being

15   discussed for Medivation; right?

16         So they're saying that Incyte's shares haven't yet fully

17   risen to, in their opinion, to reflect the fact that Medivation

18   is in talks about being acquired.

19   **Q.**   And how is that relevant to your opinion?

20   **A.**   That actually just, if anything, confirms my view that

21   industry -- market observers would expect Incyte stock to react

22   when Medivation's merger was announced, because it hadn't yet

23   fully reflected the news of Medivation's merger in this

24   analyst's view.

25   **Q.**   Thank you.

**K. Mikkelson's Declaration Read Into Trial Record on Mar. 29, 2024, Dist. Ct. Doc. 163 (Apr. 5, 2024)**

**PROCEEDINGS**

 1  just let me know.

 2          MR. DiCANIO:  Great.  Thank you, Your Honor.

 3          THE COURT:  Okay.  Thank you.  We'll see you when the

 4  jury is here.

 5                  (Recess taken at 8:04 a.m.)

 6              (Proceedings resumed at 8:36 a.m.)

 7      (Proceedings were heard out of the presence of the jury.)

 8          THE CLERK:  Please come to order.

 9          THE COURT:  Are we ready to proceed?

10          MR. DiCANIO:  Yes, Your Honor.

11                  (The jury enters the courtroom.)

12       (Proceedings were heard in the presence of the jury.)

13          THE COURT:  All right.  Please be seated, ladies and

14  gentlemen.

15      Members of the jury, welcome back.  So at the end of the

16  day yesterday, the SEC concluded its case, and now the --

17  Mr. Panuwat's case will begin.

18      And, Ms. Van Ness, are you the first person up?

19          MS. VAN NESS:  Yes, Your Honor.  The Defense would

20  like to read into the record a declaration by Keith Mikkelson

21  from Incyte Corporation.

22          THE COURT:  All right.  And this is a matter that's

23  been stipulated by the parties?

24          MS. VAN NESS:  Yes.  The parties have stipulated about

25  its authenticity, and I will also read a portion of the

**PROCEEDINGS**

 1  stipulation.

 2       **THE COURT:** Okay.

 3       **MS. VAN NESS:** And this is all contained in Trial

 4  Exhibit 2607.

 5       **THE COURT:** All right. So all of what you're about to

 6  hear is -- should be considered as evidence in this case.

 7  Please proceed.

 8       **MS. VAN NESS:** This is from page 2 of

 9  Trial Exhibit 2607 (as read):

10       "Plaintiff Securities and Exchange Commission

11       and Defendant Matthew Panuwat, together, the parties,

12       submit the following stipulation regarding the

13       authenticity and admissibility of the Mikkelson

14       declaration in this case:

15       "The declaration of Keith Mikkelson attached

16       hereto is a signed and dated statement made under

17       penalty of perjury pursuant to 28 U.S.C.

18       Section 1746.

19       "The parties agree to treat the Mikkelson

20       declaration as equivalent to the deposition testimony

21       of an unavailable witness under Rule 32 of the

22       Federal Rules of Civil Procedure if he does not

23       appear in person."

24       And this is page 5 of the trial exhibit which

25       starts his declaration. (as read):

**PROCEEDINGS**

 1          "I, Keith Mikkelson, pursuant to

 2     28 U.S.C. Section 1746 declare as follows:"

 3          Background.  Paragraph 1.  (as read):

 4          "From 2002 through the present, I have been

 5     employed by Incyte Corporation, Incyte, or the

 6     company, in various business development capacities.

 7     Between approximately February 2015 and February

 8     2022, I served as vice president of business

 9     development which was the most senior business

10     development position at the company during that

11     period.

12          "In that position, I oversaw Incyte's business

13     development department which is responsible for,

14     among other things, licensing of drug candidates and

15     identifying potential merger or acquisition targets."

16          Paragraph 2 (as read):

17          "In approximately February 2022, I was promoted

18     to division vice president and head of business

19     development and licensing, which is currently the

20     most senior business development position at Incyte.

21          "My responsibilities in this role are

22     substantially similar to the responsibilities that I

23     had as vice president of business development.  In

24     both positions, I reported directly to Vijay Iyengar,

25     executive vice president global medical affairs,

**PROCEEDINGS**

1      product, and partnership strategy.

2           "I submit this declaration in connection with

3      the above-captioned matter to provide information

4      regarding Incyte in relation to the trading of Incyte

5      securities in 2016, as alleged in the Securities and

6      Exchange Commission's complaint.

7           Background regarding Incyte.  Paragraph 4 (as

8      read):

9           "Incyte is a corporation organized and existing

10     under the laws of the state of Delaware with its

11     principal place of business also located in the state

12     of Delaware.  Incyte is a publicly traded company

13     whose stock is traded on the NASDAQ stock exchange.

14          "Incyte is a biopharmaceutical company focused

15     on the discovery, development, and commercialization

16     of medicines.  Incyte focuses on developing drug

17     candidates to treat diseases in the areas of

18     hematology, oncology, and inflammation and auto

19     immunity.

20          "In addition to developing and marketing drug

21     candidates, Incyte also runs clinical programs to

22     increase the effectiveness of its drugs and expand

23     their therapeutic uses."

24          Relationship between Incyte and Medivation, Inc.

25     Paragraph 7 (as read):

**PROCEEDINGS**

1           "Because of my senior business development roles

2      at Incyte, I am generally familiar with other

3      pharmaceutical companies with which Incyte had a

4      business relationship as a collaborator, competitor,

5      customer, supplier, or partner."

6           Paragraph 8 (as read):

7           "To aid in the drafting of this declaration, I

8      also reviewed certain files for information that

9      might identify any business relationship between the

10     former entity, Medivation, Inc., and Incyte and

11     consulted with other employees of the company."

12          Paragraph 9 (as read):

13          "Incyte did not have a business relationship

14     with Medivation in 2016 or 2017.  In particular,

15     Incyte and Medivation were not significant

16     collaborators, competitors, customers, suppliers, or

17     partners during that period."

18          Paragraph 10 (as read):

19          "Incyte did not enter into a confidentiality

20     agreement with Medivation in 2016 or 2017."

21          Acquisition proposals.  Paragraph 11.  (as

22     read):

23          "To aid in the drafting of this declaration, I

24     reviewed certain files from 2016 and 2017, and

25     consulted with other employees of the company.

PISCITELLI - DIRECT / SPERTUS

```
 1              Paragraph 12.  (as read):

 2              "Incyte did not receive any acquisition

 3         proposals in 2016 or 2017."

 4              This declaration is dated March 22nd, 2023, and

 5         it's signed by Keith Mikkelson.

 6              THE COURT:  Great.  Thank you.

 7              MS. VAN NESS:  Thank you.

 8              MR. SPERTUS:  Your Honor, as its first witness, the

 9    Defense calls Dominic Piscitelli.

10              THE COURT:  Okay.

11         (Dominic Piscitelli steps forward to be sworn.)

12              THE COURT:  Come on up, Mr. Piscitelli.

13                        DOMINIC PISCITELLI,

14    called as a witness for the Defendant, having been duly sworn,

15    testified as follows:

16              THE WITNESS:  I do.

17              THE CLERK:  Be seated.

18         And we'll move this quite near to you.  It doesn't have

19    much range.  And if you would begin, please, by stating your

20    full name for the record and spelling it for the court

21    reporter.

22              THE WITNESS:  Dominic, D-O-M-I-N-I-C.  Giuseppe,

23    G-I-U-S-E-P-P-E.  Piscitelli, P-I-S-C-I-T E-L-L-I.

24                        DIRECT EXAMINATION

25    \\\
```

**Excerpt of D. Piscitelli's Trial Testimony, dated Mar. 29, 2024,
Dist. Ct. Doc. 163 (Apr. 5, 2024)**

PISCITELLI - DIRECT / SPERTUS

1    describe it -- as you're a hobbyist trader?

2    A.    That's fair.

3    Q.    And your primary -- what was your primary job?

4    A.    My primary job was VP of finance at Medivation at the

5    time.

6    Q.    Let me direct your attention in the binder to

7    Exhibit 2601.  What is Exhibit 2601?  And start at the bottom,

8    I guess, and move up just as you think about it.

9    A.    This is an e-mail from Matt Panuwat.

10   Q.    And look at the very bottom now of the -- it's on page 2,

11   towards the end, and carries over to page 3.  What is -- what

12   is the bottom?

13   A.    This is one of the analysts' recommendations reports that

14   I referenced to.

15   Q.    And did you receive this e-mail and have the

16   communications depicted in it with Matt?

17   A.    Yes.

18          MR. SPERTUS:  And, Your Honor, I move Exhibit 2601

19   into evidence.

20          MR. MEYERHOFER:  Objection.  Hearsay.

21          THE COURT:  Overruled.  It's admitted.

22      (Trial Exhibit 2601 received in evidence.)

23          MR. SPERTUS:  So I'd like to publish Exhibit 2601,

24   please.

25          THE COURT:  Go ahead.

PISCITELLI - DIRECT / SPERTUS

1           **MR. SPERTUS:** Okay. So starting at the bottom of the

2    e-mail, if we can highlight the section called "Goldman Sachs

3    research." Okay.

4    **BY MR. SPERTUS:**

5    **Q.** What was the bottom section of this e-mail?

6    **A.** This is an e-mail from Goldman Sachs, which is one of the

7    large, reputable investment banks, from their analyst, Salveen

8    Richter, who's, again, a well-respected analyst, on a potential

9    trade for options.

10   **Q.** And directing your attention to the first bold sentence

11   (as read):

12           "Buying calls ahead of earnings continues to

13        shine."

14           What does that -- what did that mean to you?

15   **A.** Salveen is recommending buying call options. A call

16   option is a right to purchase a stock at a set price. And

17   there she's saying in front of Q2 earnings.

18   **Q.** And what is Q2 earnings?

19   **A.** That is the second quarter. So if they're a calendar-year

20   organization, their second quarter would be end of June 30th,

21   and you typically report your financials, your 10Q and your

22   earnings, a month or so after that.

23   **Q.** And when -- do you recall when Incyte was due to report

24   its earnings for Q2 in 2016?

25   **A.** Looks like it says August 9th.

**PISCITELLI - DIRECT / SPERTUS**

1  Q.  And so drawing your attention to that section by -- it's

2  highlighted on your screen.

3      Can you please describe what the recommendation from

4  Goldman Sachs was?

5  A.  The recommendation was to buy options in Incyte.  You

6  would pay $4.80, and you would have the right to buy the

7  options, which are $87.50.  So the view here is she's saying

8  you'll be trading above that price at that time.

9  Q.  Who is Goldman Sachs?

10 A.  One of the premier investment banks.

11 Q.  And what makes them a premier investment bank?  Is it the

12 quality of their research?

13 A.  Quality, just reputation.

14 Q.  And if a recommendation is endorsed by Goldman Sachs, do

15 you find that more interesting?

16 A.  I think that's a fair assumption.

17 Q.  Do you recall what you did after you received this

18 recommendation from Goldman Sachs to buy call options in Incyte

19 ahead of Incyte's second quarter earnings?

20 A.  I forwarded it to Matt.

21 Q.  Why would you forward it to Matt?

22 A.  Just to discuss it with him.  As I said before, we

23 discussed trades once in a while.

24 Q.  And did you think that Matt knew what he was -- you know,

25 was a detail-oriented guy?

PISCITELLI - DIRECT / SPERTUS

1   A.   Yes.  I think Matt is very bright.  Again, I said this

2   before, strong scientific background, strong finance

3   background, and he's well in touch, I think, with the

4   companies, and he does strong diligence on his companies that

5   he does invest in.

6   Q.   Do you respect his perspective in connection with

7   securities trades?

8   A.   I do.

9   Q.   And so did you forward the Goldman Sachs recommendation to

10  buy Incyte call options to Matt for purposes of getting a

11  second opinion?

12  A.   That's correct.

13  Q.   So drawing your attention to --

14       MR. SPERTUS:  Actually, I'm sorry.  Take down the

15  Goldman Sachs part and go to the -- highlight the second -- on

16  page 2, the recommendation by Salveen.  I want to put that on

17  the screen before we go to the top page of 2.

18  BY MR. SPERTUS:

19  Q.   The whole recommendation, I'd like you to describe what

20  you interpreted that to be.

21       So do you see now it's on the screen in front of you,

22  Salveen's recommendation?

23  A.   Yes.

24  Q.   So can you walk us through Salveen's recommendation?

25  A.   So this is an e-mail dated July 27, 2016, and the

PISCITELLI - DIRECT / SPERTUS

1    recommendation here is to buy Incyte calls ahead of their

2    earnings -- excuse me -- ahead of their earnings.

3    Q.    And this was the recommendation that then was -- was kind

4    of the cover e-mail for the underlying explanation for the

5    recommendation we just viewed first; right?

6    A.    That's correct.

7    Q.    I'm walking through this e-mail from the bottom up, so I

8    didn't want to skip the recommendation.

9         So after receiving this recommendation, you forwarded it

10   to Matt Panuwat; correct?

11   A.    Yes.

12   Q.    And did you -- after forwarding to Matt Panuwat, did he

13   reply to you?

14   A.    He did.

15   Q.    Okay.  So let's look at both your forwarding and

16   Matt Panuwat's reply.

17        What -- so is that what's depicted on the screen, the

18   7:47 a.m. e-mail from Matt Panuwat to you?  Was that his reply

19   to the Goldman Sachs recommendation that you forwarded to him?

20   A.    It is.

21   Q.    So he asked (as read):

22             "You doing it?  Seems like an odd call."

23             What did you understand Mr. Panuwat to be

24        communicating to you?

25   A.    Basically, he didn't think it was a good call.  He's

PISCITELLI - DIRECT / SPERTUS

1    basically referring to the Incyte call, saying it's an odd

2    recommendation.

3    Q.   And what is HRTX?

4    A.   That is the stock symbol for another company called Heron

5    Therapeutics.

6    Q.   And what is -- what is -- what did you understand

7    Matt Panuwat to mean when he says, "HRTX starting to move"?

8    A.   He's stating that the stock is starting to move in a

9    positive fashion, I'm assuming.

10   Q.   Had you and Matt previously discussed HRTX as an

11   investment?

12   A.   We did.

13   Q.   And is it fair to say that -- what does HRTX do?

14   A.   They have something for nonaddictive pain medication, as

15   well as a drug for CINV, which is chemo-induced nausea and

16   vomiting.  So it's almost like -- it's not a therapeutic, it's

17   more a drug for helping patients who are on chemo.

18   Q.   And did it -- did that company have anything whatsoever to

19   do with Medivation?

20   A.   No.

21   Q.   Was it a collaborator, partner, vendor, any relationship

22   whatsoever?

23   A.   Neither of these companies had anything to do with

24   Medivation.

25   Q.   And when you say neither of these companies had anything

PISCITELLI - DIRECT / SPERTUS

1  to do with Medivation, were there -- as far as you knew, was

2  there -- the movement of their stock prices even related in any

3  way to the movement of Medivation's stock prices?

4  **A.**   No.

5  **Q.**   But they still -- in the general space, biopharma, they're

6  two companies that are biopharma companies; correct?

7  **A.**   That is correct.

8  **Q.**   But they're unrelated to Medivation; is that summary

9  correct?

10  **A.**   That is absolutely correct.

11  **Q.**   Okay.  So then you responded -- I'm sorry.  Then you

12  responded (as read):

13           "Not doing this."

14           What did you mean by saying "not doing this"?

15      Was that in reference to Incyte or HRTX?

16  **A.**   That was in reference to Incyte.

17  **Q.**   And you asked -- and then you say (as read):

18           "Are you doing?  HRTX."

19            What did you mean by that?

20  **A.**   I asked him about whether -- what he's doing with Heron.

21  **Q.**   And then it appears Mr. Panuwat responded (as read):

22           "No on Incyte calls, and yes on HRTX - already

23      in."

24           What did you understand him to be communicating

25      to you?

PISCITELLI - DIRECT / SPERTUS

1    A.   He was not going to make the trade, the recommendation on

2    Incyte -- that he had already purchased some form of equity

3    with Heron.

4    Q.   And this was right after Goldman Sachs had recommended

5    purchases in Incyte call options on July 27th, 2016?

6    A.   Right.

7    Q.   And then, so when he said "already in," how did you

8    respond?

9    A.   So I asked him what trade did he do with regards to Heron.

10   Q.   And did he tell you?

11   A.   Yes.

12   Q.   And what trade did he tell you he made?

13   A.   His response is (as read):

14        "Just equity."  Which means he bought the stock.

15        And said, "Options are tricky and expensive with this

16        one."

17   Q.   And so -- and you're talking about HRTX at the time?

18   A.   That's correct.

19   Q.   And did you ultimately purchase equity in HRTX?

20   A.   I had purchased it, but I don't remember if I purchased it

21   on this date.

22   Q.   You asked, Mr. Piscitelli, then, if you should buy some

23   shares.  What was -- what were you talking about?

24   A.   I was asking him if he thought I should buy some shares in

25   Heron.

PISCITELLI - DIRECT / SPERTUS

1  Q.   And Mr. Panuwat responded to your question, "I think it's

2  interesting."

3       Can you read that whole response, please, into the record?

4  A.   (As read):

5            "I think it is interesting.  They will have two

6       major corporate milestones any day now.  Waiting for

7       approval for their lead drug for CINV and Phase II

8       data for their second drug for postsurgical pain"

9  Q.   Do you think Mr. Panuwat did diligence before he made

10 recommendations for securities purchases?

11 A.   Yes.  This is very typical of Matt.  He does his homework;

12 he studies the companies, and this is just a good example of --

13 his typical investment thesis is really grounded on good

14 research based on publicly available information.

15 Q.   And that's -- the final question is, all the information

16 underlying his analysis and recommendations to you, publicly

17 available information?

18 A.   Yeah, and that's an important --

19       THE COURT:  Calls for speculation.

20       So I don't think you can ask that question or that he can

21 answer it.  So why don't you move on to the next question.

22 BY MR. SPERTUS:

23 Q.   Did you believe that all of his recommendations and

24 analysis to you in connection with securities recommendations

25 was from publicly available information?

PISCITELLI - DIRECT / SPERTUS

```
 1   A.     Yes.  We often discussed the source of the information,
 2   like analyst reports.
 3   Q.     And are analyst reports public?
 4   A.     They are public.
 5   Q.     And this -- this Goldman Sachs recommendation to buy
 6   Incyte call options, for example, how did you end up receiving
 7   that recommendation from Goldman Sachs?
 8   A.     Just the public e-mail that they distributed to me.
 9   Q.     Does Goldman Sachs maintain a Listserv, a distribution
10   list?
11   A.     Yes.
12   Q.     And do you know how you got on their distribution list?
13   A.     It's possible -- Salveen covers -- I just probably asked
14   her to put me on the list.
15   Q.     And so when you get recommendations from Goldman Sachs
16   like the one to purchase Incyte call options, do you have any
17   concern in your mind that Goldman Sachs is making a
18   recommendation based on nonpublic information?
19   A.     Absolutely not.
20   Q.     And is the integrity of the Goldman Sachs recommendation
21   process -- do you believe that they have integrity in acquiring
22   information from public sources when they make recommendations?
23   A.     Yeah.  All these analysts, all these covering analysts
24   have strict compliance on what they write and where they source
25   that information from.  So, yes, I have no doubt that all the
```

(112 of 254), Page 112 of 254 Case: 24-6882, 05/16/2025, DktEntry: 14.3, Page 112 of 254
Case 3:21-cv-06322-WHO    Document 163    Filed 04/05/24    Page 99 of 151    820
PISCITELLI - DIRECT / SPERTUS

1   information that is included in this is public information via

2   the company or filings or presentations at medical conferences.

3       They obviously can put in their opinion on the data, but

4   the information, the source information is from public sources.

5   Q.   And do you feel that Matt absorbed this public information

6   category that you described when he did diligence and research

7   to give you his opinion on recommendations?

8       **THE COURT:**  It calls for speculation.  That's the

9   same, so please move on.

10      **MR. SPERTUS:**  I'm asking if he believes.  Okay.

11  **BY MR. SPERTUS:**

12  Q.   Do you --

13      **MR. SPERTUS:**  May I ask about the belief?  I'm sorry.

14      **THE COURT:**  Not that question.  That just calls for

15  speculation.  So you need to move to another topic,

16  Mr. Spertus.

17  **BY MR. SPERTUS:**

18  Q.   The information that Matt was giving you at the top of

19  this e-mail was -- pertained to HRTX; correct?

20  A.   That's correct.  And that's typical information the

21  company puts out with regards to timing of key milestones and

22  catalysts.  This is very standard practice in the -- in the

23  space.

24  Q.   I mean, the "major corporate milestones any day now" that

25  Matt is talking about, is that a secret or does that -- is

**Excerpts of M. Panuwat's Trial Testimony, dated Apr. 3, 2024,
Dist. Ct. Doc. 164 (Apr. 5, 2024)**

PANUWAT - DIRECT / DiCANIO

```
 1          MR. DiCANIO:  At this time, we would call Matthew
 2   Panuwat.
 3       (Matthew Panuwat steps forward to be sworn.)
 4          THE CLERK:  Step up and remain standing.  I'll take
 5   your photograph.
 6       Raise your right hand.
 7                      MATTHEW PANUWAT,
 8   called as a witness for the Defendant, having been duly sworn,
 9   testified as follows:
10          THE WITNESS:  Yes, I do.
11          THE CLERK:  Be seated, please.
12          THE WITNESS:  This is mine?
13          THE CLERK:  I believe so.  I don't think it's been
14   touched.
15       And if you would, please begin by stating your full name
16   and spelling it for the court reporter.
17          THE WITNESS:  Sure.  Matthew Panuwat, M-A-T-T-H-E-W,
18   Panuwat, P-A-N-U-W-A-T.
19          MR. DiCANIO:  Thank you, Your Honor.
20                    DIRECT EXAMINATION
21   BY MR. DiCANIO:
22   Q.   Good morning, Mr. Panuwat.
23   A.   Good morning.
24   Q.   Mr. Panuwat, you've been sitting through five days of this
25   trial.
```

PANUWAT - DIRECT / DiCANIO

1       Prior to this trial, how long has this case been going on?

2   A.   I believe the case has been going on for about four years

3   now.

4   Q.   As you understand the allegations, sir, has the SEC

5   accused you of defrauding your former employer, Medivation?

6   A.   Yes, they have.

7   Q.   Mr. Panuwat, when you were at Medivation, were you

8   involved in work that exposed you to Medivation's confidential

9   information?

10  A.   Yes, I was.

11  Q.   Did you ever use any of that confidential information to

12  engage in improper trading in the stock market?

13  A.   No, I have not.

14  Q.   When you bought Incyte call options on August 18th, 2016,

15  did you make that purchase on the basis of any confidential

16  information you obtained from your employment at Medivation?

