No. 24-6882

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

───────────────────────

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MATTHEW PANUWAT,

*Defendant-Appellant.*

───────────────────────

On Appeal from the United States District Court for the
Northern District of California (Orrick, J.)

───────────────────────

**BRIEF OF AMICI CURIAE MANAGED FUNDS ASSOCIATION,
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION,
AND CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA IN SUPPORT OF NEITHER PARTY**

───────────────────────

Janet Galeria
Audrey Dos Santos
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street, NW
Washington, DC 20062

*Counsel for Amicus Curiae
Chamber of Commerce of the
United States of America*

Michael A. Levy
Benjamin R. Nagin
James R. Horner
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019

Stephen L. Cohen
Ranah Esmaili
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

Nicole K. Chipi
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive
Miami, FL 33131

*Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Managed Funds Association (MFA) states that it has no parent corporation. No publicly held company has 10% or greater ownership in MFA.

The Alternative Investment Management Association, Ltd. (AIMA) states that it is a UK private company limited by guarantee. AIMA has no parent corporation, and no publicly held company has 10% or greater ownership in AIMA.

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

INTEREST OF *AMICI* .................................................................. 1

PRELIMINARY STATEMENT ....................................................... 4

ARGUMENT .................................................................................... 6

I.    Investment Funds and the Private Information They Are Authorized to Receive Fuel Healthy Financial Markets ......................... 6

     A.   Investment Funds Serve a Critical Role in the Markets ............... 6

     B.   Fund Managers' Receipt and Use of Private Information Serves Vital Purposes ........................................................................ 11

II.   The District Court's Rulings on Materiality and Duty ................... 15

     A.   Rulings on Materiality ................................................................ 15

     B.   Rulings on Duty .......................................................................... 17

III.    Information About One Issuer Will Rarely Be Material to Issuers That Are Not the Subject of the Information ............................ 21

IV.    The Potential for an Expansive and Ill-Defined Implied Duty of Trust and Confidence Would Cause Significant Disruption ................. 25

     A.   A Duty of Trust and Confidence Has Been Held to Arise Implicitly in Fiduciary or Fiduciary-Like Relationships ..................................... 26

     B.   Where the Parties Have Expressly Agreed on Their Confidentiality Obligations, the Terms of That Express Agreement Control Over any Duty Implied From Their Relationship .................. 30

     C.   Any Ruling That Unnecessarily or Inadvertently Expands the Circumstances in Which a Duty of Trust and Confidence Can Be Implied Will Chill Legitimate and Beneficial Trading and Investment Activity ........................................................................................ 33

CONCLUSION ............................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ............................................................. 23

*Chiarella v. United States,*
  445 U.S. 222 (1980) ......................................................... 18, 19

*Dirks v. SEC,*
  463 U.S. 646 (1983) ............................................................. 35

*Salman v. United States,*
  580 U.S. 39 (2016) ....................................................... 15, 16, 17

*SEC v. Talbot,*
  530 F.3d 1085 (9th Cir. 2008) ......................................... 20, 27, 28, 29

*TSC Indus. v. Northway,*
  426 U.S. 438 (1976) ............................................................. 23

*United States v. Chestman,*
  947 F.2d 551 (2d Cir. 1991) (en banc) ...................................... 26

*United States v. Chow,*
  993 F.3d 125 (2d Cir. 2021) ................................................. 34

*United States v. Laurienti,*
  611 F.3d 530 (9th Cir. 2010) ............................................... 33

*United States v. O'Hagan,*
  521 U.S. 642 (1997) ..................................................... *passim*

**Statutes**

Secruities Exchange Act of 1934 § 10(b), 15 U.S. Code §
  78j(b) ...................................................................... 29, 31

**Rules and Regulations**

Fed. R. App. P. 29 ..................................................................... 1

SEC Rule 10b5-2, 17 C.F.R. § 240.10b5-2 ............................. 27

**Other Authorities**

Benjamin Estes, *Shadow Trading: With Trial Looming in*
    SEC v. Panuwat*, the SEC's Latest Insider Trading Theory*
    *Takes Further Shape*, White Collar Briefly (Jan. 2, 2024),
    https://perkinscoie.com/insights/blog/shadow-trading-
    trial-looming-sec-v-panuwat-secs-latest-insider-trading-
    theory-takes ..................................................................... 25

Chair Mary Jo White, *Hedge Funds – A New Era of*
    *Transparency and Openness* (Oct. 18, 2013),
    https://www.sec.gov/newsroom/speeches-statements/2013-
    spch101813mjw ................................................................. 8

Comm'r Luis A. Aguilar, *Institutional Investors: Power and*
    *Responsibility* (Apr. 19, 2013),
    https://www.sec.gov/news/speech/2013-
    spch041913laahtm#P35685 .............................................. 8

Investing in Opportunity, https://investinginopportunity.org/
    (last visited May 21, 2025) .............................................. 7

*MFA Comment Letter on Proposed Extension of Information*
    *Collection Request Submitted for Public Comment;*
    *Comment Request on Burden Related to U.S. Income Tax*
    *Return Forms for Individual Taxpayers* (Mar. 11, 2025),
    https://www.mfaalts.org/wp-content/uploads/2025/03/
    OMB-Number-1545-0074-Public-Comment-Request-
    Notice_MFA-Comments.pdf ......................................... 7, 8

