# 24-6882

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

MATTHEW PANUWAT,

Defendant-Appellant.

On Appeal from the United States District Court for the
Northern District of California, No. 21-cv-6322 (Hon. William H. Orrick)

## BRIEF OF THE U.S. SECURITIES AND EXCHANGE COMMISSION, APPELLEE

JEFFREY B. FINNELL
Acting General Counsel

TRACEY A. HARDIN
Solicitor

JEFFREY A. BERGER
Assistant General Counsel

DAVID D. LISITZA
Senior Appellate Counsel

THEODORE WEIMAN
Senior Appellate Counsel

Securities and Exchange Commission
100 F. Street N.E.
Washington, D.C. 20549
202-551-5015 (Lisitza)
LisitzaD@SEC.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ...........................................................1

COUNTERSTATEMENT OF THE ISSUES........................................4

STATUTES AND REGULATIONS......................................................4

COUNTERSTATEMENT OF THE CASE...........................................4

    A.  The securities laws prohibit trading on material nonpublic information in violation of a duty of trust and confidence............................4

    B.  Panuwat traded in Incyte securities based on material nonpublic information he learned in his role at Medivation. ..........................................6

        1.  Medivation, a developer of cancer drugs, was acquired by Pfizer after a confidential process. ........................................6

        2.  Panuwat, a senior executive at Medivation, oversaw its due diligence for the acquisition. ................................................7

        3.  Panuwat agreed to maintain the confidentiality of Medivation's acquisition-related information. .......................................8

        4.  Panuwat continuously learned material nonpublic details about Medivation's impending acquisition......................................10

        5.  Panuwat knew Incyte's share price would likely rise when Medivation announced its acquisition. ................................................11

        6.  Seven minutes after Panuwat learned that the acquisition was imminent, he began aggressively buying out-of-the-money call options in Incyte. ................................................12

        7.  Incyte's shares rose over 7% on the public announcement of Medivation's acquisition, and Panuwat sold his options for a $120,000 gain. ................................................15

i

C. A jury found Panuwat liable for insider trading. ...........................................16

   1. The district court declined to dismiss the Commission's complaint. ...16

   2. After a trial, Panuwat was found liable for insider trading. ..................18

   3. The district court denied Panuwat's post-trial motions.........................19

STANDARD OF REVIEW ...................................................................................21

SUMMARY OF ARGUMENT ..............................................................................22

ARGUMENT ........................................................................................................25

I. The district court properly concluded that Panuwat breached his
contractual duty not to trade in Incyte using Medivation's inside
information. ...................................................................................................25

  A. The Trading Agreement unambiguously established Panuwat's
duty not to use Medivation's inside information to trade in Incyte
as "another publicly-traded company." ...............................................27

  B. Panuwat's resort to canons of construction in an attempt to restrict
the Trading Agreement to companies with whom Medivation had a
"significant business relationship" is unwarranted and incorrect. ...............31

   1. Resort to canons of construction is unwarranted because the
Trading Agreement is unambiguous. ....................................................31

   2. Panuwat also misapplies the canons, which support the
Commission's interpretation. ................................................................33

   3. Materiality and scienter—not interpretive canons—supply
proper limits on the reach of confidentiality agreements. ....................36

   4. Panuwat's remaining interpretive arguments fail. ...............................39

  C. Incyte is a covered "competitor" of Medivation. .........................................43

  D. The jury resolved any ambiguity about Panuwat's contractual
duty in favor of the Commission. ...............................................................47

ii

II. The district court acted within its discretion in its instructions and evidentiary rulings regarding Panuwat's duty. ....................................50

    A. The district court acted within its discretion in instructing the jury on Panuwat's duty. ....................................51

        1. Panuwat waived his challenge to the duty instruction. ........................52

        2. The duty instruction is not erroneous. ....................................53

        3. Any error in the duty instruction was harmless. ....................................56

    B. The district court acted within its discretion in its in limine ruling about testimony on the Trading Agreement. ....................................58

        1. Panuwat's failure to call witnesses at trial renders the district court's in limine ruling unreviewable and harmless. ....................................59

        2. The testimony Panuwat cites was inadmissible. ....................................61

CONCLUSION....................................64

CERTIFICATE OF COMPLIANCE (FORM 8)

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ...................................................................... 32

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................. 36, 37

*Cachil Dehe Band of Wintun Indians v. California*,
  618 F.3d 1066 (9th Cir. 2010) ...................................................... 59

*Cal. State Legis. Bd. v. Dep't of Transp.*,
  400 F.3d 760 (9th Cir. 2005) ........................................................ 35

*Carpenter v. United States*,
  484 U.S. 19 (1987) ........................................... 5, 26, 40, 41, 42

*Chiarella v. United States*,
  445 U.S. 222 (1980) ......................................................................... 5

*Chinaryan v. City of Los Angeles*,
  113 F.4th 888 (9th Cir. 2024) ....................................................... 57

*Claiborne v. Blauser*,
  934 F.3d 885 (9th Cir. 2019) ........................................................ 53

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
  111 F.3d 1427 (9th Cir. 1996) ...................................................... 49

*Connell v. Lima Corp.*,
  988 F.3d 1089 (9th Cir. 2021) ...................................................... 33

*Coursen v. A.H. Robins Co.*,
  764 F.2d 1329 (9th Cir. 1985) ................................................. 59, 60

*Dirks v. SEC*,
  463 U.S. 646 (1983) ...................................................................... 30

*E. I. duPont de Nemours & Co. v. Am. Potash & Chem. Corp.*,
  200 A.2d 428 (Del Ch. 1964)........................................................ 26

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ...................................................................... 38

*Evangelista v. Inlandboatmen's Union of Pac.*,
   777 F.2d 1390 (9th Cir. 1985) ............................................................. 62

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*,
   631 F.3d 1058 (9th Cir. 2011) ............................................................ 48

*Fischer v. United States*,
   603 U.S. 480 (2024) ........................................................................... 34

*FTC v. EDebitPay, LLC*,
   695 F.3d 938 (9th Cir. 2012) ........................................................ 31, 32

*FTC v. Raladam Co.*,
   283 U.S. 643 (1931) ........................................................................... 45

*Gordon v. Landau*,
   321 P.2d 456 (Cal. 1958) .................................................................... 26

*Harrison v. PPG Indus., Inc.*,
   446 U.S. 578 (1980) ........................................................................... 34

*Hart v. Larson*,
   833 F. App'x 693 (9th Cir. 2021) ....................................................... 53

*Herb's Welding, Inc. v. Gray*,
   470 U.S. 414 (1985) ........................................................................... 32

*In re Archegos*,
   156 F.4th 108 (2d Cir. 2025) .............................................................. 55

*In re Daisy Sys. Corp.*,
   97 F.3d 1171 (9th Cir. 1996) ......................................................... 48, 49

*In re Tower Park Props., LLC*,
   803 F.3d 450 (9th Cir. 2015) .............................................................. 33

*Laird v. Integrated Res., Inc.*,
   897 F.2d 826 (5th Cir. 1990) .............................................................. 26

*Lamps Plus, Inc. v. Varela*,
   587 U.S. 176 (2019) ........................................................................... 43

*Leuthauser v. United States*,
   71 F.4th 1189 (9th Cir. 2023) ............................................................. 31

v

*Luce v. United States*,
    469 U.S. 38 (1984) ................................................................ 59, 60

*McBoyle v. United States*,
    283 U.S. 25 (1931) ...................................................................... 34

*Mohamed v. Uber Techs., Inc.*,
    848 F.3d 1201 (9th Cir. 2016) .................................................... 30

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) .................................................... 61

*Onyx Pharmaceuticals, Inc. v. Bayer Corp.*,
    863 F. Supp. 2d 894 (N.D. Cal. 2011) ...................................... 63

*Oracle Int'l Corp. v. Rimini St., Inc.*,
    123 F.4th 986 (9th Cir. 2024) .................................................... 35

*Penncro Assocs.*, Inc. *v. Sprint Spectrum, L.P.*,
    499 F.3d 1151 (10th Cir. 2007) .................................................. 33

*Phelps Dodge Corp. v. NLRB*,
    313 U.S. 177 (1941) .................................................................... 33

*Post v. St. Paul Travelers Ins. Co.*,
    691 F.3d 500 (3d Cir. 2012) ................................................. 35, 36

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ............................................................. 21, 50

*Schmit v. United States*,
    896 F.2d 352 (9th Cir. 1989) ...................................................... 44

*SEC v. Clark*,
    915 F.2d 439 (9th Cir. 1990) ...................................................... 55

*SEC v. Cuban*,
    620 F.3d 551 (5th Cir. 2010) ...................................................... 48

*SEC v. Talbot*,
    530 F.3d 1085 (9th Cir. 2008) .............. 4, 20, 25, 26, 32, 36, 41, 55

*SEC v. Texas Gulf Sulphur, Co.*,
    401 F.2d 833 (2d Cir. 1968) ...................................................... 38

vi

*SEC v. Todd*,
 642 F.3d 1207 (9th Cir. 2011) .............................................................. 21

*Skidmore v. Led Zeppelin*,
 952 F.3d 1051 (9th Cir. 2020).................................................... 21, 56

*Smith v. City of Santa Clara*,
 876 F.3d 987 (9th Cir. 2017) ............................................................ 50

*Tennison v. Circus Circus Enters., Inc.*,
 244 F.3d 684 (9th Cir. 2001) ............................................................ 59

*Traver v. Meshriy*,
 627 F.2d 934 (9th Cir. 1980) ...................................................... 56, 57

*United States v. Abel*,
 469 U.S. 45 (1984) ............................................................................. 21

*United States v. Afriyie*,
 929 F.3d 63 (2d Cir. 2019) ................................................................ 54

*United States v. Alvarez*,
 358 F.3d 1194 (9th Cir. 2004) .......................................................... 21

*United States v. Carpenter*,
 791 F.2d 1024 (2d Cir. 1986) ............................................................ 41

*United States v. Castillo-Marin*,
 684 F.3d 914 (9th Cir. 2012) ............................................................ 53

*United States v. Castleman*,
 572 U.S. 157 (2014) ........................................................................... 43

*United States v. Chestman*,
 947 F.2d 551 (2d Cir. 1991) ........................................ 26, 52, 53, 54, 55

*United States v. Chow*,
 993 F.3d 125 (2d Cir. 2021) .............................................................. 54

*United States v. Crawford*,
 239 F.3d 1086 (9th Cir. 2001) .......................................................... 62

*United States v. Falcone*,
 257 F.3d 226 (2d Cir. 2001) ...................................................... 48, 54

*United States v. Hofus*,
  598 F.3d 1171 (9th Cir. 2010) ............................................................... 57

*United States v. Hubbard*,
  96 F.3d 1223 (9th Cir. 1996) ................................................................. 50

*United States v. Kosinski*,
  976 F.3d 135 (2d Cir. 2020) .................................................................. 54

*United States v. Libera*,
  989 F.2d 596 (2d Cir. 1993) .................................................................. 41

*United States v. Migi*,
  329 F.3d 1085 (9th Cir. 2003) ............................................................... 34

*United States v. Moreno*,
  102 F.3d 994 (9th Cir. 1996) ................................................................. 50

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ..................................... 5, 20, 25, 39, 41, 55, 56

*United States v. Perez*,
  116 F.3d 840 (9th Cir. 1997) ................................................................. 52

*United States v. Portillo*,
  692 F. App'x 376 (9th Cir. 2017) .......................................................... 57

*United States v. Reed*,
  48 F.4th 1082 (9th Cir. 2022) ............................................................... 56

*United States v. Smith*,
  155 F.3d 1051 (9th Cir. 1998) ................................. 13, 30, 36, 38, 39

*United States v. Transfiguracion*,
  442 F.3d 1222 (9th Cir. 2006) ........................................................ 42-43

*United States v. Winans*,
  612 F. Supp. 827 (S.D.N.Y. 1985) .................................................. 40, 41

*U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*,
  89 F.4th 1126 (9th Cir. 2023) ............................................................... 49

*Walton v. Morgan Stanley & Co.*,
  623 F.2d 796 (2d Cir. 1980) .................................................................. 55

viii

*Wells Fargo & Co. v. United States*,
  641 F.3d 1319 (Fed. Cir. 2011) ............................................................. 46

*Wyatt Tech. Corp. v. Malvern Instruments, Inc.*,
  526 F. App'x 761 (9th Cir. 2013) ....................................................... 59

**Statutes**

Securities Act of 1933, 15 U.S.C. 77a, *et seq*.