17  A.   No.

18  Q.   When you purchased those Incyte call options on

19  August 18th, 2016, did it ever occur to you that you were

20  violating any of the laws of the United States as it relates to

21  securities trading?

22  A.   No, that never occurred to me.

23  Q.   Mr. Panuwat, I want to talk a little bit about your

24  background.

25       Can you tell us where you were born.

PANUWAT - DIRECT / DiCANIO

```
 1   A.    Yes.  I was born in a small town in North Dakota.  It's
 2   called Devils Lake.
 3   Q.    Are you married, sir?
 4   A.    I am married.
 5   Q.    How long have you been married?
 6   A.    I have been married over 20 years.  22 years.
 7   Q.    And your wife's name?
 8   A.    Cambria.
 9   Q.    Do you have children?
10   A.    I do.  I have two children.
11   Q.    How old are they?
12   A.    They are 17 and 16 years old now.
13   Q.    Did you attend college?
14   A.    Yes.
15   Q.    Where did you attend and what did you study?
16   A.    The first college that I attended was Santa Clara
17   University, where I majored in biology and I received a minor
18   in chemistry.
19   Q.    After you attended college, did you do any post-graduate
20   work?
21   A.    I did.
22   Q.    Where did you go and what did you study?
23   A.    The first post-graduate school that I attended as
24   Georgetown University in Washington, D.C., where I received a
25   master's degree in physiology and biophysics.
```

PANUWAT - DIRECT / DiCANIO

1    Q.   After Georgetown, did you enter the working world?

2    A.   I did.

3    Q.   Where did you work?

4    A.   I worked for a start-up biotechnology company called

5    XenoPort.

6    Q.   How long did you work for XenoPort?

7    A.   I was there for approximately four years.

8    Q.   What were your general job responsibilities, at a high

9    level?

10   A.   From a high level, I was one of the first scientists hired

11   by the company, one of the early employees.  We discovered and

12   developed successfully a drug for neuropathic pain.  It's

13   approved today.

14   Q.   Why did you leave XenoPort?

15   A.   I left XenoPort -- I had a great experience at XenoPort.

16   We were growing pretty significantly.  My roles at the company

17   expanded into more things that were less science-related.  My

18   entire background educationally was science.  I didn't have any

19   business background, so I decided to leave the company to go

20   back to school.

21   Q.   Where did you go?

22   A.   I went to UCLA.

23   Q.   Did you obtain a post-graduate degree from UCLA?

24   A.   I did.

25   Q.   And what was your degree in?

PANUWAT - DIRECT / DiCANIO

1   A.   My degree was a master's in business administration, an

2   MBA, with a focus on finance.

3   Q.   When did you graduate from UCLA?

4   A.   I graduated in 2006.

5   Q.   Did you go back into the working world after UCLA?

6   A.   I did.

7   Q.   Where did you go?

8   A.   I went to work for Merrill Lynch, in their global

9   healthcare investment banking group.

10  Q.   How long did you work for Merrill Lynch?

11  A.   It was approximately eight years.

12  Q.   Do you remember the date you left -- the year you left?

13  A.   I do.

14  Q.   And what was that year?

15  A.   It was in 2014.

16  Q.   So from approximately 2006 to 2014, you worked at Bank of

17  America Merrill Lynch; correct?

18  A.   That would be correct.  Technically, I did do a summer

19  internship there, as well, in the summer of 2005.

20  Q.   What was your title when you first started working at

21  Merrill Lynch?

22  A.   When I first started, I was hired as an associate.

23  Q.   And as time progressed, did you get any promotions?

24  A.   I did.  I think I -- probably two of them that I can

25  remember during my time there.

PANUWAT - DIRECT / DiCANIO

1   Q.   And what were those promotions?

2   A.   I went from an associate to a vice president after a

3   couple of years, and then from vice president to director after

4   a couple more years.

5   Q.   At a very high level, can you explain your general

6   responsibilities and duties working at Merrill Lynch.

7   A.   Sure.

8        I was part of the healthcare investment banking group.

9   Generally speaking, we were working with healthcare companies,

10  mostly on helping them raise capital to fund their businesses,

11  helping them raise money, and also explore strategic

12  transactions.

13  Q.   Anything else?

14  A.   That would be primarily it, I think.

15  Q.   Now, after you left Merrill Lynch in 2014, where did you

16  go next?

17  A.   I left Merrill Lynch in early 2014 and I joined a

18  biopharmaceutical company called Questcor Pharmaceuticals.

19  Q.   And what did you do at Questcor?

20  A.   At Questcor, I joined their corporate development team,

21  where my main role there was to explore business opportunities

22  for the company.

23  Q.   When did you leave Questcor?

24  A.   I left Questcor around August of 2014.

25  Q.   And where did you go next?

PANUWAT - DIRECT / DiCANIO

1   A.   I joined Medivation right after that.

2   Q.   What was your title when you first joined Medivation?

3   A.   My title was senior director of business development.

4   Q.   Can you, at a very high level, describe for the jury what

5   your general duties and responsibilities were in that capacity.

6   A.   Sure.

7        When I joined the company, very similar to my role at

8   Questcor, my main responsibilities were to look for business

9   opportunities and collaborations that the company could pursue.

10  Q.   In that capacity, did anyone report to you?

11  A.   No.

12  Q.   And to whom did you report?

13  A.   I reported to our chief financial officer when I was hired

14  at the company.  His name was Rick Bierly.

15  Q.   And when Mr. Bierly left, did you report to his

16  replacement?

17  A.   Yes.

18  Q.   And who would that be?

19  A.   That was Jennifer Jarrett.

20  Q.   After Pfizer acquired Medivation, did you consider staying

21  on at Medivation?

22  A.   I considered it a little bit, but not too seriously.

23  Q.   Why not?

24  A.   I didn't -- I didn't aspire to work for a very large

25  company, was one.

PANUWAT - DIRECT / DiCANIO

```
 1         Two, Pfizer was based in New York City, so all of their
 2    business development team was primarily located there.  I was
 3    not interested in moving.  I had been pretty stably living on
 4    the West Coast.  And so I didn't consider it very seriously.
 5    Q.   Where did you go after you left Medivation?
 6    A.   After Medivation, I joined another biopharmaceutical
 7    company called Prothena.
 8    Q.   What was your title at Prothena?
 9    A.   I believe when I joined the company Prothena, my title was
10    vice president of business development.
11    Q.   At a very high level, could you describe your general
12    duties and responsibilities while you worked at Prothena.
13    A.   Sure.
14         Similar to my other responsibilities, it was looking for
15    business development opportunities and collaborations for the
16    company.
17    Q.   When did you leave your employment at Prothena?
18    A.   I believe I left Prothena in the fall, late 2018.
19    Q.   And where did you go next?
20    A.   After that, I joined another biopharmaceutical company
21    called ORIC Pharmaceuticals, O-R-I-C.
22    Q.   Is that where you're presently employed?
23    A.   That's correct.
24    Q.   What is your title at ORIC Pharmaceuticals?
25    A.   My title is chief business officer.
```

PANUWAT - DIRECT / DiCANIO

1   Q.   And could you describe, at a very high level, your general
2   duties and responsibilities?
3   A.   Sure.
4        My general duties are to lead most -- a lot of the
5   business functions, business development, corporate
6   development, commercial, market research.
7        I'm quite involved with investor relations and financing
8   for the company.
9   Q.   Mr. Panuwat, during this trial, we've heard from several
10  witnesses who sometimes refer to a "biotech company"; sometimes
11  they refer to a "biopharma company."
12       Is there any difference between the two?
13  A.   Technically, there are scientific differences between the
14  two and how both of those started.
15       I think people use those very commonly as the same thing.
16  I interpret those, when other people are speaking about those
17  things, to be roughly the same.
18  Q.   Now, is it fair to say, sir, that most of your entire
19  professional career has been focused on the biotech/biopharma
20  industry?
21  A.   Yes.
22  Q.   What attracted you to that particular industry?
23  A.   I think -- a couple things come to mind.
24       I have always been interested in science.  Those were the
25  classes I remember, growing up, that I actually did well in.

PANUWAT - DIRECT / DiCANIO

```
 1    Those were the classes that, I think, interest me the most --
 2    so I do remember that -- for quite a long time.
 3         My father was a physician, and so he was a doctor in the
 4    healthcare profession.  I remember him helping me with my
 5    homework, and so I have good memories about that from a science
 6    perspective.
 7         And then later in life, my mother was diagnosed with
 8    breast cancer, and so I remember spending time with her in
 9    hospitals, you know, learning about kind of the healthcare
10    industry from that perspective as well.
11         So I think it's probably a culmination of all of those
12    things, which is why I can remember I've always been interested
13    in science and the biotechnology industry.
14    Q.   Now, prior to your testimony today, sir, did you prepare
15    for your testimony?
16    A.   Today?
17    Q.   Yes.
18    A.   Yes, I did.
19    Q.   And could you describe for the jury generally what you did
20    to prepare for your testimony.
21    A.   Sure.
22         I had met with my legal team several times, reviewed
23    documents from -- I received a relatively long time ago to get
24    familiar with some of the subject matter being discussed during
25    this case.
```

PANUWAT - DIRECT / DiCANIO

1    And then I certainly have not had an experience like this,

2  so just helping me to know how this process works and what to

3  expect.

4  Q.   Now, Mr. Panuwat, this case involves -- excuse me -- some

5  of your trading in the stock market in 2016.

6    I'd like you to think back to the very first time you

7  started trading in the stock market.

8    When was that, sir?

9  A.   Very difficult for me to put an exact finger on that.  I

10  do have lots of memories on investing in the stock market

11  easily in high school.  I was very active in high school,

12  potentially, even earlier than that -- potentially, kind of

13  when I was in junior high school.

14  Q.   How did you become interested in trading in securities at

15  such a young age?

16  A.   It was something that my parents really wanted me to learn

17  about.  Both of my parents, by way of background, both of them

18  really came from nothing.  My father immigrated to this

19  country, you know, by himself when he was a young -- young age.

20    And then my mother grew up in West Virginia in a very

21  small coal-mining town.  Her father passed away when she was

22  young.

23    They ended up getting married, obviously had a good life

24  together.  They learned to invest in the stock market, and they

25  actually did quite well in it.

PANUWAT - DIRECT / DiCANIO

```
 1   was getting better at making investments.  And I think,
 2   you know, I was probably getting paid more at work and things
 3   like that.
 4   Q.   When you reference getting better at making investments,
 5   what do you mean by that?
 6   A.   I think I just gained more experience in the market over
 7   time.  I think, you know, if you focus on things, you tend to
 8   get better at that over time.
 9        MR. DiCANIO:  Your Honor, if this is appropriate, this
10   would be a good time.
11        THE COURT:  Okay.
12      Ladies and gentlemen, let's take our first break in the
13   morning, 15 minutes.  We'll be back at about 10:18.
14                (The jury leaves the courtroom.)
15     (Proceedings were heard out of the presence of the jury.)
16        THE COURT:  All right.  We're in recess.
17        MR. DiCANIO:  Thank you, Your Honor.
18                (Recess taken at 10:05 a.m.)
19             (Proceedings resumed at 10:20 a.m.)
20     (Proceedings were heard out of the presence of the jury.)
21        THE CLERK:  Please come to order.
22        THE COURT:  Ready to go?
23        MR. DiCANIO:  We are, Your Honor.
24        THE COURT:  Okay.
25                (The jury enters the courtroom.)
```

PANUWAT - DIRECT / DiCANIO

```
 1          (Proceedings were heard in the presence of the jury.)

 2              THE COURT:  All right.  Please be seated, everybody.

 3      Mr. DiCanio --

 4              MR. DiCANIO:  Thank you, Your Honor.

 5              THE COURT:  -- go ahead.

 6              MR. DiCANIO:  Mr. Shorr, can we put up Exhibit 2965,

 7      which has been admitted into evidence.

 8          I'm going to try this one more time, Your Honor.

 9          And if you could take off the highlighting, please.

10      BY MR. DiCANIO:

11      Q.  Mr. Panuwat, I apologize for earlier today.  Let me try

12      this line of questioning again.

13          This is a chart that reflects the number of trades you

14      made that were over $48,000 from 2013 to 2020.

15          Can you count the number of trades that are reflected in

16      this exhibit, please.

17      A.  Yes.

18                          (Pause in proceedings.)

19      A.  It looks to be about 55 trades.  There are some that are

20      summarized, and so I just treated those as one.

21      Q.  Now looking at the number of investments that were $90,000

22      or more.

23              MR. DiCANIO:  And, Mr. Shorr, if you can just

24      highlight those.

25      \\\
```

PANUWAT - DIRECT / DiCANIO

1    BY MR. DiCANIO:

2    Q.    And, Mr. Panuwat, could you tell us how many are in the

3    highlighted trades.

4    A.    And I think you're -- just to clarify, you're asking for

5    over $90,000?

6    Q.    Right.  And Mr. Shorr has highlighted those.

7    A.    There.  He did highlight one that I noticed.

8         Okay.  Thank you.

9    Q.    And how many of their -- how many over $90,000 in trades

10   from 2013 to 2020?

11   A.    Okay.  I understand.  Give me a second.

12                        (Pause in proceedings.)

13   A.    I think 33.

14   Q.    Okay.  I want to turn now to your purchase of Incyte call

15   options.

16        Before you made your trade in the Incyte company, did you

17   know about that company?

18   A.    I did, yes.

19   Q.    How did you become aware of the Incyte company?

20   A.    The Incyte company, it's a very -- a relatively large

21   company.  It's been around for a long time.

22        I started working in the biotechnology industry in the

23   year 2000, and so I do remember Incyte was already a successful

24   company at that time.  So I do remember that.

25        It has done a number of things.  It has changed its focus

PANUWAT - DIRECT / DiCANIO

 1  over time.  So I've remembered it for a long time.

 2      I think, secondly, I -- one of my children has a skin

 3  condition called vitiligo.  It's kind of a skin discoloration,

 4  and I remember trying to learn about it.  Interestingly, Incyte

 5  was a company that was one of the few companies that was

 6  developing a drug for that skin condition, so I am familiar

 7  with it from that standpoint as well.

 8      And then it's -- it is just a large company in the

 9  industry where I work.

10  Q.  By 2016, did you know anybody who had worked at Incyte?

11  A.  I did not.

12  Q.  What was the therapeutic focus of Incyte in 2016?

13  A.  I remember Incyte working on a lot of different diseases.

14      I remember they did have a commercial product for a

15  hematology/oncology indication.  They were working on drugs for

16  inflammatory diseases.

17      I believe they had a drug that they were developing for

18  rheumatoid arthritis, and they were working on a number of

19  drugs for skin conditions.

20      I also remember them working on hair loss.  I believe hair

21  loss for men was another condition.

22      So I remember it just being a pretty diversified-type

23  company.

24  Q.  Did Incyte have any cancer drugs?

25  A.  I believe they had one commercialized and a number of

PANUWAT - DIRECT / DiCANIO

```
 1   other ones in development.
 2   Q.   When you make the distinction between "commercialized" and
 3   "others in development," could you explain what you mean by
 4   that distinction?
 5   A.   Sure.
 6        Commercialized or marketed, for that matter, they have --
 7   the way I think about it, they have been approved by the FDA,
 8   and companies are allowed to sell those -- sell those to,
 9   essentially, patients.  You know, physicians that can write
10   prescriptions for that drug is how I think about it.
11        Anything before that would be in development.  So the
12   company is running clinical studies usually.  They're working
13   on drugs in their laboratories.  They're working with the FDA
14   to try to get drugs approved.
15        But I think of, again, commercialized, marketed products
16   being FDA approved, and then everything else before that is in
17   development.
18   Q.   What was Incyte's cancer drug that was commercialized in
19   2016?
20   A.   Sure.  It's a drug called Jakafi.  It was commercialized
21   for a couple of rare indications.  I think it's most commonly
22   referred to as myelofibrosis and polycythemia vera.
23   Q.   In 2016, did Incyte have any drugs that treated prostate
24   cancer?
25   A.   I'm pretty sure no.
```

PANUWAT - DIRECT / DiCANIO

1  Q.   By 2016, did Medivation and Incyte have any business

2  relationship?

3  A.   They did not have any business relationship.

4  Q.   Were they considered competitors of each other?

5  A.   We did not -- at Medivation -- I can easily speak to

6  that -- we did not consider Incyte a competitor by any metric.

7       I also believe that Incyte did not consider Medivation to

8  be a competitor of theirs either.

9  Q.   By 2016, had you formed a personal opinion about the

10 quality of the Incyte company?

11 A.   I believe so, yes.

12 Q.   What was your view?

13 A.   I believe, again, it was one of the larger companies in

14 the biotechnology industry.  They had a drug that was

15 commercialized.  I believe that they had developed that

16 themselves, you know, in their research, and I believe that

17 they were working on a number of others.

18      My impression, I believe, was, you know, positive.  It was

19 a well-run company that has been around for a long time, that

20 was developing a lot of different drugs for a lot of different

21 diseases.

22 Q.   I want to show you what's been marked as Exhibit 2601.

23      MR. DiCANIO:  And that has been admitted, Your Honor.

24      And, Aaron, if you could just put it up, please.

25 \\\

PANUWAT - DIRECT / DiCANIO

```
 1    BY MR. DiCANIO:
 2    Q.   Mr. Panuwat, are you familiar with the e-mail that's been
 3    marked as Exhibit 2601?
 4    A.   I am familiar with this, yes.
 5    Q.   That's an e-mail discussion between you and
 6    Mr. Piscitelli; correct?
 7    A.   That's correct.
 8    Q.   On July 27th, 2016; right?
 9    A.   Yes.
10    Q.   Okay.  Now, Mr. Piscitelli testified last week, but can
11    you remind the jury what his role was at Medivation?
12    A.   Mr. Piscitelli, he was -- I believe he was the head of our
13    finance group.  He was the vice president of finance.  That's
14    what I remember.  He might have had a little bit broader title
15    than that.
16    Q.   I want to turn your attention to the bottom footer
17    "Page 2" of Exhibit 2601.  And what I mean by the "bottom
18    footer," there's a mark on the bottom right corner that will
19    help you find the page.
20         Do you see that?
21    A.   Page 2?
22    Q.   Correct.
23    A.   Yes.
24    Q.   Mr. Piscitelli is attaching a report from Goldman Sachs.
25         What is Goldman Sachs?
```

PANUWAT - DIRECT / DiCANIO

1   **A.**   Goldman Sachs is a global investment bank.

2   **Q.**   What is the recommendation for?

3   **A.**   It looks to be a specific recommendation to buy Incyte

4   call options.

5   **Q.**   I want to go through this a little bit.  So let's focus on

6   the first paragraph.

7        The Goldman Sachs report says (as read):

8           "With option prices still low vs. history, we

9           continue to focus on ideas to buy options around

10          earnings, calls in particular, given the favorable

11          backdrop.  Focus on NVDA and INCY for positive views

12          ahead of earnings...."

13       Do you see that?

14  **A.**   I do.

15  **Q.**   Do you have an understanding of what the reference to

16  "INCY" is?

17  **A.**   Yes.

18  **Q.**   And what is that, sir?

19  **A.**   That would be the stock ticker for Incyte Corporation.

20  **Q.**   How about the reference to "NVDA"?  What is that in

21  reference to?

22  **A.**   That's in reference to another company.  That's a stock

23  tipper -- stock ticker for NVIDIA.  It is a semiconductor

24  company.

25  **Q.**   Did you have an understanding of what was meant by the

PANUWAT - DIRECT / DiCANIO

1   paragraph that I just read to you?

2   A.   I do have an understanding of that.

3   Q.   What is your understanding, sir?

4   A.   I think the first sentence is referring to options prices

5   being relatively low.  There are a number of factors that

6   contribute to options pricing, interest rates and things being

7   one of those.

8        I think they're making a reference that options prices, in

9   general, are low versus historical, and that they are

10  recommending to their clients to actually buy options.

11  I believe that is -- the first sentence references that.

12       The second one, I think they specifically reference what

13  types of companies investors should be investing in, which call

14  options.

15  Q.   The report continues as follows (as read):

16            "The company," meaning Incyte, "reports earnings

17       on August 9th.  Our analyst expects stock to trade up

18       leading into earnings and expects results to be a

19       positive catalyst for shares."

20       Do you see that?

21  A.   I do.

22  Q.   Do you have an understanding of what was meant by that

23  particular paragraph?

24  A.   Yes, I do.

25  Q.   What is your understanding?

PANUWAT - DIRECT / DiCANIO

1   A.    My understanding is that they are referencing Incyte;

2   Incyte would have an earnings announcement -- it seems like

3   here they're drawing attention to August 9th.

4        And according to their analyst, they believe the stock

5   will trade up heading into earnings; and they expect the

6   earnings to be positive, which would be good for the share

7   price of Incyte.

8   Q.    Mr. Panuwat, what is an earnings announcement?

9   A.    An earnings announcement is typically when a public

10  company of any industry reports the -- their financial results

11  from the previous quarter.  I think that's the high level.

12  Happy to talk more about that.

13  Q.    No.  Thank you for that, sir.

14       Now, looking at the next paragraph, the Goldman Sachs

15  report states (as read):

16            "Options are underpricing normal earnings

17       volatility and missing the potential for stronger

18       Jakafi sales."

19       Do you see that?

20  A.    I do.

21  Q.    What is your understanding of that?

22  A.    My understanding is that this analyst believes that the

23  Incyte options are underpriced given what they expect to be a

24  good quarter for Incyte's commercial product, Jakafi.

25  Q.    Now, the date of the Goldman Sachs report is July 27th,

PANUWAT - DIRECT / DiCANIO

1    2016.

2        By the time of that report, was news about the Medivation

3    sales process well known in the market?

4    A.    Yes.

5    Q.    Having reviewed this report, does the Goldman Sachs report

6    anywhere reference the potential Medivation sale as a reason to

7    buy Incyte call options?

8    A.    No, it does not.

9    Q.    Does the Goldman Sachs report mention anywhere the

10   scarcity value of biotech companies following the potential

11   merger of Medivation -- following the potential Medivation

12   sale?

13   A.    No, it does not.

14   Q.    Let's go back to the e-mail.

15       At the bottom of page 1, do you see where you respond to

16   Mr. Piscitelli at 7:47 a.m.?

17       Are you there?

18   A.    Yes, I see that.

19   Q.    You write, sir (as read):

20           "You doing it?  Seems like an odd call.  HRTX

21   starting to move."

22       First of all, what is "HRTX"?

23   A.    HRTX is a stock ticker for a biotechnology company called

24   Heron Therapeutics.

25   Q.    Now, you indicate that recommending the Incyte call

PANUWAT - DIRECT / DiCANIO

1    options was an odd call by Goldman Sachs.

2        Why did you think that?

3    A.   I believe it is odd for an investment bank to recommend

4    securities ahead of an earnings announcement.