Reed Brodsky, Benjamin Wagner, Mark Schonfeld, David
    Woodcock & Michael Nadler, *SEC Successfully Prosecutes*
    *Novel "Shadow Trading" Theory at Trial*, Insights: The
    Corporate & Securities Law Advisor (June 2024),
    https://www.gibsondunn.com/wp-content/uploads/2024
    /05/Brodsky-Nadler-Schonfeld-Wagner-Woodcock-SEC-
    Successfuly-Prosecuted-Novel-Shawdow-Trading-Theory-
    at-Trial-Insights-June-2024.pdf ........................................................ 25

SEC, *Annual Staff Report Relating to the Use of Form PF*
    *Data* (Jan. 17, 2025), https://www.sec.gov/files/2024-pf-
    report-congress.pdf .................................................................................... 7

SEC, *Implications of the Growth of Hedge Funds* (2003),
    https://www.sec.gov/files/implications-growth-hedge-
    funds-09292003.pdf ................................................................ 9, 10, 11

SEC, *Private Funds - Beneficial Ownership of Funds*,
    https://www.sec.gov/data-research/data-
    visualizations/private-fund-statistics/private-funds-
    beneficial-ownership-funds (last visited May 21, 2025) ...................... 7

## INTEREST OF *AMICI*[1]

The Managed Funds Association (MFA), based in Washington, D.C., New York City, Brussels, and London, represents the global alternative asset management industry. MFA's mission is to advance the ability of alternative asset managers to raise capital, invest it, and generate returns for their beneficiaries. MFA advocates on behalf of its membership and convenes stakeholders to address global regulatory, operational, and business issues. MFA has more than 180 fund manager members, including traditional hedge funds, private credit funds, and hybrid funds, that employ a diverse set of investment strategies. Member firms help pension plans, university endowments, charitable foundations, and other institutional investors diversify their investments, manage risk, and generate attractive returns throughout the economic cycle.

---

[1] *Amici* state that no counsel for any party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

1

The Alternative Investment Management Association (AIMA) is the world's largest membership association for alternative investment managers. Its membership has more firms, managing more assets than any other industry body, and through our 10 offices located around the world, AIMA serves over 2,000 members in 60 different countries. AIMA's mission, which includes that of its private credit affiliate, the Alternative Credit Council, is to ensure that our industry of hedge funds, private market funds, and digital asset funds is always best positioned for success. Success in our industry is defined by its contribution to capital formation, economic growth and positive outcomes for investors while being able to operate efficiently within appropriate and proportionate regulatory frameworks.

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that

end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

## PRELIMINARY STATEMENT

*Amici* are associations representing investment funds,[2] which manage trillions of dollars in assets and serve as essential participants in our capital markets. The SEC's extension in this case of the law of insider trading to "shadow trading" implicates important issues relating to both the scope of materiality and the circumstances under which duties of trust and confidence arise that could profoundly affect how fund managers and others operate in a competitive, information-driven marketplace. While holding no opinion on the proper resolution of this particular case, *amici* submit this brief to assist the Court in understanding the potential market-wide implications of an overbroad ruling on two key issues, which could chill legitimate investment activities that benefit all market participants.

*First*, although Panuwat does not challenge the jury's materiality finding on appeal, to the extent the Court addresses materiality, *amici* respectfully urge the Court to avoid language used by the district court that could be interpreted to suggest that a mere, vague "market

---

[2] For purposes of this brief, *amici* use the term "investment funds" to refer to funds that are actively managed.

connection" or "link" between two issuers can make nonpublic information about one issuer material to the securities of another. Rather, the materiality inquiry must rigorously assess whether the government has established a substantial likelihood that, under all the circumstances, the information would have been significant to a reasonable shareholder of the relevant issuer. The possibility that a broad and nebulous "market connection" between two issuers could alone establish materiality would create significant uncertainty for fund managers and other market participants.

*Second*, this Court should reject any suggestion that may exist in the district court's decisions below that an implied duty of trust and confidence arises simply because one party entrusts another party with confidential information, or that an implied duty can exist even when there is an express agreement between the source and recipient of confidential information governing what trading is permitted or prohibited. Precedent has long held that a fiduciary or fiduciary-like relationship must exist for there to be an implied duty of trust and confidence that can support insider trading liability under the misappropriation theory. And it is equally clear that the terms of an

5

express agreement between a source and recipient of confidential information on the permissible and prohibited trading uses of that information supplants any implied duty that might otherwise arise. Indeed, it is for this reason that fund managers who receive confidential information often rely on express agreements to provide greater certainty in this area.

A ruling from this Court that departs from well-established principles on either of these issues could dissuade fund managers from participating in transactions involving confidential information that promote market efficiency, market liquidity, and capital formation. That in turn would have unnecessary and adverse consequences for American financial markets.