  Section 2(a)(1), 15 U.S.C. 77b(a)(1) ................................................. 13

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq*.

  Section 3(a)(10), 15 U.S.C. 78c(a)(10) ............................................. 13

  Section 10(b), 15 U.S.C. 78j(b) ........................................... 4, 16, 20, 36, 37, 41

  Section 12(a), 15 U.S.C. 78*l*(a) ........................................................ 32

  Section 21A, 15 U.S.C. 78u-1 ........................................................... 20

Sarbanes-Oxley Act of 2002, 15 U.S.C. 7201, *et seq*.

  18 U.S.C. 1514A(a) ........................................................................... 32

**Rules**

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, *et seq*.

  Rule 10b-5, 17 C.F.R. 240.10b-5 ........................................... 4, 16, 20, 36, 41

  Rule 10b5-2(b)(1), 17 C.F.R. 240.10b5-2(b)(1) ............................... 26

Federal Rule of Evidence 602 ............................................................. 61

Federal Rule of Evidence 701 ...................................................... 61, 62, 63

Federal Rule of Evidence 704 ............................................................. 63

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012) ................. 34, ADD. 28

*Black's Law Dictionary* (10th ed. 2014) ................................................ 33, ADD. 34

*Cambridge Business English Dictionary* (2011) ...................................................... 32

Mihir N. Mehta, David M. Reeb & Wanli Zhao, *Shadow Trading*,
96 Acct. Rev. 367 (2021) ................................................................ 39, ADD. 35

Sharon Hannes, *The Market for Takeover Defenses*,
101 Nw. U. L. Rev. 125 (2007) ........................................................................ 44

24-6882

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
Plaintiff-Appellee,

v.

MATTHEW PANUWAT,
Defendant-Appellant.

BRIEF OF THE U.S. SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

## PRELIMINARY STATEMENT

After an eight-day trial, a jury found that Appellant Matthew Panuwat engaged in insider trading in violation of the securities laws. Panuwat served as a senior executive at Medivation, Inc., a mid-sized biopharmaceutical company that developed cancer-fighting drugs. Medivation required Panuwat to sign an agreement barring personal trades based on its material, nonpublic information that he received in his role. The trading agreement prohibited such transactions not only in Medivation's securities, but also the securities of "another publicly-traded company." As the jury found, Panuwat traded in Incyte Corp.—another publicly-traded company that developed cancer drugs—minutes after receiving inside information from Medivation that he knew would increase Incyte's stock price when that information went public.

1

While overseeing due diligence for Medivation's possible acquisition, Panuwat reviewed confidential analysis that Medivation's acquisition would likely boost Incyte's stock price on the expectation that Incyte might also be acquired. Indeed, Panuwat saw Incyte's stock price rise 6% on the preliminary news that Medivation was a potential acquisition target. And he later made a confidential presentation to Medivation's board showing that Incyte's stock price had climbed 5.5% a year earlier when another of their peer companies was acquired.

Medivation's CEO emailed Panuwat that Medivation would soon be signing a merger agreement with Pfizer. Knowing this, and just seven minutes later, Panuwat spent nearly half his annual salary buying almost all the high-risk Incyte call options traded that day. These options would be profitable only if its stock rose rapidly in a short period of time. And the day Medivation's acquisition was announced, Incyte's share price rose 7.7%, allowing Panuwat to more than double his money. Based on these facts, a jury found him liable for insider trading.

Panuwat challenges that verdict, contending that his Incyte trades did not violate his contractual duty to Medivation to forgo trading on Medivation's confidential information. He notes that the term "another publicly-traded company" was followed by the clause, "including all significant collaborators, customers, partners, suppliers or competitors" and argues that this clause should be read to prohibit trading only in publicly-traded companies with which Medivation had a "significant business relationship." But "significant business relationship" is

2

an ambiguous term that appears nowhere in the agreement. And there is no genuine factual dispute that Incyte was a "competitor[]" of Medivation, independently placing it within the express scope of the "including" clause. Nor can Panuwat rely on canons of interpretation that apply to ambiguous terms because, as the district court held, there is no ambiguity in the term "another publicly-traded company"—and there is no dispute that Incyte was publicly traded.

Even if the agreement were ambiguous, or raised questions about whether Incyte and Medivation had a "significant business relationship" or were "competitors," Panuwat made that case to the jury, which resolved those issues against him by determining that Panuwat's trading violated his duty to Medivation. Particularly in light of the deference owed to the jury's findings, there is no basis to disturb the verdict.

Panuwat's challenges to the district court's conduct of the trial fare no better. Because Panuwat's duty not to trade in Incyte was unambiguous as a matter of law, the Court need not address these remaining challenges, which concern how the jury might have found a duty in the absence of the contractual agreement. In any event, the district court acted within its discretion in both instructing the jury about Panuwat's duty and limiting speculative testimony about the trading agreement. The district court's duty instruction tracked Panuwat's own proposal and aligned with this Court's precedent. And the court's in limine ruling did not bar testimony about the trading agreement—it simply required a proper foundation.

3

## COUNTERSTATEMENT OF THE ISSUES

1.  Whether Panuwat breached his duty to Medivation under his agreement not to trade the securities of "another publicly-traded company" based on Medivation's material nonpublic information when he used such information to trade securities in Incyte—a publicly-traded company—or, alternatively, whether the jury resolved any ambiguity in the agreement against him.

2.  Whether the district court acted within its discretion in (a) instructing the jury that Panuwat's duty could arise from an express agreement, and (b) limiting proposed lay testimony about that agreement to non-legal opinions for which a sufficient foundation was laid.

## STATUTES AND REGULATIONS

An addendum to this brief reproduces relevant statutes and regulations, except those included in the addendum to Panuwat's brief.

## COUNTERSTATEMENT OF THE CASE

### A.  The securities laws prohibit trading on material nonpublic information in violation of a duty of trust and confidence.

This is a civil law enforcement action for insider trading, which is a prohibited "deceptive device" under Exchange Act Section 10(b), 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.  *See SEC v. Talbot*, 530 F.3d 1085, 1090-91 (9th Cir. 2008).  The "classical" theory of insider trading applies to trading by an insider in the stock of his own corporation, which breaches a duty to the

4

shareholders with whom he transacts. *Chiarella v. United States*, 445 U.S. 222, 228-29 (1980). This case involves the complementary "misappropriation" theory, which applies when a person misuses confidential information obtained from a source to whom he owes a duty of trust and confidence to trade in the securities of another company of which he is not an insider. *United States v. O'Hagan*, 521 U.S. 642, 650-53 (1997) (lawyer for acquiror trades in target's securities).

The misappropriation doctrine "trains on conduct involving manipulation or deception" since a person in a position of trust obtains information, "feign[s] fidelity to the source of the information" while making "undisclosed, self-serving use" of it by trading, and thereby "defrauds the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652-55. This "constitutes fraud akin to embezzlement" since a company's confidential information "qualifies as property to which the company has a right of exclusive use." *Id.* at 654-55 (discussing *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). This misconduct also frustrates "fair and honest markets" since investors will "hesitate to venture their capital in a market" where trading based on misappropriated information puts them at an "informational disadvantage" that "stems from contrivance" and "cannot be overcome with research or skill." *Id.* at 657-59.

5

**B.**   **Panuwat traded in Incyte securities based on material nonpublic information he learned in his role at Medivation.**

Panuwat does not dispute that the following evidence is sufficient to support the jury's verdict that he misappropriated Medivation's material nonpublic information and used it to trade in Incyte, another publicly-traded company.

**1.**   **Medivation, a developer of cancer drugs, was acquired by Pfizer after a confidential process.**

Medivation was a mid-sized biopharmaceutical company that developed drugs to treat cancer.  5-SER-959.[1]  Medivation stock traded on NASDAQ until Pfizer, a large biopharmaceutical company that frequently acquires smaller companies, acquired it in a transaction announced on August 22, 2016.  4-SER-613, 635; 2-ER-94; 3-SER-970; 2-SER-256.

Pfizer's acquisition of Medivation had its origins in a hostile takeover attempt by a separate company, Sanofi.  4-SER-628-29.  On March 31, 2016, Medivation's board hired J.P. Morgan and Evercore to assess Sanofi's offer of $52.50 per share and defend against that takeover attempt by demonstrating a

---

[1] "ER" is Panuwat's excerpts of record.  "SER" is the Commission's supplemental excerpts of record.  "Br." is Panuwat's brief (ECF 13).  "Chamber Br." is the amicus brief from the Managed Funds Association, Alternative Investment Management Association, and Chamber of Commerce of the United States of America in Support of Neither Party (ECF 18).  "ICAN Br." is the amicus brief from the Investor Choice Advocates Network and Professor Kevin Douglas in Support of Defendant-Appellant (ECF 19).  All emphasis is added unless otherwise noted.

6

higher valuation. 4-SER-628-29; 2-SER-230-31; 2-SER-366. In June 2016, Medivation contacted other companies to gauge their interest in a merger and formalize a process for alternative acquisition proposals, including from Pfizer. 4-SER-630-32; 2-SER-233-38.

### 2. Panuwat, a senior executive at Medivation, oversaw its due diligence for the acquisition.

During this period, Panuwat served as Medivation's Senior Director and Head of Business Development. 5-SER-939; 2-ER-180. As part of his role in evaluating strategic opportunities for Medivation, including potential acquisitions and partnerships, he closely monitored biopharmaceutical companies' stock prices, drug pipelines, and merger activity. 5-SER-939; 2-SER-282-83; 2-ER-180; 3-SER-471-72; 2-SER-384. He held an MBA and had eight years of experience as Merrill Lynch's Director of Global Healthcare Investment Banking, where he advised healthcare companies on acquisitions. 5-SER-939; 2-ER-176-80.

Panuwat identified himself as a "[c]ore team member"—one of six individuals among Medivation's 900 employees—tasked with managing Medivation's solicitation of potential acquirors and its ultimate acquisition by Pfizer. 5-SER-939; 2-ER-96-97; 2-SER-284-87. Panuwat oversaw Medivation's due diligence during the acquisition process. 5-SER-939; 3-SER-464-65; 2-SER-252-53; 2-ER-244-45. As part of that process, Medivation's investment bankers and other core team members shared confidential information with Panuwat about

7

the company's valuation.  2-SER-284-87; 2-ER-97; 2-SER-243.  Panuwat also responded to potential acquirors' diligence requests, prepared presentations about Medivation's valuation, and updated Medivation's board of directors.  5-SER-939; 2-SER-284-87; 3-SER-464-65; 4-SER-522-23.

### 3. Panuwat agreed to maintain the confidentiality of Medivation's acquisition-related information.

Panuwat understood that the information he received as part of Medivation's acquisition search was confidential.  2-ER-245.  Medivation restricted access to acquisition-related information about its business operations, including board minutes and its financial projections.  4-SER-632; 2-SER-236-41.  Potential acquirers confidentially submitted their proposals, and the acquisition process was codenamed "Project Masterpiece" to preserve secrecy further.  2-SER-288-90; 2-SER-251; 4-SER-524-27.  Medivation also used codenames for entities involved: it was "Van Gogh," Sanofi was "Seurat,"  Pfizer was "Picasso," and so on.  5-SER-937; 2-SER-246-47.

Panuwat agreed to abide by Medivation's Policy Regarding Securities Trading by Company Personnel and Treatment of Confidential Information ("Trading Agreement") which set forth a "prohibition on insider trading."  2-ER-82-89.  The Trading Agreement explained that "[d]uring the course of [his] employment" with Medivation," Panuwat "may receive important information … about [Medivation] or about other publicly-traded companies with which

8

[Medivation] has business dealings." 2-ER-82. The agreement contained a "by no means … all-inclusive list" of items that "may be considered to be inside information," among them "acquisitions or dispositions of businesses." 2-ER-83.