5        You know, I've been following the space for a long time.

6    I've made a lot of investments.  I personally do not invest

7    ahead of earnings calls.  I think, at least in my opinion, very

8    difficult to know what a company is going to announce on an

9    earnings announcement, and then potentially even more difficult

10   on what actually the stock will do based on an earnings

11   announcement.

12       So for Goldman Sachs to recommend that, it strikes me --

13   is a little bit unusual.  I think that is kind of the reference

14   I'm making here.

15   Q.   Moving to Mr. Piscitelli's response at 7:54, he replies

16   (as read):

17           "Not doing this.  Are you doing?"

18       And then it says "HRTX."

19       Is it fair to read this as Mr. Piscitelli was not going to

20   trade in the Incyte call options?

21   A.   That is how I would interpret this e-mail, yes.

22   Q.   Then, turning to your response at 7:56, you say (as read):

23           "No on INCY calls, and yes on HRTX - already

24       in."

25       What did you mean by that?

PANUWAT - DIRECT / DiCANIO

1   A.   I think what I mean by that is that I was not planning to

2   make the investment in Incyte call options at this time, but

3   that I already had invested in the other company, Heron

4   Therapeutics.

5   Q.   Why not buy the Incyte call options as of this date,

6   July 27, 2016?

7   A.   I think, similar to my earlier answer, you know, it's not

8   common for me.  In fact, I can't recall a time ever having done

9   that, where I would actually invest ahead of a company's

10  earnings call, any company, let alone Incyte.  And so that was

11  just not something that I would have been comfortable doing at

12  that time.

13  Q.   Mr. Piscitelli writes back at 7:58 and asks (as read):

14          "What's the trade?  I want in!!"

15      Do you see that?

16  A.   I do.

17  Q.   And then you respond (as read):

18          "Just equity.  Options are tricky and expensive

19      with this one."

20      What company were you referring to when you said that

21  "options are tricky and expensive with this one"?

22  A.   I believe I'm -- we've kind of moved on from Incyte.

23  I believe, at this point, we are exchanging e-mails regarding

24  Heron Therapeutics.

25  Q.   Was Heron a biotech/biopharma company?

PANUWAT - DIRECT / DiCANIO

1    **A.**    Yes, it was.

2    **Q.**    Was Heron also focused on oncology?

3    **A.**    That was one of the areas where they were focused.

4    **Q.**    To the best of your recollection, in 2016, did they have a

5    commercialized oncology product?

6    **A.**    It's hard for me to remember exactly on that date.

7    I believe that they did actually have a drug that was approved

8    for an oncology indication or just about to get approved.

9         But they did have a number of other programs as well.

10   **Q.**    Now, eventually, you did decide to buy Incyte call

11   options; right?

12   **A.**    Yes.

13   **Q.**    What changed your mind?

14   **A.**    I think the stock price of Incyte.

15   **Q.**    And how so, sir?

16   **A.**    I think at this point, when Goldman Sachs was making the

17   recommendation in July, I did notice that the Incyte stock

18   price fell very significantly shortly after this period of

19   time, so significantly, for a company that large, it was an

20   unusual type of decrease in the stock price in a very short

21   period of time.  That is not something that is typical for a

22   company the size of Incyte.

23        And I do remember -- following their earnings

24   announcement, which is what Goldman Sachs was doing -- I do

25   remember reading their earnings announcement.  That is

PANUWAT - DIRECT / DiCANIO

1    something that I commonly do, especially for the large

2    companies in the industry that I follow.  And I remember their

3    earnings announcement was actually quite favorable.

4         And for reasons hard to explain -- but I believe the stock

5    price continued to fall.  I think it dropped into the earnings

6    announcement and it continued to fall after the earnings

7    announcement, multiple days in a row.  I think, ultimately, it

8    was down 10 days in a row.  Very unusual.

9    Q.   I'd like to show you what's been marked as Exhibit 2968.

10        MR. DiCANIO:  Your Honor, this is in evidence.

11        And, Aaron, if you would display it, please.

12   BY MR. DiCANIO:

13   Q.   Mr. Panuwat, are you familiar with this document?

14   A.   I'm familiar with the information on this page.  I believe

15   this document was shown earlier today.

16   Q.   Does the chart accurately reflect the stock prices of

17   Incyte during the relevant time period, as far as you remember?

18   A.   As far as I remember, it looks accurate, yes.

19   Q.   Now, in July and August of 2016, did you have access to

20   stock price charts, stock prices?

21   A.   I did have access to stock prices and stock price charts,

22   yes.

23   Q.   How did you have access to stock prices?

24   A.   Stock prices are publicly available information.  They're

25   available in many places.  I typically use Yahoo! Finance most

PANUWAT - DIRECT / DiCANIO

1  frequently.  Stock prices of every company that's publicly

2  traded, I believe, is listed on Yahoo! Finance.

3      I also read the Wall Street Journal.  I watch CNBC.

4  There's a lot of different ways -- stock prices are, I guess,

5  very common, in my opinion.

6  Q.  During this period of time, sir, were you checking the

7  stock prices of various companies on Yahoo! Finance or the

8  Wall Street Journal and those other media outlets?

9  A.  Yes.

10 Q.  Can you walk us through how you would typically check

11 prices every day.

12 A.  Sure.

13     I would say almost every single day, I check the stock

14 market multiple times a day.  It tends to be -- excuse me.  It

15 tends to be likely the first thing I do when I wake up in the

16 morning.  The stock market opens up at 6:30 a.m. on the West

17 Coast.  I do check to see what the stock market is doing.

18     I do generally want to understand what's going on in the

19 industry, and so I follow every biotech company that I'm aware

20 of, really looking for material news, important news of the

21 day.  That's generally what I do first thing in the morning.

22     At the very least, I check the stock market in the

23 afternoon.  The market, on the West Coast, closes at 1:00 p.m.

24     And so it's -- it's very common for companies to announce

25 news before the market opens or after the market closes.  Very

PANUWAT - DIRECT / DiCANIO

1    rare, if at all, a company would announce anything during the

2    day -- during the trading day, and so I quite frequently will

3    check the whole -- a whole host of stocks after the market and

4    before.

5         So that's just in general, but I think it's quite common

6    that I'm checking the market many times every single day.

7    **Q.**   In connection with the times that you would check the

8    market and check the stock prices, how many companies are you

9    looking at?

10   **A.**   I tend to -- when I look at Yahoo! Finance, for example,

11   it essentially consists of every biotechnology company that I

12   know.

13        I think, at this time frame, it was probably 4-, 5-, maybe

14   600 companies in the biotechnology industry.  I do believe

15   that's a lot more now.  The industry has grown since this time

16   frame.  But, essentially, that would be on my Yahoo! page.

17        I'm not memorizing every single stock price movement, for

18   sure, but I am looking for kind of material movements in the

19   stock price, which generally reflects that there's probably

20   news going on about that company.

21   **Q.**   Would it be fair to say, sir, that you're kind of

22   scrolling through the stock prices when you do this?

23   **A.**   I think that's exactly how -- probably a better way to

24   explain it than I did, yes.

25   **Q.**   Okay.  Now, was checking the stock prices of other biotech

PANUWAT - DIRECT / DiCANIO

1   companies relevant to your job at Medivation?

2   **A.**    I think it is, yes.

3   **Q.**    How so?

4   **A.**    I think somebody in business development for a

5   biotechnology company, I believe it's very useful to be very

6   familiar with what's going on in the industry, following news,

7   following developments, following what other companies are

8   doing, having an understanding of what is working for other

9   companies, trying to understand what isn't working, and so

10  using those learnings to help inform the company that I'm

11  working for.  I believe that's extremely useful.

12  **Q.**    Now, sir, you just testified that you recall reviewing the

13  Incyte earning announcement on August 9th and that it was

14  generally positive.

15         What do you remember about that earnings announcement, if

16  anything?

17  **A.**    Sure.  I remember, essentially, just it being relatively

18  unremarkable.

19         When I look at earnings releases, usually you're looking

20  for how is the commercial product doing.  I think their

21  commercial product was doing well at this quarter, as it had

22  been for other quarters.

23         And then I think where I usually pay a particular focus is

24  what is the news around their pipeline.  Sometimes companies

25  will report the status or even clinical data of some of their

PANUWAT - DIRECT / DiCANIO

1    drug candidates, things that might have failed, things that

2    might have worked.  That's generally the types of news that I

3    pay particular attention to.

4         I do remember, given that Incyte's stock price was not

5    well received, I would have expected there must have been a

6    clinical trial failure, there must have been a poor earnings

7    announcement, their commercial product must not have been doing

8    well.

9         But I do remember not seeing anything like that in review

10   of their earnings announcement.  It seemed to be a relatively

11   routine, if not, again, you know, relatively positive earnings

12   announcement.

13   Q.   Now, using the chart which has been marked as 2968, can

14   you walk us through your thought process when you made your

15   trades in the Incyte company.

16   A.   Sure.

17        I generally -- I mean, starting -- I think this slide

18   helps, but starting -- remember, I was conversing with one of

19   my colleagues about Incyte a couple weeks before my Incyte

20   trade.  And so that was brought to my attention.  We were

21   trading e-mails about it.

22        I was following Incyte's earnings announcement, and then

23   after that, the stock price decreased pretty significantly.

24        I would have followed Incyte's stock price.  It would have

25   been unusual -- again, the magnitude of the drop here is very

**PANUWAT - DIRECT / DiCANIO**

 1    usually general categories of that.

 2    Q.    Let me ask that question a different way.

 3          So you purchased your call options on August 18th.

 4          How much prior did Incyte's stock price trade at $82.50,

 5    prior to your trade?

 6    A.    How much did it, prior, trade above 80?

 7    Q.    How many days prior --

 8    A.    Oh.

 9    Q.    -- did Incyte's stock price trade at 82.50?

10    A.    I see.

11          Probably five or six days previously.

12    Q.    And what about your $85 strike prices?

13    A.    Maybe seven or eight.

14    Q.    So all of your strike prices that you selected to make

15    your Incyte call option trades, the stock price at Incyte had

16    been trading at those levels within a couple of days and no

17    more than a week of your trade; correct?

18    A.    Yes, that's fair.

19    Q.    And did you view that as de-risking or making your trade

20    less risky?

21    A.    Yes, I believe so.  I mean, every investment is risky, but

22    I believe that those characteristics -- this was a good

23    investment at the time.

24          MR. DiCANIO:  I want to go to Exhibit 2966, which also

25    is in evidence, Your Honor.

PANUWAT - DIRECT / DiCANIO

1          And if we could display that, Aaron.  Thank you.

2     BY MR. DiCANIO:

3     Q.   Your total investment in the Incyte company was

4     approximately 117,000.

5          Do you see that on the chart, sir?

6     A.   Yes, I do.

7     Q.   Why did you invest that amount?

8     A.   Probably a couple of things.

9          I think, one, again, that was a company I knew extremely

10    well.  I had an understanding of their business, what they were

11    doing, generally well-run company.  And the stock price, again,

12    decreased very significantly very quickly.  I thought it was a

13    very good investment.

14         When I kind of look at the amount invested, I generally

15    kind of think of things, roughly speaking, that, in my view,

16    would have been roughly a $100,000 investment.  There is

17    variability, just depending on what price you'll ultimately get

18    in the market, and so some of these vary a little bit higher, a

19    little bit lower.

20         But, in general, I believe that size of that investment

21    would have been consistent with some of the other ones I made.

22    Q.   Did your prior trading gains in 2016 influence, in any

23    way, the amount of money you invested in the Incyte company?

24    A.   Yes, I think that also helps, as well, yes.

25    Q.   Can you explain that, please.

PANUWAT - DIRECT / DiCANIO

```
 1    A.    Sure.
 2          I think similar to kind of how I explained taxes, I was
 3    having a very strong investment year, so I would -- did have a
 4    number -- a pretty significant profit for the year.
 5          As I think about the rest of the year trading, I was
 6    relatively active.  Part of that reason was that I had a pretty
 7    significant profit, and, again, I would have known for sure
 8    that I would have been -- had a very large tax bill due for my
 9    2016 year.
10          And, again, as I think about that, it essentially
11    encourages you to make more investments, potentially even more
12    sizeable investments, because, again, your downside is limited.
13          If, for example, I had -- would -- made an investment that
14    did not work out, I could use those losses to offset the gains
15    and essentially minimize my tax bill.  So the way that I think
16    about it is there's basically -- the risk/reward changes.
17          If the downside is you can use that to offset your taxes,
18    technically, that's a relatively good thing; if the investment
19    actually works out and you make more money, that's obviously a
20    good thing too.  So the dynamic does change depending on how my
21    trading is going for the year.
22    Q.    Let me make sure I understand, sir.
23          So if you had a gain of a hundred dollars and then you had
24    a loss of 50, you could take that loss to reduce your gain so
25    your taxable gain would only be $50.
```

**PANUWAT - DIRECT / DiCANIO**

1        Is that what you're describing?

2  **A.**    I believe that's a hundred percent accurate, yeah.

3  **Q.**    And, therefore, your taxable gain would be less.

4  **A.**    Yes.

5  **Q.**    Now, when you invested the $117,000 in the call options in

6  Incyte, did you view that entire money at risk?

7  **A.**    No, I did not.

8  **Q.**    Why not?

9  **A.**    I think part of it is, like I said, these are publicly

10  traded types of securities.  They do rise and fall throughout

11  the day, and so making any investment that I make, I know that

12  I can sell it at any point in time.

13        I think in particular with options, again, options have

14  been something that I have been investing in now for over --

15  over -- around 20 years.  I think it's -- I definitely don't

16  want to say never, but I would say it's very unlikely,

17  unusual -- I actually can't think of a time where I might have

18  done it, actually hold an option into the actual expiration

19  date.  It tends to be a security that I will buy and sell, as

20  opposed to just waiting for it to expire.

21  **Q.**    I see.

22        So any time before the expiration of the option, you could

23  have sold the option to limit any potential losses; is that

24  correct?

25  **A.**    That's correct.

PANUWAT - DIRECT / DiCANIO

 1   Q.   Now, you ultimately sold some of your options on

 2   August 24th, 2016; is that correct?

 3   A.   Sorry.  No, it's okay.

 4   Q.   I misstated that.

 5   A.   I was distracted.

 6   Q.   You ultimately sold some of your options on August 22nd,

 7   2016.

 8   A.   I believe that's right.

 9   Q.   Do you recall why you sold on that particular --

10   A.   Excuse me.  Sorry.  Can we start that -- I think the

11   dates -- are the dates wrong?  I'm a little confused.  Can

12   you ask that question again?

13   Q.   Yeah.

14        Do you recall when you sold your Incyte call options?

15   A.   I believe I sold less than half of them the following week

16   after I bought them.

17        I believe -- I don't have it in front of me, but I do

18   believe it was -- August 24th is when I first sold a little bit

19   less than half of my options in Incyte.

20   Q.   Why did you sell on that particular date?

21   A.   There was a stock price increase in Incyte over the

22   several days that I owned the options.  I believe I had a gain

23   in the options that I had held, and so I sold some of it and

24   then kept, again, about half, a little bit more than that.

25   Q.   Now, why did you sell only roughly half and not all of

1  your options on the 24th?

2  **A.**  I believe I sold some of it because there was a gain, and

3  so I wanted to, basically, lock in that gain.

4      And then also I still believed that the company was

5  undervalued.  It was still trading below where it was even the

6  prior week, and so I did think that it was still undervalued.

7  I did expect it would continue to go up, and so I still held at

8  least half of my position.

9  **Q.**  Did your judgment ultimately prove correct on that?

10 **A.**  My judgment on holding the rest of my Incyte options was

11 not good from a financial perspective.

12 **Q.**  Did you lose money on those?

13 **A.**  I did lose money on that.

14 **Q.**  Okay.  Now, Mr. Panuwat, I want to take you back to early

15 2020, when this case all started.

16      Do you recall being interviewed by the SEC for the first

17 time in May of 2020?

18 **A.**  Yes, I do.

19 **Q.**  You received a subpoena from the SEC; correct?

20 **A.**  That's correct.

21 **Q.**  Do you remember what time period that subpoena covered?

22 **A.**  I do.  I believe I received the subpoena in April 2020,

23 and there was a request for a lot of information.  I do believe

24 it generally covered the time period from 2016 through the

25 present date, which was April 2020, so a period of about five

PANUWAT - DIRECT / DiCANIO

1  years.  And there might have been requests for information even

2  earlier than 2016, I believe.

3  Q.  Did the subpoena require you to collect certain documents?

4  A.  It did.

5  Q.  What -- generally, at a very high level, what types of

6  documents?

7  A.  It was a ton of information.  I guess, generally speaking,

8  I did have to turn over -- I turned over my computers to

9  lawyers.  I turned over my cell phone to lawyers.  E-mails.

10     I had to provide contact information that I've had, that

11  my family has had, that my children has had.  Bank account

12  information.  Trading brokerage account statements.

13     It was pretty extensive.  I'm sure I'm forgetting a lot.

14     My employment history.  It was -- it was a pretty big

15  effort, I guess, from a high -- from a high level.

16  Q.  So did it include, sir, your trading records from 2016 to

17  2020?

18  A.  Yes, it did.

19  Q.  And did you comply with the subpoena by providing the

20  requested documents to the SEC?

21  A.  Yes, I did.

22  Q.  Did the subpoena specifically identify your trading in

23  Incyte company as something the SEC wanted to speak with you

24  about?

25  A.  No, there was no reference to that.

PANUWAT - DIRECT / DiCANIO

1  Q.   Did the subpoena specifically identify your trading in any

2  other company?

3  A.   Yes, I believe another company was described in the

4  subpoena.

5  Q.   But that was not the Incyte company; correct?

6  A.   That's correct.

7  Q.   Other than the company specifically identified in the

8  subpoena, did the SEC tell you which particular trades they

9  were going to ask you about in your first interview?

10  A.   They did not.  I actually believe that we had asked

11  them -- we provided a lot of information.  I believe we asked

12  them what companies and what trades they might want to discuss

13  over that time frame, and they declined to provide any

14  information on that.

15  Q.   Now, before your interview, from 2016 to 2020, do you

16  recall approximately how many trades you made?

17  A.   I would have to estimate.  It's likely to be approximately

18  150 to 200 trades during that time period -- time frame.

19  Q.   From 2016 to 2020, do you remember how many companies you

20  might have invested in during that period of time?

21  A.   How many different types of companies?

22  Q.   Correct.

23  A.   I would have to estimate that as well.  Probably

24  approximately 40 to 50.

25  Q.   Before your first interview with the SEC, had you thought

PANUWAT - DIRECT / DiCANIO

1   about your trades in the Incyte company?

2   A.   I don't believe I had ever thought about those after that.

3   Q.   How long before your first SEC interview did you make your

4   trades in the Incyte company?

5   A.   I believe it was close to four years prior.

6   Q.   Before your first SEC interview, did you have access to

7   all of your Medivation documents?

8   A.   No, I did not.

9   Q.   Did you have access to all of your Medivation e-mails?

10  A.   No.  Medivation was acquired.  I was working at a

11  different company at that time.  I did not have access to my

12  Medivation computer or e-mails and things like that.

13  Q.   You had left the company about four years prior; correct?

14  A.   That's right.

15  Q.   Now, that first interview was conducted during COVID;

16  right?

17  A.   Yes.

18  Q.   And you were at your home when you did that interview;

19  right?

20  A.   Yes.

21  Q.   Before the SEC interview, did they tell you that they

22  would be asking you about the Medivation sales process?

23  A.   No, they did not.

24  Q.   Had you thought much about the Medivation sales process

25  before that -- before May of 2020?

PANUWAT - DIRECT / DiCANIO

 1   **A.**   Nothing that I can remember.  It has probably come up from

 2   time to time, but certainly nothing that I really remember

 3   thinking about too much.

 4   **Q.**   In the first SEC interview, you testified under oath;

 5   correct?

 6   **A.**   That's right.

 7   **Q.**   And in that first SEC interview, they asked you why you

 8   made your trades in the Incyte company; correct?

 9   **A.**   They did.

10   **Q.**   Do you recall what you told them?

11   **A.**   I believe I told them a number of things about the Incyte

12   company.

13        I had described my familiarity with the company and what

14   they had done.  I believe I had answered questions about the

15   trade.  I do believe that I couldn't remember the very

16   specifics around the timing of that trade, but I do remember

17   there being a lot of questions about Incyte generally during

18   that first interview.

19            **MR. DiCANIO:**  Your Honor, at this point in time, may

20   we play the video that we discussed previously?

21            **THE COURT:**  Yep.  Go ahead.

22            **MR. DiCANIO:**  Mr. Shorr.

23        Now, Your Honor, maybe before we play that, let me just

24   set it up for the jury.

25        This is a videotape of Mr. Panuwat's first interview with

PANUWAT - DIRECT / DiCANIO

1   the SEC in May of 2020.

2                    (Video played but not reported.)

3              MR. DiCANIO:  Thank you.

4   BY MR. DiCANIO:

5   Q.    Now, Mr. Panuwat, you had a second interview with the SEC

6   on November 6th, 2020; is that correct?

7   A.    That's correct.

8   Q.    Was that testimony under oath?

9   A.    Yes, it was.

10  Q.    What did you do between your first interview on May -- in

11  May of 2020 and your second interview in November of 2020 to

12  refresh your recollection about the trades in the Incyte

13  company?

14  A.    Sure.  I believe that I looked at the news around Incyte

15  around the time that I made the trade, and I also looked at the

16  stock price performance around that time and I also looked at

17  my trading records and things like that.

18  Q.    And did that refresh your recollection as to the more

19  detailed reasons that you traded in Incyte call options?

20  A.    Yes, it did.

21             MR. DiCANIO:  Your Honor, at this time, I'd like to be

22  able to present the witness with a transcript from that second

23  interview.  That is an interview where we don't have videotape.