## ARGUMENT

### I. Investment Funds and the Private Information They Are Authorized to Receive Fuel Healthy Financial Markets

#### A. Investment Funds Serve a Critical Role in the Markets

Investment funds empower investors, provide retirement security, and support nonprofits and small businesses that create opportunity for millions of Americans. They serve a diverse array of stakeholders, including pension plans, charitable foundations, and college

6

endowments, which seek risk-adjusted returns and diversified investments to support their missions.[3] These investments provide retirement security to tens of millions of retired teachers, firefighters, police officers, and other public employees; support the mission-driven work of more than 1,500 nonprofits and foundations nationwide; and help to provide scholarships and fund academic research at hundreds of American educational institutions.[4]

Investment funds are also critical market participants, with assets under management ("AUM") estimated in the trillions of dollars.[5] In

---

[3] *See* SEC, *Private Funds - Beneficial Ownership of Funds*, https://www.sec.gov/data-research/data-visualizations/private-fund-statistics/private-funds-beneficial-ownership-funds (last visited May 21, 2025); Investing in Opportunity, https://investinginopportunity.org/ (last visited May 21, 2025); *see also MFA Comment Letter on Proposed Extension of Information Collection Request Submitted for Public Comment; Comment Request on Burden Related to U.S. Income Tax Return Forms for Individual Taxpayers* (Mar. 11, 2025) at 1 n.1, https://www.mfaalts.org/wp-content/uploads/2025/03/OMB-Number-1545-0074-Public-Comment-Request-Notice_MFA-Comments.pdf.

[4] Investing in Opportunity, https://investinginopportunity.org/ (last visited May 21, 2025).

[5] SEC, *Annual Staff Report Relating to the Use of Form PF Data* (Jan. 17, 2025), https://www.sec.gov/files/2024-pf-report-congress.pdf ("These funds, including hedge funds, private equity funds, and liquidity funds (which operate, in certain respects, similarly to money market funds), currently have approximately $15 trillion in net assets.").

working to optimize investment returns, investment funds benefit not only investors and their stakeholders (*e.g.*, retirees covered by government and corporate pensions, students who rely on college endowments for financial assistance, and charitable causes supported by funding from philanthropic organizations), but also the financial markets, and—ultimately—all market participants, including individual retail investors.[6] Over the years, SEC commissioners themselves have repeatedly recognized the vital role investment funds play in the securities markets with regard to price discovery, market liquidity, competition, and capital formation.[7]

---

[6] *See id.* at 1 ("Private funds and their advisers play an important role in both private and public capital markets.… Private funds invest in large and small businesses and use strategies that range from long-term investments in equity to rapid trading and investments in complex instruments. Their investors include individuals, institutions, governmental and private pension funds, and non-profit organizations. The economic activity of private funds is significant both to large portions of the capital markets and to many individual American investors.").

[7] *See id.*; Chair Mary Jo White, *Hedge Funds – A New Era of Transparency and Openness*, (Oct. 18, 2013), https://www.sec.gov/newsroom/speeches-statements/2013-spch101813mjw ("Private funds, including hedge funds, play a critical role in capital formation, and are influential participants in the capital markets."); Comm'r Luis A. Aguilar, *Institutional Investors: Power and Responsibility* (Apr. 19, 2013), https://www.sec.gov/news/speech/2013-spch041913laahtm#P35685 ("Institutional investors are known to improve price discovery, increase

8

With respect to price discovery, fund managers (on behalf of the funds they advise) take trading positions based on a variety of sophisticated research methods and analyses, which seek to discern the true value or potential future value of a security or asset.[8] They use this fundamental research to identify mispricing of securities and market inefficiencies.[9] Such trading, over time, helps move the market prices of securities toward their true value, effectively incorporating the information uncovered by fund managers' research into the broader market.[10] Trading executed by fund managers, therefore, brings price information to the securities markets, which can translate into greater market price efficiency and stability.[11] This benefits not only other active investors but also passive—often retail—investors who rely on this type

---

allocative efficiency, and promote management accountability. They aggregate the capital that businesses need to grow, and provide trading markets with liquidity—the lifeblood of our capital markets."); *see also* SEC, *Implications of the Growth of Hedge Funds* vii (2003) (hereinafter "Staff Report"), https://www.sec.gov/files/implications-growth-hedge-funds-09292003.pdf.

[8] *See* Staff Report at 4.

[9] *Id.*

[10] *Id.*

[11] *Id.*

of price discovery mechanism to ensure that their investments are appropriately valued at any point in time.[12]

Investment funds also play an important role with respect to providing liquidity in financial markets. In this context, liquidity refers to the ease with which securities can be bought or sold in the market. Many fund managers employ active trading strategies that involve frequent buying and selling of securities, which helps to ensure that individual retail investors and others are able to find buyers and sellers in the market to take the other side of their orders.

The variety of investment strategies deployed by managers (*e.g.*, long/short equity, arbitrage, global macro, and event-driven strategies), moreover, means that investment funds are active in different market conditions and across various asset classes, further promoting overall market liquidity. Investment funds also attract significant capital from institutional and high-net-worth individual investors. This influx of capital contributes to increases in trading volume and affords investment funds the ability to take positions in a variety of securities, which also bolsters market liquidity for other market participants.

---

[12] *Id.*

Finally, investment funds are key players in capital raising equity offerings, especially for start-up and mid-sized businesses.[13] Without access to equity markets, these smaller businesses would be forced to take on expensive debt, which could hamper their competitiveness.

**B.  Fund Managers' Receipt and Use of Private Information Serves Vital Purposes**

Neither investment funds nor their investments are monolithic. For example, many hedge funds engage in a variety of investment strategies and instruments across a wide range of industries and asset classes, including investing in illiquid or distressed securities, securities of companies in emerging markets, derivatives, or capital formation transactions, such as Private Investment in Public Equity ("PIPE") transactions, secondary offerings, credit restructurings, or convertible debt offerings. To determine the viability of potential investments, managers rely on a broad array of research and analysis techniques, including analyzing financial statements, overall industry landscapes, and macroeconomic trends; and performing quantitative analysis, benchmarking exercises, and sentiment analysis.