The Trading Agreement warned that such information may put him in a "position to profit financially by buying or selling … [Medivation]'s securities … or the securities of *another publicly-traded company*," and expressly "prohibited" any such securities trading. 2-ER-82. The agreement contained a nonexclusive list of examples of publicly-traded companies in which Panuwat could not trade, "*including all* significant collaborators, customers, partners, suppliers *or competitors*" of Medivation. 2-ER-82. The agreement obligated him to "refrain from trading in a company's securities … until [he] [knew] that the information has been publicly disseminated," informed him that the use of such information for personal gain "is illegal," and put him on notice that he could "be held liable … for [his] transactions." 2-ER-82-83.

In addition, Panuwat signed Medivation's Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement"). 2-ER-73-77. He thereby agreed "at all times during the term of [his] employment" to "hold in strictest confidence, and not to use, except for the benefit of [Medivation], … any … confidential knowledge, data or other proprietary information[,] … business plans, financial information or other subject matter pertaining to any business of" Medivation. 2-ER-73.

9

### 4. Panuwat continuously learned material nonpublic details about Medivation's impending acquisition.

August 2016 was a critical period in Medivation's acquisition process. On August 8, 2016, five "big biotech" companies submitted confidential, preliminary proposals to buy Medivation, each at a price "meaningfully higher" than Sanofi's unsolicited offer. 4-SER-633; 2-SER-278-79; 2-SER-241-42; 5-SER-918, 931; 4-SER-680.

On August 12, 2016, Medivation's investment bankers sent Panuwat a summary of these proposals, labeled "STRICTLY PRIVATE AND CONFIDENTIAL." 5-SER-918, 920, 929-31; 5-SER-933-37. The summary detailed each of the proposals' (a) price per share offer, (b) level of board approval, and (c) waiver of financing contingencies (*i.e.*, each firm would make an all-cash offer). 5-SER-937; 2-SER-244-50. Although it was publicly reported that Medivation sought to be acquired, this summary was confidential, and no one disclosed or leaked its details. 2-SER-385-400; 5-SER-979; 5-SER-973.

This confidential summary also informed Panuwat that the acquisition would close "in days not weeks," targeting an August 22 announcement. 5-SER-931. An August 14 board meeting that he attended confirmed that August 22 was the anticipated announcement date and required definitive proposals by August 19. 4-SER-524-27; 4-SER-633; 2-SER-309; 3-SER-462-63. That target date was nonpublic. 2-SER-257-58; 2-SER-389.

10

### 5. Panuwat knew Incyte's share price would likely rise when Medivation announced its acquisition.

Panuwat was aware that Incyte's stock price was also expected to rise on news of the acquisition. Panuwat knew that Medivation and Incyte had both positioned themselves as valuable targets for acquisition by a larger biotechnology firm, and were two of the "few profitable, revenue-generating" oncology companies. 2-SER-232; 2-SER-262; 2-SER-242; 5-SER-869, 878-80 (noting "[s]carcity of oncology assets with these blockbuster attributes"). He received confidential analysis that, at the time, there were only 36 oncology-focused public companies; only seven had a market capitalization under $75 billion; and just three of those were valued above $5 billion—Seattle Genetics, Incyte, and Medivation. 5-SER-849-50, 880; 2-SER-262-64. Moreover, Panuwat participated in the process where Medivation's bankers repeatedly identified Incyte as a comparable company. 4-SER-644 (similar "business sector participation, financial metrics and form of operations"); 4-SER-651 ("peer group" with similar "business characteristics"); 5-SER-830-31, 2-SER-280-81 (comparable "relative risk" to investors); 4-SER-571-72 ("peer group" for executive compensation); 2-ER-103.

Analyst and media reports aligned with this internal assessment that Medivation's acquisition would boost the stock price of other oncology-focused companies, including Incyte. Panuwat received a published report that "[l]arge pharmaceutical and biotech companies [had] been eyeing valuable assets especially

11

in cancer," but there were "only a handful of … mid-cap cancer assets (*i.e.*, Incyte, Medivation, Seattle Genetics)," representing a "scarcity of valuable biotech assets." 4-SER-677-78; 2-SER-267-73; 2-SER-332-40; 4-SER-704-05. He received other reports confirming that should Medivation be acquired, "Incyte could be Big Pharma's next M&A target[]." 4-SER-679-81.

Panuwat closely followed Incyte and had twice observed such a "spillover effect" from news about other companies that caused Incyte's stock price to rise. 3-SER-471-73; 2-SER-380-82; 3-SER-410-12; 3-SER-481-82. First, Incyte's stock price rose 6% based on the initial, March 31, 2016, news that Medivation was a potential target. 2-SER-350-57, 2-SER-366. Second, as he informed Medivation's board during the acquisition process in a confidential report, Incyte's stock had risen 5.5% when AbbVie acquired Pharmacyclics in March 2015—even though Incyte was not a party to that deal. 4-SER-745-46, 770; 4-SER-521-23; 2-SER-293-98; 3-SER-472-73; 2-SER-380-82; 2-SER-363-65. Medivation's bankers cited that acquisition as the most recent comparable transaction to Pfizer's proposed buyout of Medivation. 4-SER-645, 652; 2-SER-357-65.

> **6.** **Seven minutes after Panuwat learned that the acquisition was imminent, he began aggressively buying out-of-the-money call options in Incyte.**

Panuwat traded Incyte securities immediately after learning nonpublic, material information about the acquisition's imminence. On Thursday August 18, 2016, at 12:19 pm—one day before binding offers were due—Medivation's CEO

12

emailed Panuwat that Medivation anticipated signing a merger agreement with Pfizer "this weekend." 5-SER-940; 2-SER-304-08; 2-SER-254. This email gave Medivation's bankers a "high degree of confidence" that Medivation would be acquired in the near future, and they anticipated a "swift ability to close" the transaction. 2-SER-255-56; 2-SER-307-08 (same, Medivation's CFO). Medivation expected members of its acquisition team, including Panuwat, to maintain its confidentiality and refrain from personal trading. 2-ER-140-41; 2-SER-256.

Nevertheless, seven minutes later, at 12:26 pm, Panuwat logged into a personal trading account and bought Incyte call options. 5-SER-952; 5-SER-940. Call options are leveraged bets that a stock will rise above a fixed price (the "strike price") within a set period of time (the "expiration" date); they offer potentially greater returns than stock purchases but carry greater risk, especially when "out-of-the-money"—*i.e.*, if the option were to expire at that day's stock price it would be worthless. 2-SER-315-21; 5-SER-954-56; 3-SER-487-89.[2]

Between 12:26 pm and 12:50 pm, Panuwat bet that Incyte's stock price would rapidly rise on the soon-to-be-announced Medivation acquisition. Without telling anyone at Medivation or seeking its permission to trade (3-SER-474, 2-ER-139-41), he spent $117,380.20 on 578 Incyte call options. 5-SER-952; 2-SER-

---

[2] *See United States v. Smith*, 155 F.3d 1051, 1069 n.26 (9th Cir. 1998) (describing stock options); 15 U.S.C. 77b(a)(1) & 78c(a)(10) ("security" includes stock options).

310-13.  The cost of this trade represented almost half his base annual salary and marked his largest single securities purchase.  3-SER-483-84; 3-SER-440-41. Although he had followed Incyte for years, this was his only trade in its securities. 3-SER-482-83; 2-SER-315; 3-SER-472-73; 3-SER-410-13.

Panuwat bought options at three strike prices ($80, $82.50, and $85), and each had a short-term expiration date of September 16, 2016.  5-SER-952-53; 2-SER-310-14.  He purchased more of those options than anyone else in the market—representing 81% of the daily volume at $80, 84% at $82.50, and 70% at $85.  2-SER-321-22; 3-SER-475-76.  All his options were out-of-the-money; Incyte's stock price was trading below $80 per share when he bought them. 2-SER-315-21; 5-SER-995-97.

Panuwat later claimed his trading had "nothing to do with" the Medivation buyout, despite knowing that analysts expected it to affect Incyte's stock price and his awareness of the buyout's nonpublic details.  3-SER-479-82; 2-ER-245-50; 2-ER-230.  He testified that he could not recall reading his CEO's August 18 email confirming the acquisition's timing.  3-SER-449-61; 5-SER-940-42; 2-ER-71.  At his April 2025 trial, Panuwat offered multiple reasons for purchasing Incyte options—including tax strategy, a recommendation he received, as well as Incyte's clinical results, earnings call, and stock price.  3-SER-402-23.  But in his sworn testimony four years earlier, he mentioned none of those reasons and repeatedly stated he did not recall why he traded.  3-SER-431-48; 1-SER-48-63 (2-SER-378-79); 1-SER-34-39; 1-SER-30-32.  Even at trial, Panuwat could not

14

explain why he bought so many short-term, out-of-the-money call options if, as he claimed, he was not anticipating any significant event that would increase Incyte's stock price during that narrow window. 3-SER-484-86.

### 7. Incyte's shares rose over 7% on the public announcement of Medivation's acquisition, and Panuwat sold his options for a $120,000 gain.

Medivation publicly announced its acquisition on August 22, 2016. In the days prior, Pfizer and two other firms submitted binding proposals (August 19-20), and Medivation's board approved the merger agreement (August 20). 4-SER-633-35; 2-SER-259-61. Pfizer acquired Medivation for $81.50 per share, a "compelling premium" over Sanofi's earlier $52.50 offer (4-SER-635), and Medivation's stock increased 19.7% that day. 5-SER-995; 4-SER-702; 2-SER-324; 2-SER-377. This price jump showed that the market learned new and important information, including being "surprised" by the buyout's high price and all-cash structure. 4-SER-702; 3-SER-466-67.

Incyte's share price concurrently rose 7.7% on August 22, 2016. An expert economist concluded that Medivation's merger caused Incyte's increase, with no valid alternative explanation. 2-SER-323-27. The expert attributed Incyte's price increase to (a) industry spillover effects (2-SER-327-40); (b) comparability with Medivation (2-SER-341-48); and (c) prior reactions to merger news (2-SER-349-65). Market observers likewise attributed Incyte's rise to this acquisition news, noting that "[s]hares of other companies that are developing cancer drugs, like

15

Incyte, … rose on [August 22, 2016] on hopes they might also attract suitors."
4-SER-695-97; *see also* 4-SER-684-85 (Incyte was among the "potential targets
for drugmakers that lost out to Pfizer"); 4-SER-689-90 ("It would make sense that
the Medivation price tag would boost Incyte (another mid-cap oncology
company).").

Panuwat liquidated his Incyte call options starting on August 24, 2016.
5-SER-952-53; 3-SER-424-25.  He sold all his options for $237,411.52, realizing a
net gain of $120,031.32.  5-SER-952-53.  Panuwat captured profits from Incyte
becoming a post-announcement "target[] of takeover speculation," whether or not
it was "actually" a takeover target or received any acquisition proposals.  4-SER-
689-91; 4-SER-685.  He testified that the acquisition had "nothing to do" with his
gains.  3-SER-481-82.

**C.      A jury found Panuwat liable for insider trading.**

**1.      The district court declined to dismiss the Commission's
complaint.**

The Securities and Exchange Commission commenced this action against
Panuwat in August 2021.  It alleged that Panuwat violated Exchange Act Section
10(b) and Rule 10b-5 by trading in Incyte based on material nonpublic information
about Medivation's acquisition.  3-ER-408-18.  The district court rejected
Panuwat's efforts to dismiss the action.

16

First, the court denied Panuwat's motion to dismiss, holding that the "plain language" of Medivation's Trading Agreement covered trading in "the securities of another publicly traded company," including Incyte. 3-ER-400-01. The court reasoned that information may be material to more than one company; the Commission sufficiently pleaded that Panuwat had breached his duty by using Medivation's material, acquisition-related information to trade in Incyte— information that a reasonable investor in Incyte would also have viewed as material. 3-ER-393, 398-401 & n.1. The court also determined that the Trading Agreement's use of "including" in the phrase "including all significant collaborators, customers, partners, suppliers, or competitors" introduced illustrative "examples," rather than limited the scope of its prohibition to those specific categories of publicly-traded companies. 3-ER-401.