24             THE COURT:  All right.  Go ahead.

25             MR. DiCANIO:  Thank you.

PANUWAT - DIRECT / DiCANIO

```
 1                    (Pause in proceedings.)

 2   BY MR. DiCANIO:

 3   Q.   Mr. Panuwat, I've been told it's the last tab in your

 4   binder.

 5   A.   Like the floppy one?  Yeah, I got it.

 6            THE COURT:  I think the second day would be the

 7   11/16/2020.

 8            MR. DiCANIO:  Correct, Your Honor.

 9            THE COURT:  The second section.

10            THE WITNESS:  Oh, got it, yes.  I think you're right.

11   BY MR. DiCANIO:

12   Q.   Mr. Panuwat, there should be a document binder in front of

13   you.  I think it's that one.  Yes.  It's the last tab in there,

14   I've been told.

15   A.   I see.

16        What number?

17   Q.   It's the very last tab, and it's marked "11/6/20

18   Interview."

19   A.   Oh, I see it.

20        Okay.

21            MR. DiCANIO:  So, Your Honor, with your permission,

22   I'll read the question and Mr. Panuwat would read the answer

23   that he gave during that second interview.

24            THE COURT:  All right.  Go ahead.

25            MR. DiCANIO:  Thank you.
```

PANUWAT - DIRECT / DiCANIO

```
 1  BY MR. DiCANIO:

 2  Q.   (As read):

 3       "QUESTION:  Okay.  I want to switch gears and talk about

 4       your trades in Incyte at this time.

 5            "So during your previous testimony on May 15, 2016,

 6       the staff asked you about call option trades that you

 7       placed in Incyte in August 2016.

 8            :Do you recall that?

 9       "ANSWER:  I do.

10       "QUESTION:  And why did you purchase Incyte call options

11       at that time?

12       "ANSWER:  I believed Incyte was undervalued at the time of

13       my investment.  It had suffered very steep declines over

14       the previous year, very significant declines in a very

15       short period of time, and nothing that I believed really

16       affected the fundamentals of the company.  And so I

17       believed that the stock price would increase, you know,

18       over the next month or so, and so I chose to make an

19       investment in call options at that time.

20       "QUESTION:  So during our prior -- the prior testimony, we

21       had discussed why Mr. Panuwat purchased Incyte call

22       options at that time.

23            "So, Mr. Panuwat, did you do anything between your

24       prior testimony and today to refresh your recollection on

25       why you traded?
```

PANUWAT - DIRECT / DiCANIO

1    "**ANSWER:**  Yes.

2    "**QUESTION:**  What did you do?

3    "**ANSWER:**  Sure.

4         "Similar to the question earlier, I did look at my

5    trading records, again, my Merrill Lynch brokerage

6    account, looking at those dates, thinking about where I

7    was and what I was doing at that time and the news and

8    events around Incyte at that time period.

9    "**QUESTION:**  And other than your -- your brokerage --

10   Merrill Lynch brokerage records, did you review any news

11   and events related to Incyte at that time and, if so, how

12   did that help refresh you?

13   "**ANSWER:**  I did.  I did review news and articles related

14   to Incyte at that time and it did help refresh my memory

15   of the company and what was going on with the company

16   around that time.

17   "**QUESTION:**  Did you review any particular news articles or

18   releases for any other, you know, particular document that

19   helped refresh you?

20   "**ANSWER:**  I believe, yeah, the general press releases of

21   the company and the company filings around that time

22   period.  The stock price performance, as well, also

23   helped."

24   **Q.**   Thank you.

25        **MR. DiCANIO:**  And thank you, Your Honor.

PANUWAT - DIRECT / DiCANIO

1   BY MR. DiCANIO:

2   Q.   Mr. Panuwat, I'm going to change topics now.

3   A.   Okay.

4   Q.   At the end of 2015, you were working at Medivation;

5   correct?

6   A.   That's correct.

7   Q.   Did you have any inkling that Medivation might be sold

8   during 2016?

9   A.   No, I did not.

10  Q.   To the best of your recollection, what triggered the sales

11  process in 2016?

12  A.   What triggered it was a large pharmaceutical company

13  called Sanofi had approached us unsolicitedly [sic].  They

14  approached us, I think initially said that they wanted to

15  pursue a strategic collaboration, potentially, and that quickly

16  escalated to them wanting to acquire the company.

17  Q.   What was management's reaction to the Sanofi outreach?

18  A.   Management's reaction, I recall, was very negative.

19  Selling Medivation was not something that we had considered.

20  We weren't planning to do that at the time.

21      I do remember our CEO, David Hung, he was also the founder

22  of the company.  I know he treated that company like it was his

23  life's work.  He did not want to sell the company.

24      Myself, working in business development, when we were

25  asked to have meetings with big pharmaceutical companies, he

PANUWAT - DIRECT / DiCANIO

```
 1    would tell me not to do that because we had no need to partner
 2    with a large pharmaceutical company at that time.
 3         And so -- a couple of other things.
 4         I think we had felt, in early 2016, that our stock price
 5    was extremely low.  There was a number of industry events going
 6    on, and so I remember Medivation's stock price falling pretty
 7    significantly in early 2016, exactly the time when Sanofi made
 8    a proposal to Medivation.
 9         We believed it was very opportunistic.  We believed that
10    was not something that we wanted to do, and so I remember that
11    being very strongly the initial reaction when we first learned
12    of the Sanofi news.
13    Q.   We've heard some testimony in court about Medivation's
14    response to the Sanofi outreach.
15         Did you have a role in any of that process?
16    A.   I did have some role in that part of the process, yes.
17    Q.   And what was your role, at a high level?
18    A.   From a high level, I think I was one of the people from
19    Medivation that were involved on kind of this project.
20         The first thing that we did was we hired a number of
21    advisors, and I was part of the team that basically helped put
22    that together.
23         We did generate a lot of information to the market at that
24    time, press releases and presentations.  I was involved in
25    helping facilitate a lot of that stuff.
```

PANUWAT - DIRECT / DiCANIO

1  Q.   Was Sanofi's effort to acquire Medivation reported in the

2  press?

3  A.   Yes, it was.  I believe that they had actually first put

4  that in the press.

5  Q.   After Sanofi's effort to buy Medivation became public, did

6  other public companies start to express an interest in

7  acquiring Medivation?

8  A.   Early on in the process, I remember there were a lot of

9  news reports citing that.  I can't remember if we actually knew

10  that at the time, but I do remember general news being reported

11  about that.

12  Q.   Let me ask it a different way.

13  A.   Sure.

14  Q.   In 2016, did there come a time when other large companies

15  were reaching out to Medivation to express an interest in

16  acquiring Medivation?

17  A.   Yes.

18  Q.   And did Medivation, during that process, also reach out to

19  other companies to join that process?

20  A.   I believe investment bankers did.  I don't remember

21  Medivation, or any employee at Medivation, actually doing that;

22  but, technically, yes, there was an outreach to other companies

23  to see if they would be interested in Medivation.

24  Q.   You talked about investment bankers.

25       Can you describe their particular role in the sales

PANUWAT - DIRECT / DiCANIO

 1   process?

 2   **A.**    Sure.

 3          The investment bankers were hired as financial advisors to

 4   help us kind of through the situation we were in.  When it

 5   first started, I don't believe we had, nor the bankers,

 6   considered this to be a sales process.  They would call it,

 7   you know, defense advisory, how to prevent your company from

 8   being acquired.  And so that was kind of a large part of their

 9   role.

10          Their role -- they have a lot of experience in dealing

11   with situations like that, a lot of experience on valuing

12   companies the way that pharmaceutical companies do it and also

13   just interacting with other companies.  And so that's largely,

14   to my knowledge, their role.

15          When we ultimately did have an outreach to other

16   companies, the investment bankers were kind of the ones that

17   were managing that part of this project.

18   **Q.**    Did you play a role in the sales process?

19   **A.**    I believe so, yes.

20   **Q.**    And, generally, at a high level, what was your role?

21   **A.**    From a very high level, I was one of the Medivation -- one

22   of the Medivation employees that was just helping anywhere I

23   could whenever somebody needed some help.  That would be one.

24          And then, two, most of my background, I remember where it

25   came in useful was that I have a background in science, so

1   helping explain some of our drug candidates to investors.  That

2   was not something that we had really focused on at Medivation

3   before.  Explaining some of our drug candidates, ultimately, to

4   big pharmaceutical companies, that was not something that we

5   had done before.  I think that was kind of my main

6   responsibility that I can remember.

7   Q.   We heard some testimony during the trial about a process

8   whereby the potential suitors of Medivation would submit bids

9   to acquire the company.

10       Do you recall that testimony so far?

11  A.   I do.

12  Q.   Who determined when the bid solicitations would be sent to

13  potential buyers?

14  A.   I believe the ultimate determination of that would have

15  been the Medivation board of directors, to my knowledge.

16  Q.   Who would decide the types of information that would be

17  included in any bid solicitation?

18  A.   I believe, again, the Medivation board of directors would

19  have decided that, would have approved that, probably with --

20  quite certain with -- have been the advice of the investment

21  bankers, potentially the legal advisors we had as well.

22  Q.   Who within the Medivation organization would make the

23  determination of whether or not to accept a particular bid?

24  A.   I believe that was entirely -- the Medivation board of

25  directors would ultimately decide what they wanted to do with a

PANUWAT - DIRECT / DiCANIO

 1   bid.

 2   Q.   Did you have any role in deciding whether or not to accept

 3   a particular bid?

 4   A.   No, I did not.  I was not on the Medivation board of

 5   directors.

 6   Q.   I'd like to show you what's been marked as Exhibit 2141.

 7   It's not yet admitted.  It should be in your binder.

 8   A.   Okay.  I'm sorry, the number?

 9   Q.   2141.

10        Just let me know when you have it.

11   A.   I have it.

12   Q.   Are you familiar with this document?

13   A.   It is an e-mail.  It looks like I was sent this document,

14   so I think I'm generally familiar with it, but not specifically

15   at this time.

16   Q.   It was sent to your e-mail address at the Medivation

17   company; correct?

18   A.   That's correct.

19        MR. DiCANIO:  Okay.  Your Honor, I'd like to move this

20   into evidence as Exhibit 2141.

21        MR. BUSSEY:  No objection.

22        THE COURT:  It's admitted.

23      (Trial Exhibit 2141 received in evidence.)

24        MR. DiCANIO:  Your Honor, may we display it?

25        THE COURT:  Yes.

PANUWAT - DIRECT / DiCANIO

```
 1              MR. DiCANIO:  Thank you.

 2   BY MR. DiCANIO:

 3   Q.   Now, I want to turn your attention, sir, to the e-mail on

 4   the bottom of this e-mail string from Dr. Hung at 11:50 a.m.

 5        Do you see that?

 6   A.   I do.

 7   Q.   And I think there's been some prior testimony Dr. Hung was

 8   the CEO of Medivation; correct?

 9   A.   That's right.

10   Q.   The subject line is "Matisse."

11        What does that refer to?

12   A.   I seem to remember that "Matisse" was the code name that

13   we were using to describe Merck, a large pharmaceutical

14   company.

15   Q.   Now, who is Merck?

16   A.   Merck is one of the largest pharmaceutical companies in

17   the world, I believe based in New Jersey.  They're a U.S.-based

18   but global pharmaceutical company.

19   Q.   So this is an e-mail sent from David Hung to several

20   individuals, including yourself, on August 8th; correct?

21   A.   That's correct.

22   Q.   Looking at the bottom of page 1, Dr. Hung says (as read):

23           "Ken just called me to tell me that they are

24        submitting a bid but prior to getting it, he wanted

25        to reiterate how impressed they were with our
```

PANUWAT - DIRECT / DiCANIO

```
 1              company, our team and our strategy."
 2         Do you see that?
 3    A.   I do.
 4    Q.   Who is the "Ken" referenced in that sentence?
 5    A.   I would assume that "Ken" refers to the CEO of Merck, who
 6    at the time was Ken Frazier.  I don't recall another "Ken" at
 7    Merck at that time.
 8    Q.   And do you have an understanding of what was meant by the
 9    sentence I just read?
10    A.   Yes, I think so.
11    Q.   And what is your understanding?
12    A.   I think our understanding was that he had told David that
13    they would submit a bid for the company.  It seems like he gets
14    a few compliments, that they were impressed by our company, our
15    team, and our strategy.
16    Q.   Now, Ken Frazier from Merck is a pretty big deal in the
17    biotech/biopharma industry, isn't he?
18    A.   Very significantly so, yes.
19    Q.   Now, Mr. Hung says Mr. Frazier (as read):
20              "...reiterated how thoughtfully he thought we
21         had developed our drugs and they would love to be
22         partners."
23         Do you see that?
24    A.   I do.
25    Q.   What did you understand that to mean?
```

PANUWAT - DIRECT / DiCANIO

```
 1   A.   I believe that's, essentially, further compliments that
 2   we -- that he had thought that we had done a good job
 3   developing our drugs and that they wanted to partner with us.
 4   Q.   Dr. Hung then writes (as read):
 5            "We'll see what the bid is, but they certainly
 6        sound very interested!"
 7        Do you see that?
 8   A.   I do.
 9   Q.   What did you understand that to mean?
10   A.   I believe that he is interested on seeing what their bid
11   would be.  It looks like that was not discussed on this call.
12   So I think David is referring, it will be interesting to see
13   what their bid ultimately is, but it sounded good, I think is
14   essentially what he's trying to communicate.
15   Q.   Is that because, in your business, expressions of interest
16   are interesting, but what matters is the actual money they'd be
17   willing to pay for the company?
18   A.   I believe that's probably the most important thing if
19   you're selling a company, or anything, for that matter, what
20   price somebody is willing to pay, yes.
21   Q.   In your career, Mr. Panuwat, has there ever been a time
22   where somebody talked big about how interested they were in
23   making an acquisition, but then when you saw the bid come in,
24   it was, let's say, disappointing?  Has that ever happened to
25   you?
```

PANUWAT - DIRECT / DiCANIO

```
 1                  (Recess taken at 11:46 a.m.)

 2                (Proceedings resumed at 12:01 p.m.)

 3      (Proceedings were heard out of the presence of the jury.)

 4           THE CLERK:  Please come to order.

 5           THE COURT:  Mr. DiCanio, are you ready to proceed?

 6         MR. DiCANIO:  Yes, Your Honor.  Thank you.

 7                  (The jury enters the courtroom.)

 8       (Proceedings were heard in the presence of the jury.)

 9           THE COURT:  All right.  Please be seated, everybody.

10      Mr. DiCanio, when you're ready.

11           MR. DiCANIO:  Thank you, Your Honor.

12    BY MR. DiCANIO:

13    Q.   Mr. Panuwat, I want to turn to another topic.

14         During your first interview with the SEC, do you remember

15    being asked about Medivation's insider trading policy?

16    A.   I do remember that, yes.

17    Q.   I want to show you a document that has been admitted into

18    evidence as Exhibit 1372.

19         Let me know when you have it in front of you, sir.

20    A.   Okay.  I have it.

21    Q.   Mr. Panuwat, did you sign this document?

22    A.   Yes, I did sign this.

23    Q.   And when did you sign it?

24    A.   I signed this on September 2nd, 2014.

25    Q.   Was that your first day at Medivation?
```

PANUWAT - DIRECT / DiCANIO

```
 1   A.   Yes.
 2   Q.   On your first day at work at Medivation, as part of the
 3   onboarding process, did the company ask you to sign other types
 4   of documents?
 5   A.   Yes, they did.
 6   Q.   As part of the onboarding process, do you remember
 7   reviewing the insider trading policy?
 8   A.   I don't remember viewing this policy in any detail.  I
 9   perhaps might have just skimmed it.  I was probably aware that
10   I was signing an insider trading policy, but I wouldn't -- I
11   don't believe I would have read this in detail.
12   Q.   After you signed the policy on your first day at
13   Medivation, do you recall the next time you saw a copy of that
14   policy?
15   A.   I believe the next time I saw this policy was during my
16   interview with the SEC.
17   Q.   Did Medivation provide you with any training on the
18   insider trading policy?
19   A.   Not that I can remember.
20   Q.   At the time you made your trades in the Incyte company,
21   did you believe you had an understanding of what constituted
22   improper insider trading?
23   A.   I think I had a general understanding of that, yes.
24   Q.   And how did you develop that understanding?
25   A.   I think I developed that understanding just working for a
```

PANUWAT - DIRECT / DiCANIO

 1  number of different companies, is probably one, potentially;

 2  during training when I was in investment banking.

 3      I did get a master's degree in finance.  Potentially, I

 4  learned it there.

 5      I don't recall anything specifically, but I do believe I

 6  was generally familiar with insider trading.

 7  **Q.**  Before this case was filed back in 2016, what was your

 8  understanding of what constituted improper insider trading?

 9  **A.**  I believe what constitutes insider trading, my

10  understanding would have been, at this time, was that someone

11  is not allowed to make an investment based on confidential

12  material, nonpublic information.

13  **Q.**  Before the SEC filed this action against you, were you

14  aware of any other time where the SEC alleged that someone had

15  violated the security laws by using his or her employer's

16  confidential information to trade in the stock of another

17  public company that had no business or competitive relationship

18  with their employer?

19  **A.**  I have never heard of anything like that, no.

20  **Q.**  When you made your trade in the Incyte company in 2016,

21  did you think that the SEC might later suggest that your

22  trading in the stock of another biotech company during the

23  sales process would somehow violate securities laws?

24  **A.**  No.  I would have had no idea.

25  **Q.**  Now, in this action, the SEC has alleged that Medivation's

PANUWAT - DIRECT / DiCANIO

1  insider trading policy prohibits the use of Medivation's

2  confidential information to trade in other public companies.

3  That's their allegation.

4      Are you familiar with that?

5  A.  Yes, I am.

6  Q.  Did you use Medivation's confidential information to make

7  or to inform your trade in the Incyte company?

8  A.  No, I did not.

9  Q.  Putting that issue aside, do you agree with the SEC's

10  interpretation of how they read the policy, as you sit here

11  today?

12  A.  As I sit here today?  I think it's -- I think it's a bit

13  unclear in certain places.  There are several references, I

14  believe, in an attempt to define what this policy is limited

15  to.  In my opinion, it's relatively unclear in certain places.

16  Q.  Why don't you walk us through, with reference to the

17  policy that's on the screen, where you see it as being unclear.

18          MR. BUSSEY:  Objection; relevance to the extent the

19  questions are pertaining to how he interprets it today.

20          THE COURT:  Yeah, sustained.

21          MR. DiCANIO:  I'll move on, Your Honor.

22  BY MR. DiCANIO:

23  Q.  Now, Mr. Panuwat, before you purchased Incyte call

24  options, had you run any statistical analysis to determine

25  whether the stock prices of Medivation and Incyte tended to

PANUWAT - DIRECT / DiCANIO

1  move in the same direction?

2  A.  I don't believe so, no.

3  Q.  Had you even thought about doing something like that

4  before you made your trade?

5  A.  I don't believe that would have ever occurred to me.

6  Q.  Before you made your trades in the Incyte company, did you

7  conduct any type of analysis studying whether the stock prices

8  of Medivation and Incyte moved in the same direction?

9  A.  I don't believe so, no.

10  Q.  Had you even thought about doing that before you made your

11  trade?

12  A.  I don't think so.

13  Q.  Before you made your trade in the Incyte company, did you

14  think about how transactions in the biotech industry could

15  potentially impact the stock prices of other biotech stocks?

16  A.  I don't believe that that would have been relevant in my

17  investment of Incyte, but I am generally familiar with

18  acquisitions in the industry.

19  Q.  Did you think about that before you made your trade in the

20  Incyte company?

21  A.  No, I did not.

22  Q.  Before you made your trades in the Incyte company, did you

23  think about how the Pharmacyclics sale may have impacted the

24  stock price of the Incyte company?

25  A.  No, I don't believe so.

PANUWAT - DIRECT / DiCANIO

1  Q.  Now, throughout this trial, Mr. Panuwat, the SEC has

2  suggested that Medivation and Incyte were so similar as

3  companies that the announcement of the Medivation sale would

4  likely result in an increase in the stock price of Incyte.

5      Do you recall that?

6  A.  I do.

7  Q.  Before you made your trades in the Incyte company, did you

8  consider whether the Medivation sale could possibly impact the

9  stock price of Incyte?

10 A.  No, I don't believe I considered that at all.

11 Q.  We've seen some documents in this trial so far where there

12 is references to Incyte as a peer to Medivation.

13     Do you recall those documents that we've seen?

14 A.  I do.

15 Q.  Is there an industry-accepted definition of what it means

16 to be a "peer"?

17 A.  I'm quite certain that there is not.  I believe that

18 people use "peers" in certain contexts, depending on what

19 exactly they're talking about.

20     I do believe that is consistent with some of the documents

21 that have been shown during this.

22 Q.  Let's put aside the use of that term.

23     In 2016, did you view Medivation and Incyte as similar

24 companies?

25 A.  No.  I believe they were very different, actually.

PANUWAT - DIRECT / DiCANIO

1   Q.   How so?

2   A.   I think they are different in, essentially, all material

3   aspects of the company.

4        Let me maybe start with Medivation.  I think it was an

5   extremely unique company.  I think there's many references to

6   that.

7        We had a commercial product for prostate cancer that was

8   called Xtandi.  We were -- essentially, the entire company was

9   focused on prostate cancer.

10       Just to put that into context, prostate cancer is the

11  second largest cancer.  It's a very significant disease.  One

12  in eight men will get prostate cancer.  I think that means

13  several of us in this room have prostate cancer or will get it.

14  So it's a very significant disease.

15       It is a very significant disease for companies in the

16  biotechnology industry, including most of the big

17  pharmaceutical companies.

18       Medivation had a drug commercialized for that.  It was not

19  just any drug; it was an extremely good drug.  It was very

20  significant in prostate cancer.  It has been shown, in multiple

21  clinical studies, that it's actually able to extend life.

22  That's something that's very rare for an oncology drug to

23  actually do.

24       If somebody were to get diagnosed with prostate cancer

25  today, very likely they would be prescribed, by their doctor,

PANUWAT - DIRECT / DiCANIO

1   with Xtandi.  Xtandi is a pill that you take once a day.  It

2   has very minimal side effects, and so patients can take this

3   for a very long period of time and actually extend their life.

4   And so it is considered to be one of the best oncology drugs of

5   all time, to my knowledge.

6        And so that's Medivation, their commercial product.

7        We also had a second product that we were working on.  I

8   think there's been reference to talazoparib.  We were planning

9   to develop that drug in prostate cancer.  That was, in our

10  view, going to be our next big drug.

11       We did not get to complete that drug -- that development

12  of that drug.  It was going to -- going into Phase 3

13  development at that time.  Today, that drug has been very

14  successful.  It is now approved for prostate cancer.

15       And so two very significant drugs in prostate cancer came

16  from Medivation.  I'm not aware of any other company in the

17  history of biotechnology that has been successfully able to

18  develop two drugs in prostate cancer, so a very unique company.

19  That was our focus.  That's what we knew.  I would assume that

20  is what we would have continued to do even if we were not

21  acquired by Pfizer.

22       That was Medivation.

23       Incyte, completely different business.  I'm not aware they

24  had any work in prostate cancer, so I certainly did not view

25  them as a competitor by any means.  I believe other people

PANUWAT - DIRECT / DiCANIO

1   would have agreed with that at the time.

2       Incyte, as I mentioned earlier, was just focused on a lot

3   of different things.  They were a very diversified company.

4       Again, they were older than Medivation.  I think, for the

5   most part, they were a bigger, you know, company.  It was just

6   so fundamentally different from a business perspective.

7       I believe that's how investors look at companies.  I tend

8   to think that investors actually know what they're investing

9   in.  They understand a company's businesses.

10      And so when I think about the two companies, they are just

11  so different, you know, in my mind.