---

[13] *Id.* at 7-8.

In the course of considering investments, fund managers often receive confidential information from businesses and other market participants. For example, a fund manager may elect to receive nonpublic information from an issuer of securities or their financial advisers as part of the manager's research or due diligence on a private investment. To illustrate, imagine a hedge fund is conducting due diligence on a publicly traded biotech company seeking to raise capital quickly to continue developing a new technology. The publicly traded company invites the fund to participate in a PIPE transaction. Before the deal is announced, the biotech company may share material nonpublic information ("MNPI") with the fund manager, such as unpublished data concerning results of beta testing, details about pending regulatory approvals, and upcoming major corporate transactions (like a strategic partnership). This information would assist the manager in making an informed investment decision in the private deal involving a product in development.

The receipt of MNPI may also occur in the context of distressed debt investments. To evaluate whether to make a private loan to a publicly traded retail company that is facing liquidity issues, a fund manager specializing in distressed debt may receive private information such as

12

detailed cash-flow forecasts and liquidity runway projections not disclosed in public filings, pending supplier agreements, or preliminary bankruptcy contingency plans. Such key information and context would allow the fund manager to evaluate the credit risk or structure the private loan.

In situations like these, managers are well aware of the source of the potential MNPI and frequently enter into written agreements setting forth the source's expectations or requirements with respect to the information's confidentiality and how the information may or may not be used. Although those terms will necessarily vary, they generally will convey the source's expectation that the fund managers receiving the nonpublic information refrain from using it to engage in trading in the securities of the issuer or issuers that are the subject of the nonpublic information, with the obvious exception of being permitted to use it to engage in the specific (typically private) transaction being proposed.

This process is typically called "wall-crossing," because the manager is brought over an informational wall. Fund managers are familiar with the requirements associated with wall-crossing and have policies and procedures reasonably designed to prevent the misuse of

MNPI in connection with wall-crosses, such as by either placing the issuers or securities that are the subject of the MNPI on restricted lists or establishing information barriers to prevent access to the MNPI by personnel engaged in public investing. In light of regulatory or investigative risk—which alone can have severe business, reputational, and economic consequences—many fund managers in an abundance of caution restrict trading in the securities of issuers who are the subject of the nonpublic information by personnel who are not even aware of that information.

Such cautious, prophylactic measures to avoid activity that could create the appearance of insider trading or potentially trigger regulatory scrutiny do help fund managers mitigate regulatory risk, but they are not costless to the funds or the market. Trading restrictions can limit the circumstances in which fund managers will agree to contemplate potential investments that require wall-crossing, and information barriers can overcautiously restrict the sharing of information that is not MNPI. The result in each case is to reduce some of the beneficial price discovery, liquidity, competition, and capital formation functions that

investment funds perform in the securities markets, as well as limit other opportunities for the fund and its investors.

## II. The District Court's Rulings on Materiality and Duty

### A. Rulings on Materiality

In the case before this Court, the SEC alleged—and established to the satisfaction of a jury—that Appellant Matthew Panuwat engaged in securities fraud when he received information from his employer, Medivation, about Medivation's impending acquisition by Pfizer, and, based on that information, traded in the securities of a third company, Incyte.

For Panuwat to have committed insider trading, the SEC had to show that the "nonpublic information" he traded on was "material." *Salman v. United States*, 580 U.S. 39, 46 n.2 (2016). In this context, that meant demonstrating that the confidential information that Panuwat had received about Medivation's impending acquisition by Pfizer was material to the securities of Incyte—which was merely another company in Medivation's industry and was not involved in the Medivation transaction. On this issue, the district court instructed:

> Information is material to a company if there is a substantial likelihood that a reasonable investor would consider the information important in deciding whether to buy or sell that

15

company's securities. You must decide in this case whether, at the time the defendant traded, reasonable Incyte investors would believe the allegedly nonpublic Medivation information significantly altered the total mix of information available concerning Incyte.

2-ER-268. Ultimately, the jury found that the news of the Pfizer acquisition of Medivation was material to investors in Incyte.

In rejecting Panuwat's post-trial motions, the district court held that the evidence presented by the SEC had been sufficient "for the jury to find that information [about Medivation's potential acquisition] that was material to Medivation at the time was also material to Incyte." 1-ER-44. In particular, the district court noted that the SEC's expert—who conducted event studies and statistical analysis to opine that market observers would have expected Incyte's stock price to react to the Medivation merger—"provided sufficient explanation for her studies and opinions for the jury to weigh her credibility." *Id.* at 43.

Although not discussed in detail in the post-trial opinion, the district court on summary judgment had explained that the evidence of materiality also included analyst reports and financial news reports that could establish materiality. 3-ER-377. For example, one analyst report opined that "acquisition interest in [Medivation] highlights the

16

attractiveness of [Incyte]." *Id.* Another "reported that 'a scarcity of valuable biotech assets' available for purchase by larger biotech and pharmaceutical companies 'should keep a floor under Medivation—and by implication … Incyte.'" *Id.* (cleaned up). And still another "predicted that given the small number of midsize biotech companies with 'high-quality assets,' Incyte could 'interest buyers' in the wake of Medivation's acquisition." *Id.* at 377-78.

These facts and others were sufficient, according to the district court at the time of summary judgment, to establish that "a market connection exist[ed] between Medivation and Incyte." *Id.* at 376. And such a "connection" or "link[]," per the district court, was what was needed to show materiality. *Id.* at 376-77.