Second, the district court denied Panuwat's motion for summary judgment. The court reaffirmed that the Trading Agreement's "plain language" covered trading in the securities of "another publicly traded company," and that "Incyte is a publicly traded company" that "fall[s] within [its] ambit." 3-ER-384-85. The court concluded that the "including" clause provided examples of covered companies and was "not exhaustive." 3-ER-384-85. It also held that Medivation's Confidentiality Agreement further demonstrated Panuwat's duty. 3-ER-385-86. The court rejected Panuwat's interpretation that the Trading Agreement restricted

17

trading to companies that had a "business relationship" with Medivation, but allowed him to present that theory at trial, noting that Panuwat's contrary arguments "may persuade a jury." 3-ER-384-85.

Before trial, the district court also granted in part and denied in part the Commission's motion in limine as to speculative testimony about the Trading Agreement and Confidentiality Agreement by former Medivation executives—David Hung (CEO), Kenneth Guernsey (outside counsel), and Dominic Piscitelli (VP of Finance). *See* 3-ER-328 (pretrial order); 1-SER-184-88 (motion). The court permitted those witnesses to "testify about: (1) non-hearsay conversations with Panuwat about issues related to the policies/trading with Incyte or similar companies; (2) trainings regarding the policies; and (3) enforcement of the policies." 3-ER-328. The court also permitted witnesses to "describe their perception of the culture of the office as it may relate to the Incyte trade." 3-ER-328. But the court ruled that "[t]hey may not claim" that "there was a policy, practice, or understanding without a sufficient foundation having been laid," and that "[t]hey may not speak to the legal meaning" of the Agreements or "speculate." 3-ER-328.

### 2. After a trial, Panuwat was found liable for insider trading.

The central question at the eight-day trial was why Panuwat bought call options in Incyte: whether, as the Commission contended, Panuwat purchased them based on the information he misappropriated from Medivation or, as Panuwat

18

claimed, that he traded for reasons unrelated to such information (2-SER-222, 3-SER-505, 3-SER-479). After hearing testimony from Panuwat, other executives at Medivation (including Piscitelli but not Hung or Guernsey), and experts on both sides, the jury took less than three hours to find Panuwat liable. 1-ER-58-59, 3-SER-514-19 (verdict); 3-SER-490-504, 3-SER-509-13 (jury instructions).

### 3. The district court denied Panuwat's post-trial motions.

The district court denied Panuwat's motions for a new trial and judgment as a matter of law. 1-ER-7-47. In his motions, Panuwat argued that his trading did not breach a duty he owed Medivation and that the duty-related instruction was erroneous. The court disagreed, concluding that the jury had a "sufficient basis to find that a duty arose" from the Trading Agreement, and again rejected his contention that it was confined to entities with whom Medivation had a "business relationship." 1-ER-38-40. The court held that "the jury was able to determine what it meant for itself." 1-ER-40.

The court upheld the duty-related jury instruction. 1-ER-12-16 (discussing 3-SER-500-01). Panuwat asserted that the instruction allowed the jury to find a duty "based only on the receipt" of inside information, but the court rejected that characterization, stating that "misrepresents my instruction." 1-ER-12. Rather, the instruction stated that a duty can arise when a person "expressly agrees" to maintain confidentiality, or, "in the absence of a written agreement," "when an

19

employer entrusts an employee" with material nonpublic information. 3-SER-500-01. The court underscored that this formulation was consistent with *O'Hagan* and *Talbot*. 1-ER-12-14 & n.1. And the court found that any error was harmless since the jury "had a sufficient basis to find that a duty arose" from the Trading Agreement, which clearly "foreclose[d]" his trading. 1-ER-15-16, 38-40.

The court also sustained its in limine ruling. 1-ER-32-34. The court emphasized that its "only explicit limitation" was that witnesses could not "claim that there was a policy, practice, or understanding" without a "proper foundation" having been laid, speak to the "legal meaning" of the Trading Agreement, or "speculate." 1-ER-32-34 & n.9. Yet, Panuwat failed to "put on witnesses" to testify that the Trading Agreement was understood to apply solely to entities with whom Medivation had a business relationship. 1-ER-39.

Regarding remedies, the court ordered Panuwat to pay a civil penalty of $321,197.40, representing three times his profit gained. 1-ER-7, 52-54, 18-22, 46-48 & n.14; 1-ER-4-5; *see* 15 U.S.C. 78u-1. The court declined the Commission's request to bar Panuwat from serving as an officer or director of a public company—a ruling the Commission has not cross-appealed. 1-ER-48-52. The court permanently enjoined Panuwat from violating Section 10(b) and Rule 10b-5, given his current role as an officer of a public company and its finding that there

20

was a reasonable likelihood he would violate the securities laws in the future. 1-ER-54-56, 18-22, 46-48; 1-ER-3-4.

## STANDARD OF REVIEW

In reviewing the denial of Panuwat's motion for judgment as a matter of law, this Court reviews legal determinations de novo and must uphold the jury's factual determinations if supported by substantial evidence. *See SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011). "Substantial evidence" supports the verdict "even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* Reviewing the "record as a whole," the Court "must draw all reasonable inferences in favor of" the Commission and "must disregard all evidence favorable to [Panuwat] that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

This Court reviews the jury instructions for an abuse of discretion, and may not reverse a verdict if an error is harmless. *See Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) (en banc). A district court likewise has "wide discretion in determining the admissibility of evidence," *United States v. Abel*, 469 U.S. 45, 54 (1984), and this Court considers any error harmless and will not order a new trial unless there is "grave doubt" it "substantially affected the verdict," *United States v. Alvarez*, 358 F.3d 1194, 1214 (9th Cir. 2004).

21

## SUMMARY OF ARGUMENT

Panuwat held a senior role at Medivation and expressly agreed not to use any of Medivation's material nonpublic information obtained in that role to trade in Medivation's securities or the securities of "another publicly-traded company," including its "competitors." 2-ER-82. A jury found that he breached that duty by using confidential information about Medivation's acquisition to trade in Incyte—a publicly-traded company and a competitor of Medivation—whose stock he expected to rise, and which in fact rose over 7% upon the acquisition's announcement.

1. The district court correctly concluded that the plain language of his Trading Agreement with Medivation prohibited his insider trading. Medivation protected its proprietary information from misappropriation by prohibiting employees from using it to personally trade in "another publicly-traded company," and Panuwat stipulated that Incyte is a publicly-traded company. Undisputed trial evidence also showed that Incyte was Medivation's "competitor," independently placing it within the agreement's scope.

Panuwat attempts to manufacture ambiguity where there is none. He would graft onto the agreement a limitation—that it applies only to publicly-traded companies that share a "significant business relationship" with Medivation—which appears nowhere in its text. The agreement instead protects Medivation's inside

22

information from being exploited for personal gain in any public company, "including" a list of examples: "collaborators, customers, partners, suppliers, or competitors." 2-ER-82. That list is illustrative, not limiting, and is not confined to companies with some undefined "significant business relationship." Panuwat's recourse to canons of construction is unwarranted (there is no ambiguity to justify their use) and misguided (he misapplies them). To the extent there are concerns about the reach of such trading agreements, the securities laws impose inherent safeguards by requiring that the information be material to investors in the traded company, and that the trader act with intent to defraud the source of the information.

Even if the Court were to conclude that the agreement is ambiguous, the jury resolved any factual disputes regarding Panuwat's duty in the Commission's favor—including whether Incyte was publicly traded, was Medivation's "competitor," or whether the two had a "significant business relationship," a theory Panuwat presented to the jury without success.

2. The district court acted within its discretion in its instructional and evidentiary rulings regarding Panuwat's duty, and a new trial is unwarranted.

a. The court did not abuse its discretion in instructing that Panuwat's duty could arise from the written agreement. He now objects that the instruction went on to state that, in the absence of a written agreement, a duty may be found where

23

an employer "entrusts" an employee with inside information for the company's benefit rather than the employee's personal gain. But he waived this challenge by proposing an instruction that included the same language, and by waiting until after the trial to argue that this formulation allowed the jury to find a duty based solely on Medivation's purportedly "unilateral" provision of information.

In any event, the duty instruction accurately reflected governing law. Medivation trusted Panuwat to safekeep the inside information it provided to him not unilaterally, but under a mutual agreement. And any error was harmless because Panuwat had an express duty under the written agreement, and the jury did not need to consider whether a duty could arise absent that agreement.

b. The district court also acted within its discretion in its ruling regarding testimony from former Medivation's executives about their interpretations of the Trading Agreement. The court did not exclude these lay witnesses from testifying, but reasonably required that they avoid the speculation or legal conclusions reflected in their deposition testimony. Panuwat ultimately chose not to call these witnesses at trial, thus any error in the court's tentative ruling was harmless. And the jury did not need these personal interpretations because the agreement unambiguously applied to trading in "another public company" or "competitor."

24

## ARGUMENT

**I.    The district court properly concluded that Panuwat breached his contractual duty not to trade in Incyte using Medivation's inside information.**

The jury found, based on sufficient—indeed ample—evidence, that the Commission satisfied each element of the misappropriation theory.  Panuwat: (1) owed a duty of trust and confidence to Medivation regarding information provided to him in his position; (2) was made aware of nonpublic information that was material to investors in Incyte; (3) breached his duty by using that information to buy Incyte securities; and (4) acted with intent to defraud Medivation.  3-SER-499-504; *see O'Hagan*, 521 U.S. at 651-53; *Talbot*, 530 F.3d at 1090-92.

The only element Panuwat challenges on appeal is whether his trading in Incyte breached a duty he owed to Medivation.  Br. 31-59.  But Panuwat had an express contractual duty not to use Medivation's inside information to trade in "another publicly-traded company."  2-ER-82.  And because Incyte is undisputedly a publicly-traded company, his trading in Incyte breached that duty.

Panuwat and amici do not dispute that, under the misappropriation theory of insider trading, the requisite duty may arise in various ways, including, as here, through an "express agreement."  Br. 34; *see* Chamber Br. 30-33; ICAN Br. 8-11. The misappropriation theory "bars trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, *contractual*, or

25

similar obligation to the owner or rightful possessor of the information." *Talbot*, 530 F.3d at 1096; *accord United States v. Chestman*, 947 F.2d 551, 571 (2d Cir. 1991) (en banc) ("an express agreement of confidentiality" can establish a duty of trust and confidence); 17 C.F.R. 240.10b5-2(b)(1) ("[A] duty of trust or confidence exists … [w]henever a person agrees to maintain information in confidence.").[3]

Similarly, there does not appear to be any dispute that, if such an express agreement exists, the Court need look no further than Panuwat's contractual obligations to confirm his duty. Panuwat "acknowledge[d]," "read and underst[ood], and agree[d] to comply with" Medivation's Trading Agreement (2-ER-89, 1-ER-15-16), which he "signed as a condition of employment with Medivation" (1-ER-38). *See Carpenter*, 484 U.S. at 27-28 (employee manual "removed any doubts" that employer had "business information that it intended to be kept confidential"). As the district court repeatedly found (1-ER-38-39, 3-ER-384-85, 3-ER-400-01), the Trading Agreement prohibited Panuwat from using material nonpublic information not only by trading in Medivation's securities, but

---

[3] The Court here need not reference "state corporate and securities law or the state law of fiduciary relationships" as there exists a "developed federal standard" that a contract can establish such duty. *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 836-37 (5th Cir. 1990); *contra* ICAN Br. 5-14. In any event, Medivation was a Delaware corporation based in California (4-SER-613; 2-ER-77), and both states recognize that an agreement may give rise to a duty not to use corporate information for personal benefit. *See, e.g., E. I. duPont de Nemours & Co. v. Am. Potash & Chem. Corp.*, 200 A.2d 428, 431 (Del Ch. 1964); *Gordon v. Landau*, 321 P.2d 456, 457-59 (Cal. 1958).

also by trading in the securities of "another publicly-traded company," such as Incyte. 2-ER-82. Accordingly, this Court need not decide if a duty could exist without an express agreement. *See* Chamber Br. 5-6, 13-14 & ICAN Br. 6-11.