12      They're -- I'm sure there are general similarities.

13  They're both biotechnology companies.  They both develop drugs.

14  They both employ scientists.  They both hire executives, things

15  like that.  There are some similarities.

16      But when I think of the businesses, when I think of what

17  actually drives stock prices, I really don't see any connection

18  between the two companies.

19  Q.  You talked about the differences in product, where

20  Medivation has a prostate cancer drug and Incyte's drugs are

21  for other types of therapeutic focus.

22      Why does that matter?

23  A.  Sure.  Actually, I probably didn't explain that part of

24  Incyte, but I believe, at the time of 2016, Incyte also had one

25  drug, an oncology drug.  It was for a hematology indication,

PANUWAT - DIRECT / DiCANIO

```
 1   myelofibrosis.  My knowledge of the disease, it's extremely
 2   rare.
 3        Based on the prevalence estimates that I know, it would be
 4   most likely that nobody in this room would have myelofibrosis.
 5   Most likely nobody has probably ever heard of it, is how rare
 6   it is.  I certainly apologize if anybody does actually have the
 7   disease or a family member does.  It is not a good disease.
 8   But it's fundamentally different.
 9        If you are a patient that has myelofibrosis, you will be
10   seen and treated by a hematologist.  When I think about the
11   Medivation business, very unique.  It's a disease generally for
12   men, and so it's usually diagnosed by a urologist and treated
13   by a urologist.  It's a different physician, oftentimes
14   different centers, different places to get treated.  And,
15   ultimately, when prostate cancer spreads, it becomes
16   metastatic, you are treated by an oncologist.  So as I think
17   about the customers of these drugs, different customers,
18   different patients, different diseases.
19        It's different regulatory divisions of the FDA.  They're
20   priced different.  They're reimbursed different.
21        And so, again, to put, you know, Incyte's product in
22   context, again, I think, in my mind, it's hard for me to think
23   of many similarities that matter, especially from kind of a
24   stock business perspective.
25   Q.   Mr. Panuwat, I want to walk you through a couple of
```

PANUWAT - DIRECT / DiCANIO

1  documents that have been admitted into evidence in this case.

2      And I'd like to start with Exhibit 1260.

3          MR. DiCANIO:  Again, Your Honor, this has been

4  admitted.

5  BY MR. DiCANIO:

6  Q.  The caption of the first slide reads "Strategic Review

7  Process."

8      What was the "strategic review process"?

9  A.  The strategic review process, I guess not to be confused

10  with the sale process or the bidding process and the hostile

11  process, all of the other things that we've been talking about

12  related to Medivation and Sanofi and the other bidders -- this

13  was separate from that -- "strategic review process," I think,

14  is just a general term.  I don't believe I would have came up

15  with that, but I think that's how we referred to it.

16  Basically, it's an annual review of the Medivation business.

17      This was, I think, something that we were just starting in

18  Medivation.  I do see "Draft" on this presentation.  I don't

19  remember if we actually completed this process and this type of

20  work, but this is, you know, the type of work I'm familiar with

21  from working at other companies.

22      It is very common that companies will do an annual review

23  to just make sure that everybody is aligned with what we're

24  doing, understand things that potentially we could consider and

25  things like that.  And so I'm often involved in putting in that

PANUWAT - DIRECT / DiCANIO

```
 1   type of work.
 2   Q.   I want to make sure I understand.
 3        When you see "Draft" on here, do you ever recall this deck
 4   being finalized?
 5   A.   I can't remember that and I don't believe I have ever seen
 6   that.  But, again, it is a long time ago.
 7        But I do see "Draft" very clearly on this -- on this
 8   presentation.
 9   Q.   Now, this draft presentation includes a couple of slides
10   discussing potential acquisitions and mergers by Medivation.
11        Do you recall those slides?
12   A.   Generally so.  I think so, yes.
13   Q.   What was the purpose of those slides?
14   A.   I think it is a very, you know, large slide deck.  I
15   think, from my view, people sort of want to understand what
16   potential opportunities could be with the business.
17        I know that there's one slide in here, Medivation was just
18   a U.S.-focused company.  There are slides on where else in the
19   world should we expand that would be an opportunity for
20   Medivation?  What are some other drug candidates that we could
21   acquire?  How much money should we be spending in research?
22        You know, it's basically a lot of general criteria to make
23   sure people understand sort of how Medivation looks like in the
24   industry.
25   Q.   Mr. Panuwat, are you familiar with the phrase "thought
```

PANUWAT - DIRECT / DiCANIO

1    exercise"?

2    A.    I think generally so.

3    Q.    Was this presentation a thought exercise on behalf of

4    Medivation?

5    A.    I think that's a reasonable explanation for it, yes.

6    Q.    What do you understand "thought exercise" to be?

7    A.    Essentially, just a collection of different thoughts that

8    people might have on the business, things that people might

9    want to discuss about the Medivation business and things like

10   that, an exercise to really just think creatively about, again,

11   some of the potential options that the company might consider.

12   Q.    Now, if you look at the footer on page 19 -- it's footer

13   page 19.

14        Did you or any of your colleagues at Medivation actually

15   recommend that Medivation merge with Incyte?

16   A.    No, we did not.

17   Q.    Is that a recommendation you would ever have made?

18   A.    No, I don't believe so.

19   Q.    Why not?

20   A.    I think there's a couple things.

21        I think mergers with companies of size is extremely rare

22   in the biotechnology industry.

23        I do know that Incyte was always a larger company of

24   Medivation, always much bigger.  If you are considering merging

25   with a company that's bigger, you would expect to lose control

**Excerpt of M. Panuwat's Trial Testimony, dated Apr. 4, 2024,
Dist. Ct. Doc. 165 (Apr. 5, 2024)**

PANUWAT - CROSS / BUSSEY

```
 1              "It would be good to connect over the coming

 2        weeks."

 3   Q.    And there was an attachment to this e-mail; right?

 4   A.    Yes.

 5              MR. BUSSEY:  And maybe we could highlight that.

 6   BY MR. BUSSEY:

 7   Q.    The attachment was your résumé.

 8   A.    That looks to be the case, yes.

 9   Q.    And it also looks to be the case that you updated your

10   résumé as of that very day; right?

11   A.    It's hard for me to know at this time if I updated my

12   résumé at that time.  I do see it was dated that day when I

13   sent my attachments.

14              THE WITNESS:  My light went off.

15        Oh, sorry, I did what you did yesterday.

16              MR. BUSSEY:  You saw me yesterday, so I'm not going to

17   throw any stones.

18              THE WITNESS:  I think I know where I was going.

19        I do see the file name as dated on the 18th.

20   BY MR. BUSSEY:

21   Q.    And the file name, just to be clear, is "Matthew

22   Panuwat_Resume 18AUG16.pdf"; right?

23   A.    Yes.

24   Q.    And then let's take a look at the résumé.

25              MR. BUSSEY:  And I'd like to blow up the first set of
```

PANUWAT - CROSS / BUSSEY

1   bullets under the "Experience" heading.

2   **BY MR. BUSSEY:**

3   Q.   So the first thing you're highlighting here to potential

4   employers is that you reported to the CEO and CFO as the head

5   of business development; right?

6   A.   I see that, yes.

7   Q.   And the second thing you're highlighting here is that you

8   were the core team member -- or a core team member, one of six,

9   in the hostile defense and consent solicitation of Sanofi;

10  right?

11  A.   Yes.

12  Q.   And that's the sales process that we've been talking

13  about, isn't it?

14  A.   It's similar, but a little bit different.  Again, this is

15  in reference to Sanofi that was in the news since March.

16  Again, that, as it's written here, I think is a hostile

17  defense, slightly different than the sales process that

18  happened later.

19  Q.   But it also says "consent solicitation," doesn't it?

20  A.   Of Sanofi?  Yes.

21  Q.   And that was later on, after the defense, wasn't it?

22  A.   I'm not sure if I follow.

23  Q.   I'm sorry?

24  A.   I'm not sure if I exactly follow that.

25  Q.   Well, the consent solicitation was different than the

PANUWAT - CROSS / BUSSEY

 1   defense, wasn't it?

 2   **A.**   I seem to remember it similar.

 3   **Q.**   Isn't the whole point of the defense that you're getting

 4   an unsolicited offer to acquire the company?

 5   **A.**   What was the question?  Sorry.

 6   **Q.**   Strike that.  Never mind.

 7   **A.**   Okay.

 8   **Q.**   Let me ask you this:  You sent this résumé on the -- on

 9   the 18th; right?

10   **A.**   Yes.

11   **Q.**   So is it your testimony that you weren't considering

12   leaving the company at the time that you sent that?

13   **A.**   I don't think so.  I don't remember that.

14        There are some other kind of interesting details in the

15   e-mail.  I'm happy to read that for you if you'd like.

16   **Q.**   So it's just a coincidence that you happened to send out a

17   résumé on this day; it's not any indication that you were any

18   more interested in leaving at this point than any other point?

19   **A.**   I actually have no idea if it's a coincidence or not.  I

20   do send my résumé to recruiters very frequently.

21        I do interact with them for networking purposes for myself

22   and other colleagues and people in the industry.  I do do that.

23        And it looks like I did send my résumé at this time.

24   **Q.**   And you did send your résumé from your Medivation e-mail

25   account; right?

PANUWAT - CROSS / BUSSEY

1   A.   That's right.

2   Q.   And that's the same e-mail account that you received that

3   e-mail from Dr. Hung that same day; right?

4   A.   Yes.

5   Q.   And is the reason that you're highlighting you're one of

6   six in this process, whatever part of the process, that you

7   think that is important to potential employers?

8   A.   It's possible it could be important to other employees --

9   other employers.

10  Q.   And Medivation was a pretty big company at this point in

11  time, so to be one of six makes you stand out from the rest of

12  the organization; right?

13  A.   For that specific project, responding to Sanofi, it's a

14  very specific skill set, so it could be useful.

15  Q.   So putting this here on your résumé, you're emphasizing

16  the degree to which you were in the inner circle.

17  A.   I think I have a lot of stuff on my résumé.

18  Q.   I didn't ask you about that; I'm asking you about this

19  particular bullet point.

20       And the question is:  You included that information in

21  that bullet because you wanted to emphasize the degree to which

22  you were in the inner circle at Medivation.

23  A.   I don't know about "inner circle."  That sounds somewhat

24  overly generalizing things.

25       This does say "a core team member in the hostile defense

PANUWAT - CROSS / BUSSEY

1  of Sanofi," I think, word for word.  So I think I was a member

2  of that work.

3  Q.  You were emphasizing the degree to which you were involved

4  in that process.

5  A.  Yes.

6  Q.  You were emphasizing the degree to which the company

7  trusted you with confidential information.

8  A.  I don't think I technically wrote that, but -- I think the

9  language that I used is a little bit different than the way

10 you're characterizing it.

11 Q.  One could certainly infer that if a person is one of six

12 on the core team, that the company trusts that individual;

13 right?

14 A.  I assume people can -- that could be implied.

15 Q.  And precisely because you were on the core team, you did

16 receive a lot of confidential information about the deal,

17 didn't you?

18 A.  Yes.

19 Q.  And whether or not you read Dr. Hung's e-mail on

20 August 18th before you began placing your trades seven minutes

21 later, you would agree you had been privy to confidential

22 information about the deal process at that point in time?

23 A.  Yes.

24 Q.  You knew the specific bid prices, for example, that each

25 of the companies had -- had made up until that point.

**PANUWAT - CROSS / BUSSEY**

1   A.   Yes, I believe that's correct.  On August 18th, we had

2   received bids before that, and I was generally aware of that.

3   Q.   Well, you knew the specific prices of those bids as of

4   August 18th; right?

5   A.   Of the bids that were all rejected by the boards of

6   directors, I did -- I would have been generally familiar with

7   that.

8   Q.   You knew the prices of every bid that had been submitted

9   up until that point in time, August 18, 2016; yes or no?

10   A.   Yes, I think so.

11   Q.   And you knew -- we covered this morning, you knew the

12   timing, as well, that was being aimed for.

13   A.   The timing of bids for that specific part of the process?

14   Yes.

15   Q.   You knew when final bids were due.

16   A.   Final bids for that round of the process, I was probably

17   aware of that, yes.

18   Q.   And that information was confidential.

19   A.   That information, I believe, was confidential.

20   Q.   And you knew, separate and apart from any written policy,

21   that you were supposed to maintain the confidentiality of

22   information that Medivation entrusted to you.

23   A.   Yes.

24   Q.   And you knew, separate and apart from any written policy,

25   that you were not supposed to use Medivation's confidential

PANUWAT - CROSS / BUSSEY

1    information for your own personal benefit.

2    A.    Yes, I believe I had that understanding.

3    Q.    Now, when the SEC first questioned you, did you tell the

4    SEC that you were not aware of specific bid prices as of

5    August 18, 2016?

6    A.    I would probably want to look at the specific language on

7    what I may or may not said.

8         I do believe, again, we were in the middle of a round of

9    bidding.  Specifically, on August 18th, we had not received

10   bids for that part of the process yet.

11         MR. BUSSEY:  Your Honor, permission to play Day 1,

12   page 195, lines 13 to 16.

13         THE COURT:  Are you ready?

14    Yeah, go ahead.

15         MR. BUSSEY:  Whenever you're ready, Mr. Taylor.

16              (Video played but not reported.)

17         MR. BUSSEY:  That's not the correct --

18              (Video played but not reported.)

19   BY MR. BUSSEY:

20   Q.    Now, did you also say, when you were interviewed by the

21   SEC, that you did not have direct access to information about

22   the bidding process?

23   A.    I actually don't remember.  What do you mean by "direct

24   access"?

25   Q.    Well, they were your words, not mine, sir.

PANUWAT - CROSS / BUSSEY

```
 1        Were you asked what -- actually, why don't we do it this

 2   way.

 3            MR. BUSSEY:  Permission to play the clip that you

 4   almost played, 195 -- page 195, line 20, to 196, line 11.

 5            THE COURT:  Hang on just a sec.

 6            (Video partially played but not reported.)

 7            THE COURT:  Hang on just one sec.

 8        Are you there?  Apologies for that.

 9            MR. DiCANIO:  No objection.

10            THE COURT:  Okay.  Now you can play it.

11            MR. BUSSEY:  Sorry about that.

12                (Video played but not reported.)

13   BY MR. BUSSEY:

14   Q.  And we've seen today, Mr. Panuwat, and the last few days,

15   that, in fact, you did have access to the specific bids that

16   had been submitted up until that date, August 18; correct?

17   A.  The bids prior to August 18th?  Yeah, I would have been

18   aware of those.

19   Q.  And you were made aware of the timing that was anticipated

20   moving forward from August 18th; correct?

21   A.  I think I would have been generally aware of the timeline

22   for the next round of the process, yes.

23   Q.  And did you tell the SEC that you didn't have access to

24   that information because you thought if you -- it would make

25   your Incyte trades seem less suspicious if you didn't have that
```

PANUWAT - CROSS / BUSSEY

```
 1   information?

 2   A.   Could you repeat that?  Did I tell the -- sorry.

 3   Q.   Yeah.

 4        Did you tell the SEC that you didn't have access to the

 5   bid prices and the deal timing because you thought it would

 6   make your Incyte trades seem less suspicious?

 7   A.   No.

 8   Q.   Did you say those things to make it seem less likely that

 9   you traded based on inside information?

10   A.   No.

11        MR. DiCANIO:  Your Honor, just a quick objection on

12   rule of completeness.  May I ask that a certain portion of the

13   transcript be played right after what Mr. Bussey had just

14   played for rule of completeness?

15        THE COURT:  What is the --

16        MR. BUSSEY:  What is the --

17        MR. DiCANIO:  Just waiting for the judge.

18        THE COURT:  Okay.  So what do you want to play?

19        MR. DiCANIO:  Your Honor, it would be page 196 and it

20   would be lines 12 through -- 12 through 18.  196, lines 12

21   through 18.  I'm sorry, Your Honor, 15 through 18.

22        THE COURT:  Gotcha.

23        MR. DiCANIO:  And if we could just have those played.

24        THE COURT:  Yeah.  Hang on just a second.

25        Yeah, please go ahead and play those.
```

PANUWAT - CROSS / BUSSEY

```
 1              MR. TAYLOR:  Actually, we don't have that.

 2              MR. BUSSEY:  Oh, we don't have that.

 3              MR. DiCANIO:  Your Honor, Mr. Shorr may have that

 4    tee'd up.

 5              THE COURT:  Okay.

 6              MR. DiCANIO:  Thank you.

 7                      (Pause in proceedings.)

 8                   (Video played but not reported.)

 9    BY MR. BUSSEY:

10    Q.   Mr. Panuwat, you didn't just have access to the

11    information, you were aware of the information, weren't you?

12    A.   Are we talking about August 18th?

13    Q.   Yes.

14    A.   Yes, I would have known on August 18th that we had

15    received prior bids for the company.  I believe we had just

16    discussed those --

17    Q.   Yes.

18    A.   -- that were received on August 8th and the 12th.  I would

19    have been aware of those bids that were ultimately rejected by

20    the board of directors, yes.

21    Q.   Thank you.

22         Mr. Panuwat, we've heard a lot during this trial about how

23    some information about the sales process was public --

24              MR. BUSSEY:  Actually, can we take that down?  It

25    seems like we still have -- yeah.
```

PANUWAT - CROSS / BUSSEY

1  BY MR. BUSSEY:

2  Q.   We've heard a lot about how some information about the

3  sales process was made public.

4       You've heard that; right?

5  A.   I have.

6  Q.   And the information that was in the press was different

7  than the information that you had, wasn't it?

8  A.   That is probably correct.  It probably would depend on

9  what exactly we're discussing.

10      But Medivation put a lot of information into the market.

11 I believe other bidders and other investors and other analysts

12 were also doing the same thing.

13 Q.   The specific bid prices were not in the press, were they?

14 A.   I believe some of the bid prices were mentioned.

15 I believe that Medivation had made some of the Sanofi bids --

16 there were multiple bids that we publicly disclosed in press

17 releases, SEC filings, and things like that.

18 Q.   Fair enough.  That early part of the process was public,

19 with Sanofi; correct?

20 A.   The dates are a little bit hard for me to remember, but I

21 do think that Medivation issued a press release probably around

22 July about a Sanofi proposal.

23      Sanofi had multiple bids for Medivation.  I remember

24 Medivation made the -- both of those public.  I do believe the

25 last one is around July, again, back to your -- I don't know if

**Excerpt of Proceedings, dated Apr. 5, 2024,**
**Dist. Ct. Doc. 166 (Apr. 5, 2024)**

(193 of 254), Page 193 of 254
Case: 24-6882, 05/16/2025, DktEntry: 14.3, Page 193 of 254
Case 3:21-cv-06322-WHO    Document 166    Filed 04/05/24    Page 4 of 144    1257

PROCEEDINGS

| 1 | **Friday - April 5, 2024**                  **8:03 a.m.** |

2           **P R O C E E D I N G S**

3           ---o0o---

4    (Proceedings were heard out of the presence of the jury.)

5       **THE CLERK:**  Please come to order.

6       **THE COURT:**  Good morning, everybody.  Please be

7 seated.

8       **ALL:**  Good morning, Your Honor.

9       **THE COURT:**  Well, you can stand up, Mr. Spertus.  Are

10 you going to come in and --

11       **MR. SPERTUS:**  No, I was late to stand so I decided I

12 was going to catch up.

13           (Laughter.)

14       **THE COURT:**  All right.  So I saw the suggestion for

15 Number 22 on use of the term "insider trading."  I was thinking

16 that a better place to put that would be in the first time that

17 we used -- that I used "insider trading" in the jury

18 instruction, which would be in Number 16.  And the first

19 sentence of what is proposed in Number 22, I think, is exactly

20 the language that I would use.

21       **MR. SPERTUS:**  So it would follow 16 and become the new

22 17?

23       **THE COURT:**  No.  So I would put it in 16.  So I would

24 say, "I will now describe for you the civil misappropriation

25 theory of insider trading.  The term 'insider trading' as used

PROCEEDINGS

```
 1   in these proceedings and in these instructions is a legal term

 2   of art and is not pejorative," and then proceed on with the

 3   elements.

 4           MR. SPERTUS:  I think, Your Honor, that's fine.  Thank

 5   you.

 6           MR. MEYERHOFER:  Fine with the SEC as well, Your

 7   Honor.

 8           THE COURT:  Okay.  Is there -- did you find any other

 9   nits or things that we ought to change in the instructions?

10                      (No response.)

11           THE COURT:  Sounds perfect.  Thank you.

12       All right.  Is there -- so I saw the JMOL motion.  Thank

13   you.  I don't know whether the SEC wants to say anything about

14   that right now other than say it's all wrong.

15       Mr. Bussey, good morning.

16           MR. BUSSEY:  Your Honor, I haven't had a chance to

17   read it since it was filed at 2:30 in the morning.  I'm happy

18   to just briefly orally run through some of the evidence that's

19   been received in the case that we think supports the elements.

20       As to the existence of a duty of trust, I think, most

21   importantly, the defendant admitted that he understood he

22   wasn't supposed to trade on the basis of confidential

23   information, wasn't supposed to disclose confidential

24   information, and understood the information that he had to be

25   confidential.
```

**PROCEEDINGS**

1      We also have the confidentiality and insider trading

2   agreements in evidence.  I believe those are Exhibits 1371,

3   1372.

4      We have testimony from the defendant's boss, Ms. Jarrett,

5   that she expected the information he had to be kept

6   confidential and that that information was entrusted to him.

7      We have testimony from Mr. Baxter corroborating

8   Ms. Jarrett's testimony and the defendant's testimony about the

9   confidentiality of the information.

10      We also played clips from the defendant's deposition where

11   he agreed there, as well, that he understood he was not

12   supposed to use any of that information for personal use.

13      As to the element that the information he possessed was

14   nonpublic, again, the defendant admitted that in his testimony.

15   He admitted that the sales information he possessed was not

16   public, and that included the specific details of the bids,

17   including -- as reflected in Exhibit 1294 and the timelines as

18   reflected in Exhibit 1301 and 1209, among others, and also the

19   e-mail from August 18th, Exhibit 1338.

20      As for materiality to Incyte, we have Dr. Becker's

21   testimony on that point, including that the stock rose and that

22   this deal was the reason for the stock rising.

23      We have her testimony about the general phenomenon of a

24   spillover effect being well established and well known in the

25   economic industry and among sophisticated traders.

**PROCEEDINGS**

 1    We have multiple articles from industry observers linking

 2   the fortunes of the two companies.  Those include

 3   Exhibits 1216, 1220, 1245, 1227.

 4    We had the strategic slide deck with the Pharmacyclics

 5   graph, which pointed out that Incyte's stock rose when

 6   Pharmacyclics and AbbVie were involved in an acquisition the

 7   year before.  That's Exhibit 1260.  And that slide deck has

 8   defendant's name on it, and I believe he admitted to having

 9   seen at least the deck, if not the particular slide.