### B.  Rulings on Duty

To establish that Panuwat had engaged in insider trading, the SEC also had to prove—and did, to the satisfaction of the jury—that Panuwat's trades breached a duty of trust and confidence owed to *his employer, Medivation*, since it was the source of the information.

It is firmly established that there is no "general duty between all participants in market transactions to forgo actions based on material,

nonpublic information." *Chiarella v. United States*, 445 U.S. 222, 233 (1980). As the Supreme Court has explained: "Formulation of such a broad duty … [would] depart[] radically from the established doctrine that duty arises from a specific relationship between two parties[.]" *Id.*

Instead, insider trading turns on a violation of a specific duty. Here, the SEC pursued its case under the misappropriation theory. Under the "misappropriation theory," the relevant duty is one of "loyalty and confidentiality" owed by a fiduciary to the source of confidential information, and it is violated by the "fiduciary's undisclosed, self-serving use of [the] principal's information to purchase or sell securities"; *i.e.*, "the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). This meant the SEC had to show that Panuwat owed a duty of trust and confidence to Medivation and breached that duty through deception by trading on the information without disclosing to Medivation that he planned to do so.

The district court instructed the jury that it could locate this duty running from Panuwat to his employer in one of two places. Most

18

tangibly, the district court instructed the jury that it should consider whether Medivation's written policies concerning insider trading and confidential information prohibited Panuwat from trading in Incyte based on material nonpublic information obtained from Medivation, because "[a]n employee has a duty of trust, confidence, or confidentiality with regard to nonpublic information when he *expressly agrees* to maintain the confidentiality of his employer's nonpublic information or to refrain from using that information for personal gain." 2-ER-266-267 (emphasis added).

But the district court *also* instructed the jury that the requisite duty could arise implicitly from the nature of the relationship between Panuwat and Medivation, explaining:

> A duty also arises, *even in the absence of a written agreement, when an employer entrusts an employee with confidential information*. This is because a company's confidential information is the company's property, and employees are not permitted to use their position of trust and confidence to further their private interests without disclosing that use to the company and gaining the company's consent.

*Id.* at 267 (emphasis added). The jury found that the SEC established the existence and breach of such a duty.

19

In its opinion denying Panuwat's post-trial motions, the district court explained that its instruction about an unwritten duty of trust and confidence running from an employee to an employer was rooted in this Court's decision in *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008), another misappropriation-theory case. The district court viewed *Talbot* as having "looked to principles of agency law to explain the duty of trust and confidence," observing that under the common law "an agent [must] refrain from using his or her position or the principal's property to benefit him or herself unless the princip[al] consents to such use." 1-ER-13. Since employees can be agents of their employers, the district court concluded that a "duty of trust and confidence" can "arise when an employer entrusts its employee with confidential information." *Id.* at 12 (cleaned up).

Satisfied that its instruction on the sources of the relevant duty was correct, the district court went on to find that the SEC had offered sufficient evidence that Panuwat owed both an express duty of trust and confidence based on Medivation's written policies and an implicit, unwritten duty based on his relationship with Medivation. 1-ER-15-16, 37-40.

20

## III. Information About One Issuer Will Rarely Be Material to Issuers That Are Not the Subject of the Information

The notion that confidential information about a particular issuer will be material to the value of an issuer that is *not* the subject of the information is, at minimum, an unusual one in the annals of insider trading cases. But as the evidence cited by the district court makes clear, the facts in this case that might support such a finding of materiality—*i.e.*, a finding that information about Medivation's expected acquisition by Pfizer was material to the value of the completely uninvolved Incyte—were also unusual, including proof that a number of market observers had specifically recognized that an acquisition of Medivation would positively impact Incyte's share price. In other words, the materiality evidence involved more than just a *post-hoc* observation that Incyte's share price moved upon announcement of the Medivation acquisition, or a vague sense that the two issuers shared a market connection or were linked.

*Amici* take no position on whether the district court was correct to conclude that the evidence was sufficient to demonstrate materiality. *Amici* urge this Court, however, to refrain from repeating the broad language used by the district court in describing materiality, since doing

21

so could create the impression that the standard for materiality is looser in these types of cases than binding precedent requires it to be.

In particular, the district court suggested on several occasions that materiality would be satisfied if there was a general "market connection" or economic "link" between Medivation and Incyte. For example, in denying Panuwat's motion for summary judgment, the district court framed its materiality analysis in terms of "whether a market connection exists between Medivation and Incyte." 3-ER-376; *see also id.* at 375 ("The question now is whether the SEC has shown a connection between Medivation and Incyte."); *id.* at 377 ("The SEC references the same report as evidence that the market *did* consider Medivation and Incyte's stock performance to be linked."); *id.* at 378 (stating that Panuwat "could have perceived Medivation and Incyte to be connected in the market such that pertinent information about one was material to the other"). The post-trial opinion likewise suggested that "testimony linking Medivation and Incyte in the market" was "sufficient evidence from which the jury could infer the [nonpublic] information [was] material to Incyte." 1-ER-43 n.13; *see also id.* at 43 (referring to the SEC's materiality argument as "the SEC's theory of stock price connection between Medivation and Incyte").