With all eyes on the agreement, Panuwat's efforts to introduce ambiguity through various canons of construction should be rejected. The Trading Agreement is not ambiguous: it is clear on its face, and does not limit its broad ban on trading in "another publicly-traded company" to companies with which Medivation had a "significant business relationship," as Panuwat contends. Rather, the agreement includes a nonexclusive list of examples of public companies in which Panuwat could not trade. Moreover, that list expressly includes a prohibition on trading in Medivation's "competitors" (2-ER-82) and, at a minimum, the jury had sufficient evidence to conclude that Medivation and Incyte were competitors. To the extent there is ambiguity about the Trading Agreement's scope, or whether Incyte had a "significant business relationship" with Medivation under Panuwat's reading, the jury decided those issues in the Commission's favor.

### A. The Trading Agreement unambiguously established Panuwat's duty not to use Medivation's inside information to trade in Incyte as "another publicly-traded company."

The district court correctly found that the "plain language" of the Trading Agreement prohibited Panuwat from exploiting his confidential knowledge of Medivation's planned acquisition by trading in Medivation or "another publicly

27

traded company," such as Incyte.  3-ER-400-01, 3-ER-384-85, 1-ER-38-40.

The Trading Agreement broadly defined "inside information" to include nonpublic information about Medivation ("the Company") as well as other publicly-traded companies:

> During the course of your employment … with the Company, you may receive important information that is not yet publicly disseminated ("inside information"), about the Company or about other publicly-traded companies with which the Company has business dealings.

2-ER-82.  It is undisputed that this definition encompassed Panuwat's knowledge of the impending acquisition because it was information about Medivation that he received in the "course of [his] employment."  2-ER-82.  Furthermore, the Trading Agreement specifically listed information about "acquisitions or dispositions of businesses" as an example of "inside information."  2-ER-83.

Medivation expressly extended its trading prohibition beyond just Medivation's securities.  Its Trading Agreement warned that employees might profit from such information, not only by trading in Medivation or companies with which Medivation had business dealings, but also by trading in the securities of "*another publicly-traded company*":

> Because of your access to this [inside] information, you may be in a position to profit financially by buying or selling or in some other way dealing in the Company's securities (including not only stock but also debt securities such as convertible notes) or the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company.

28

2-ER-82. The agreement unequivocally prohibited such "[u]se of inside information to gain personal benefit," warning that would be "illegal" and "[y]ou can be held liable … for your own transactions." 2-ER-82.

This prohibition plainly applied to Panuwat, whose awareness of confidential acquisition information put him in a position to profit financially by trading in Incyte stock. And Panuwat stipulated that Incyte is "a publicly traded company whose stock is traded on the NASDAQ stock exchange" (2-ER-155-56, 158), confirming the district court's conclusion that Incyte falls squarely within the "plain language" of this agreement's terms (3-ER-384-85).

In his testimony, Panuwat admittedly understood that he had a duty not to "use Medivation's confidential information to make trades in the stock market" (3-SER-479), and that the Trading Agreement prohibited insider trading in the "securities of another publicly-traded company" (1-SER-71). *See also* 1-ER-20, 42 (district court's post-trial finding that Panuwat "admitted" that he had a "duty to not trade securities using Medivation's confidential information"). While the Commission agrees that Panuwat's subjective understanding is not dispositive (Br. 33-34)—and the district court did not hold otherwise (1-ER-40)—Panuwat's testimonial admission reinforces his objective obligation not to exploit Medivation's inside information by using it to trade in any public company.

The district court also correctly concluded that Panuwat's obligation under the Confidentiality Agreement reinforced his duty under the Trading Agreement.

29

3-ER-385-86. Medivation's Confidentiality Agreement required him "at all times during the term of [his] employment" to "hold in strictest confidence, and not to use, except for the benefit of the Company, … any … confidential knowledge, data[,] … business plans, financial information or other subject matter pertaining to any business of the Company." 2-ER-73.

Contrary to his claim that the Confidentiality Agreement "says nothing about trading securities" (Br. 56), it expressly barred him from using for his "personal benefit" information "intended to be available only for a corporate purpose," *Dirks v. SEC*, 463 U.S. 646, 654-55 & n.14 (1983)—the touchstone of insider trading. The jury found that Panuwat lacked Medivation's consent to "use the information" (3-SER-500) and it was a "significant factor in [his] decision" to buy Incyte call options in his personal accounts (3-SER-501-02). *See Smith*, 155 F.3d at 1066-70 & n.28 (requiring "use" of inside information). The Confidentiality Agreement's broad prohibition on personal "use" of "any" Medivation business information (2-ER-73) therefore complements, rather than conflicts with, the Trading Agreement's specific bar on trading in "another publicly-traded company" (2-ER-82-83). *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (finding no conflict between general and specific provisions).

30

**B.** **Panuwat's resort to canons of construction in an attempt to restrict the Trading Agreement to companies with whom Medivation had a "significant business relationship" is unwarranted and incorrect.**

Panuwat concedes that the Trading Agreement covers trading in "the securities of another publicly-traded company, including all significant collaborators, customers, partners, suppliers or competitors of the Company," and that Incyte is a "publicly traded" company. Br. 13-15. That concession alone should lead to affirmance.

Yet Panuwat reads the agreement's "including" clause to alter the plain meaning of "publicly-traded company" and limit its scope to companies having a "significant business relationship" with Medivation. Br. 42-46. Panuwat reaches this conclusion through his application of the *ejusdem generis* and *noscitur a sociis* canons, but the Court should reject his reading because: (1) the Trading Agreement's prohibition on trading in "another publicly-traded company" is unambiguous, and there is no need to turn to interpretive canons; (2) his application of these canons is incorrect; (3) the legal requirements of materiality and scienter—not interpretive canons—appropriately limit the scope of insider trading liability; and (4) his remaining interpretive arguments lack merit.

### 1. Resort to canons of construction is unwarranted because the Trading Agreement is unambiguous.

Canons of construction are "only useful where words are of obscure or doubtful meaning" and thus "ambigu[ous]." *Leuthauser v. United States*, 71 F.4th 1189, 1199 (9th Cir. 2023) (discussing *noscitur a sociis*); *FTC v. EDebitPay, LLC*,

31

695 F.3d 938, 944 (9th Cir. 2012) (*ejusdem generis* is "inapplicable where the contract language is unambiguous"). Courts properly reject use of these canons where litigants "attempt to create ambiguity" that does not exist. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008).

These canons are unnecessary here because, as the district court correctly held, the "plain language" of the Trading Agreement covers the securities of "other publicly traded companies," and "Incyte is a publicly-traded company" that "fall[s] within [its] ambit." 3-ER-384-85. The term "publicly-traded company" is clear, carrying the ordinary meaning of a company "whose shares can be bought and sold on a stock exchange." *Publicly-traded*, *Cambridge Business English Dictionary* (2011), available at https://dictionary.cambridge.org/us/dictionary/english/publicly-traded. The securities laws likewise define "publicly traded companies," 18 U.S.C. 1514A(a), to include those whose securities are "transact[ed] … on a national securities exchange." 15 U.S.C. 78*l*(a); *see Talbot*, 530 F.3d at 1087 (defendant purchased shares in a company "publicly traded on … NASDAQ.").

The term "publicly-traded company" is not made ambiguous because it is followed by an illustrative, nonexclusive list, "*including*": "significant collaborators, customers, partners, suppliers, or competitors." 2-ER-82. As the district court correctly determined (3-ER-401, 3-ER-384-85), the word "including" introduces examples, it does not restrict the general category of "publicly-traded companies." *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 423 & n.9 (1985)

32

("including" indicates that "specifically mentioned" examples are "not exclusive");

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 189-94 (1941) ("including"

introduces an "illustrative" list, not a comprehensive "catalogue"); *In re Tower

Park Props., LLC*, 803 F.3d 450, 457 (9th Cir. 2015) ("including" precedes a list of

examples that are "illustrative, and not exhaustive"); *Connell v. Lima Corp.*, 988

F.3d 1089, 1102 (9th Cir. 2021) (same); *Include, Black's Law Dictionary* (10th ed.

2014) ("*including* typically indicates a partial list," and "*including*" and "*including

but not limited to*" "mean the same thing") (original emphasis).  In this way,

Medivation sensibly structured its Trading Agreement to apply to trading in any

public company using its inside information, rather than attempting to exhaustively

name every company or every type of company where insider-trading

opportunities might arise.

> **2.    Panuwat also misapplies the canons, which support the Commission's interpretation.**

Even if the canons of construction Panuwat invokes applied, he misuses

them by treating "including"—a term that is plainly *inclusionary*—as if it were

*exclusionary*, narrowing "another publicly-traded company" to those with a

"significant business relationship" with Medivation.  The correct principle is that

the "general term" sets the scope and "informs the subsequently listed examples,"

"not the other way around."  *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499

F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.).

33

Accordingly, *ejusdem generis*—that a general term is read as applying only to other items akin to those specifically enumerated—is a principle that this Court "will not apply" where, as here, the general term is followed by "including, but not limited to," and then illustrated with a "list of examples." *United States v. Migi*, 329 F.3d 1085, 1089 (9th Cir. 2003); *see also Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) (*ejusdem* applies only "where general words *follow* an enumeration of specific items"). Likewise, under *noscitur a sociis*—which teaches that "[a]ssociated words bear on one another's meaning"—"introducing the specifics with a term such as *including*" is properly read to "provide [a] belt-and-suspenders function" making "doubly sure" that the "introductory general term is given its broadest application." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132-33, 195, 204-05 (2012). In support, Panuwat cites (Br. 43-44) inapposite cases interpreting a catchall term at the *end* of a list. *Fischer v. United States*, 603 U.S. 480 (2024) (which also lacks the term "including"); *McBoyle v. United States*, 283 U.S. 25 (1931).

Panuwat's use of canons would also create, not eliminate, ambiguity. First, "significant business relationship" is an unclear standard compared to "publicly-traded company," a defined category, and Panuwat identifies no guideposts for a court (or Medivation employee) to measure "significance" or identify qualifying "relationships." Second, the "including" clause lists "competitors," which have no direct relationship with Medivation and thus do not share that purported "common

34

denominator" (Br. 46) with the other listed categories. *See Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 994-95 (9th Cir. 2024) (only when "several items in a list share an attribute" does *noscitur* favor "interpreting the other items as possessing that attribute as well"). Properly understood, the common denominator among these types of companies is not their business relationship with Medivation, but rather that Medivation employees "may be in a position to profit financially by buying or selling" these types of companies' shares based on Medivation's inside information. 2-ER-82. The Trading Agreement thus sensibly uses the clear, administrable phrase "publicly-traded company," not the ambiguous, extra-textual phrase Panuwat would graft in its place.

Panuwat's citations of cases where the court relied on a well-established commercial or legal meaning to inform its interpretation of a general term (Br. 44-45) only reinforces the Commission's position. For example, this Court concluded that railroad employees' "sleeping quarters," "including crew quarters, camp or bunk cars, and trailers," did not encompass public "hotels and motels," where for 25 years the Federal Railroad Administration had interpreted that general term and list as restricted to private lodgings "typically owned or operated by railroads." *Cal. State Legis. Bd. v. Dep't of Transp.*, 400 F.3d 760, 761-63 (9th Cir. 2005). Similarly, "costs" of a lawsuit "includ[ing] court reporter's, arbitrator's, and mediator's fees" was held to exclude "attorneys' fees," which "traditionally are distinguished from costs." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520

(3d Cir. 2012).  Here, it is well-established that a "publicly-traded company" includes a company such as Incyte that is traded on the NASDAQ stock exchange.

### 3. Materiality and scienter—not interpretive canons—supply proper limits on the reach of confidentiality agreements.

Panuwat suggests that interpreting "publicly-traded company" to mean "*every*" publicly-traded company would lead to absurd results, such as prohibiting "trading Starbucks securities."  Br. 41, 46 (original emphasis).  The district court properly rejected that argument (1-ER-39-40), and this Court should do the same.  Liability under the securities laws is already limited by two safeguards: (a) the information must be material to investors in the traded company, and (b) the trader must act with an intent to defraud.  Indeed, Medivation's Trading Agreement mirrors the materiality limitation.  Those requirements would not be met by a Medivation employee hypothetically trading in Starbucks securities, as Panuwat suggests.

a.  Materiality is a threshold requirement in all Section 10(b) and Rule 10b-5 actions, "including those based on insider trading."  *Smith,* 155 F.3d at 1063-66; *see also* Chamber Br. 21-25, ICAN Br. 15-17 (highlighting the importance of the materiality element).  Information is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Talbot*, 530 F.3d at 1097-98 (quoting *Basic Inc. v. Levinson*, 485

U.S. 224, 231-32 (1988)).  Medivation's Trading Agreement mirrored the materiality constraint, prohibiting trading in "another publicly-traded company" only on information that is "material [to] investors who are considering trading in that issuer's securities."  2-ER-83.  But even if an agreement prohibits trading on any nonpublic information, liability under Section 10(b) attaches only where the information is also material.  *See Basic*, 485 U.S. at 231-32.