10    We have the valuation and fairness opinions that the

11   investment bankers prepared.  That's Exhibit 1213.  We have the

12   banker slide decks, Exhibits 1266 and 1277.

13    And then there were multiple admissions about similarities

14   between the companies throughout the trial, from multiple

15   exhibits.

16    As to the existence of a breach and that the defendant

17   traded on the basis of the information he possessed, we have

18   there the fact that defendant has offered multiple explanations

19   for his trades over time.

20    We have the fact that the defendant was initially unable

21   to remember the details of his trades.

22    We also have other circumstances surrounding the trades,

23   including the timing of the purchase, within seven minutes of

24   receiving the e-mail, within two days of the board approving

25   the deal.  We have the timing of the sale shortly after the

PROCEEDINGS

 1   deal was announced.

 2       We have the fact that it was the first ever Incyte trade,

 3   the largest ever options trade, and we have the fact that the

 4   defendant did not disclose or seek permission before trading,

 5   did not say anything to his boss, Ms. Jarrett, or Mr. Baxter or

 6   anybody else, including Mr. Piscitelli.

 7       Regarding scienter, many of the same facts that I just

 8   identified relating to breach are relevant to that as well,

 9   including specifically the changing story, inability to

10   remember, and the failure to disclose the trade.

11       And we have also played testimony about the defendant

12   having not consulted the policies before and not having asked

13   anybody within the company for permission or for further

14   guidance on the scope of his duties and that he did not seek

15   preclearance.

16       **THE COURT:**  Okay.

17       So, Mr. Pacheco, I just want you to know I'm letting this

18   case go to the jury, and I'm going to be dealing with the

19   issues, at a later point, from the motion.

20       If you want to respond in a brief way, feel free, but

21   that's how it's going to go.

22       **MR. PACHECO:**  Thank you, Your Honor.  We submit based

23   on our papers.  We've addressed the arguments that the SEC has

24   raised.

25       **THE COURT:**  Okay.  Great.  Thank you.

PROCEEDINGS

```
 1            MR. PACHECO:  Thank you.

 2            THE COURT:  So this morning -- who's -- Mr. Bussey,

 3   are you giving the closing or the -- what's the --

 4            MR. BUSSEY:  Mr. Smyth has the honor of delivering the

 5   closing this morning, Your Honor.

 6            THE COURT:  Okay.

 7       And, Mr. Smyth, how long do you expect the opening closing

 8   to be?

 9            MR. SMYTH:  That's a good question.  My best estimate

10   is probably an hour to an hour 15 minutes.

11            THE COURT:  Okay.

12       All right.  So my plan, then, will be to -- I'll read the

13   instructions to the jury, except for the final deliberation

14   instructions, and I'll show them the verdict form.

15       Then we'll just go right into the SEC's closing, take a

16   break, do the defense closing, take a break, have the rebuttal,

17   whatever -- whatever it is, and then I'll do the deliberation

18   instructions and we'll be done.

19       Anything else for anybody?

20            MR. DiCANIO:  Not from the Defense.

21            THE COURT:  Okay.  So, Mr. Smyth, you may want to set

22   up the podium in the way that -- that you like it before the

23   jury comes in at 8:30 so that we don't have to mess around with

24   thing.

25       Mr. Bussey, were you coming up for some reason?
```

PROCEEDINGS

```
 1          MR. BUSSEY:  I was just going to ask you briefly, once

 2   it goes to the jury early this afternoon, will it be the

 3   Court's expectation that we remain within the courthouse or a

 4   certain distance from --

 5          THE COURT:  So I want -- I want somebody with

 6   authority to be within 15 minutes of -- of here so if the jury

 7   has a question, you'll be able to respond quickly.  And we'll

 8   just see how the afternoon progresses.

 9       I do -- I have a pretrial conference at 2:00 on my next

10   trial, but it turns out that there's illness afoot, so I don't

11   know exactly what's going to happen with that.

12       But I -- I want you within 15 minutes.

13          MR. BUSSEY:  Very well.  Thank you.

14          THE COURT:  Okay.  All right.  See you in a moment.

15                   (Recess taken at 8:12 a.m.)

16                (Proceedings resumed at 8:34 a.m.)

17      (Proceedings were heard out of the presence of the jury.)

18          THE CLERK:  Please come to order.

19          THE COURT:  You all ready?

20          MR. DiCANIO:  Yes, Your Honor.

21          THE COURT:  Okay.

22                 (The jury enters the courtroom.)

23       (Proceedings were heard in the presence of the jury.)

24          THE COURT:  All right.  Please be seated, everybody.

25   Ladies and gentlemen, good morning.  Welcome back.
```

PRELIMINARY JURY INSTRUCTIONS

```
1        We're -- it's time for the final instructions and the

2   argument of counsel.

3        The way it's going to work today is I'm going to give you

4   the instructions now, almost all of them, and I'm going to show

5   you what the verdict form looks like.

6        Then the SEC will argue.  We'll take our first break after

7   their argument.  Then Mr. Panuwat's counsel will argue and

8   we'll take a break after that.  And then the SEC has the right

9   to come back and make any sort of closing argument after that.

10        And then I'll give you a few more instructions on how you

11   deliberate, and then it will be time for you to -- to do the

12   work that -- that you've been sworn in to do.

13        So with that, let me read you the final instructions.
```

### PRELIMINARY JURY INSTRUCTIONS

```
15        THE COURT:  Members of the jury, now that you've heard

16   all the evidence and the arguments of the attorneys, it's my

17   duty to instruct you on the law that applies to this case.  A

18   copy of these instructions will be sent to the jury room for

19   you to consult during your deliberations.

20        It's your duty to find the facts from all the evidence in

21   the case.  To those facts, you will apply the law as I give it

22   to you.  You must follow the law as I give it to you whether

23   you agree with it or not, and you must not be influenced by any

24   personal likes or dislikes, opinions, prejudices, or sympathy.

25   That means you must decide the case solely on the evidence
```

**Excerpt of Preliminary Jury Instructions, dated Apr. 5, 2024,**
**Dist. Ct. Doc. 166 (Apr. 5, 2024)**

**PRELIMINARY JURY INSTRUCTIONS**

1  When the defendant gave this testimony, he took the same

2  oath to tell the truth that a witness takes before testifying

3  in court.

4  A deposition is the sworn testimony of a witness taken

5  after this lawsuit was filed but before trial.  The SEC took

6  the defendant's deposition on March 23rd, 2023.  You saw

7  excerpts of a video recording from that deposition.  At this

8  deposition, the defendant took the same oath to tell the truth

9  that a witness takes before testifying in court.

10  Certain charts and summaries not admitted into evidence

11  have been shown to you in order to help explain the contents of

12  books, records, documents, or other evidence in the case.

13  Charts and summaries are only as good as the underlying

14  evidence that supports them.  You should, therefore, give them

15  only such weight as you think the underlying evidence deserves.

16  Certain charts and summaries have been admitted into

17  evidence to illustrate information brought out in the trial.

18  Charts and summaries are only as good as the testimony or other

19  admitted evidence that supports them.  You should, therefore,

20  give them only such weight as you think the underlying evidence

21  deserves.

22  You have heard testimony from Chyhe Becker and Lawrence

23  Pines, who testified about their opinions and the reasons for

24  those opinions.  This opinion testimony is allowed because of

25  the specialized knowledge, skill, experience, training, or

**PRELIMINARY JURY INSTRUCTIONS**

1   education of these witnesses.

2       Such opinion testimony should be judged like any other

3   testimony.  You may accept it or reject it, and give it as much

4   weight as you think it deserves considering the witness's

5   specialized knowledge, skill, experience, training, or

6   education, the reasons given for the opinion, and all the other

7   evidence in the case.

8       Do not let bias, sympathy, prejudice, or public opinion

9   influence your decision.  You may not allow any personal

10  feelings or preconceptions that you may have had about

11  corporate executives or the defendant's wealth to affect your

12  decision.  Your decision must be based only on the evidence

13  presented.

14      In this case, the plaintiff is the United States

15  Securities and Exchange Commission, SEC, an agency of the

16  United States Federal Government.  The fact that a governmental

17  agency is involved as a party must not affect your decision in

18  any way.  A governmental agency and all other persons stand

19  equal before the law and must be dealt with as equals in a

20  court of justice.

21      We all have feelings, assumptions, perceptions, fears, and

22  stereotypes about others.  Some biases we're aware of and

23  others we may not be fully aware of, which is why they're

24  called implicit or unconscious biases.

25      No matter how unbiased we think we are, our brains are

**PRELIMINARY JURY INSTRUCTIONS**

 1   hardwired to make unconscious decisions.  We look at others and

 2   filter what they say through our own personal experience and

 3   background.  Because we all do this, we often see life and

 4   evaluate evidence in a way that tends to favor people who are

 5   like ourselves or who have had life experiences like our own.

 6       We can also have biases about people like ourselves.  One

 7   common example is the automatic association of male with career

 8   and female with family.

 9       Bias can affect our thoughts, how we remember what we see

10   and hear, whom we believe or disbelieve, and how we make

11   important decisions.

12       As jurors, you're being asked to make an important

13   decision in this case.  You must:

14       One, take the time you need to reflect carefully and

15   thoughtfully about the evidence.

16       Two, think about why you're making the decision you're

17   making and examine it for bias.  Reconsider your first

18   impressions of the people and the evidence in the case.  If the

19   people involved in this case were from different backgrounds --

20   for example, richer or poorer, more or less educated, older or

21   younger, or of a different gender, gender identity, race,

22   religion, or sexual orientation, would you still view them and

23   the evidence the same way?

24       Three, listen to one another.  You must carefully evaluate

25   the evidence and resist, and help each other resist, any urge

PRELIMINARY JURY INSTRUCTIONS

1  to reach a verdict influenced by bias for or against any party

2  or witness.  Each of you have different backgrounds and will be

3  viewing this case in light of your own insights, assumptions,

4  and biases.  Listening to different perspectives may help you

5  to better identify the possible effects these hidden biases may

6  have on decision-making.

7       And, four, resist jumping to conclusions based on personal

8  likes or dislikes, generalizations, gut feelings, prejudices,

9  sympathies, stereotypes, or unconscious biases.  The law

10  demands that you make a fair decision based solely on the

11  evidence, your individual evaluations of that evidence, your

12  reason and common sense, and these instructions.

13       I will now describe for you the civil misappropriation

14  theory of insider trading.  The term "insider trading," as used

15  during these proceedings and in these instructions, is a legal

16  term of art and is not pejorative.

17       A person is liable for a violation of the securities laws

18  if that person acts with an intent to defraud the source of

19  confidential, material, and nonpublic information by either

20  knowingly or recklessly misappropriating that information for

21  securities trading purposes in breach of a duty arising from a

22  relationship of trust and confidence owed to the source of the

23  information on which he traded.

24       In order for you to find the defendant liable for insider

25  trading, the SEC must prove each of the following elements by a

PRELIMINARY JURY INSTRUCTIONS

1   preponderance of the evidence:

2       One, that the defendant owed a duty of trust, confidence,

3   or confidentiality to his employer, Medivation;

4       Two, that as a result of his relationship with Medivation,

5   the defendant possessed nonpublic information that was material

6   to Incyte;

7       Three, that the duty -- that the defendant bought Incyte

8   call options on the basis of that information and in breach of

9   duty owed to Medivation; and

10      Four, that the defendant, at the time he bought Incyte

11  call options, knew that the information he received from

12  Medivation was both nonpublic and material to Incyte, or acted

13  recklessly as to whether the information was both material and

14  nonpublic and knew that, or acted recklessly as to whether he

15  lacked consent from Medivation to use the information.

16      If you find that the SEC has proved each of the above

17  elements by a preponderance of the evidence, your verdict

18  should be for the SEC.

19      If, on the other hand, you find that the SEC has failed to

20  prove any of these elements, your verdict should be for the

21  defendant.

22      I'll now define for you each of the four elements.

23      An employee has a duty of trust, confidence, or

24  confidentiality with regard to nonpublic information when he

25  expressly agrees to maintain the confidentiality of his

PRELIMINARY JURY INSTRUCTIONS

1   employer's nonpublic information or to refrain from using that

2   information for personal gain.

3       A duty also arises, even in the absence of a written

4   agreement, when an employer entrusts an employee with

5   confidential information.  This is because a company's

6   confidential information is the company's property, and

7   employees are not permitted to use their position of trust and

8   confidence to further their private interests without

9   disclosing that use to the company and gaining the company's

10  consent.

11      In determining whether a duty of trust and confidence

12  existed between the defendant and Medivation, you must consider

13  all of the facts and circumstances presented to you about

14  defendant's relationship with Medivation.

15      In order for you to find the defendant engaged in insider

16  trading, the SEC must prove that the defendant purchased Incyte

17  call options because of material, nonpublic information he

18  knowingly possessed.

19      It is not sufficient that the SEC proves only that the

20  defendant bought Incyte call options while knowingly in

21  possession of Medivation Inc.'s nonpublic information that was

22  material to investors in Incyte.

23      While the SEC need not prove that the defendant bought

24  Incyte call options solely because of the non- -- of the

25  material, nonpublic information, it must prove that such inside

PRELIMINARY JURY INSTRUCTIONS

1   information was a significant factor in the defendant's

2   decision to buy Incyte call options.

3       Information is material to a company if there is a

4   substantial likelihood that a reasonable investor would

5   consider the information important in deciding whether to buy

6   or sell that company's securities.

7       You must decide in this case whether, at the time the

8   defendant traded, reasonable Incyte investors would believe the

9   allegedly nonpublic Medivation information significantly

10  altered the total mix of information available concerning

11  Incyte.

12      Further, you must make this determination based on the

13  circumstances as they existed at the time defendant purchased

14  Incyte securities.

15      Nonpublic information is information which is not

16  generally available to the public through such sources as press

17  releases, trade publications, or other publicly available

18  sources.

19      Information is considered nonpublic for purposes of

20  insider trading liability until such information has been

21  effectively disseminated in a manner sufficient to ensure its

22  availability to the investing public.

23      Information from a corporate insider that is more reliable

24  or specific than public rumors is nonpublic information,

25  despite the existence of such rumors in the media or investment

**PRELIMINARY JURY INSTRUCTIONS**

1  community.  Whether or not the confirmation of a rumor by an

2  insider qualifies as material, nonpublic information is an

3  issue of fact for you to decide.

4      The SEC must prove by a preponderance of the evidence that

5  the defendant acted knowingly or recklessly with an intent to

6  defraud Medivation as described in Instruction 16.

7      "Recklessly" means highly unreasonable conduct that is an

8  extreme departure from ordinary care, which is either known to

9  the defendant or is so obvious that the defendant must have

10 been aware of it.

11     The remedies provided by law for a claim brought by the

12 SEC are for the Court to decide.  You may not consider remedies

13 in deciding whether the SEC has proved its case against Panuwat

14 by a preponderance of the evidence.

15     So, ladies and gentlemen, those are the -- all of the

16 instructions other than the ones concerning your deliberations,

17 which I'll give you at the end of the argument.

18     I do want to show you the -- what the verdict form is.

19 This is the question that you will be answering once you start

20 deliberating.

21     So you'll see:

22         "We, the jury in the above-titled action, find

23     as follows:

24         "Did the SEC establish by a preponderance of the

25     evidence that Matthew Panuwat is liable under the

CLOSING ARGUMENT/ SMYTH

1    civil misappropriation theory of insider trading as

2    explained in Instruction Numbers 16 through 21?"

3        That's the question.  You'll answer that question either

4    "yes" or "no," and then -- I'll tell you about how to choose

5    the presiding juror, but then the presiding juror would sign

6    this and that would be the verdict.

7        So those are the instructions.

8        And, Mr. Smyth.

9            MR. SMYTH:  Thank you, Your Honor.

10                  **CLOSING ARGUMENT**

11            MR. SMYTH:  Good morning.

12        The central question you'll be asked to answer in this

13    case is:  Why did the defendant trade?

14        You've been offered two explanations, one by the SEC and

15    one by the defense, and it will be up to you to determine which

16    is more likely.

17        The SEC's explanation is simple and straightforward:

18    Mr. Panuwat purchased Incyte call options because he had

19    confidential inside information that he believed would move

20    Incyte's stock.  He traded a mere seven minutes after receiving

21    an e-mail confirming Medivation's acquisition was on track to

22    be publicly announced in just a few days.

23        The Defense's explanation, on the other hand, is a story

24    that gets more elaborate and complicated with each telling.  As

25    we've heard, the defendant's explanation as to why he traded

**Excerpts of Closing Argument for Plaintiff, dated Apr. 5, 2024,
Dist. Ct. Doc. 166 (Apr. 5, 2024)**

CLOSING ARGUMENT/ SMYTH

```
 1        civil misappropriation theory of insider trading as

 2        explained in Instruction Numbers 16 through 21?"

 3        That's the question.  You'll answer that question either

 4    "yes" or "no," and then -- I'll tell you about how to choose

 5    the presiding juror, but then the presiding juror would sign

 6    this and that would be the verdict.

 7        So those are the instructions.

 8        And, Mr. Smyth.

 9            MR. SMYTH:  Thank you, Your Honor.

10                      CLOSING ARGUMENT

11            MR. SMYTH:  Good morning.

12        The central question you'll be asked to answer in this

13    case is:  Why did the defendant trade?

14        You've been offered two explanations, one by the SEC and

15    one by the defense, and it will be up to you to determine which

16    is more likely.

17        The SEC's explanation is simple and straightforward:

18    Mr. Panuwat purchased Incyte call options because he had

19    confidential inside information that he believed would move

20    Incyte's stock.  He traded a mere seven minutes after receiving

21    an e-mail confirming Medivation's acquisition was on track to

22    be publicly announced in just a few days.

23        The Defense's explanation, on the other hand, is a story

24    that gets more elaborate and complicated with each telling.  As

25    we've heard, the defendant's explanation as to why he traded
```

CLOSING ARGUMENT/ SMYTH

1   has changed, but the story he now offers, the story he offered

2   during trial, may be the least probable of all.

3       It ignores coincidence after coincidence and requires you

4   to check your common sense at the door.  The reason we have

5   jurors is so that you can apply your common sense.  And when

6   you do that in this case, you can only come to one conclusion:

7   The defendant committed insider trading.

8       Now, I'm about to go through a chronology of the key

9   events here.  There are a lot of dates and I understand it's

10  not easy to keep them all straight, but there will be an

11  exhibit that will be available to you during your deliberations

12  that includes many of those important dates.  It is

13  Exhibit 1213.

14      It is the 14D-9 that you heard reference to many times

15  throughout the course of this trial.  That's the document that

16  Medivation publicly filed on August 30th, 2016, more than a

17  week after its acquisition was announced.

18      In particular, pages 19 through 26 of Exhibit 1213 provide

19  a chronology of the key events of the Medivation sales process.

20  You may want to refer to that document during your

21  deliberations, and you may also want to make note of the

22  numbers of the exhibits that we will soon be walking through so

23  that you can review them during your deliberations.

24      With that said, let's go back and walk through what we

25  learned during the course of this trial.

CLOSING ARGUMENT/ SMYTH

1      It really begins in March 2016, when Sanofi reached out

2  and expressed interest in acquiring Medivation.  That put into

3  motion a process that culminated approximately five months

4  later with the announcement that Pfizer, one of the world's

5  largest drug companies, would acquire Medivation at a huge

6  premium, a price that was 120 percent higher than what

7  Medivation stock was trading at before the process began.

8      We heard from -- that from the start of that process, the

9  defendant, Mr. Panuwat, was involved.  And he wasn't just

10  involved, he was one of just six core team members at

11  Medivation, a company with hundreds and hundreds of employees,

12  and he was one of just six entrusted to help run this highly

13  sensitive, confidential process at the company.

14      We heard how Medivation took steps to maintain the

15  confidentiality of the process.  Meetings were held behind

16  closed doors.  Code names were used.  There was limited

17  distribution for e-mails.  Information was kept within that

18  inner circle, and Mr. Panuwat was in that inner circle.

19      We have heard that Medivation wasn't happy with Sanofi's

20  proposal.  Medivation felt that it significantly undervalued

21  the company, and by April 2016, it had hired two investment

22  banks to help it fend off Sanofi.

23      By August 2016, things had moved to a new stage.  By

24  August, Medivation was no longer fighting off Sanofi's hostile

25  bid.  Instead, Medivation was engaged in the sales process.

CLOSING ARGUMENT/ SMYTH

1    It had signed confidentiality agreements with five

2   companies, including Pfizer.  All five companies had expressed

3   interest in acquiring it, and a diligence process was underway.

4   The five interested companies sought and received information

5   about Medivation.

6        Mr. Panuwat was still very involved at this stage in the

7   process.  He was responsible for coordinating with Medivation's

8   investment bankers and managing the diligence process.

9        On August 8th, all five companies submitted initial bids,

10  nonbinding proposals to acquire Medivation, and those initial

11  bids came in high.  They were met with excitement by

12  Medivation's management.

13       Mr. Taylor, can you please put up Exhibit 1288.

14       For example, we saw that when Celgene submitted its

15  initial bid, David Hung, Medivation's CEO, forwarded it to

16  Medivation's core team, including Mr. Panuwat, exclaiming

17  "wow," in all caps, "$71!  Good start."

18       We heard Medivation's chief financial officer, Jennifer

19  Jarrett, testify that Medivation's management was excited about

20  the initial bids.  She said five bids is a lot.  And, remember,

21  this was just round one.

22       There was every expectation that the bids would only go up

23  from there.  It was becoming increasingly clear that Medivation

24  was likely to sell for a high premium; thus the excitement.

25  Mr. Panuwat was aware of those bids.  He knew about the

CLOSING ARGUMENT/ SMYTH

1   excitement at the company.

2        All five companies that had signed confidentiality

3   agreements submitted initial bids on August 8th, but two of the

4   companies submitted bids that weren't competitive, and they

5   were told that they would not be invited to continue in the

6   sales process.

7        But they didn't go away; instead, they asked to be let

8   back in and they submitted revised bids.  That was a big deal.

9   We heard Ed Baxter, Medivation's investment banker, say that he

10  had never seen that happen in his 26 years as an investment

11  banker, and it was very good news for Medivation.  As

12  Mr. Baxter said, the more bidders, the more likely you will

13  find the highest potential value of the company.

14       On August 12th, a revised bid summary that reflected all

15  five bids, including the two rebids, was sent around to the

16  core members at Medivation.

17       Mr. Taylor, can you please put up Exhibit 1294.

18       Mr. Panuwat received that e-mail.  He received that bid

19  summary.

20       Mr. Taylor, if you could move to page 5 of the exhibit.

21       And as we can see, and as Mr. Panuwat saw at the time, the

22  bids reflected in the "Total Nominal Offer" row on this page of

23  Exhibit 1294 ranged from $65 to $71.  This was a very

24  competitive sales process.