22

Irrespective of whether the Court determines that the evidence in this particular case was sufficient to meet the standard of materiality, the type of language used by the district court concerning "connection in the market" or "link[s]" should be avoided because it does not accurately reflect the law and could have significant unintended consequences. Contrary to the district court's language, materiality requires "a substantial likelihood that, under all the circumstances, the [] fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976). In other words, the proper materiality analysis focuses rigorously on the connection between the information and the value of the traded security—in particular, whether the "information significantly altered the 'total mix' of information" about the value of that security, *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988), not just on general "links" or "connections" between the company that is the subject of the information and some other, uninvolved company in the same industry.

The well-established standard for materiality is difficult to meet in the context at issue here—*i.e.*, where the question concerns the materiality of information about one company to the value of the

securities of another company that is not itself either named or at issue in the information. And it *should* be difficult. An excessively permissive standard for materiality in the "shadow trading" context could result in regulatory scrutiny based on vague, *post-hoc* theories of materiality—like economic "linkage" or "market connectivity"—that appear only in hindsight. That, in turn, would have a chilling effect on fund managers' determinations about whether and when to participate in transactions that are beneficial to investors and the market writ large. Fund managers must already take great care to make judgments about when information is material to the issuer to whom it directly relates. They necessarily err on the side of caution when determining to impose restrictions on trading in the securities of that issuer. An opinion from this Court that adopted terms like "economically linked" or "market connection" would leave fund managers struggling and at times unable to understand in real time which issuers, unnamed in the confidential information, might nonetheless have sufficient economic or market connection to each other to warrant restriction.

Because the district court's unduly permissive language has the potential to take on a life of its own,[14] *amici* urge the Court to avoid employing it and thereby avoid the risk of confusing the limits of the well-established materiality standard.

## IV. The Potential for an Expansive and Ill-Defined Implied Duty of Trust and Confidence Would Cause Significant Disruption

The highly specific and particular circumstances of this case also warrant this Court taking care to recognize and avoid improperly expanding the limited circumstances in which a recipient of information takes on a duty of trust and confidence to the source of that information. Because the SEC necessarily brought this case under the misappropriation theory, the SEC had to show that Panuwat deceptively

---

[14] Indeed, in the wake of the district court's decision, numerous commentators seized on the language. *See, e.g.*, Reed Brodsky, Benjamin Wagner, Mark Schonfeld, David Woodcock & Michael Nadler, *SEC Successfully Prosecutes Novel "Shadow Trading" Theory at Trial*, Insights: The Corporate & Securities Law Advisor (June 2024), https://www.gibsondunn.com/wp-content/uploads/2024/05/Brodsky-Nadler-Schonfeld-Wagner-Woodcock-SEC-Successfuly-Prosecuted-Novel-Shawdow-Trading-Theory-at-Trial-Insights-June-2024.pdf; Benjamin Estes, *Shadow Trading: With Trial Looming in* SEC v. Panuwat*, the SEC's Latest Insider Trading Theory Takes Further Shape*, White Collar Briefly (Jan. 2, 2024), https://perkinscoie.com/insights/blog/shadow-trading-trial-looming-sec-v-panuwat-secs-latest-insider-trading-theory-takes.

breached a duty of trust and confidence to the source of the information not to trade on the information. Such a duty—as the district court correctly instructed the jury—could only arise from one of two sources: implicitly from the nature of the relationship between Panuwat and Medivation, or expressly from an agreement between them.

Each type of duty—and the reasons for the Court to exercise care to respect the limits on when it can or will arise—is discussed below.

### A.  A Duty of Trust and Confidence Has Been Held to Arise Implicitly in Fiduciary or Fiduciary-Like Relationships

To the extent a duty of trust and confidence has been held to arise *implicitly* from the mere nature of a commercial or professional relationship between a source of information and a recipient of information—without any express agreement between them—it has generally only arisen when the recipient has a fiduciary or fiduciary-like relationship with the source.[15] A review of the circumstances of the two

---

[15] Although not at issue here, in non-commercial settings, a duty of trust and confidence has also been implied from familial or similarly close personal relationships or when the persons involved have a history, pattern, or practice of sharing confidences. *See, e.g., United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (en banc) (personal relationship is one "of trust and confidence" only if it is "the functional

main cases relied upon by the district court—*United States v. O'Hagan*, 521 U.S. 642 (1997) and *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008)—is illustrative.

In *O'Hagan*, James O'Hagan was a lawyer who learned from one of his law firm partners that the firm's client was poised to attempt to acquire a target company. 521 U.S. at 647. O'Hagan used that MNPI to buy call options for the target company's stock. *Id*. The Supreme Court held that O'Hagan had a "fiduciary duty" of trust and loyalty to both his firm and its client, which included an obligation not to use confidential information for personal benefit. *Id*. at 652-54. O'Hagan was held to have had (and violated) "a duty to disclose or abstain from trading" that arose from this "specific relationship" with the law firm in which he was a partner and his law firm's client, *id*.; *id*. at 661, each of which were traditional, hornbook fiduciary duties, *id*. at 653. And as the Court further explained, "undisclosed misappropriation of [confidential] information, in violation of a fiduciary duty … constitutes fraud akin to embezzlement." *Id*. at 654.

---

equivalent of a fiduciary relationship"); *see also* SEC Rule 10b5-2, 17 C.F.R. § 240.10b5-2.