This case illustrates why materiality is the appropriate safeguard.  The evidence of materiality was not only sufficient; it was "unusual … in the annals of insider trading cases."  Chamber Br. 21-24.  The Commission presented unique proof that a particular acquisition would trigger a "spillover" effect for another publicly-traded company that was neither the acquiror nor the target, and that Panuwat was aware of and traded on that effect.  *Supra* at 11-12.  Panuwat was privy to confidential analyses that "had specifically recognized that an acquisition of Medivation would positively impact Incyte's share price."  Chamber Br. 21.  He had studied Incyte in his role at Medivation, drawing on prior experience as an investment banker specializing in healthcare mergers, and reported to Medivation's board that Incyte's stock had risen following AbbVie's oncology acquisition.  *Supra* at 7-8, 11-12.  Accordingly, "the materiality evidence involved more than just a *post-hoc* observation that Incyte's share price moved upon announcement of the Medivation acquisition, or a vague sense that the two issuers shared a market

37

connection or were linked." Chamber Br. 21. By contrast, it is implausible that an employee would learn from their job at Medivation inside information that would be material to a Starbucks trade.

Panuwat's conduct confirmed that he understood the information was material. Minutes after receiving his CEO's email announcing his "high degree of confidence" in the acquisition's imminence, Panuwat bought nearly all of the out-of-the-money Incyte call options traded that day. *Supra* at 12-15. This was the largest single trade of his career and his first-ever transaction in Incyte securities. *See SEC v. Texas Gulf Sulphur, Co.*, 401 F.2d 833, 851 (2d Cir. 1968) (en banc) (defendants' "trading activity"—their "timing" and "purchases of short-term calls"—"surely constitutes highly pertinent evidence and the only truly objective evidence of the [information's] materiality"). Perhaps because of the strength of this evidence, Panuwat does not challenge the jury's finding that he was aware that information about Medivation's acquisition would have been material to a reasonable investor in Incyte. *See* 3-SER-500-02 (jury instruction).

b. Scienter is another safeguard. Irrespective of contractual terms, an "intent to deceive, manipulate, or defraud" is a "necessary element of an insider trading violation." *Smith*, 155 F.3d at 1066-69 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). A Medivation employee trading Starbucks shares would not be at risk of liability because of the absence of an intent to defraud

38

Medivation. By contrast, Panuwat fraudulently deprived Medivation of the "exclusive use" of its acquisition-related information by using it for personal gain. *O'Hagan*, 521 U.S. at 653-54. Indeed, the jury found that Panuwat acted with "an intent to defraud Medivation" when he bought Incyte call options. 3-SER-503, 499 (jury instructions); 1-ER-18-22, 46-47, 54-55 (district court's post-trial ruling); *contra* Br. 63-64. The jury's scienter finding is strongly supported by Panuwat's heavy trading in out-of-the-money call options—minutes after learning the acquisition was imminent and despite the Trading Agreement's clear warning and his admission that he had a duty not to trade. *See Smith*, 155 F.3d at 1068-69 (scienter shown where individual learns inside information and "the very next day invests a significant sum of money in substantially out-of-the-money call options").

### 4. Panuwat's remaining interpretive arguments fail.

a. Panuwat also argues that the Trading Agreement was drafted "against the backdrop of SEC and judicial precedent" and that "the SEC had never applied the misappropriation theory" to an employee who trades in the securities of other companies that lack the kind of business relationship he claims is required. Br. 47. But companies are free to craft insider trading policies that go beyond the minimum—and many do. *See* Mihir N. Mehta, David M. Reeb & Wanli Zhao, *Shadow Trading*, 96 Acct. Rev. 367, 392-99 (2021) (finding over 100 companies

39

that contractually prohibit employees from using inside information to trade in other "stakeholders," including business partners and competitors). Medivation did so here. Under the Trading Agreement's plain text—and even Panuwat's reading—Medivation employees were prohibited from insider trading in Medivation securities and "the securities of another" company, including customers or competitors. 2-ER-82.

Even if some background principle suggested otherwise, the agreement's express application to trading in other companies reflects the parties' intent to override it. *See* Br. 2, 28, 32, 38 (the Trading Agreement "supersedes any background fiduciary duties that might apply"); Chamber Br. 30 (contractual terms "control"). By signing the agreement, Panuwat accepted the duty that flowed from its terms, and his violation of that duty forms a necessary element of his insider trading violation.

In any event, courts have long upheld misappropriation-based liability where employees were bound by broad trading policies. In the *Carpenter* case, for example, newspaper employees were held liable for trading on prepublication information about issuers with whom the newspaper had no business relationship, in violation of an express policy that "specifically forb[ade] the purchase or sale of securities on the basis of articles an employee knows will appear in the newspaper." *United States v. Winans*, 612 F. Supp. 827, 829-38 (S.D.N.Y. 1985),

40

*aff'd in part, rev'd in part sub nom.*, *United States v. Carpenter*, 791 F.2d 1024, 1026-27, 1032 n.9 (2d Cir. 1986), *aff'd by an evenly divided court*, 484 U.S. at 24; *see Talbot*, 530 F.3d at 1093-94 (discussing *Carpenter*); *see also United States v. Libera*, 989 F.2d 596, 597-99 & n.1, 602 (2d Cir. 1993) (upholding misappropriation by magazine employees bound by a policy "explicitly" stating that the "contents of the magazine may affect the price of particular stocks and, prior to release, are regarded as 'inside' information").

Nor is Panuwat's insider trading excused because he "traded securities of a company that wasn't the subject of [the] material nonpublic information." Br. 47. As the district court correctly concluded, Section 10(b) and Rule 10b-5 prohibit insider trading of "*any* security" using "*any* manipulative or deceptive device," without requiring the information to originate from the issuer of the traded security. 1-ER-9 (original emphasis); *see also* 3-ER-398-99. Rather, the relevant limitation is that the information must be material to investors in the traded security. And the advantage Panuwat gained from Medivation's inside information when he traded in Incyte—information that other investors could not have "overcome with research or skill"—inflicted the same type of harm to market integrity and investor confidence as if he had traded in Medivation or Pfizer. *O'Hagan*, 521 U.S. at 658-59.

41

b.  Panuwat also cites (Br. 48) a paragraph two pages later in the Trading Agreement referencing "securities of other public companies engaged in business transactions" with Medivation.  2-ER-84.  But that reference does not alter the agreement's broader prohibition on trading in "the securities of another publicly-traded company."  2-ER-82.  It addresses another category of proscribed transactions in a document filled with illustrative examples that demonstrate how broadly Medivation intended its trading prohibitions to apply.  While Panuwat's reading would include collaborators, customers, and suppliers with whom Medivation had regular "business transactions," he would read out "competitors" with whom Medivation had no such transactions—an unnatural reading that cannot be squared with the agreement's express inclusion of "all … competitors."  2-ER-82.  Medivation's efforts to protect its proprietary information from being used to trade in other publicly-traded companies and competitors warrant full effect, as "[c]onfidential information acquired or compiled by a corporation … is a species of property to which the corporation has the exclusive right and benefit."  *Carpenter*, 484 U.S. at 25-26.

c.  Nor does Panuwat's citation of *contra proferentem* or the rule of lenity support his interpretation.  Br. 48-51.  *Contra proferentum*—which advises that ambiguities in a contract be construed against the drafter—is inapplicable because the government did not draft the Trading Agreement.  *Compare United States v.*

42

*Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006) (construing ambiguity in plea agreement against the government as drafter). Even if it could apply, that doctrine would still be unwarranted because the Trading Agreement's prohibition on trading in "another publicly-traded company" is clear on its face, and courts invoke *contra proferentem* "only as a last resort," not to create ambiguity where none exists. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019).

Finally, the rule of lenity applies only to interpretations of ambiguous criminal or penal statutes, *United States v. Castleman*, 572 U.S. 157, 172-73 (2014), and has no relevance here, where the purported ambiguity arises in a private contract, not a statute. There is also no ambiguity, let alone a "grievous" one, *id.*, in the Trading Agreement. Lenity is not called for because the Trading Agreement gave Panuwat "fair warning," *id.*, that he could be held liable for trading in another public company's securities, and Panuwat admitted that he understood the warning. 1-SER-71, 3-SER-479; *see also* 1-ER-20, 42.

### C. Incyte is a covered "competitor" of Medivation.

Regardless of whether trading in Incyte is covered because it is a "publicly-traded company," undisputed facts at trial showed that Incyte was a "competitor[]" of [Medivation]" and therefore falls within the express scope of the Trading Agreement's prohibition of trading in the securities of "another publicly-traded company, including all … *competitors*." 2-ER-82. While Panuwat offered only

43

conclusory assertions that Medivation and Incyte were not competitors (2-ER-159, 2-ER-190), the trial record demonstrates that Medivation and Incyte significantly competed across multiple dimensions.  *See generally Schmit v. United States*, 896 F.2d 352, 353 (9th Cir. 1989) (judgment can be affirmed on any ground that appears in the record).

*First*, Medivation and Incyte competed to be acquired.  Panuwat knew that both Medivation and Incyte were positioned as "scarce," revenue-generating oncology assets attractive to larger biotech companies.  2-SER-232; 5-SER-849-50, 869, 878-80; 2-SER-262; 2-SER-242; 2-SER-326-65.  While five firms competed in the bidding process to acquire Medivation (4-SER-628-35), Medivation and Incyte also competed to become "Big Pharma's next M&A target[s]."  4-SER-679-81; 5-SER-773, 781-82 (Medivation's confidential analysis of "potential suitors"); 2-SER- 298-302.  Scarcity produced competition on both sides: among acquirers seeking to buy scarce oncology research companies, and also among the potential target companies, since "[t]argets compete among themselves for the prospects of a takeover."  Sharon Hannes, *The Market for Takeover Defenses*, 101 Nw. U. L. Rev. 125, 160 (2007).  Indeed, shares of Incyte increased when Medivation's acquisition was announced on hopes that Incyte "might also attract suitors."  4-SER-695-97; 3-SER-468-70; 4-SER-684-85 (Incyte

44

shares rose because it is one of the "potential targets for drugmakers that lost out to Pfizer"); 2-SER-327-40, 2-SER-367-70 (expert testimony).

*Second*, as Panuwat was aware, Medivation and Incyte competed in the market for both blood and breast cancer drugs. *See* 2-SER-375-76 (expert testimony noting "overlap" in the "medicines that they were developing"). In the blood cancer space, Incyte had an FDA-approved commercial product, Jakafi (2-ER-100, 2-ER-189), while Medivation held exclusive rights to develop and commercialize its own blood cancer drug, Pidilizumab. 5-SER-959, 967-69, 971; 4-SER-548, 569, 574-75; 4-SER-715, 717, 730; 5-SER-820; 4-SER-704-06. Medivation was also developing a drug to treat breast cancer, Talazoparib (4-SER-548, 569; 5-SER-959, 965), and repositioning its prostate cancer drug Xtandi to target breast cancer (5-SER-959, 963-64; 4-SER-569; 2-SER-383). For its part, Incyte "was also working on breast cancer drug development" (2-SER-375), and "had competed with Medivation to acquire" licensing rights for Talazoparib (2-SER-291-92, 303; 4-SER-763).