25       And as we can see in the "Timing" row on this exhibit,

CLOSING ARGUMENT/ SMYTH

1    just below the row showing the amount of the bids, all five

2    companies indicated that they were prepared to complete the

3    transaction within the targeted time frame.

4        So what was the targeted time frame?  Well, we saw that on

5    August 14th, Medivation's investment bankers e-mailed around

6    letters they were to send to the bidders that spelled out that

7    timeline with specificity.

8        Mr. Taylor, if you could please put up Exhibit 1301.

9        Mr. Panuwat received this e-mail.  He was aware of the

10   timeline that was to be communicated to the bidders.  We can

11   see that timeline at the bottom of the first page of this

12   exhibit and continuing on to the top of the second page.

13       The investment bankers were proposing that markup of the

14   merger contracts be provided by 5:00 p.m. on Thursday,

15   August 18th.  Definitive proposals were due by noon the next

16   day.

17       And as we can see right here, the idea was to give the

18   parties time to do the due diligence they needed to do and give

19   Medivation a shot at announcing on Monday, August 22nd.

20       And this letter also set a deadline for bidders to

21   complete their diligence.

22       If you could turn to page 5 of the exhibit, please.

23       We can see that in the section titled "Completion of Due

24   Diligence," that bidders were told they should have completed

25   all due diligence prior to submitting final proposals, which,

CLOSING ARGUMENT/ SMYTH

 1    explanation for his trades.  I will go over those in a bit more

 2    detail before I conclude.

 3        There are, however, some other facts you may wish to

 4    consider when weighing the credibility of Mr. Panuwat's

 5    testimony.

 6        You may remember that there were several representations

 7    Mr. Panuwat made to the SEC before this case that were either

 8    inconsistent with his testimony at trial or contradicted by

 9    documents that were received into evidence.

10        First, Mr. Panuwat told the SEC that at the time he

11    traded, on August 18th, 2016, he did not know the details of

12    the bids that had been submitted up to that point.  However,

13    you've seen in this trial that Mr. Panuwat did have that

14    information.  He received the bid summaries, he was at the

15    board meetings, and he ultimately admitted on cross-examination

16    that he did know the details of the bids when he traded.

17        Second, Mr. Panuwat told the SEC that he thought he was

18    not in the office on August 18th, but we saw that he sent many

19    e-mails that day.

20        We heard him admit that he normally did not work out of

21    the office at that time, and we saw e-mails from August 18th

22    about in-person meetings that Mr. Panuwat responded to without

23    suggesting he was not working or out of the office.

24        Third, Mr. Panuwat told the SEC that he wasn't really

25    involved in the sales process as of August 18th.  He said his

 1   involvement was diminishing at that time.  But we saw at trial

 2   that he was still attending meetings, participating in the

 3   diligence process, and acting as a core member of the team.

 4        Ms. Jarrett talked about the -- how the daily meetings --

 5   excuse me.

 6        Ms. Jarrett talked about the daily meetings she continued

 7   to have with him and other members of the core team.

 8        Mr. Panuwat himself talked about the almost 1,000

 9   deal-related e-mails he received in the first 18 days of August

10   alone.  So his involvement, in fact, did not wind down or

11   diminish.

12        Fourth, Mr. Panuwat testified that he does not recall

13   reading Dr. Hung's August -- that he does not recall reading

14   Dr. Hung's August 18th e-mail, but we saw that Mr. Panuwat sent

15   many e-mails from that same account that same day, both shortly

16   before and shortly after receiving the e-mail from Dr. Hung.

17        What do all these contradictions have in common?  In each

18   case, Mr. Panuwat provided testimony to the SEC that minimized

19   his role in the sales process and suggested he did not know

20   important deal-related information when he traded.

21        Why is that important?  Because it reflects consciousness

22   of guilt.  If Mr. Panuwat did not actually trade based on

23   information about the deal, there would be no reason to

24   minimize his involvement in that deal, to suggest he wasn't in

25   the office or suggest that he wasn't paying attention to or

CLOSING ARGUMENT/ SMYTH

 1   reading his e-mails.

 2        One would expect him to admit that he continued to act as

 3   a core member on the deal team up until August 18th, but stand

 4   by a consistent explanation for why he traded.  That is not

 5   what we saw.  Instead, we see Mr. Panuwat fighting the facts.

 6        And there is yet another fact that speaks to Mr. Panuwat's

 7   consciousness of guilt.  Mr. Panuwat did not recall mentioning

 8   this trade to any of his colleagues at Medivation.

 9        He did not mention it to Ms. Jarrett, his boss.  We heard

10   that from both of them.  She testified that she was unaware of

11   the trade that he made in the middle of the workday and at the

12   11th hour of the sales process until the SEC contacted her much

13   later.

14        Even more significant is the fact that Mr. Panuwat cannot

15   remember saying anything about the trade to Mr. Piscitelli.

16   Mr. Piscitelli was both Mr. Panuwat's friend and colleague.

17   His office was just a few doors down from Mr. Panuwat's.  They

18   regularly got coffee, lunch, and drinks together.  In the

19   nearly two months Mr. Panuwat spent thinking about this trade,

20   he could not remember mentioning it to Mr. Piscitelli even

21   once.

22        That fact is all the more surprising because Mr. Panuwat

23   says it was an e-mail exchange with Mr. Piscitelli that

24   initially got him thinking about buying Incyte call options.

25        He told Mr. Piscitelli in late July that he was not

CLOSING ARGUMENT/ SMYTH

1   following the recommendation to buy Incyte call options.  He

2   then decided a few weeks later that he would buy Incyte call

3   options.  He made that decision after seeing what he now says

4   was a very unusual movement by Incyte stock, and he made the

5   biggest trade of his life.

6        Remember, Mr. Panuwat says he is a longtime trader, since

7   at least high school.  He checks stock prices first thing in

8   the morning when he wakes up.  He genuinely enjoys trading.

9   And yet, during all his lunches, coffee breaks, meetings, and

10  drinks after work with Mr. Piscitelli, Mr. Panuwat did not

11  recall mentioning anything about this trade even once.

12       He did incredibly well on his Incyte trades, doubled his

13  money in a matter of days.  Those kinds of trades don't happen

14  often.  Yet Mr. Panuwat never mentioned it to his friend,

15  Mr. Piscitelli.  He's like the golfer that forgot to mention to

16  his buddy that he got a hole in one.

17       If Mr. Panuwat truly believed the trade was innocent, that

18  fact is surprising, especially since he regularly talked to

19  Mr. Piscitelli about trading.

20       On the other hand, if Mr. Panuwat had breached a duty to

21  Medivation and knew that, his silence is exactly what one would

22  expect.

23       Now, we've spent the last 40 minutes or so talking about

24  the facts of this case, talking about what the evidence has

25  shown over the course of this trial.  Now I'm going to switch

CLOSING ARGUMENT/ SMYTH

1  gears a little bit and talk about how those facts match up with

2  the law of insider trading.

3      The judge instructed you on the law earlier this morning,

4  and the key legal instruction that's going to guide your

5  consideration of this case is Instruction Number 16.  That's

6  the instruction that tells you what you need to find in order

7  to find that the SEC proved its case.

8      If we can pull that up, please.

9      Instruction 16 lists four elements:

10      One, that the defendant owed a duty of trust, confidence,

11  or confidentiality to his employer, Medivation;

12      Two, that as a result of his relationship with Medivation,

13  the defendant possessed nonpublic information that was material

14  to Incyte;

15      Three, that the defendant bought Incyte call options on

16  the basis of that information in a breach -- and in a breach of

17  duty owed to Medivation;

18      And, four, that the defendant, at the time he bought

19  Incyte call options, knew that the information he received from

20  Medivation was both nonpublic and material to Incyte or acted

21  recklessly as to whether the information was both material and

22  nonpublic, and knew that or acted recklessly as to whether he

23  lacked consent from Medivation to use the information.

24      As the instructions say, if the SEC proved each of these

25  elements by a preponderance of the evidence, then your verdict

CLOSING ARGUMENT/ SMYTH

```
 1    should be for the SEC.
 2         So we're going to go through all four of those elements
 3    one at a time, but before we do that, I want to talk about the
 4    phrase "preponderance of the evidence" one more time.
 5         "Preponderance of the evidence" simply means that
 6    something is more likely than not.
 7         Can you put up that scale, please.
 8         It's like the scale that Mr. Meyerhofer described in his
 9    opening statement.  For each element, you weigh all the
10    evidence that supports that element against all the evidence
11    that contradicts it.  If you find that the evidence in favor
12    outweighs the evidence against, even just barely, then the SEC
13    has carried its burden.
14         So keeping that in mind, let's go through the elements.
15         If we could go to the next slide.
16         Element 1:  First, that the defendant owed a duty of
17    trust, confidence, or confidentiality to his employer,
18    Medivation.
19         This is not seriously in dispute.  Mr. Panuwat admitted
20    that he had a duty to protect Medivation's confidential
21    information, he admitted that he was not supposed to use
22    Medivation's confidential information for his own benefit, and
23    he admitted that he was not supposed to use Medivation's
24    confidential information to trade securities.
25         Those facts alone demonstrate that he owed a duty of
```

CLOSING ARGUMENT/ SMYTH

 1  trust, confidence, and confidentiality to Medivation.  They

 2  demonstrate that the SEC has proved the first element.

 3       So it's not even necessary to look at other potential

 4  sources of Mr. Panuwat's duty to Medivation, but to be clear,

 5  he did sign two policies that further demonstrate his duty.  So

 6  let's take a brief look at those.

 7       He received and signed the confidentiality agreement,

 8  Exhibit 1371.  Here it is.

 9       Very simply, Mr. Panuwat promised to hold in the strictest

10  confidence and not to use, except for the benefit of the

11  company, any trade secrets, confidential knowledge, data, or

12  other proprietary information relating to, among other things,

13  business plans and financial information.

14       He also received and signed Medivation's policy regarding

15  securities trading.  That's Exhibit 1372.  Here it is.

16       This policy noted that Mr. Panuwat, as a Medivation

17  employee, may receive important information that is not yet

18  publicly disseminated about the company.

19       It also noted that this information could put Mr. Panuwat

20  in a position to profit financially by buying or selling or in

21  some other way dealing in the company's securities or the

22  securities of another publicly traded company.

23       But it admonished Mr. Panuwat that for anyone to use such

24  information to gain personal benefit is illegal, regardless of

25  the quantity of shares, and is, therefore, prohibited.

CLOSING ARGUMENT/ SMYTH

1    These two policies show that Mr. Panuwat owed a duty of

2  trust, confidence, and confidentiality to Medivation.  But,

3  again, you don't even need to get to the policies, because

4  Mr. Panuwat admitted he had this duty to Medivation.

5    Let's turn to the second element.

6    The second element is that, as a result of his

7  relationship with Medivation, the defendant possessed nonpublic

8  information that was material to Incyte.  There are two

9  concepts here, that the defendant possessed nonpublic

10  information and that the information was material to Incyte.

11    First, let's talk about what "nonpublic" means.  This also

12  isn't in serious dispute.

13    As I went through earlier, Mr. Panuwat had lots of

14  confidential details about the bids and the timeline for the

15  bid process.  He acknowledged that he had all that information

16  and he acknowledged that it was confidential.

17    So let's talk about the second part of this element,

18  "material to Incyte."

19    Information is material if there is a substantial

20  likelihood that a reasonable investor would consider it

21  important, and the evidence showed that reasonable Incyte

22  investors would have considered Medivation's acquisition

23  important information.

24    It's everything we walked through about why Incyte's stock

25  price went up on August 22nd.  The market perceived Medivation

CLOSING ARGUMENT/ SMYTH

1  and Incyte to be similar companies, mid-sized oncology drug

2  companies with an FDA-approved, commercially available product.

3  They were described as "scarce assets."

4      And the market also perceived that a Medivation

5  acquisition would be good news for Incyte.  Market observers,

6  both before and after the Medivation merger, linked the idea of

7  a Medivation acquisition to Incyte itself being acquired.

8      They also linked Medivation's acquisition directly to

9  Incyte's stock price, and that's exactly what Dr. Becker said

10 you'd expect to see in this situation.

11     Dr. Becker explained that when one public company is

12 acquired, the stock prices of other, similar public companies

13 typically go up too.

14     All of that evidence goes to show that a reasonable Incyte

15 investor certainly would have considered Medivation's

16 acquisition announcement to be an important piece of

17 information.

18     Let's turn to Element 3.  The third element is that the

19 defendant bought Incyte call options on the basis of that

20 information and in a breach of duty owed to Medivation.

21     This is another element that itself has two concepts:

22 That the defendant bought his Incyte call options on the basis

23 of the nonpublic information he had and that his purchase of

24 Incyte call options breached a duty he owed Medivation.

25     "On the basis" means that the information the defendant

CLOSING ARGUMENT/ SMYTH

1   had about the Medivation acquisition was a significant factor

2   in the defendant's trade.  It means he traded because of what

3   he knew about Medivation's impending acquisition by Pfizer.

4   And there's lots of evidence that that's what happened.

5        The clearest evidence is the timing.  He bought Incyte

6   call options seven minutes after he got Dr. Hung's e-mail.  He

7   had been following Incyte for as long as he could remember, but

8   he didn't buy until the very end of the Medivation sales

9   process.

10        And he bought options that were going to expire in less

11   than a month.  His trade depended on something boosting

12   Incyte's stock price very soon.

13        And not just that, he made the biggest options purchase of

14   his life.  He knew something that made him confident enough to

15   wager almost four times as much money on this bet than he had

16   on any other of his previous options trades.

17        Now, when you're deliberating, you may want to refer to

18   Exhibit 1418, which is a summary of Mr. Panuwat's prior trades

19   up until the point that he made his trades in Incyte call

20   options.

21        And if you conclude that he bought Incyte's options -- or

22   Incyte options because of what he knew about Medivation's

23   acquisition, then it's clear that he breached a duty to

24   Medivation because he admitted that he was not supposed to use

25   Medivation's confidential information for his own personal

CLOSING ARGUMENT/ SMYTH

```
 1    benefit.
 2          If we can turn to the next slide, please.
 3          At trial, just yesterday, he specifically admitted that he
 4    knew he was not supposed to use Medivation's confidential
 5    information to trade in the stock market.  So if you find that
 6    Mr. Panuwat traded Incyte based on the nonpublic information he
 7    had about Medivation's impending acquisition, then, by his own
 8    admission, that trade was a breach of the duty he owed to
 9    Medivation.
10          That brings us to the fourth element.  This is a wordy
11    one:  That the defendant, at the time he bought Incyte call
12    options, knew that the information he received from Medivation
13    was both nonpublic and material to Incyte or acted recklessly
14    as to whether the information was both material and nonpublic,
15    and knew that or acted recklessly as to whether he lacked
16    consent from Medivation to use the information.
17          Again, there are two concepts here:  That the defendant
18    knew that the information was nonpublic and material and that
19    the defendant knew he didn't have Medivation's consent to
20    trade.
21          The defendant admitted that the information he had about
22    the Medivation acquisition was confidential.  That's not in
23    dispute.
24          And you know he thought it was material for the same
25    reason that you know he traded on the basis of that -- for the
```

2-ER-288

CLOSING ARGUMENT/ SMYTH

1   same reason that you know he traded on the basis of that

2   information.

3       He bought these options at the very end of Medivation's

4   acquisition process, seven minutes after he got the CEO's

5   e-mail.  He knew this information was important because he

6   himself traded on it.

7       And the defendant knew he didn't have Medivation's consent

8   to use the information about Medivation's acquisition to trade.

9   He admitted that he knew he wasn't supposed to use Medivation's

10  business secrets for his own personal benefit.  He admitted

11  that he wasn't supposed to use Medivation's confidential

12  information to trade securities.

13      And he never told anyone about his trades.  He didn't tell

14  his boss.  He didn't consult with the company's lawyers.  He

15  didn't even tell his friend, Mr. Piscitelli, the same guy who

16  had sent him an e-mail about Incyte call options just a couple

17  weeks earlier.

18      He kept this a secret, so there was no way that Medivation

19  could have consented to what Mr. Panuwat did, because

20  Mr. Panuwat never even sought consent for his trades.

21      I began my -- excuse me.

22      I began my remarks this morning by talking about common

23  sense.  Common sense is why we have jurors like you to decide

24  cases like this, and common sense is a good guide here.

25      To credit the defendant's explanation for his trades, you

CLOSING ARGUMENT/ SMYTH

1    must find that many seemingly crucial facts were mere

2    coincidences:

3         The fact that Mr. Panuwat traded just seven minutes after

4    receiving an important deal-related e-mail from his CEO is,

5    according to the Defense, just a coincidence.

6         That he traded 48 hours before Medivation's board of

7    directors approved that same deal, also a coincidence.

8         Mr. Panuwat had never traded in Incyte before, and yet

9    that is just yet another coincidence, according to his defense.

10        So was the fact that Mr. Panuwat's first ever trade in

11   Incyte also happened to be his biggest ever purchase -- I'm

12   sorry.

13        So is the fact that Mr. Panuwat's first ever trade in

14   Incyte also happened to be his biggest ever purchase of any

15   kind in the stock market.

16        The coincidences do not end there.

17        Mr. Panuwat timed his trade just right to benefit from an

18   increase in Incyte's stock price, an increase that market

19   observers widely attributed to Medivation's acquisition.

20        The Defense dismisses that as mere happenstance, and it

21   invites you to conclude that it is just coincidence that

22   Mr. Panuwat never mentioned his trade to any of his colleagues.

23        Common sense tells you that if one explanation of a

24   person's conduct requires you to dismiss many seemingly

25   important facts as coincidences, it probably is not accurate.

**Excerpt of Closing Argument for Defendant,**
**dated Apr. 5, 2024, Dist. Ct. Doc. 166 (Apr. 5, 2024)**

 1   any heads up that that was going to be covered in this

 2   interview?  They had it all ready.  They came to that interview

 3   with that in hand.  All of that preparatory work had already

 4   been done.

 5        Now, in this case, the SEC has accused Mr. Panuwat of not

 6   remembering anything.  And I remember counsel for the SEC's

 7   opening statement, where he said (as read):

 8             "For the first time he was asked about it, he

 9        said he couldn't remember a thing."

10        Well, we know that's not true.  The trial has shown that

11   that's not true.

12        So let's take a look at Mr. Panuwat's testimony in his

13   first SEC interview.

14                  (Video played but not reported.)

15        **MR. DiCANIO:**  Their theory is this is a person who's

16   lying.  Maybe it's just a person who wasn't aware they were

17   going to ask him about that trade four and a half, four years

18   ago.

19        He remembers an awful lot.  "I think it was a valuation,"

20   meaning the stock price was undervalued.  "I don't recall it

21   being an event, but, boy, what I'd like to do is I'd like to

22   refresh my recollection so I can think back and try to remember

23   what I was thinking almost four years before."

24        Let's play the next clip, Aaron.

25                  (Video played but not reported.)

CLOSING ARGUMENT/ DICANIO

1          **MR. DiCANIO:**  See what they're doing there?  That's a

2     lawyer trying to put words in the mouth of a person on the

3     other side of the questioning.  That's exactly what they were

4     trying to do there.  They were trying to trick Mr. Panuwat, to

5     have him make a mistake into making an admission here.  They're

6     trying to put words in his mouth.

7          Let's look at the next clip.

8                    (Video played but not reported.)

9          **MR. DiCANIO:**  So, ladies and gentlemen, you have the

10    actual video that you can take a look at.  The SEC suggests

11    that that's a person who's lying.

12         What that suggests to me is that's a person that's just

13    confused.  "A connection between Medivation and Incyte?  I

14    don't kind of understand that.  I don't see that."  Because he

15    didn't believe that.  In his mind, as a professional, as

16    someone who spent his whole life in this industry, he did not

17    see it that way.  You heard him testify about it.  He saw them

18    as different on all of the fundamental reasons they're

19    different.

20         And that was the first time he was asked about it and that

21    was his reaction.

22         Now, why did Mr. Panuwat trade in Incyte?  Well, we asked

23    him on the stand, and he said that he had been trading in the

24    stock market since high school.  "I do have lots of memories on

25    investing in the stock market easily in high school," the

**CLOSING ARGUMENT/ DICANIO**

1   ballpark of thousands and thousands and thousands, potentially,

2   in terms of the amount of trades he would have made since he

3   started trading.  So this is a very, very active trader.

4        Again, for someone like that, it's very, very hard to say,

5   "Well, what about this one trade this period of time?"  You're

6   trading a lot.  There's a lot of different trades that you've

7   made.

8        Let's go on to the next slide.

9        Now, Mr. Panuwat also testified that he's been familiar

10  with Incyte for years (as read):

11           "Before you made your trade in the Incyte

12       company, did you know about that company?

13           "I did, yes.  It was one of the larger companies

14       in the biotechnology industry.  It was a well-run

15       company that has been around for a long time that was

16       developing a lot of different drugs for a lot of

17       different diseases."

18       We also provided testimony about the Goldman Sachs

19  recommendation to buy Incyte.  Now, ladies and gentlemen, this

20  is something that happened.  This Goldman Sachs recommendation

21  happened in -- July 27th, and Mr. Panuwat and -- as well as

22  Mr. Piscitelli, talked about it.

23       And if you recall, the recommendation was, "We think --

24  heading in to Incyte's earnings call, we think that it would be

25  a good time to buy Incyte call options.  We think that they're

**CLOSING ARGUMENT/ DICANIO**

1    undervalued.  We think that that's a good buying opportunity."

2         Now, Goldman Sachs, one of the leading investment banks in

3    the world.  This is July 27th.  This is less than three weeks

4    before the Medivation sale is announced.  Nowhere in that

5    report are you going to see, "Well, you know what, there's been

6    a lot of rumors in the market" -- and there were at that

7    time -- "that Medivation is about to be sold.  That's another

8    good reason, because we think Incyte would be positively

9    impacted by that."  You won't find that in the report.

10        You also won't find in the report any suggestion that,

11   "Well, you know, because Medivation might get purchased, that

12   might make other biotech companies that have an oncology drug

13   more scarce."  Don't see that.  But what you see is a

14   recommendation to buy.

15        Now, Mr. Panuwat talked about this and he said (as read):

16             "Incyte was going to have an earnings

17        announcement, and it seems like they're drawing

18        attention to August 9th."

19        That was the date of the earnings announcement.  And

20   according to the Goldman Sachs folks who put this together,

21   their analyst, they believed the stock would trade up heading

22   in to earnings and they expect earnings to be positive, which

23   would obviously be a good thing for the share price of Incyte.

24        Now, what's really interesting about this is that this is

25   a conversation between Mr. Piscitelli and Mr. Panuwat --

CLOSING ARGUMENT/ DICANIO

 1        Aaron, if we could go to Slide 26.  Thank you.

 2        That's open, it's transparent, it's done on the company

 3    e-mail, and they're talking about whether or not to trade.