Similarly, in *Talbot*, J. Thomas Talbot learned as a director of Fidelity National Financial, Inc. ("FNF") that a company in which FNF held an interest was going to be acquired. 530 F.3d at 1087. Talbot used this information to buy shares of the target company. *Id.* at 1088. As this Court explained, it was axiomatic that Talbot's status as a director created a fiduciary duty of trust and confidence that was breached by his trades. *See Talbot*, 530 F.3d at 1092-94 (observing that the SEC "must demonstrate … that [] Talbot breached a fiduciary duty arising from a relationship of trust and confidence owed to the source of the information on which he traded").

In rejecting Panuwat's post-trial motions below, the district court arguably expanded on these principles, holding that a jury could reasonably find Panuwat owed a duty of trust and confidence to Medivation not because of a fiduciary relationship, but because Panuwat was an "employee" of Medivation whom Medivation had entrusted with confidential information. 1-ER-12. In concluding that the requisite duty of trust and confidence arose from a relationship that was at best fiduciary-like but not truly fiduciary, the district court seems to have relied principally on some language from *Talbot* that the district court

28

interpreted as "root[ing]" the requisite duty "in traditional principles of *agency* law." 3-ER-387 (citing *Talbot*, 530 F.3d at 1094) (emphasis added).

Applying principles of agency law may have been an overreading of what this Court actually said in *Talbot*. There, this Court explained that Talbot's status "as a member of [FNF's] Board of Directors" meant that he "st[ood] in a fiduciary relation to the corporation and its stockholders." *Talbot*, 530 F.3d at 1094-95. Although the Court did refer to principles of traditional agency law for further support of its conclusion, the Court's rationale was clear—Talbot owed a duty of trust and confidence to FNF because directors owe a fiduciary duty to the corporation and its stockholders and not simply because he was an agent. *Id.*[16]

*Amici* again take no position on whether the district court was correct to take a step beyond the traditional requirement of a fiduciary duty to find an implicit, fiduciary-like duty of trust and confidence in the relationship a relatively senior employee like Panuwat has with his

---

[16] *O'Hagan* also cited principles of agency law, but only as support for its finding that misappropriation satisfies § 10(b)'s requirement of deception. *See O'Hagan*, 512 U.S. at 655-56. It did not incorporate agency principles into its analysis of duty, which it grounded instead in the notion that "[t]he undisclosed misappropriation of such information, in violation of a *fiduciary duty* … constitutes fraud akin to embezzlement[.]" *Id.* (emphasis added).

employer. But to the extent that particular expansion is affirmed, the Court should be careful to resolve the question on the particular, potentially fiduciary-like facts of this case and not suggest a softening in commercial contexts—particularly arm's length ones—of this Court's and the Supreme Court's clear recognition that an implied duty of trust and confidence will only arise from fiduciary and fiduciary-like relationships.

**B.** **Where the Parties Have Expressly Agreed on Their Confidentiality Obligations, the Terms of That Express Agreement Control Over any Duty Implied From Their Relationship**

Furthermore, regardless of whether an implied duty would arise from a particular relationship, it is inherent in the misappropriation theory that where a source and recipient of information have reached an *express* agreement as to confidentiality, the terms of that express agreement control over any implied duty.

The district court arguably muddled this point somewhat in its post-trial opinion, stating that an implied duty of trust and confidence (when one is found to exist) "is *independent* from written or express agreements and does not rely on the employer specifically laying out what is allowed and what is prohibited in terms of use of its confidential information." 1-ER-14 (emphasis added). To the extent the district court

simply meant that the lack of an express agreement does not preclude the possibility of an implied duty, that is consistent with the law. But to the extent the district court's language could be interpreted to mean that a recipient of information who has an agreement with the source on what is allowed and what is prohibited could nonetheless be subject to some *implied* prohibition that the parties did not agree on, that cannot be squared with the fundamental legal principles that undergird the misappropriation theory.

Two key limitations are inherent in the misappropriation theory of securities fraud. First, there must be "misappropriation" "in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652 (emphasis added). That is, the trading must occur *without authorization* from the source of the information. Second, the trading must be "undisclosed" to the source of the information. *Id.* This follows from the fact "that § 10(b) is not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception." *Id.* at 655. Without both unauthorized use and nondisclosure there can be no liability. As the Supreme Court put it in *O'Hagan*: "To satisfy the common law rule that a trustee may not use the property that [has] been

31

entrusted [to] him, there would have to be *consent*. To satisfy the requirement of the Securities Act that there be no deception, there would only have to be *disclosure*." 521 U.S. at 654 (emphasis added).

Accordingly, sophisticated parties operating at arm's length may enter into agreements that determine *ex ante* what trades they agree will and will not be prohibited. That may include a prohibition on so-called "shadow trading" like Panuwat's—trades in the securities of an issuer that is not named in or the subject of the confidential information—but it need not. And where the parties have an agreement on confidentiality that does not preclude the recipient of the information from trading in the securities of some unnamed, uninvolved issuer, there can be no liability under the misappropriation theory. That is because, in that scenario, there is no duty and therefore no misappropriation. *See O'Hagan*, 521 U.S. at 654. Likewise, there would be no deception. "[T]he deception essential to the misappropriation theory involves feigning fidelity to the source of information." *Id.* at 655. But if the parties agree on what uses of information are prohibited, the recipient of the information "feign[s]" nothing by acting in a way that is not prohibited. In such circumstances, there can be no fraud.