Although Medivation's blood and breast cancer drugs (and Incyte's breast cancer drugs) were still in development, that is sufficient to establish that the two companies were competitors. *See FTC v. Raladam Co.*, 283 U.S. 643, 649 (1931) ("It is obvious that the word 'competition' imports the existence of present or potential competitors."). Indeed, analysts and Medivation's investment bankers

45

attributed "meaningful pipeline value" to its drug candidates, with their valuation projecting worldwide sales of over $1 billion for Talazoparib and $750 million for Pidilizumab. 5-SER-877, 881, 883, 889, 907, 912-13; 5-SER-823-29, 844-47; 4-SER-704-06; 2-ER-101-03; 4-SER-707, 709, 714-18, 727-38; 2-SER-265-66. Medivation's CEO described Pfizer as an ideal partner to make these "late-stage assets" available to patients. 4-SER-687-89; 4-SER-695-97.

*Third*, Medivation and Incyte were competitors for investment capital. Medivation's own "weighted average cost of capital" analysis identified Incyte as a "selected peer[]," placing both companies within a set of seven mid-cap biopharmaceutical companies. 5-SER-830 (confidential analysis Panuwat participated in producing). This analysis measured the rate of return that shareholders expect on their investments, *see Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1326 n.3 (Fed. Cir. 2011), and, as testimony explained, was designed to "ascertain the relative risk of an investment by a shareholder into Medivation versus other potential investments that [a shareholder] could make." 2-ER-103-08; *see* 2-SER-280-81; 3-SER-427-28. Investors deciding where to allocate capital in this segment of the industry would choose among several comparable companies—including Medivation and Incyte (5-SER-830)—and thus the two companies competed for the same limited pool of investment dollars.

46

*Finally*, Medivation and Incyte were competitors for executive talent. Medivation's public disclosures about its compensation specifically identified Incyte in a discrete "peer group" of companies "with which we compete for highly qualified executive officers." 4-SER-571-72. This group was limited to 20 "publicly-held commercial life science companies" based on "market capitalization and revenue" criteria. 4-SER-571-72, 542. Medivation acknowledged that, in this set of companies, it was "competing for this limited pool of highly skilled employees" possessing a science background, and that such "competition for talented employees is fierce." 4-SER-548, 570-72; 2-SER-371-74. To respond to this rivalry, Medivation designed its executive compensation program "to make [Medivation] competitive in this environment." 4-SER-570.

**D.    The jury resolved any ambiguity about Panuwat's contractual duty in favor of the Commission.**

The Trading Agreement (as reinforced by the Confidentiality Agreement) unambiguously applied to Panuwat's trading in two ways that independently warrant affirmance: because Incyte was "another publicly-traded company" and a "competitor" of Medivation. 2-ER-82. Panuwat is wrong to suggest that the agreement "unambiguously permit[ted]" him to trade (Br. 3-4, 40); it contains no affirmative grant of permission to trade in other public companies' securities. Even under his canon-driven interpretation, the record does not establish as a

47

matter of law that Incyte lacked a "significant business relationship" with Medivation.

Even if the Trading Agreement could be interpreted as Panuwat argues, the existence of a duty of trust and confidence becomes a "question of fact," and here, the jury resolved that in the Commission's favor. *In re Daisy Sys. Corp.*, 97 F.3d 1171, 1178 (9th Cir. 1996); *see SEC v. Cuban*, 620 F.3d 551, 558 (5th Cir. 2010) (noting "fact-bound nature" of defendant's duty under the misappropriation theory); *United States v. Falcone*, 257 F.3d 226, 234-35 (2d Cir. 2001) (confidentiality agreement and surrounding facts supported the jury's finding of a duty not to misappropriate). The district court did not conclude, as Panuwat contends, that the Trading Agreement was "ambiguous" (Br. 6-7, 66); the court held the opposite. The court determined that the trading in Incyte "*does* fall within the ambit" of the Trading Agreement because it is a "publicly traded company" and the "plain language" of the agreement prohibits Medivation employees from trading based on inside information in the securities of other "publicly traded companies." 3-ER-384-85 (original emphasis). The court nevertheless permitted Panuwat to present his contractual interpretation to the jury (along with his arguments about whether Medivation's information was material to Incyte and whether he acted with scienter). 3-ER-384-85, 369; *see First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) ("[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence," and it is not error to let the jury resolve such a potential conflict).

48

The court then properly instructed the jury to "consider all of the facts and circumstances" in "determining whether a duty of trust and confidence existed between [Panuwat] and Medivation." 3-SER-500-01; *compare Daisy*, 97 F.3d at 1178. Panuwat did not request a jury instruction incorporating his proposed "significant business relationship" standard. Instead, he repeatedly argued to the jury that he lacked the requisite duty because Medivation and Incyte had "no business relationship." 2-SER-222-23 (opening statement); 2-ER-123, 2-ER-190 (testimony); 3-SER-507-08 (closing argument). "[T]he jury was able to determine what [the Trading Agreement] meant" (1-ER-40), and the jury rejected his contention—either because the jury found no such limitation in the agreement, or because it found that Medivation and Incyte had the "business relationship" that Panuwat argued was required.

Likewise, to the extent that Panuwat disputes that Medivation and Incyte were "competitors" under the Trading Agreement (2-ER-82), that too was a factual question, and the jury had sufficient evidence to allow a reasonable factfinder to reach that conclusion. *See U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1143-44 (9th Cir. 2023) (whether two businesses compete is for the factfinder); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1440 & n.13 (9th Cir. 1996) (same). As explained *supra* at 43-47, the trial record showed that Medivation and Incyte competed to be acquired, to develop drugs, for investors, and for talent. "The reviewing court must respect

49

the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996); *accord Reeves*, 530 U.S. at 150-51.

## II. The district court acted within its discretion in its instructions and evidentiary rulings regarding Panuwat's duty.

Panuwat incorrectly argues that the district court erred in instructing the jury about his duty under the Trading Agreement and in its in limine rulings regarding testimony about that agreement. As an initial matter, since Panuwat's duty not to trade in another public company was established as a matter of law by the text of the agreement (*supra* 27-30, 32, 43-47), any error in this instruction was harmless. *See Smith v. City of Santa Clara*, 876 F.3d 987, 995 (9th Cir. 2017) (an "error in [a] jury instruction is harmless when [the] subject of [the] instruction is resolved as a matter of law"). Likewise, there can be no error in excluding proposed evidence that addresses an issue of law, such as the unambiguous meaning of a contract. *See United States v. Moreno*, 102 F.3d 994, 998 (9th Cir. 1996). The district court acted within its discretion in its duty-related jury instructions and evidentiary rulings. Panuwat did not properly preserve his challenges, and they lack merit in any event.

50

**A.** **The district court acted within its discretion in instructing the jury on Panuwat's duty.**

The district court did not abuse its discretion in instructing the jury about Panuwat's duty of trust and confidence to Medivation. The court instructed the jury that it had to find that, by trading in Incyte call options, Panuwat breached "a duty of trust, confidence, or confidentiality to Medivation" (3-SER-499-500) and that the requisite duty could be found by express agreement:

> An employee has a duty of trust, confidence, or confidentiality with regard to nonpublic information when he *expressly agrees* to maintain the confidentiality of his employer's nonpublic information or to refrain from using that information for personal gain.

3-SER-500-01. The court also explained that "in the absence of a written agreement," the duty can be found "when an employer entrusts an employee with confidential information," since such information is the "company's property," and "employees are not permitted to use their position of trust and confidence to further their private interests without disclosing that use to the company and gaining the company's consent." 3-SER-500-01.

The instruction emphasized that Panuwat's duty not to trade on Medivation's confidential information turned on "all of the facts and circumstances" about Panuwat's "relationship with Medivation"—including when he "expressly agree[d] to maintain the confidentiality" of Medivation's inside information and "refrain from using that information for personal gain"—and

51

whether those circumstances placed Panuwat in a "position of trust and confidence" concerning that information. 3-SER-500-01.

### 1. Panuwat waived his challenge to the duty instruction.

Panuwat's argument on appeal is that the duty-related instructions were erroneous under the Second Circuit's decision in *Chestman*, 947 F.2d 551, because they purportedly allowed the jury to find that Medivation "unilaterally impose[d]" a fiduciary relationship merely by "entrusting" him with confidential information. Br. 35. But he waived this challenge by proposing instructions that included the language to which he now objects, failing to raise this issue before his post-trial motions, and, in any event, failing to brief the plain-error standard on appeal.

Panuwat "invited" any error by proposing the entrusting language himself. *See United States v. Perez*, 116 F.3d 840, 844-46 (9th Cir. 1997) (en banc). His proposed instruction stated in relevant part:

> In order for you to find that Mr. Panuwat breached a fiduciary duty to Medivation, Inc., the SEC must prove that Medivation. Inc. *entrusted* Mr. Panuwat with confidential information that was material to an investor in Incyte Corporation.

1-SER-145; *see also* 1-SER-207 (Panuwat's answer admitting "he was *entrusted* with certain confidential information," including "potential transactions or acquisitions"). To the extent this instruction is erroneous, the Court should "deny review under the invited error doctrine." *Perez*, 116 F.3d at 844.

52

Panuwat also did not object to the instruction on the grounds he now raises. His pretrial objections were not that the instruction failed to require "mutual consent" or otherwise allowed for a "unilaterally" imposed duty, nor did he cite *Chestman*. While Panuwat argued that "entrust[ing] him with confidential information" was insufficient, his proposed additional requirement in district court (not advanced on appeal) was that Medivation must have explicitly "prohibited Mr. Panuwat from trading Incyte securities" in particular. 1-SER-143-44 (jury cannot find duty if "Medivation did not prohibit such a trade"); 1-SER-103 (same); 1-SER-91-92 (instruction must require Panuwat to have "a duty not to acquire the securities in Incyte").

He raised his *Chestman* argument for the first time in his post-trial motions (1-SER-14-16), which "does not preserve it for appeal." *Hart v. Larson*, 833 F. App'x 693, 694 (9th Cir. 2021); *see Claiborne v. Blauser*, 934 F.3d 885, 893-94 (9th Cir. 2019). Moreover, his objections are waived on appeal since he "makes no attempt to show that he has satisfied the plain error factors" in his opening brief. *Hart*, 833 F. App'x at 694; *see United States v. Castillo-Marin*, 684 F.3d 914, 919 (9th Cir. 2012).

### 2. The duty instruction is not erroneous.

In any event, the instruction properly stated that a duty may arise from the circumstances under which Medivation entrusted Panuwat with inside information,

specifically through their express agreement. As the district court correctly explained, Panuwat "misrepresents" the duty instruction. 1-ER-12. He contends that the jury was erroneously told that it could find that Medivation "unilaterally" created a duty without Panuwat's "mutual consent" (Br. 29, 35-37, 61), but neither term appears in the duty instruction. *See* 1-ER-14-15. The instruction correctly stated that the duty may arise where a person "expressly agrees" to maintain confidentiality (3-SER-500-01)—and a duty imposed by *agreement*, by definition, is not imposed *unilaterally*.

*Chestman*'s concern about "unilaterally" imposing duties arose in the context of personal relationships, but *Chestman* itself recognizes that a "pre-existing agreement of confidentiality"—like the agreements here—can establish the requisite duty of trust and confidence. 947 F.2d at 567-71. While *Chestman* held that a husband's unilateral disclosure to his wife did not establish such a duty, *id.*, courts interpreting that decision have consistently recognized that corporate insider-trading policies and confidentiality agreements constitute an "explicit acceptance of a duty of confidentiality." *Falcone*, 257 F.3d at 234-35; *see also United States v. Chow*, 993 F.3d 125, 128-39 (2d Cir. 2021) ("confidentiality agreements" established requisite duty); *United States v. Kosinski*, 976 F.3d 135, 144-51 (2d Cir. 2020) (express employment contract requiring confidentiality established duty); *United States v. Afriyie*, 929 F.3d 63, 68 (2d Cir. 2019) ("[a]n express agreement of confidentiality may establish fiduciary status").

54

Absent such agreements, courts have also declined to find the requisite duty in "commercial arrangement[s] between adverse parties." *In re Archegos*, 156 F.4th 108, 119 (2d Cir. 2025); *see Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 & n.5 (2d Cir. 1980) (same).