 4        Who raises the idea first?  Well, it's Mr. Piscitelli.  He

 5    says, "I got this Goldman Sachs report.  What do you think,"

 6    and they start to talk about whether or not to trade in Incyte.

 7        This is done on the company e-mail.  All of the stuff that

 8    was going on in the sales process was going on at this point in

 9    time.  This is July 27th.

10        Mr. Piscitelli doesn't say, "Well, I'd love to trade in

11    Incyte but we can't."  You know why he didn't say that?

12    Because Mr. Piscitelli doesn't agree with the SEC's version of

13    events here.  He, like Mr. Panuwat, does not think that Incyte

14    and Medivation are similar.  He, like Mr. Panuwat, does not

15    think that there is any type of correlation or any likelihood

16    that the stock price of Incyte would be positively impacted by

17    Medivation because they're so different as companies.

18        Now, we talked about the reasons why Mr. Panuwat decided

19    not to trade at that particular time.  We asked him about it

20    and he said (as read):

21            "I believe it is odd for an investment bank to

22        recommend securities ahead of an earnings

23        announcement.  I personally do not invest ahead of

24        earnings calls.  I think, at least in my opinion,

25        it's very difficult to know what a company is going

CLOSING ARGUMENT/ DICANIO

```
 1          to announce on earnings announcement, and then
 2          potentially even more difficult on what actually the
 3          stock will do based on the earnings announcement."
 4      And what's really interesting here is Mr. Panuwat was
 5  exactly right.  This was a very positive earnings announcement,
 6  and the expectation would be, on a positive earnings
 7  announcement, the stock price would go up.  But it did not.
 8  Hard to understand why, but it didn't.
 9      Let's take a look at his testimony on that.
10      So Mr. Panuwat traded because of the Goldman Sachs
11  recommendation, favorable earnings announcement, and unusual
12  stock drop, right?  So here's what he said (as read):
13          "Their earnings announcement was actually quite
14          favorable, and for reasons hard to explain -- but I
15          believe the stock price continued to fall.  I think
16          it dropped into the earnings announcement and it
17          continued to fall after the earnings announcement,
18          multiple days in a row."
19      And if you remember, that is the nine, ten days in a row
20  that it fell.
21      And when we asked Mr. Panuwat why he traded, he said (as
22  read):
23      "ANSWER:  The stock price fall.  It went down
24          significantly right after earnings."
25      And you could see the stock price chart right there, and
```

(238 of 254), Page 238 of 254 Case: 24-6882, 05/16/2025, DktEntry: 14.3, Page 238 of 254
Case 3:21-cv-06322-WHO    Document 166    Filed 04/05/24    Page 76 of 144    1329
CLOSING ARGUMENT/ DICANIO

1  you could see on July 27th -- that's the day of the Goldman

2  Sachs recommendation to buy Incyte call options -- stock price

3  is trading at $88.72, and then on the earnings announcement,

4  the stock price goes down to $86.48.

5       And then what you see for a series of days, a very, very,

6  very sharp decline, all the way down to August 18th, the day

7  that Mr. Panuwat purchased his call options, and the stock

8  price there was $76.16.  So very, very significant stock price

9  drop.  That's what Mr. Panuwat was looking at and that's why he

10 decided to trade.

11      Now, I think that the SEC counsel, in their opening

12 remarks here today, overstated what it means to watch a stock

13 price.  He made it seem like Mr. Panuwat is, every moment of

14 the day, looking at the stock ticker to see what it is now,

15 now, now, now.  That's not what Mr. Panuwat testified to.

16      He talked about his routine, how he would every day kind

17 of roll through a large number of stocks to see what they're

18 doing, that he would like at Incyte, but he had a job to do.

19 He had other responsibilities.  He had his personal

20 responsibilities.  He did not look at this every minute of the

21 day, as suggested by SEC counsel, but he was watching it.  He

22 was seeing the stock price drop day after day, and he was

23 watching to see when and if that would bottom out.

24      So now we get to the second SEC interview.  And at this

25 particular point in time now, Mr. Panuwat, for the first time,

**CLOSING ARGUMENT/ DICANIO**

1  understands, "Really what they're interested in is my trading

2  in Incyte," and so he has an opportunity, then, to try to

3  refresh his recollection as to what he was thinking almost four

4  years prior, when he made that trade.

5      So they asked him about it in that second interview, and

6  here's what he said (as read):

7          "I believe that I looked at the news around

8          Incyte around the time that I made the trade, and I

9          also looked at the stock price performance around

10         that time, and I also looked at my trading records

11         and things like that."

12     That's how he refreshed his recollection.  The SEC has

13  suggested that there's something nefarious about that.  Ladies

14  and gentlemen, how would you refresh your recollection on

15  something that happened so long ago?

16     You try to understand what you were thinking in the

17  moment.  You try to look at your records of the time to see if

18  that triggered a recollection of what you were thinking and

19  why.  That's how you refresh your recollection on things that

20  happened so long ago.

21     Now, after having a chance to review his records,

22  Mr. Panuwat confirmed the original reasons he gave for making

23  the trade.  Remember, his original reason was that he believed

24  that there was undervaluation in the stock price of Incyte.

25     And the SEC asked him about it, and this is what he said

CLOSING ARGUMENT/ DICANIO

```
 1    (as read):
 2              "I believe Incyte was undervalued at the time of
 3         my investment.  It had suffered very steep declines
 4         over the previous year, very significant declines in
 5         a very short period of time, and nothing that I
 6         believed really affected the fundamentals of the
 7         company.  And so I believed that the stock price
 8         would increase, you know, over the next month or so,
 9         and so I chose to make an investment in call options
10         at that time."
11         You know, ladies and gentlemen, if you take a step back
12    and you start to line up what Mr. Panuwat said in his first
13    interview, his second interview, and in his third interview, it
14    is consistent.
15         Aaron, if we could put up a slide.  Thank you.
16         Take a look at his first interview (as read):
17              "I obviously thought that the stock price might
18         rise again over the coming month or so, but, again, I
19         don't believe that there were any clinical trial
20         results or things that I can recall specifically
21         about that time period.
22              "Incyte was a company I was very familiar with
23         and was following them, and I believe it was good.  I
24         felt it was likely a valuation idea at the time.  The
25         stock generally seems lower than it should be."
```

CLOSING ARGUMENT/ DICANIO

1          That's what he remembered without knowing that they were

2   going to ask him about that.

3          And then in the second interview, he says, very

4   consistently (as read):

5              "I believe Incyte was undervalued at the time of

6          my investment.  It had suffered very deep declines

7          over the previous year, very significant declines in

8          a very short period of time, and so I believed that

9          the stock price would increase, you know, over the

10         next month or so.  And so I chose to make an

11         investment in call options at that time."

12         And then again in his trial testimony (as read):

13             "I think, similar to how I explained it, it's

14         just the stock price fall.  It went down

15         significantly after the earnings."

16         So at its core, throughout these three periods of time,

17  Mr. Panuwat's recollection of what he did is entirely

18  consistent.

19         Now, this case has been going on for a long time, and I've

20  been involved in it from the beginning.  And as issues came up,

21  the SEC asked more questions, they raised new issues, and they

22  were responded to.  We're going to get to some of that later.

23         But it's unfair to say, "Well, he didn't talk about his

24  tax strategy, he didn't talk about this, he didn't talk about

25  that."  He answered the questions that were asked of him.

**CLOSING ARGUMENT/ DICANIO**

1          Now, where are we in our story?  The SEC does a setup

2     interview with Mr. Panuwat in May of 2020.  They know exactly

3     what they're going to talk to him about.  They have Dr. Becker

4     and her team doing the analysis back in their headquarters in

5     Washington to confront him with that.

6          But here's what happens.  Now, they take a look at, "Well,

7     what happened with Incyte's stock price?"  And they see the

8     chart and they see, "Wow, that is a pretty steep decline and it

9     did decline after that earnings call, and so now we're going to

10    need to deal with this in some way, because maybe just his

11    recollection -- lack of recollection alone isn't going to be

12    enough."

13         So what do they start to do then?

14         Well, they start to try to put thoughts in his head that

15    he didn't have when he made his trade.  Thoughts in his head

16    that he didn't have when he made his trade.

17         The fundamental flaw in the SEC's case is that they're

18    picking up bits and pieces of documents and information and

19    they're saying, "That must have been what he was thinking

20    about."  What is the evidence of that?  What is the evidence of

21    that?

22         Mr. Panuwat was an experienced businessperson in the

23    biotech space.  He was a very experienced trader in the biotech

24    space.  You heard what he said, "I make the decisions based

25    upon how I see the world, how I view an investment, not based

CLOSING ARGUMENT/ DICANIO

```
 1    this case?  "Listen, I got it in the bag.  I know the
 2    Medivation sale is going to be announced in a day or two.
 3    Incyte is going to go up like a skyrocket.  Just go out and buy
 4    my -- my strike -- buy my call options.  I don't care what
 5    price I pay at it."  That's inconsistent with someone that's
 6    thinking that way.
 7         A limit order is someone thinking, "Well, you know what,
 8    if I have to pay too much for my strike price, I could lose on
 9    this investment.  I got to be careful.  So you know what?  I'd
10    rather not invest if the stock price -- if the strike price
11    goes too high."  That's someone that doesn't think he has
12    something in the bag or something within knowledge; that's
13    someone managing his risk.
14         Let's take a look at the next slide.
15         I think another thing that I'd ask you all to consider is
16    how Mr. Panuwat acted when he bought and then sold his options.
17    Here's what I mean by that.
18         The theory that the SEC has in this case is that the only
19    reason Mr. Panuwat bought the Incyte call options was because
20    he knew that the Medivation sale was coming and that he
21    thought, upon the announcement of the Medivation sale, Incyte's
22    stock price was going to go up.  That's their theory.
23         Well, if that theory is correct, then what would you have
24    expected him to do?  The event happened.  Medivation sale was
25    announced, right?  You would have expected he would have sold
```

CLOSING ARGUMENT/ DICANIO

1   all of his options, grab all of that profit, "Well done, me."

2        Is that what he did?  No.  He held roughly half of his

3   options.  And why did he do that?  Because he said, "I think

4   the stock price of Incyte is going to go even higher."

5        His investment thesis was never the Medivation sale.  His

6   investment thesis was Incyte was undervalued, it was still

7   undervalued, and he waited to see, "I think it's going to go

8   higher."

9        Now, as fate would have it, his judgment proved wrong.

10  His judgment proved wrong.  That happens in the stock market.

11  Sometimes your trades are profitable; sometimes you lost.  In

12  this particular instance, he was wrong about his judgment.  But

13  that action, the manner in which he sold, is inconsistent with

14  the SEC's theory.

15       Now, I don't know what the SEC is going to say in rebuttal

16  on this.  I don't know.  Maybe they'll say, "You know what?  I

17  think Mr. Panuwat did this to cover his tracks."

18       If they say that, I want you to take a look at me and

19  imagine over my head a bubble that says, "Wow.  Really?  What's

20  the evidence of that?"

21       One thing is for certain:  Mr. Panuwat is not a dumb man,

22  right?  And if he wanted to hide his tracks, there are other

23  ways to do it.

24       Let's go on to the next one.

25       You heard about this a little bit this morning as well,

CLOSING ARGUMENT/ DICANIO

```
 1    and this is the "I better not tell anybody about this because
 2    I'm violating my duty to Medivation."  Kept it to himself,
 3    didn't tell Mr. Piscitelli.  Let's kind of unravel that a
 4    little bit.
 5         First of all, if you didn't use Medivation confidential
 6    information to make your trade, there would be no need to tell
 7    anybody about your trade.  You didn't need to seek permission
 8    if you were not using Medivation confidential information.
 9    That is what Mr. Panuwat testified to.  So he would not need to
10    tell anybody about his trade.
11         Second, the idea that somehow he was keeping this from
12    Mr. Piscitelli is a really odd argument.  They were talking
13    about it on July 27th.  Mr. Piscitelli raised it with him as
14    something he might do.  They were talking about it.  There
15    would be no reason to particularly hold it from him.
16         It's not like Mr. Piscitelli -- well, let me take a step
17    back.  We keep talking about this core group of five or six
18    people.  Mr. Piscitelli was one of those people too, like he
19    was in whatever that secret club was that they talk about.
20         Mr. Piscitelli knew all of the stuff about the sales
21    process; he knew all of it, and yet he is talking about
22    purchasing Incyte call options on the 27th openly,
23    transparently.
24         Mr. Panuwat is conversing with him in that.  No one is
25    suggesting that there's a problem in doing that.  There would
```

CLOSING ARGUMENT/ DICANIO

 1    be no reason for Mr. Panuwat not to go back and tell him about

 2    that.

 3        There was a lot going on at the company at that time, if

 4    you remember Mr. Piscitelli's testimony.  And whether he

 5    mentioned it to him or not, doesn't remember.  But he had no

 6    reason not to tell him, because they were talking openly about

 7    it.

 8        Now, we asked Mr. Panuwat some questions about this, and

 9    I'd like to play a video of this particular portion of his

10    testimony.  I'm sorry, this is his first interview.

11        Let me set this up a little bit cleaner, Aaron.  Thank

12    you.

13        Sorry.  Apologize, ladies and gentlemen.

14        So this is from Mr. Panuwat's first interview with the SEC

15    in May of 2020.

16                (Video played but not reported.)

17        **MR. DiCANIO:**  What does that mean?  "When I made my

18    trade, I don't see the connection you're trying to draw now in

19    this SEC interview.  I don't see it that way.  I don't see it

20    that way now, and I didn't see it that way then.  And so

21    getting permission is not something I needed to do.  I wasn't

22    using Medivation confidential information."

23        Now, let's go through -- let's talk a little bit about his

24    trial testimony.

25        Now, because Mr. Panuwat did not use Medivation

CLOSING ARGUMENT/ DICANIO

1    confidential information to trade in Incyte, he did not breach

2    a duty to Medivation.

3        So we asked the question (as read):

4        **"QUESTION:** Do you believe you were breaching any duty

5        that you owed to Medivation?

6        **"ANSWER:** No.

7        **"QUESTION:** Did you intend to defraud Medivation?"

8        Mr. Panuwat testified (as read):

9        **"ANSWER:** No.

10       **"QUESTION:** Did you think even for a second that you might

11       be violating federal securities laws?

12       **"ANSWER:** No, not for one second.

13       **"QUESTION:** If there had been a possibility that your

14       trades in the Incyte company would have violated federal

15       security laws, would you have made that trade?

16       **"ANSWER:** No, definitely not."

17       Now, couple of things, ladies and gentlemen, I want to

18   just point out, and that is that, you know, the SEC, in its

19   closing remarks, said that Mr. Panuwat did not go to Jen

20   Jarrett -- I think he described her as his boss -- to ask for

21   permission to trade in Incyte call options.

22       Well, here's the thing.  The policy in effect at that

23   time, that insider trading policy at the time, was overseen by

24   the general counsel of Medivation, not Ms. Jarrett.  So to the

25   extent that there would need to be any reporting, it would not

**CLOSING ARGUMENT/ DICANIO**

1  be to Ms. Jarrett; it would have been to the general counsel.

2      Ms. Jarrett was asked the question (as read):

3      **"QUESTION:**  So the policy that was in effect during the

4      sales process requires Mr. Panuwat to discuss trades with

5      the general counsel?"

6      And she agrees, not Ms. Jarrett.

7      But there's a more fundamental point, and that more

8  fundamental point is, ladies and gentlemen, he didn't trade on

9  confidential information, so there was no need to seek

10  permission.

11      The SEC also showed you two policies in its initial

12  remarks.  One was the confidential information; the other was

13  the insider trading policy.  I want to put that up.

14      Now, there's been no testimony that's been presented to

15  you interpreting what this policy means, right?  We just talked

16  a little bit about the general counsel being the person who is

17  responsible for seeking permission to trade if you're trading

18  based upon confidential information or trading in Medivation.

19      Did we hear from the Medivation general counsel about what

20  this policy means and how it's to be interpreted?  Did we hear

21  from any Medivation employee about how to interpret this

22  policy?  We did not.

23          **MR. SMYTH:**  Objection, Your Honor.  Motion in limine.

24          **THE COURT:**  So I'm going to remind the jury, first,

25  that what you are hearing is not evidence.  This is doubly not

CLOSING ARGUMENT/ DICANIO

1    evidence because that's what Mr. DiCanio is arguing about.

2        The -- with respect to the objection itself, there was

3    pretrial -- there were pretrial rulings which dealt with

4    portions of this.

5        So I think, Mr. DiCanio, the smartest thing to do is to

6    move on from here.

7            **MR. DiCANIO:** Okay.

8        Let's go to Slide 67.

9        So let's talk a little bit about the SEC's failure of

10   proof.

11       Let's go to the next slide.

12       So, again, we talked a little bit about the SEC failed to

13   call the Medivation CEO.

14       They failed to call any of the bidders who were involved

15   in the bidding process to get their perspective on the deal and

16   the likelihood of the deal.

17       They didn't call any of the analysts whose reports came

18   into evidence.  I want to pause on that for a second.

19       They find a handful of analyst reports or news media

20   reports, and they introduce them as evidence and they ask you

21   to treat them as gospel.  Why?

22       Did the person who wrote those articles appear in court,

23   talk to you about his or her credentials?  Did they talk about

24   the basis for why they said what they said?  No.  What they did

25   is they put a report in and asked you to treat it as gospel.

**CLOSING ARGUMENT/ DICANIO**

1    Well, as in all things in the news, right, you could

2  agree, you could disagree.  That's our right as American

3  citizens not to just accept whatever is spoon-fed to us, right?

4    And that's what happened here.  They're taking those

5  analyst reports, and because there's an e-mail that sends it to

6  Mr. Panuwat, they're saying, "You read it and that's what you

7  did.  You did exactly what that person said."

8    There's no evidence of that, ladies and gentlemen, and I

9  would say this to you:  There's no evidence that the opinions

10  of those analyst reports are the types of opinions that you

11  should give any credence to.  We don't know who they are.

12  They're just names on a page.

13    I'd also say that the SEC -- this is unlike a criminal

14  trial; this is a civil trial.  And in a civil trial, parties

15  can call the party that's adverse to them.

16    The SEC could have called Mr. Panuwat to testify in their

17  case-in-chief and ask him the questions directly.  Did they do

18  that?  What did they do?  They played clips from his first

19  interview, right?  They played clips because they wanted to use

20  that lack of recollection to make the argument that they're

21  making in court today.

22    Could have called him, asked him directly.  They didn't.

23    I would also say, ladies and gentlemen, that the SEC has

24  not introduced any stock price charts into evidence.  Think

25  about it.  It's an alleged insider trading case talking about

CLOSING ARGUMENT/ DICANIO

 1  correlation of stock prices.  You would think that they would

 2  put a stock price chart in to show that there was some type of

 3  correlation.  They didn't.  The chart that we showed you that's

 4  based on the trial exhibits shows that there was not.

 5        And, lastly, the hindsight bias.  And I think it's

 6  particularly acute when you look at the analyst reports that

 7  they put into evidence after the Medivation sale, where the

 8  analyst said, "Whoa, Incyte's stock price went up, and it's

 9  probably because of the Medivation sale."

10        Okay.  That's great to know after the fact.  You see the

11  stock price rise, you know about the sale; that's all

12  hindsight.  Those articles were not -- were not in

13  Mr. Panuwat's possession at the time he made his trade.  That's

14  all after the fact.

15        As I said, everybody is a genius in hindsight.  It's hard

16  to live your life moving forward and looking forward.

17        Now, I want to talk a little bit about some of the

18  testimony from Dr. Becker, who testified -- I guess it was last

19  week.

20        Option traders look at open interest to measure activity,

21  not trading volume, as Dr. Becker wrongly assumed.  If you

22  remember her testimony, she argued about the volume of

23  Mr. Panuwat's trading to suggest that, "Wow, in the entire

24  market, he had such a large percentage of trades, he must have

25  had some information that was not available to everyone else."

CLOSING ARGUMENT/ DICANIO

1          Well, you heard from Dr. -- you heard from Mr. Pines, and

2    Mr. Pines, this is what he has done his whole life, how he

3    makes his living.  And he testified (as read):

4               "It's not what I think; it's what everybody in

5          the market looks at since I've been trading."

6          This is a classic example of those who study versus those

7    who do.  Mr. Pines is someone who does.  This is what he does

8    every day.  This is how he earns his living.

9          He says when you look at these issues, you can't look at

10   market volume or trading volume.  That's not the right

11   parameter.  You have to look at open interest; and he explained

12   to you what open interest was.

13         Now, I understand that portion of the testimony, maybe for

14   you -- it was complicated for me.  I get it.  But that's how

15   the real world works.  Sometimes the real world is a little bit

16   complicated, but that's how people who look at options look at

17   this issue.

18         And when he did his calculations, he said to you, "When I

19   look at the percentage of open interest that Mr. Panuwat held

20   for each of his options, I didn't see this as atypical.  I

21   didn't see this as a -- unusual in any way.  This happens,

22   particularly in a stock that's more illiquid, more thinly

23   traded."  That's what he said.  There was no testimony that

24   rebutted that testimony.

25         Dr. Becker also relies on the bankers' peer analysis.  If

(253 of 254), Page 253 of 254 Case: 24-6882, 05/16/2025, DktEntry: 14.3, Page 253 of 254
Case 3:21-cv-06322-WHO    Document 166    Filed 04/05/24    Page 114 of 144   1367
CLOSING ARGUMENT/ DICANIO

1  you remember, there were some banker reports where they

2  reference and do some peer analysis for the purpose of

3  valuation or fairness opinions.

4      But the bankers themselves say that Incyte is not

5  comparable.  We saw this slide a little bit earlier where, in

6  the actual -- one of the actual reports, there is a line that

7  says (as read):

8          "None of these companies is directly comparable

9      to Medivation.  Certain of these companies may have

10     characteristics that are materially different from

11     that of Medivation."

12     Dr. Becker also cherrypicked certain data and ignores

13 significant news events that drive biotech stock prices.

14     So in one of her answers, she said (as read):

15         "I concluded that the New England Journal of

16     Medicine article did not cause Incyte's stock price

17     move on March 31st, 2016."

18     Do you remember that testimony?  Let me roll back just a

19 little bit.

20     She talked about a stock price move on the first news in

21 the market of a potential Medivation sale, when Sanofi was

22 making moves to try to acquire the company.  And Dr. Becker

23 noticed that there was a movement in Incyte stock price on that

24 same day.

25     What she failed to consider, though, is that there was

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, I electronically filed Defendant-Appellant Matthew Panuwat's Excerpts of Record: Volume 2 of 3 with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: May 16, 2025                    Respectfully submitted,

                                       _/s/ Parker Rider-Longmaid_
                                       Parker Rider-Longmaid

                                       _Counsel for Defendant-Appellant_
                                       _Matthew Panuwat_