32

To be clear, *amici* take no position on how these issues specifically apply to this case—that is, whether the written policies the jury was asked to consider prohibited the trading in which Panuwat engaged. But in addressing Panuwat's arguments on duty, the Court should take care not to disturb the ability of sophisticated, arm's length counterparties to determine for themselves the scope of the duties that will run between them when nonpublic information needs to be shared.

### C.    Any Ruling That Unnecessarily or Inadvertently Expands the Circumstances in Which a Duty of Trust and Confidence Can Be Implied Will Chill Legitimate and Beneficial Trading and Investment Activity

These issues—concerning the circumstance in which a duty of trust and confidence might be implied—are of particular consequence to *amici*. As set forth in Section I.B, above, fund managers generally operate at arm's length from the sources who supply them with confidential information in connection with potential transactions, and the parties often rely on written agreements setting forth the source's expectations or requirements with respect to the confidentiality of the information and how it may or may not be used. These are not circumstances in which a duty of trust and confidence has been implied. *See, e.g.*, *United States v. Laurienti*, 611 F.3d 530, 540 (9th Cir. 2010) (explaining in the securities

33

fraud context that "persons in trust relationships [*i.e.*, relationships of trust and confidence] have greater duties to each other than do persons involved in arms-length transactions"); *see also United States v. Chow*, 993 F.3d 125, 138 (2d Cir. 2021) (finding written agreement was source of duty of trust and confidence in insider trading case "where the company and the individual ha[d] an arm's-length relationship").

An expansive, ill-defined potential for an *implied* duty of trust and confidence in a commercial setting between parties who are not in a fiduciary or fiduciary-like relationship would introduce significant uncertainty to a fast-paced industry already adequately bridled by the precautionary measures responsible fund managers presently employ. Where independent, sophisticated parties like these use written agreements to define the contours of the confidentiality obligation owed by one to the other, any suggestion that some contradictory duty could be *implied* from their relationship—a suggestion that has no basis in law or the district court's resolution on the particular facts of this case—is unnecessary and potentially destabilizing, resulting in a universe of uncertainty in which fund managers can take no comfort from the terms of the agreements they and their sources of information have reached.

This would be contrary to how insider trading rules are meant to operate. As noted by the Supreme Court, "Unless the parties have some guidance as to where the line is between permissible and impermissible disclosures and uses, neither corporate insiders nor analysts can be sure when the line is crossed." *Dirks v. SEC*, 463 U.S. 646, 658 n.17 (1983).

Uncertainty improperly chills conduct. That is particularly true for fund managers, for whom even a regulatory inquiry—well-founded or not—can have dire consequences. Faced with the fear of being subject to unknown, implied duties of confidentiality *beyond* what they expressly agreed on with the party who shared the confidential information, fund managers will be chilled in their consideration of investments that are aided by the receipt of such information, to the detriment of their investors, who rely on fund managers to make investment decisions in the funds' best interests.

Lack of certainty would also undermine investment funds' important role providing liquidity, efficiency, and pricing accuracy to the markets. When evaluating whether to execute on opportunities to participate in capital formation transactions that would be aided by the receipt of nonpublic information, fund managers routinely balance the

potential benefits of the prospective investment against the cost of the trading restrictions associated with any confidentiality commitments made to the source of the information. Even the possibility that fund managers could be subjecting themselves to some *additional*, undefined, implied duty that was *not* agreed to by the parties would severely upset that balance, chilling fund managers from considering such investments, to the detriment of the many companies that rely on such funding and at the expense of the stability and efficiency of the financial markets writ large.

Accordingly, however the Court resolves this unusual "shadow-trading" case, *amici* urge the Court to remain conscious of the limitations precedent places on both the misappropriation theory and the circumstances in which a duty of trust and confidence can be implied in a commercial context.

## CONCLUSION

To the extent it addresses materiality, this Court should avoid language used by the district court that could be interpreted to suggest that a mere, vague "market connection" or "link" between two issuers can make nonpublic information about one issuer material to the securities

of another. Furthermore, this Court should reject the notion that an implied duty of trust and confidence arises simply because one party entrusts another party with confidential information, or that an implied duty can exist even when there is an express agreement between the source and recipient of confidential information governing what trading is permitted or prohibited.

Dated: May 23, 2025        Respectfully submitted,

 

                                        */s/ Michael A. Levy*

Janet Galeria                      Michael A. Levy

Audrey Dos Santos            Benjamin R. Nagin

U.S. CHAMBER LITIGATION    James R. Horner

  CENTER                          SIDLEY AUSTIN LLP

1615 H Street, NW             787 7th Avenue

Washington, DC 20062       New York, NY 10019

(202) 463-5337              (212) 839-5300

                                     mlevy@sidley.com

*Counsel for Amicus Curiae*

*Chamber of Commerce of the*  Stephen L. Cohen

*United States of America*     Ranah Esmaili

                                  SIDLEY AUSTIN LLP

                                  1501 K Street, NW

                                  Washington, DC 20005

                                  (202) 736-8000

                                  Nicole K. Chipi

                                  SIDLEY AUSTIN LLP

                                  1001 Brickell Bay Drive

                                  Miami, FL 33131

                                  (202) 736-8000

                                  *Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** No. 24-6882

I am the attorney or self-represented party.

**This brief contains** 6,952 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Michael A. Levy* **Date** 5/23/2025

38

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's ACMS electronic filing system, which will serve all counsel of record.

Dated: May 23, 2025

*/s/ Michael A. Levy*
Michael A. Levy