In addition to providing that an express agreement can create a duty, the instruction also stated that the jury "must consider all of the facts and circumstances presented … about [Panuwat]'s relationship with Medivation" in "determining whether a duty of trust and confidence existed between" them when Medivation "entrust[ed]" Panuwat with confidential information. 3-SER-500-01. Panuwat objects to the instruction's use of the term "entrusts" (Br. 61), but that formulation is consistent with this Court's precedent. In *SEC v. Clark*, the Court noted that an executive serving on an acquisition team had a duty not to "divulge or use to her own advantage information *entrusted* to her," which extended to "all information regarding takeovers." 915 F.2d 439, 441, 443-49, 452 (9th Cir. 1990). In *Talbot*, this Court explained that an employee's trading on information "*entrusted* to him by [the company] in his capacity as a [company] director" is "textbook misappropriation." 530 F.3d at 1094 (9th Cir. 2008). *Chestman* likewise recognizes that the requisite duty may arise "in the context of employer/employee associations." 947 F.2d at 566-67. The instruction also echoes the Supreme Court's maxim in *O'Hagan* that "the misappropriation theory

55

premises liability on a fiduciary-turned-trader's deception of those who *entrusted* him with access to confidential information." 521 U.S. at 652.

The district court's formulation of the instruction was a reasonable exercise of its discretion to craft language that accurately reflects governing law and is tailored to the facts of the case. *See Led Zeppelin*, 952 F.3d at 1065. The instruction appropriately directed the jury to evaluate the entirety of the business relationship between Panuwat and Medivation, rather than infer a duty from the unilateral provision of information or a bare assertion of "entrustment." It properly allowed the jury to consider whether Medivation affirmatively entrusted him with confidential information—through an express agreement and in light of his role as Head of Business Development and "core" member of its acquisition team.

### 3. Any error in the duty instruction was harmless.

Even if the instruction were erroneous, any such error was harmless because the portion Panuwat challenges applied only "in the *absence* of a written agreement" (3-SER-501), and here, there is no dispute that one existed. The "same instruction" that included the "entrusted" language also "told the jury that it could find that a duty arose from the confidentiality agreement and [Trading Agreement] that Panuwat signed." 1-ER-15-16 (district court's post-trial ruling).

Where multiple theories are submitted to the jury, and one is legally sufficient and supported by substantial evidence, a general verdict will be upheld. *See Traver v. Meshriy*, 627 F.2d 934, 938-39 (9th Cir. 1980); *United States v. Reed*, 48 F.4th 1082, 1088 (9th Cir. 2022) (same). Even "when the district court

56

improperly instructs the jury, the party prevailing below need only demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 903 (9th Cir. 2024).

There was no "potential for confusion of the jury," *Traver*, 627 F.2d at 938-39, because Panuwat does not challenge the correctness of the instruction on the first duty theory submitted to the jury—that he owed a duty based on an "express agree[ment]" not to use inside information for personal gain. 3-SER-500-01. Jury instructions are reviewed "as a whole," *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010), and at most, the additional language about entrustment was legally correct but "superfluous and, in turn, harmless," *United States v. Portillo*, 692 F. App'x 376, 377 (9th Cir. 2017).

The remaining *Traver* factors also support affirmance. Panuwat has no valid "defenses" to the Trading or Confidentiality Agreements, such as fraud, forgery, or coercion (he "signed both agreements and understood them," 1-ER-15-16); the "strength of the evidence" of these express agreements' unambiguous terms "sustain the verdict"; and any "disputed issues of fact" about them were resolved in the Commission's favor. *Traver*, 627 F.2d at 938-39. Given the clarity of the instruction on express agreement and the Trading Agreement squarely before the

57

jury, it is more probable than not that the jury found Panuwat's duty was established on that express contractual basis.

**B.     The district court acted within its discretion in its in limine ruling about testimony on the Trading Agreement.**

The district court did not abuse its discretion in denying in part and granting in part the Commission's motion in limine to limit certain anticipated testimony about the Trading Agreement from David Hung, Medivation's CEO, and Kenneth Guernsey, a former Medivation outside lawyer. *See* 3-ER-328; 1-ER-32-34, 39. The court broadly permitted witnesses to "testify about: (1) non-hearsay conversations with Panuwat about issues related to the policies/trading with Incyte or similar companies; (2) trainings regarding the policies; and (3) enforcement of the policies." 3-ER-328. The court also ruled that "[t]hey may describe their perception of the culture of the office as it may relate to the Incyte trade." 3-ER-328. With respect to their understanding of the Trading Agreement's policies, the court instructed that "[t]hey may not claim that there was a policy, practice, or understanding without a sufficient foundation having been laid." 3-ER-328. And the court ruled that lay witnesses "may not speak to the legal meaning of the policies" or "speculate." 3-ER-328.

Panuwat argues that the district court erroneously prevented him from introducing trial testimony from Hung and Guernsey. Br. 67. But the district court did not preclude those witnesses from testifying. Rather, the court merely required Panuwat to satisfy basic admissibility standards *if* he called those witnesses.

Panuwat made a strategic decision not to call either witness, and any error he now alleges was harmless. Even if the district court had excluded the cited testimony, that decision would have been correct because both statements were inadmissible. *See Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1077 (9th Cir. 2010) (extrinsic evidence about contract language "must qualify for admission").

### 1. Panuwat's failure to call witnesses at trial renders the district court's in limine ruling unreviewable and harmless.

Panuwat's failure to call Hung or Guernsey at trial forecloses appellate review of the in limine ruling. "[T]o raise and preserve for review" the claim of improper in limine exclusion of testimony, a party must attempt to introduce the testimony at trial. *Luce v. United States*, 469 U.S. 38, 41-43 (1984). "*In limine* rulings are by their very nature preliminary." *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1342 (9th Cir. 1985). Once a tentative ruling is made, "the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial." *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 689 (9th Cir. 2001). Where, as here, a party "pass[es] on the chance to have the district court revisit" its ruling, the issue is "unreviewable." *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, 526 F. App'x 761, 763 (9th Cir. 2013).

Panuwat also cannot show that the in limine ruling was prejudicial. The court did not blanketly exclude Hung's or Guernsey's testimony, but merely required that they not speculate, offer a legal conclusion, or speak to a "policy,

59

practice, or understanding without a sufficient foundation." 3-ER-328. To preserve his challenge, Panuwat was required to call the witnesses and obtain "a ruling on this evidence in the context of a trial." *Coursen*, 764 F.2d at 1340. Because "[h]e did not" (1-ER-39), "[i]t is impossible to determine" whether he was prejudiced, *Coursen*, 764 F.2d at 1342, especially where admissibility turned on whether a foundation was laid—something which cannot be known unless Panuwat actually tried to lay one. "A reviewing court is handicapped" without knowing the "precise nature" of a witness's testimony and the "scope of the cross-examination," which is "unknowable" when the witness "does not testify" and his trial testimony could, "for any number of reasons, differ" from his deposition testimony. *Luce*, 469 U.S. at 41-42 & n.5.

The limine ruling was not tested by other trial witnesses. Although Piscitelli testified subject to the court's in limine ruling (3-ER-328), Panuwat's counsel did not question him about the Trading Agreement. Panuwat testified that he had signed the Trading Agreement (2-ER-227-28, 2-SER-380), and that, as he "sit[s] here today" at trial, "[i]n my opinion" the agreement is "relatively unclear in certain places" (2-ER-230). The court then sustained the Commission's relevance objection "to the extent the questions are pertaining to how he interprets it today"—rather than during his employment. 2-ER-230. Following that ruling, Panuwat's counsel "move[d] on" to other topics without asking him about training,

60

enforcement, or other matters relating to the Agreement. 2-ER-230-31. For its part, the Commission asked Medivation's CFO to authenticate the Trading Agreement but not to opine about its legal meaning. 2-ER-133-39; 2-SER-224-29.

Panuwat appears to have made a strategic choice not to call Hung and Guernsey and instead argued to the jury that their absence reflected a deficiency in the Commission's case. During closing argument, Panuwat's counsel emphasized their nonappearance:

> Did we hear from the Medivation general counsel about what this [Trading Agreement] means and how it's to be interpreted? Did we hear from any Medivation employee about how to interpret this [Trading Agreement]? We did not.

2-ER-308. Panuwat's decision not to test the court's in limine ruling at trial forecloses appellate review.

### 2. The testimony Panuwat cites was inadmissible.

Even if Panuwat had called Hung or Guernsey at trial and offered the cited deposition testimony, the district court would have acted within its discretion to exclude it. It is black-letter law that testimony "based on speculation" is inadmissible, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008), that a proper foundation must be laid for lay witnesses, including that the witness "has personal knowledge of the matter," Fed. R. Evid. 602, and that any opinion be "rationally based on [their] perception, Fed. R. Evid. 701(a).

61

Panuwat bases his current argument on Hung and Guernsey's deposition testimony. Br. 67. When the paragraph about trading in another publicly-traded company was read to him during his deposition, Hung expressed his personal view of what the Trading Agreement "seems" to say. 3-ER-365. And Guernsey expressed his "own belief" based on his "read[ing]" the Trading Agreement. 3-ER-354-55. These are speculative assertions, not testimony about the agreement's drafting or implementation. *See* 3-ER-328; 1-ER-32-34. To the extent Panuwat could have established a sufficient foundation showing otherwise, the district court explicitly gave him that opportunity, which he chose not to pursue.

The court also had the discretion to treat these lay witnesses' testimony as impermissible legal opinion. 3-ER-328. A "lay witness may not … testify as to a legal conclusion, such as the correct interpretation of a contract." *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001); *see Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985) (lay witness's opinion about the "correct construction" of a contract is an "inadmissible legal conclusion"). Hung's deposition testimony that the Trading Agreement "seems like it applies to publicly traded companies with which the company has business dealings" (3-ER-365), and Guernsey's testimony that it "was not intended" to "sweep that broadly" (3-ER-354-55), are precisely the sort of legal interpretations that Rule 701 forbids. Even if Panuwat had offered this testimony, the court could have exercised its discretion to exclude lay opinions telling the jury

62

"what result to reach" by offering conclusions based on "inadequately explored legal criteria." Fed. R. Evid. 704, Advisory Committee Notes (1972 proposed rules) (discussing Fed. R. Evid. 701).

Panuwat relies on *Onyx Pharmaceuticals, Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894 (N.D. Cal. 2011), but that case undermines his position. In *Onyx*, as in this case, the district court reasonably precluded testimony about a witness's "understanding" of a contract that was "simply a private interpretation," while permitting testimony of an understanding "founded in personal knowledge of the negotiations and the parties' expressed intent." *Id.* at 897.

Finally, Panuwat mischaracterizes the district court's ruling in asserting that the court prohibited Guernsey "from testifying about his understandings of the [Trading Agreement] policies at all." Br. 67-68. The court expressly ruled that Guernsey was "not exclude[d]," but that "[h]e should not testify about his understandings of the policies beyond the parameters laid out" in the in limine ruling. 3-ER-328 & n.5. The court reasonably advised that Panuwat "should proceed with caution" in presenting Guernsey's testimony because "Guernsey apparently never spoke with Panuwat about the policies" (3-ER-328 n.5), underscoring the need for a witness's "personal knowledge of the negotiations and the parties' expressed intent," *Onyx*, 863 F. Supp. 2d at 897. Panuwat's failure to lay such a foundation was his strategic choice, not a court-ordered exclusion.

63

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Respectfully submitted,

JEFFREY B. FINNELL
Acting General Counsel

TRACEY A. HARDIN
Solicitor

JEFFREY A. BERGER
Assistant General Counsel

/s/ David D. Lisitza
DAVID D. LISITZA
Senior Appellate Counsel

THEODORE J. WEIMAN
Senior Appellate Counsel

Securities and Exchange Commission
100 F. Street N.E.
Washington, D.C. 20549
202-551-5015 (Lisitza)
LisitzaD@SEC.gov

January 2026

64

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  <u>24-6882</u>

I am the attorney or self-represented party.

**This brief contains** <u>13,992</u> **words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  <u>/s/ David D. Lisitza</u>                    **Date**  <u>January 2, 2026</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2026, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.  I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

January 2, 2026

/s/ David D. Lisitza
David D. Lisitza
Securities and Exchange Commission
202-551-5015
LisitzaD@SEC.gov